20-1025 (Lead); 20-1138 (Consolidated)

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ENVIRONMENTAL HEALTH TRUST; CONSUMERS FOR SAFE CELL PHONES; ELIZABETH BARRIS; THEODORA SCARATO

CHILDREN'S HEALTH DEFENSE; MICHELE HERTZ; PETRA BROKKEN; DR. DAVID O. CARPENTER; DR. PAUL DART; DR. TORIL H. JELTER; DR. ANN LEE; VIRGINIA FARVER, JENNIFER BARAN; PAUL STANLEY, M.Ed.

*Petitioners*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA

*Respondents*

Petition for Review of Order Issued by the
Federal Communications Commission

### PETITIONERS' JOINT OPENING BRIEF

### ADDENDUM VOLUME III (PAGES JA_00282-JA_00412)

Edward B. Myers
Law Office of Edward B. Myers
14613 Dehaven Court
North Potomac, MD 20878
Phone: 717-752-2032
edwardmyers@yahoo.com

*Counsel for Petitioners 20-1025*

W. Scott McCollough
McCollough Law Firm, P.C.
2290 Gatlin Creek Rd.
Dripping Springs, TX 78620
Phone: 512-888-1112
wsmc@dotlaw.biz

*Counsel for Petitioners 20-1138*

# TABLE OF CONTENTS

**STATUTES AND REGULATIONS** .......................................................JA_00001

### FEDERAL STATUTES

42 U.S.C. §4331 .................................................................JA_00003

42 U.S.C. §4332 .................................................................JA_00004

47 U.S.C. §151 ..................................................................JA_00006

47 U.S.C. §152 ..................................................................JA_00007

47 U.S.C. §154 ..................................................................JA_00008

47 U.S.C. §253 ..................................................................JA_00015

47 U.S.C. §254 ..................................................................JA_00016

47 U.S.C. §302a .................................................................JA_00027

47 U.S.C. §303 ..................................................................JA_00030

47 U.S.C. §305 ..................................................................JA_00036

47 U.S.C. §306 ..................................................................JA_00037

47 U.S.C. §307 ..................................................................JA_00038

47 U.S.C. §321 ..................................................................JA_00040

47 U.S.C. §324 ..................................................................JA_00041

47 U.S.C. §332 ..................................................................JA_00042

47 U.S.C. §336 ..................................................................JA_00047

47 U.S.C. §414 ..................................................................JA_00055

47 U.S.C. §601 ..................................................................JA_00056

47 U.S.C. §925 ..................................................................JA_00057

47 U.S.C. §1455 .................................................................JA_00059

### FEDERAL REGULATIONS

40 C.F.R. §1500.1 ...............................................................JA_00063

40 C.F.R. §1508.9 ...............................................................JA_00064

40 C.F.R. §1508.11 ..............................................................JA_00065

40 C.F.R. §1508.13 ..............................................................JA_00066

40 C.F.R. §1508.27 ................................................... JA_00067

47 C.F.R. §1.1310 .................................................... JA_00068

47 C.F.R. §2.1 ......................................................... JA_00072

47 C.F.R. §2.201 ..................................................... JA_00090

47 C.F.R. §2.1049 ................................................... JA_00093

47 C.F.R. §15.231 ................................................... JA_00097

47 C.F.R. §73.128 ................................................... JA_00100

47 C.F.R. §73.681 ................................................... JA_00102

47 C.F.R. §73.1570 ................................................. JA_00106

47 C.F.R. §74.463 ................................................... JA_00107

47 C.F.R. §78.115 ................................................... JA_00108

47 C.F.R. §87.141 ................................................... JA_00109

47 C.F.R. §95.975 ................................................... JA_00111

47 C.F.R. §101.141 ................................................. JA_00112

47 C.F.R. §101.811 ................................................. JA_00115


**SUPPORTING AFFIDAVITS AND DECLARATIONS** ....................... JA_00116

Affidavit of Dafna Tachover in Support of Standing ............................... JA_00117

Affidavit of Dr. Paul Dart, MD in Support of Standing .......................... JA_00131

Affidavit of Virginia Farver in Support of Standing ............................... JA_00145

Affidavit of Dr. Toril Jelter, MD in Support of Standing ........................ JA_00153

Affidavit of Hannah McMahon in Support of Standing ......................... JA_00164

Affidavit of Ysobel Gallo in Support of Standing ................................. JA_00282

Affidavit of Paul Stanley in Support of Standing .................................. JA_00290

Affidavit of Jennifer Baran in Support of Standing ............................... JA_00297

Affidavit of Dr. Erica Elliot, MD in Support of Standing ...................... JA_00306

Affidavit of Petra Broken in Support of Standing ...................................JA_00312

Affidavit of Angela Tsiang in Support of Standing..................................JA_00319

Affidavit of Dr. Ann Lee in Support of Standing ...................................JA_00328

Affidavit of Mary Adkins in Support of Standing ...................................JA_00337

Affidavit of Michele Hertz in Support of Standing .................................JA_00413

Affidavit of Professor David Carpenter, MD in Support of Standing .....JA_00419

Declaration of Devra Lee Davis in Support of Standing ........................JA_00482

Declaration of Cynthia Franklin in Support of Standing ........................JA_00499

Declaration of Theodora Scarato in Support of Standing .......................JA_00505

Declaration of Liz Barris in Support of Standing ...................................JA_00520

**Affidavit of Ysobel Gallo in Support of Standing**

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| Children's Health Defense, Michele Hertz, Petra Brokken, Dr. David O. Carpenter, Dr. Paul Dart, Dr. Toril H. Jelter, Dr. Ann Lee, Virginia Farver, Jennifer Baran, Paul Stanley, M.Ed.<br>Petitioners<br><br>v.<br><br>Federal Communications Commission and United States of America,<br>Respondents | Case No: 20-1138<br><br>Petition for Review of Order by the Federal Communications Commission (FCC 19-126)<br><br>(Consolidated with Case No. 20-1025) |

**AFFIDAVIT OF YSOBEL GALLO IN SUPPORT OF STANDING**

1.     My name is Ysobel Gallo. My home address is 2431 N. Spaulding, Chicago IL 60647. I am a member of Children's Health Defense.

2.     The purpose of this Affidavit is to provide evidence of Children's Health Defense's Article III standing to pursue the matter. To do that I must show that I, as a member, would have Article III standing to proceed in my own name. I will provide some of the basic facts particular to my individual circumstances, but also rely on the presentations contained in the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter to explain why the basic facts I present below demonstrate that I have suffered an injury-in-fact traceable to the FCC Order that could be redressed by an order from this Court holding unlawful, vacating, enjoining, and/or setting aside the FCC Order and remanding the matter to the FCC for further consideration and action. I will then provide some additional information about Children's Health Defense to provide further evidence in support of the organization's standing.

I.     My Individual Art. III Standing.

3.     I am nineteen (19) years old and I was injured by wireless radiofrequency and microwave radiation from wireless technology, when I was sixteen (16) years old while going to a public arts high school.

4.     Before starting to experience the adverse health effects from wireless devices, I was a straight-A student and active in my school community. I represented the school twice in fundraising galas, participated in a pitch to donors for a school library, and manned tables to engage with prospective students. I was in the Creative Writing conservatory and was selected to write a children's book promoting the school. I devoted myself to my writing, earning silver and gold keys in the Chicago regional Scholastic Arts and Writing Awards for poetry, fiction, and creative nonfiction. Computers were a necessary part of my craft: my access to applications, submission portals, and literary news. I began to realize I had an adverse reaction to them (or more precisely their wireless communications) but had no idea they might lead to a life-long health crisis.

**AFFIDAVIT OF YSOBEL GALLO IN SUPPORT OF STANDING**

5.    Before high school I was home-schooled. I went from a one Wi-Fi router home to a building with numerous Wi-Fi access points in common areas and almost every classroom. Microwave radiation was at high or extreme levels throughout the building as measured by a 200MHz-8GHz Broadband RF Detector (Brand, Safe Living Technologies). In addition, computers were a classroom staple: there are often thirty wireless radiation emitting laptops in each room. Then, of course almost everyone had a cell phone. Twice a semester we took two online exams. Even when we were not using laptops, we played classroom quiz games on our phones, and spent study hall navigating the online homework portal. Our school day was nine hours long, after which we went home for a few more hours of online homework.

6.    After a year of this intense exposure at school I started developing headaches and aching fingers. If I didn't stop using the wireless devices when the pain started the symptoms would worsen, and I would experience bursts of dizziness and brain fog. If I stopped using my devices the symptoms receded and eventually disappeared. Since the symptoms were happening when I used the laptop and the cell phone, the connection was clear and easy to make. Although I was aware my symptoms were caused by wireless computers and cell phones, I didn't pay much attention to it. In fall 2017 my grade took a mandatory computer science class. This classroom had about thirty desktop computers for the students, two more on the side, a computer with two monitors and an accompanying laptop for the teacher, thirty laptops in a cart on the back wall, and a cell phone for each of the 20 students. All these devices were on and continuously emitting microwave radiation.

7.    My symptoms increased to nausea, extreme fatigue, and even more intense brain fog. The scariest symptoms were racing and irregular heartbeats. If I did not leave the classroom when I experienced these symptoms, I would get stabbing pains in my chest. Within the first twenty minutes of the class I was unable to think, and I could not even read. I tried to transfer out of the class, but this was not allowed. Instead, I left the computer science room and sat for about an hour in the hallway outside the main office – too ill even to sleep. Sometimes, when I pushed myself to a full 15 minutes inside the computer science room, I had trouble breathing. I would pull myself toward the main office as fast as I could, but every step exhausted me and sent stabbing pains through my chest.

8.    The source of my trouble was painfully obvious. My mother began to take me to a large nearby park every day during the lunch hour, and each time the symptoms would disappear within thirty minutes. I would spend the lunch hour rollerblading or swimming in the lagoon, and never experienced any heart pain, headaches or any other symptom during these activities. When we turned off the Wi-Fi at home, I was also perfectly fine. The symptoms would always return when I was inside a building with Wi-Fi, near another large wireless radiation source or on a wireless computer. These symptoms occurred whether or not I was already aware of a radiation source. I was usually able to quickly locate the position of Wi-Fi routers, smart meters or cell towers by paying attention to my symptoms and then searching for the source. I could enter a room with my eyes closed and successfully point to every wireless computer in that room.

9.    In February 2018, I was given an echocardiogram at Lurie Children's Hospital to screen for heart defects. The screen came back clear. The only correlation between my heart palpitations and pain was the presence of wireless radiation. In January 2018, since it was then clear that my symptoms were from wireless radiation, I emailed all my teachers explaining my condition, with links to a related page on the World Health Organization, and asked for their "patience and

Page -2-

## AFFIDAVIT OF YSOBEL GALLO IN SUPPORT OF STANDING

cooperation as I eliminate as much EMF exposure as possible." A school representative responded, without any prior communication with me or my family, "EMF sensitivity (or wireless allergy) has been scientifically debunked in multiple studies, so Ysobel will not be able to be medically excused because of her self-diagnosis." If I left class or was absent due to my microwave sickness, my teachers were to report it to him and the administration.

10.    Some teachers allowed me to turn assignments in on paper instead of wirelessly and allowed me to leave the classroom when I became "too sick." Other teachers, though sympathetic, felt themselves unable to depart from the administration's line. The most I could hope for was an extension when the keyboard made my fingers ache so much I couldn't type. Once, during another online test, I experienced stabbing pains in time with my heartbeat. I became seriously alarmed, but the teacher would not give me permission to go to the main office. Instead, she suggested I sit in a dim storage area about four feet below the classroom router and practice deep breathing.

11.    The prevailing attitude at school was that I was either seeking undue attention for myself or even perhaps mentally ill. One of my writing teachers ridiculed and dismissed my aversion to wireless technology and commented I might end up like the Unabomber. I had no idea what she was talking about, so she looked it up on her computer and called me to the front of the class during work time to read it. The comparison was hurtful and insulting. I later incorporated it into a sketch as a coping mechanism.



12.    After the exchange with the writing teacher I became obsessed with proving my own sanity. Unable to do online research myself, I relied on my father to print out articles on the damage wireless radiation inflicts on DNA- including the 2018 National Toxicology Program study. I carried these articles with me everywhere – even when I was too ill to understand the words swimming on the page. Eventually my creative writing department head became alarmed and sent me to the school mental health counselor. The school counselor listened attentively to my story and advised me to see a professional psychologist. According to him, I was probably

JA_00285

**AFFIDAVIT OF YSOBEL GALLO IN SUPPORT OF STANDING**

suffering from an ingrained cyber-phobia. He suggested that I was afraid of wireless technology (even though before my symptoms I was completely and happily dependent on it) and opined that this fear tricked my nervous system into self-manufacturing symptoms. This caused increased depression to the point I became suicidal.

13.    A few weeks into my senior year, fall 2018, I could no longer tolerate my own house and lived with various friends, visiting my parents on the weekends. Still, I fought to stay in school. I took an hour and half train ride to and from school every day. I began reacting to the radiation from devices on the train and entered the school building already ill from the journey.

14.    I had no role models and very few resources during this time. Everyone except my mother believed the FCC had established accurate, safe guidelines and assumed I was imagining the whole thing. This opposition to what my body was telling me caused delay and severe further injury; far more so if I'd been believed and had resources from the beginning. However, since then, my father changed his mind. He has been very supportive and in fact started advocating on this issue independently.

15.    I wanted to contribute to society and work to make the world a better place. Instead, I was forced to withdraw from my high school. By this time, I reacted intensely to even a small amount of wireless radiation and any kind of normal life became impossible. My parents spent around $4,900 on further home EMF mitigation and shielding to allow me to live with my family. The outside world became inaccessible. I was unable to use public transportation, walk in dense cell-tower areas, or enter any building with Wi-Fi. Since every building besides my own home had Wi-Fi, I became functionally housebound. Even within my house I spent days bedridden inside a microwave-blocking canopy. I was accepted into two degree bearing university programs but was unable to attend due to the wireless radiation environment.

16.    In November 2018 I was introduced to Dafna Tachover by a journalist for the Epoch Times who wrote an article called *Resistance to 5G: Roadblocks to a High Tech Future or a Warning of a Serious Health Risk?* for which both Dafna and I were interviewed. It was helpful to speak to someone who understood what I was going through, and it made me feel less alone. I was also grateful there was someone out there who is working to protect the rights of children who developed this terrible sickness and who are being rejected.

17.    I was inspired to begin my own activism efforts. I wrote 7 letters to teachers, counselors, the principal, and my case-manager at my old school discussing injury from wireless radiation. I talked with other radiation-sufferers: a teacher in California, a social worker in Evanston, and an electrician specializing in EMF home remediation. I gave an hour-long presentation to a home school co-op health class on the physics of EMFs, the current obsolete standards, and the adverse health effects these standards encouraged. When a cell tower was proposed for the bar across the street from my church, I researched the zoning laws for telecommunications and collected signatures from the neighborhood protesting the placement. When my father went in my stead to the zoning hearing our signatures were dismissed out of hand, and my father was told not to bother speaking because of the zoning official's understanding that we could not contest the placement of cell towers based on health concerns. It did not matter how many signatures we had collected. Our rights to protect our own health as a matter of self-defense and prevent non-consensual and harmful exposure were denied.

18.    In March 2019, I received an official diagnostic note from my physician, Dr. Paul Schattauer, confirming that I had developed sickness from this radiation and asking that I be

**AFFIDAVIT OF YSOBEL GALLO IN SUPPORT OF STANDING**

accommodated. He wrote: "I am the primary care physician of Ysobel. I have diagnosed her with severe hypersensitivity to electromagnetic fields and I appreciate any accommodation you can make for her." Exhibit 1.

19.     I tried to change my work to that in remote areas, where I could be far from wireless radiation. For example, I participated on a backcountry volunteer trail crew at Yellowstone National Park for 5 weeks through the Student Conservation Association's high school program. In the absence of wireless radiation, I felt healthier than I had in months. The work was hard: my crew of 8 brushed 40,000-45,000 feet and widened 1,000 feet of trail, set 8 check steps, built 5 other structures and hiked 200 miles within 26 days. I experienced no chest pain, heart arrhythmia or abnormal shortness of breath. In the absence of wireless radiation, I was as capable as anyone else. When I returned to Chicago, the symptoms immediately returned.

20.     More recently, I applied for various Americorps trail crew programs and was accepted into the Excelsior Conservation Corps in New York. Unfortunately, I was not able to take the job as they refused to accommodate me during training. This job is in a clean outdoor environment, away from Wi-Fi buildings, cell towers, and other forms of wireless radiation. It is work I am good at and enjoy. It is some of the only work I can successfully pursue with my ongoing microwave sickness. The training facilities are all wireless, however, and even after Dr. Shattauer wrote a letter with diagnosis I was denied accommodations. Exhibits 2 and 3.

21.     I am increasingly concerned about the new "small-cell" 5G towers that have been erected all over Chicago. There is one on almost every main block. When I am near a 5G tower I have difficulty breathing, my chest aches, and it becomes difficult to understand what people say to me. My head feels like it is being split apart. The migraine lasts for hours, often for the rest of the day. Mild nausea and extreme fatigue can last for up to 4 days after passing a single "small cell" 5G antenna. I can locate 5G towers simply by walking or driving through the neighborhood. The symptoms occur and sure enough, I soon find a cell mast nearby. Each new 5G mast functionally prevents me from going to that area. As a result, I am increasingly isolated. I was, and am, functionally housebound. If a site goes up near my home I will have to leave my family and will likely become homeless at the age of 19.

22.     By now, I have been injured beyond repair, especially if nothing changes in terms of our forced exposure to this radiation. I feel like I have no future, that my life is over before it had properly begun. My quality of life is untenable, but the FCC continues to absurdly and irresponsibly deny harm and pushes more and more of this harmful technology. Unless the FCC reforms their wireless radiation standards I will be unable to avoid harmful radiation and will exist in a living hell.

23.     **I am the evidence** that wireless radiation at what the FCC claims is "safe" levels is very harmful. Since the FCC is misrepresenting the evidence including the human evidence, children and teenagers like me are prevented from taking measures to protect themselves from non-consensual exposure. Had I known before I got injured how harmful this radiation can be, I would have taken early measures to protect myself and likely would not be in as bad a shape. But I was not informed. This radiation was forced on me in school. It is now being forced on me in public. It is intruding my home. The right to choose was taken away from me and now I am sick because those who are entrusted with protecting my health and safety failed. Even now they absurdly deny the undeniable and I am not even accommodated for my condition because of the authorities' denial of the safety issues.

JA_00287

**AFFIDAVIT OF YSOBEL GALLO IN SUPPORT OF STANDING**

24.     If the FCC reviews and revises their guidelines in accordance with the science, my situation can be redressed. I can still have a better life. With revised emissions standards I would regain mobility and be able to move around my city. This would allow me to connect with friends I haven't seen in over a year, volunteer in city parks and nature centers, and be involved in community tree plantings. I could reconnect with the writing world through annual city-wide literary events I have not been able to attend. With revised microwave radiation guidelines on cell phones and Wi-Fi routers, I could spend longer periods of time in buildings, allowing me to complete my education and training.

25.     My future rests in the FCC's hands. By maintaining the current outdated, hazardous standards, which are out of step with the rest of the globe, the FCC denies me education, employment, and freedom of movement and even encourages denial of my sanity. By recognizing the evidence, by listening to our doctors, by reviewing and revising their guidelines, the FCC could repair my life and restore the very things it took away. They would give back my access to education, opportunities for employment, and the liberty to move freely throughout my city and country – the basic rights of all citizens.

26.     The FCC order did not adequately consider or reasonably respond to the comments of those who requested that the FCC create biological standards. The FCC's decision to retain their existing guidelines entirely fails to resolve the problems I face in daily life as a result of constant exposure to harmful radiation. I have been harmed by rules that do not adequately protect health and safety, and in fact directly allow continuous harm. This harm will continue until the rules are changed to truly protect health and safety and take into account the needs of those who are or may become injured by electromagnetic radiation. The FCC's apparent claim that Microwave sickness is not an actual condition disregards the overwhelming weight of science and medical information around the world showing that it is real. My own experience provides undeniable evidence. I am offended and hurt by the FCC's (and others') casual and demeaning assertion that a large number of people like me are making it all up or just need psychiatric help.

II.     Children's Health Defense's Art. III Standing

27.     I was recently offered and have accepted a part-time position with Children's Health Defense. Working with Children's Health Defense validates my experience and gives me something to strive for, when all my goals had been ripped away. They believe my story, want to help and have found a way for me to contribute my talents in the effort to educate the public and especially children and teenagers and assist others like me who suffer from exposure. I will be the Assistant Director of the Children's Health Defense "EMF Child Ambassador Program." The program aims to encourage children and teenagers around the country to educate their peers about the harms of wireless technology.

28.     The EMF Child Ambassador Program will try to mitigate the harm flowing from the FCC's recent decision. I will be encouraging children to take action, including choosing science projects in the schools that focus on the harms of wireless technology. I will employ my creative writing skills to develop educational information that will help our Child Ambassadors raise awareness on the dangers of wireless radiation, especially among young people. Since CHD is working with many children who have been injured, I will also be a source of acceptance and support for those who are experiencing adverse reactions, trying to understand what is happening and helping them understand how to reduce their exposure. In other words, I will be able to fill –

Page -6-

## AFFIDAVIT OF YSOBEL GALLO IN SUPPORT OF STANDING

for at least some – the deficit of support and information that delayed my recognition of the problem and caused me so much more suffering. I will also assist in Children's Heath Defense's efforts to sponsor and/or gather additional scientific and medical information showing the harms caused by exposure at or below the FCC's "safe" guidelines as it continues to emerge, work to distribute it to the public – especially the young – and then counteract the disinformation campaigns by industry and their captive agency minions that will undoubtedly follow.

29.      Children's Health Defense had to create the EMF Child Ambassador program precisely because of the FCC's abject abandonment of its duty to prevent harmful radiation, its choice to put the economic interest of a few large corporations over the health and safety of the public and its outrageous claims that people like me need to see psychologist to get over some kind of irrational cyber-phobia. We are not suffering from a psychological problem but from a very painful *physiological* reaction to this radiation. The ridiculous denial of our situation, the rejection we are experiencing and the hopelessness of the situation, however, **are** causing psychological damage in children that suffer from exposure. Some, like me, even engage in suicidal thoughts. A 15-year old girl in the UK who suffered from Microwave Sickness did commit suicide as a result of the rejection she was experiencing.

30.      Children's Health Defense has been forced to undertake this activity to counteract the FCC's misinformation and otherwise ameliorate the FCC's action and inaction. Sadly, Children's Health Defense will have to divert some of its precious and limited resources (e.g., money and personnel) from other health and environmental issues in order to confront this public safety threat.

31.      This concludes my Affidavit, but as noted above I am also relying on the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter for the purpose of explaining why the particular facts described above demonstrate I and Children's Health Defense each have Article III standing.

Ysobel Gallo
Ysobel Gallo

SUBSCRIBED AND SWORN TO BEFORE ME this 1 day of May, 2020, to certify which witness my hand and official seal.

"OFFICIAL SEAL"
ZULEYKA REYES VEGA
Notary Public, State Of Illinois
My Commission Expires 12/13/2023

Commission No. Notary Public in and for

JA_00289

**Affidavit of Paul Stanley in Support of Standing**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Children's Health Defense, Michele Hertz, Petra Brokken, Dr. David O. Carpenter, Dr. Paul Dart, Dr. Toril H. Jelter, Dr. Ann Lee, Virginia Farver, Jennifer Baran, Paul Stanley, M.Ed. Petitioners | ) ) ) ) ) ) | Case No: 20-1138 Petition for Review of Order by the Federal Communications Commission (FCC 19-126) |
| v. | ) ) ) | (Consolidated with Case No. 20-1025) |
| Federal Communications Commission and United States of America, Respondents | ) ) ) ) | |

## AFFIDAVIT OF PAUL STANLEY IN SUPPORT OF STANDING

1.  My name is Paul Stanley. My home address is 95-1032 Melokia Street, Mililani, HI 96789. I am one of the named Petitioners in the above captioned proceeding. I am also a member of Children's Health Defense.

2.  I filed comments at the FCC in the proceedings below and asked the FCC to look into the harm that radiofrequency radiation causes to people. I advised them that I had been diagnosed with Electromagnetic Hypersensitivity (Microwave Sickness) and explained why the FCC's standards and guidelines were a significant contributor to my condition and suffering. I asked them to change their rules and relieve my suffering. They did not do so.

3.  I will provide some additional basic facts particular to my individual circumstances. The Affidavit of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter also provide further analytical and factual support for the proposition that I have suffered an injury-in-fact traceable to the FCC Order that could be redressed by an order from this Court holding unlawful, vacating, enjoining, and/or setting aside the FCC Order and remanding the matter to the FCC for further consideration and action.

4.  I have a Bachelor's in Education, a Professional Diploma and a Masters in Educational Technology. I have worked as a computer teacher, a school level technology coordinator and as a state level multimedia resource teacher. I have worked now for 26 years in Hawaii's education system. I love technology and work to advance the use of technology in education. I was chosen as Apple Distinguished Educator (ADE), an Apple program that recognizes K-12 and higher-education teachers who are using technology to transform teaching and learning. According to Apple, those who are chosen as ADE are "educators who are looking to change the world. They are active leaders from around the

**AFFIDAVIT OF PAUL STANLEY IN SUPPORT OF STANDING**

world helping other educators rethink what's possible with iPad and Mac to make learning deeply personal for every student."

5.    I first began experiencing symptoms from exposure to radiation from wireless sources in 2001.  My symptoms include a burning sensation in my head that continues and increases until I move away from the source of the wireless radiation, a terrible sensation of pain throughout the head and body, muscle spasms, digestive issues, irritability, confusion, insomnia, inability to concentrate, chest pain, and heart palpitations.

6.    I was unaware that wireless radiation could be harmful until I became ill myself.  The symptoms, later diagnosed as an illness that is referred to as Electromagnetic Hypersensitivity (EHS) and/or Electromagnetic Sensitivity and/or Microwave Sickness, were caused by an exposure to Radio-Frequencies ("RF") microwave radiation from various sources, including microwave receiving dishes for TV broadcast, a cell phone repeater on the roof of the building where I worked, and Wi-Fi.

7.    Three different doctors have diagnosed me with symptoms consistent with Microwave Sickness (or EHS). In 2005, Dr. John Michael Uszler, M.D., Assistant Clinical Professor of Molecular and Medical Pharmacology at UCLA and Medical Director of clinic in Santa Monica had me undergo a SPECT scan (3D brain scan).  It showed brain dysfunction which is consistent with others that have EHS. *He wrote: "I have seen similar abnormal scan patterns in adults who have been exposed to electromagnetic radiation."* See Exhibit 1.

8.    The second doctor, Dr. Gunnar Heuser, MD., Ph.D., FACP, is a clinical toxicologist. He was a member of UCLA Brain Research Institute (BRI) until he decided to go back to working as a clinician.  He analyzed my SPECT scan and concurred with Dr. Uszler's findings.  Dr. William Rea, M.D. is at the Environmental Health Center in Dallas, Texas (EHC-D).  I went to the EHC-D in 2015 for three weeks of testing. Dr. Rea diagnosed me as having EHS. Exhibit 2.

9.    The Rea diagnosis letter refers to a study he conducted to develop testing protocol for Electromagnetic sensitivity.[1] Rea's work is considered by scientists as the best provocation study[2] that has been done on this condition, and one of the few that were done correctly.  It shows that the condition is real, and some people with this condition can sense or detect non-thermal levels of EMF emissions. The study was done with scientists from the University of Texas, Jacksonville State University and universities in Japan and China.

---

[1] Rea et al (1991), Electromagnetic Field Sensitivity, Journal of Bioelectricity Volume 10, 1991 - Issue 1-2, mentioned in the docket below at: https://ecfsapi.fcc.gov/file/7520943191.pdf.

[2] A provocation study is a type of medical clinical trial whereby participants are exposed to something claimed to provoke a response, or to a sham substance or device that should provoke no response. Skin allergy tests are an example.

**AFFIDAVIT OF PAUL STANLEY IN SUPPORT OF STANDING**

10.     As I explained in my comment to the FCC, radio frequencies and microwaves are the ultimate pollutant. Most cannot see, smell or hear them, although some people can hear them. This is called the "Auditory Effect" or the "Frey Effect," named after a US Navy scientist, Dr. Alan Frey whose study from 1962 showed that radars, which just like cell phones and cell towers, use pulsed or modulated microwave frequencies in non-thermal levels can create an auditory effect in the brain.[3] But contrary to the position of the FCC, those of us who have become ill from this radiation know that our bodies are stressed by these waves and the pain can be quite unbearable. Unfortunately for me, my exposure to this "safe" radiation injured me and now I suffer from Microwave Sickness.

11.     In 2004, my symptoms worsened and eventually became unbearable. At the time, I was working for the State of Hawaii's Educational TV, which had been my dream job. Whenever I went to work, my symptoms would increase. The job that I loved exposed me to microwave signals daily for six years until my body finally broke down and I had to leave. It became increasingly clear that it was the radiation from wireless devices that caused the symptoms. When I was near a wireless source, I would have symptoms. When I was not, my symptoms subsided. For example, I had Wi-Fi in my home. At the time, my headaches and body pains were unbearable. When I realized that it was the radiation that was making me ill I turned off the home Wi-Fi and my symptoms were immediately better.

12.     But the damage had already been done. Although I was better in my home, I was still reactive to RF radiation, including to my neighbor's Wi-Fi. I spoke to my neighbors and asked them to turn off the Wi-Fi when it was not in use or at least at night so I could sleep. Most people were understanding and tried to comply. I even helped them set up Ethernet cables so that they could have wired access to the internet when the Wi-Fi is off. As soon as the Wi-Fi came back on I would feel immediate pain, so much that I would have to leave my home, even if it was in the middle of the night. I would load my car and drive to a remote location to sleep in my car.

13.     I have been asked how I know radiation from wireless technology sources causes the symptoms. I use sunburn to explain since it is familiar to everyone in Hawaii. I would in turn ask them, "When you get a sunburn, how do you know that it was the sun that caused it?" Your body tells you when you are around a source that is harming you, whether they are microwaves or sun waves. I do experience the damage from the exposure as similar to a sunburn. Your body still hurts even after you remove yourself from the sun. You are more susceptible to further burning. So it is with Microwave Sickness. When you receive an injurious exposure to radiofrequency and microwave radiation you will be more sensitive to any other subsequent sources. You will sustain further injury from sources that might not have harmed you in the past until your body

---

[3] Allan H. Frey "Human auditory system response to modulated electromagnetic energy". Journal of Applied Physiology. 17 (4): 689–692 (1962). The study itself was not submitted to the docket below but the story behind the study was at: https://ecfsapi.fcc.gov/file/7520958446.pdf

Page -3-

**AFFIDAVIT OF PAUL STANLEY IN SUPPORT OF STANDING**

has time to recover through a period of non-exposure. Furthermore, if you have been injured, you will likely feel even small exposures that others do not feel at all.

14. The damage I sustained from the wireless radiation has affected my family as well. I have a wife and two daughters, and my illness has been very difficult for them. My daughters were in elementary school and it made for a very unstable home life. When I was very sick from radiation I couldn't be at home and many nights slept in my car in isolated places where there was no radiation. I made sure to be home in the mornings to get the children ready for school, dropped them off and picked them up after school. I would often go to the park with them after school, as I could not be in the home for very long without feeling ill.

15. My illness put a big strain on my marriage. In the beginning my wife did not know what to think, but she believed and supported me. Then our closest friend who was also the senior pastor of our church, began to have the same affliction. My wife saw firsthand from two of her closest people that EHS is real and is devastating. I would not have been able to recover and improve my health in the way that I have without her love and support.

16. I had to leave my job for a while, and this put a big strain on our finances. Not only did I lose my dream job, I also had to sell my dream home. For several years thereafter I simply tried to improve my health by following the protocols and advice of the doctors listed above and other health practitioners. My efforts to avoid exposure to radiation from wireless sources is the main reason I have been able to improve my ability to function. But over the years I spent over $60,000 seeking treatment. I was unemployed for years, with no income. I spent my life savings and have no money for my children's college education.

17. In 2008, I was able to go back to my old job as a middle school computers and media teacher. Things went fine, until 2011 when the school decided to install Wi-Fi in every room in the school. I approached my school principal and asked to be accommodated under the Americans With Disabilities Act for my Electromagnetic Sensitivity. This request was granted. My school principal moved me to the music building because Wi-Fi was not going to be installed there.

18. My computer and digital media lab has state of the art technology including 35 iMacs, cameras, and a 75-inch promethean touch screen writable display. All the devices in my lab are connected to the internet using Ethernet cables instead of using wireless Wi-Fi connection. My internet connection is faster and safer than the Wi-Fi system which is used in the rest of the school. I currently teach 185 students per week. Connecting the computers to the internet using Ethernet cables rather than a Wi-Fi wireless connection undoubtedly did not have any negative effect on my teaching or on the students' ability to learn using advanced technology.

19. Had my employers not accommodated my disability the gains in my health would be erased and most likely I wouldn't be able to stay at my job. I feel sad for the people who

JA_00294

**AFFIDAVIT OF PAUL STANLEY IN SUPPORT OF STANDING**

are in have the same condition and need to have work environments free of Wi-Fi but their employers do not accommodate their disability. I know many teachers and students who have become sick but were routinely been refused accommodation based on the fact that their wireless emissions fall within the FCC "safety" guidelines.

20.    All three of my doctors have been very clear that I must stay away from Wi-Fi and other wireless devices and infrastructure. This has become and will become even more difficult as the telecom companies continue to install more transmitters and society moves toward "the internet of things," and 5G. My fear is that I will not be able to survive in this society. I will not be able to leave my home or will simply be ill in my home as well. I'm fearful that the principal in my school will change and the new principal will refuse to accommodate me because of the FCC's guidelines. I have met many others in the same situation and have no doubt that if biologically based and appropriate standards are not enacted many other people will find themselves refugees from society. Finding a place to escape nonconsensual exposure is becoming more and more difficult.

21.    I feel I live on borrowed time. If a smart meter was installed on my home, I would not be able to live there. If 5G antennas that are now being deployed in neighborhoods all around the country are deployed in my neighborhood, I will not be able to stay in my home and will have to live in my car again. Life will become even more impossible with 5G antennas every few blocks, and thousands of satellites beaming radiation down at us from space. It is so sad, because technology can be safe. As with where I work, wired internet is available, safe, and even less likely to be hacked. Society can lessen the use of wireless technology greatly without giving up access to the internet.

22.    The FCC's inadequate guidelines do not protect from non-thermal effects or frequency modulation and pulsation. Nonconsensual exposure to emissions from wireless technology operating within the FCC's "safety" guidelines led to my injury. The FCC guidelines must be changed. It is the first step in order for me to have a chance of surviving in this world. The health threat must also be disclosed to the public so they will be aware how harmful this technology is. Once the public becomes aware people will make smarter decisions, be able to exercise informed choices about, and reduce, their exposure. They can take steps to eliminate or at least minimize nonconsensual exposure. Proliferation of this technology will be reconsidered, and safer solutions will be found. If the FCC does not adopt protective guidelines the uncontrolled proliferation of this harmful technology will continue, and people will continue to be either unaware of the threat of made to suffer exposure against their will. Sadly, it seems the FCC must be forced to do its job.

23.    The FCC order did not adequately consider or reasonably respond to my comments or those of others who raised similar issues. The FCC's decision to retain their existing rules entirely fails to resolve the problems that I face in daily life as a result of constant exposure to harmful radiation. I have been harmed by rules that do not adequately protect health and safety, and in fact directly allow continuous harm. This harm will continue

JA_00295

# AFFIDAVIT OF PAUL STANLEY IN SUPPORT OF STANDING

until the rules are changed to truly protect health and safety and take into account the needs of those – like me – who are or may become injured by RF Microwave electromagnetic radiation. The FCC order is ignored my sickness and effectively denied my rights, it ignored the clear and decades long science that supports its existence, it ignored medical observations and diagnoses of doctors and ignored courts' decisions from around the world. The FCC's order ignored my own situation and that of the many others who told the FCC they were suffering and asked for relief from that suffering.

24.     I have been in touch with Dafna Tachover from the Children's Health Defense for many years now. I have been supporting her work on behalf of those of us who have become injured by wireless technology radiation.  To support her efforts to get accommodation for children in schools, I provided her with an affidavit about my accommodation, hoping it would help her efforts. It is infuriating that children's sickness from this radiation is being denied and their requests for accommodation are rejected based on the FCC's guidelines. Recently she visited Hawaii, and I helped organize one of her lectures, hoping that educating the public will help create change. In the lecture I met so many who have become sick from this radiation and whose lives have been devastated as a result. I also met a student who did her science project about this health threat and now she working to educate her peers. It is absurd that children have to figure out the harms by themselves while our government continues to force this nonconsensual harmful radiation on them and recklessly harm them.

25.     This concludes my Affidavit, but as noted above I am also relying on the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter for the purpose of explaining why the particular facts described above demonstrate standing.

Paul Stanley

SUBSCRIBED AND SWORN TO BEFORE ME this ___ day of ___ 2020, to certify which witness my hand and official seal.

[Seal]

My Commission: 05/14/2022
Notary Public in and for State of Hawaii



Doc. Date: _____ # Pages: 6
Notary Name: Shelley A. Masui    1st Circuit
Doc. Description: _____

Notary Signature                    Date
NOTARY CERTIFICATION



Page -6-

JA_00296

**Affidavit of Jennifer Baran in Support of Standing**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| Children's Health Defense, Michele Hertz, Petra Brokken, Dr. David O. Carpenter, Dr. Paul Dart, Dr. Toril H. Jelter, Dr. Ann Lee, Virginia Farver, Jennifer Baran, Paul Stanley, M.Ed. <br> Petitioners | Case No: 20-70297 <br><br> Petition for Review of Order by the Federal Communications Commission |

v.

Federal Communications Commission and
United States of America,
 Respondents

**AFFIDAVIT OF JENNIFER BARAN IN SUPPORT OF STANDING**

1.    My name is Jennifer Baran. My home address is 20080 Cox Lane, Bend, Oregon, 97703, I am one of the named Petitioners in the above captioned proceeding and I am a member of Children's Health Defense.

2.    The purpose of this Affidavit is to provide evidence of my standing to pursue the matter. I will provide some of the basic facts particular to my individual circumstances, but also rely on the presentations contained in the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter to explain why the basic facts I present below demonstrate that I and my sons have suffered an injury-in-fact traceable to the FCC Order that could be redressed by an order from this Court holding unlawful, vacating, enjoining, and/or setting aside the FCC Order and remanding the matter to the FCC for further consideration and action.

3.    I filed comments at the FCC on September 29, 2016[1] in the proceedings below. I mentioned the "enormous amount of evidence of harm," advised them that many are already suffering as a result of emissions within the current guidelines.

4.    My husband and I have three children, two boys ages ten (10) and six (6) and a daughter who is four (4). I have a bachelor's in chemical engineering and a master in bio-medical engineering. My husband has bachelor's and a master's in chemical engineering and he also has an MBA.

5.    My two sons and I are harmed from exposure to Radio frequency (RF) and microwave radiation from wireless sources, at exposure levels which are considered safe by the FCC. When exposed to this radiation, we suffer from various adverse health effects including neurological and behavioral effects. Our physicians have confirmed that long term exposure to pulsed and modulated RF and Microwave radiation from wireless devices and infrastructure are the cause of many of our symptoms and are at least a contributory factor to the significant and ongoing medical problems I and our sons battle on a daily basis. See Exhibits 1-4.

---

[1] In the record below at https://www.fcc.gov/ecfs/filing/1092854958736.

**AFFIDAVIT OF JENNIFER BARAN IN SUPPORT OF STANDING**

6.    Once we were made aware of the connection between our symptoms and wireless radiation, we eliminated all sources of RF radiation from our home and shielded the house from outside sources. We worked with an Electro Magnetic Fields ("EMF") mitigation specialist to identify the various sources of wireless radiation (for example, Wi-Fi, smart' utility meters, 'smart' TVs and other wireless appliances and radiation from our neighbors' wireless devices). As a result, my health and the health of my children has improved.

7.    The EMF Mitigator also introduced me to Dafna Tachover of the Children's Health Defense ("CHD"). Dafna has provided valuable assistance toward my efforts to better understand our challenges and symptoms and address the wireless issue with my children.

8.    In 2009, My husband and I were living in Menlo Park, California. My husband worked as a Resources Manager and I was a Clinical Trials Manager. As with most people in the San-Francisco's Bay Area and Silicon Valley, we gladly incorporated wireless "smart" technology that promised to make our lives easier and more connected. We had smart phones, wireless laptop computers connected to internet via Wi-Fi routers, and various "smart" appliances. 'Smart' means they have an RF transmitting and radiation emitting antenna. We were not even aware that our appliances had a Wi-Fi antenna and were constantly transmitting. The house had wireless "Smart" utility meters. This is when I started experiencing sleeping problems and concentration problems.

9.    In 2010 we had our first child and our use of RF as wireless technology continued to expand. My health continued to deteriorate and our firstborn child's problems emerged. At the time, we did not firmly attribute any of this to RF and wireless exposures but began to take measures to minimize them as a precautionary measure.

10.    It was not until we had a brief encounter with the mother of one of our neighbors, Cindy Sage, that I began to unearth the cause of my health problems. Cindy Sage is an EMF mitigation consultant, and she's known for her work on the effects of EMFs on human health.

11.    Initially, my husband didn't believe that this technology could possibly be harmful. After all, there were government agencies such as the FCC in place, specifically chartered to ensure such devices were safe. However while doing his own research on the topic and, among other resources, reviewing the Harvard Law School report titled "Captured Agency, How the Federal Communications Commission is Dominated by the Industries it Presumably Regulates" by Norm Alster,[2] which exposed the FCC's abandonment of its duty to protect our health and safety, he came to regret trusting the government and failing to change to our lifestyle much sooner than we ultimately did.

12.    Looking back, our efforts at that time to minimize exposure were far too ineffective. Our brief encounter with Cindy Sage gave us a starting point, but we did not yet have a full picture of the predicament we were in. We had a wireless router in our home located closer to our sleeping quarters, which we thought was OK. We thought "disabling" it at night would be sufficient. I

---

[2] Norm Alster, Captured agency: How the Federal Communications Commission is dominated by the industries it presumably regulates, Cambridge, MA: Edmund J. Safra Center for Ethics, Harvard University, 2015. Page citations are to the version in the record below at https://ecfsapi.fcc.gov/file/60001111298.pdf.

JA_00299

**AFFIDAVIT OF JENNIFER BARANIN SUPPORT OF STANDING**

used a wireless mouse and laptop connected to this Wi-Fi router during the day when I was pregnant with our second child, thereby constantly radiating my unborn son with high levels of RF and microwave radiation.

13.    Later, we learned that the steps taken to "disable" the Wi-Fi in the router at night did not actually eliminate all the RF emitted by the router. Apparently, when disabling the Wi-Fi in the router by accessing the router's settings online, does not completely disable all wireless transmissions. It seems that the router still transmits a persistent microwave signal for other purposes.

14.    It wasn't until after our second child was born in 2014 and our decision to relocate to Bend, Oregon, that we began to learn how to more effectively minimize and eliminate sources of Wi-Fi and other wireless radiation. But we discovered the painful truth about the negative health effects our family had already suffered.

15.    There is no doubt both my sons are adversely affected when exposed to wireless radiation. Had we known sooner–had the FCC done its job to fully understand these dangers and clearly communicate the dangers of RF and wireless technology radiating emitting devices to the public–my family would not have been so severely damaged.

16.    My daughter is the lucky one. I became pregnant with her after becoming fully aware of all the harms that can be caused by wireless and the various sources of this radiation. I therefore knew what to avoid and how to protect me and her. Throughout my pregnancy with her we did not use wireless devices at home at all and shielded our home from radiation from wireless sources coming in from neighbors and elsewhere. My daughter has just turned four in March this year and so far she presents no symptoms. Sadly however, both my sons have been injured and are severely affected. They both have adverse health and behavioral problems as a result of exposure to what are considered safe levels according to the FCC.

17.    Some of the observable symptoms my older son have had and/or continue to exhibit when he is exposed to this radiation include difficulty concentrating, restlessness, hyperactivity, fatigue, tinnitus, letter reversal when writing, diminished writing and spelling skills, and diminished overall learning ability.

18.    The California Department of Public Health ("CDPH") published guidelines in December 2018[3] confirming there are peer reviewed scientific studies showing that long term exposure to this radiation may cause "*headaches and effects on learning and memory, hearing, behavior, and sleep.*" The CDHP guidelines clearly contradict the FCC's decision in this matter finding no evidence of harm or a need to provide better warnings to the public.

19.    CDHP had actually concluded as early as 2009 there was enough evidence to justify a public warning and actually began the to work on guidelines. Nevertheless, for 9 years it didn't

---

[3] How to Reduce Exposure to Radiofrequency Energy from Cell Phones, available at https://www.cdph.ca.gov/Programs/CCDPHP/DEODC/EHIB/CDPH%20Document%20Library/ Cell-Phone-Guidance.pdf. The Guidelines were described in a filing in the FCC case at https://ecfsapi.fcc.gov/file/1091330786203/Wireless%20radiation%20and%20EMF%20abstracts %20August%202016%20-%20August%202019%20Joel%20Moskowitz%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.pdf on page 11.

JA_00300

**AFFIDAVIT OF JENNIFER BARAN IN SUPPORT OF STANDING**

publish any of the 27 drafts it developed. A Court order forced CDPH to comply with a FOIA request submitted by Dr. Joel Moskowitz from Berkeley University, and the agency finally went forward with promulgation of the 2018 public warning.

20.     CDHP, just like the FCC, knew the public should be warned but it withheld this critical information for several years, and now my children and I are sick. How many more children should become sick for the truth to be told? How long we will keep the truth from the public and prevent people from knowing that this technology is making them and their children sick and from taking effective measures to restore their health – disabling their harmful, microwave radiating wireless devices.

21.     My oldest son has been diagnosed with ADHD, sensory processing disorder and methylation and immune system disorder. I do not know the extent to which his RF exposure *in utero* caused these conditions, but I do know current exposure causes and further aggravates his existing symptoms, whatever the original cause.

22.     The science also shows positive correlations between at least some of the conditions my son has been diagnosed with and exposure to RF radiation, both pre- and post-natal. For example, a study conducted by Professor Hugh Taylor, Chair, Department of Obstetrics Gynecology and Reproductive Sciences at Yale School of Medicine and Chief of Obstetrics and Gynecology at Yale-New Haven Hospital showed that fetal exposure to wireless radiation affects neurodevelopment and behavior and can lead to ADHD[4]. A meta-analysis paper on a total of over 83,884 women concluded that maternal cell phone use during pregnancy may increase the risk for behavioral problems in the offspring, particularly hyperactivity/inattention problems.[5]

23.     My son is direct evidence that this radiation is causing ADHD like symptoms and removal of exposure very effectively reduces symptoms. My son was diagnosed with ADHD in September 2018. A year later, in September 2019, the same doctor reevaluated him and removed the diagnosis of ADHD. Since we didn't have any conventional medical interventions, the only thing that we changed and can explain the improvement is the reduction of exposure to wireless sources.

24.     It makes me wonder how many children are being diagnosed with ADHD, getting psychiatric medications with various long tern adverse effects, when their symptoms and condition will be alleviated by simply turning off their Wi-Fi routers. But because of the FCC actions and omissions, they are being misdiagnosed, getting unnecessary psychiatric medications

---

[4] Aldad TS, Gan G, Gao X-B, Taylor HS. Fetal radiofrequency radiation exposure from 800-1900 Mhz-rated cellular telephones affects neurodevelopment and behavior in mice, Scientific Reports, Published online March 15, 2012 and in the record below at:https://ecfsapi.fcc.gov/file/7520940705.pdf.

[5] Tsarna E, Reedijk M, Birks LE, Guxens M, Ballester F, Ha M, Jiménez-Zabala A, Kheifets L, Lertxundi A, Lim HR, Olsen J, Safont LG, Sudan M, Cardis E, Vrijheid M, Vrijkotte T, Huss A, Vermeulen R., Maternal Cell Phone Use During Pregnancy, Pregnancy Duration And Fetal Growth In Four Birth Cohorts, Am J Epidemiol, 2019 Apr 17, filed in the record below at:https://ecfsapi.fcc.gov/file/1091330786203/Wireless%20radiation%20and%20EMF%20abstra cts%20August%202016%20-%20August%202019%20Joel%20Moskowitz%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.pdf.

JA_00301

**AFFIDAVIT OF JENNIFER BARANIN SUPPORT OF STANDING**

that also harm them and their parents and their doctors are being kept ignorant of the harms they are causing to their own children and patients.

25.     My middle son has been diagnosed with developmental delay, Autism Spectrum Disorder (ASD), anxiety, epilepsy, concentration difficulties, anomia and immune system disorders. When he is exposed to radiation from wireless sources he exhibits the following symptoms and/or exacerbated symptoms: extreme difficulty concentrating and understanding; inability to comprehend verbal request; restlessness; forgetfulness; sleep problems; tremulousness, shaking, and seizures.

26.     Peer-reviewed scientific studies, many of which were submitted in comments to the below docket, have shown that wireless radiation in non-thermal levels may be involved in the development of the various conditions with which he was diagnosed with and that exposure to RF radiation may cause the symptoms he is experiencing, many of them are referenced in the BioInitiaive Report whose Co-Editor, Professor David Carpenter, MD is a Petitioner in this matter.

27.     The benefits of minimizing exposure to Wi-Fi and wireless sources are also clear with my second son. In April 2018, he was diagnosed with ASD. In his reevaluation in December 2019, after we removed all wireless sources in our home and reduced his exposure to outside sources, his doctor indicated significant improvements in his ASD and other cognitive functions. The evidence is clear.

28.     Later blood tests revealed significant levels of oxidative stress in our two sons. 93 out of 100 peer-reviewed studies analyzed in a meta-analysis peer reviewed paper, show that non-thermal levels of RF radiation, levels which are considered safe by the FCC, cause oxidative stress.[6] Oxidative stress is a mechanism involved in the creation of cancer, non-cancerous conditions and DNA damage. I'm grateful for my background in Chemical and Bio-Medical engineering. It has unfortunately become quite useful for making sense of this situation.

29.     Both my sons were exposed to continuous RF radiation from various wireless sources *in utero* and in early childhood, from cell phones and Wi-Fi at home, work and daycare. Their medical conditions and symptoms have significantly improved once we removed all wireless radiation emitting devices from our home and relocated to a residence in a rural setting. We now live in a house on 20 acres. After eliminating and shielding from sources of wireless, we observed significant improvements in both their health and behavior.

30.     Our children's physicians confirmed the association between our sons' exposure to RF radiation and their symptoms and recommended exposure avoidance. Nevertheless, and despite their diagnosis and recommendations, our requests for accommodation in school were denied. Our local schools have wireless access points (Wi-Fi transmitting devices) throughout the school, Apple TV, Apple computer and iPads in every room. The environment is toxic for our children.

---

[6] Igor Yakymenko et al, Oxidative mechanisms of biological activity of low-intensity radiofrequency radiation, Electromagnetic Biology and Medicine 35:2, 186-202 (2016), filed in the record below at https://www.fcc.gov/ecfs/filing/1001669617135, https://ecfsapi.fcc.gov/file/1001669617135/Yakymenko-et-al-2015.pdf.

JA_00302

**AFFIDAVIT OF JENNIFER BARAN IN SUPPORT OF STANDING**

31.    We made the reasonable request to hard-wire the class and minimize the RF and microwave radiation to accommodate our sons. Using wired networks would not have affected the teaching and the learning but would have kept our children safer and able to get access to education. Our request was supported by the children's physicians, who wrote letters asking to minimize our children's exposure to wireless radiation sources. But we were denied because of the FCC guidelines. The district officials informed us in the 504-accommodation meeting that they take the position of the Oregon Department of Education, which in turn cites the FCC and claims that RF and wireless technology do not cause any adverse health effects. The special education director of the Bend La Pine School District, Sean Reinhart, stated in my older son's 504 meeting in the fall of last year, that he and the district are "aligned with the position of the Oregon DOE that Wi-Fi Radiation *does not cause any harm.*" Thus, he refused to follow our physician's diagnosis, prognosis and prescription that was part of the accommodation request. My notes from the meeting with Mr. Reinhart are attached as Exhibit 5. I recorded his comment in my handwriting on the middle part of the second page of those notes within moments of when he made the statement.

32.    As a result of the denial of our accommodation request, our children can only attend school for a few hours a day, and when in school, they are excluded entirely from classes, activities and assessments where we know the Wi-Fi exposure will be very high. Further, we are forced to pay for private instruction at home in addition to dealing with the adverse effects on their health from the short time they do spend at school.

33.    We are lucky that my husband has a job with a good medical insurance, so some of our medical costs are constrained by the annual self-participation of $15,000. That is nevertheless a lot of money. Nonetheless, we do incur significant health care costs as a result of the damage that this radiation has been causing to our children. My older son receives occupational and speech therapy ($1,100 per month) and ongoing supplementation management ($250 per month) for methylation and oxidative stress and immune system disorder. Since my son is unable to access the curriculum at school (since it is delivered via wireless iPads), we hire tutors to teach him math, spelling and reading ($400 per month).  This amount of tutoring will only increase as more of his curriculum is only accessible via the wireless iPad in the wireless-saturated school buildings.

34.    My middle son's occupational and speech therapy (3 times a week), physical therapy (once a week), ABA therapy at $7,500 per month, and ongoing supplementation management for methylation and oxidative stress and immune system disorder at $250 per month impose significant recurring financial injury. In addition, physician management of his conditions cost $450 per month. Seizure management requires EEGs, MRIs with anesthesia and oversight by a neurologist. We are required to travel to the specialist in California and this imposes an additional cost of airfare, car rental, and hotel. In addition, my middle son also receives tutoring as he cannot access the curriculum at school and this costs approximately $400 a month. I do not know if there is a chance of recovery for my middle son and do not know the future costs of or even the viability of being an adult that is not able to independently function and provide for himself in a wireless-saturated world that makes him perpetually and progressively more ill.

35.    In addition to the painful and expensive medical interventions, treatments, and precautions we take, we have had to make significant modifications to how and where we live. We had to move out of our neighborhood that has wireless smart meters and go to a more rural

**AFFIDAVIT OF JENNIFER BARAN IN SUPPORT OF STANDING**

location. We had to shield our home with expensive materials to block external RF radiation from cell towers, from neighbors Wi-Fi, smart meters, satellites and other sources. However, with the FCC granting tens of thousands of satellite applications that will cover the earth with Wi-Fi it seems that soon enough there will not be any place for our family to live.

36.    In our daily life, we have to carefully avoid and minimize exposure to RF radiation by not participating in many normal life activities – for example, we cannot visit with friends or go out to restaurants and cafes, kids play areas, fitness and fun centers. We have had to significantly decrease the amount of time that our children spend at school.

37.    As long as the FCC continues to ignore the evidence and refuses to recognize the human toll like that we have suffered and similar experiences for many others, we will remain isolated; our children will not be able to attend school. We cannot much participate in community activities. We will continue to bear large and ongoing medical bills to treat the effects of the exposure we have had and cannot fully avoid to this day. If the FCC continues its reckless efforts to proliferate uncontrolled wireless technology with complete disregard to human biology, our situation is going to get worse. Our lives already do not make sense; soon enough there will not be a place for us in this world.

38.    If the FCC revises its guidelines to actually reflect the science and the human evidence on non-thermal effects instead of only promoting wireless based technologies regardless of the human costs, there is a chance that the health of our family will improve and we could start to live a more tolerable life. When that happens people will become aware of the harms and be informed enough to voluntarily take measures to reduce and/or eliminate their exposure, just as we did (or try to do although much is completely outside our control). The denial of the harms in general and to those already affected would stop and, to address the health threat, wireless infrastructure will be more controlled. That would give a chance for my children to live a better life in the community, attend our local schools and participate in society in ways they cannot today.

39.    *Captured Agency* states on pages 15-16 that "[t]he best ally of industry and the FCC on this (and other) issues may be public ignorance." It quotes an online poll of 202 respondents. Many of them indicated "they would change behavior—reduce wireless use, restore landline service, protect their children—if claims on health dangers of wireless are true." *These "claims" are true* - not only is there more than ample scientific evidence, **I and my sons *are* the evidence**. The public deserves to know the truth. I need the public to hear the truth. But the FCC denies the truth from us all.

40.    If the FCC guidelines are not reevaluated and amended to address the clear sickness this wireless technology is creating, wireless technology will become even more ubiquitous and all-encroaching. I have no idea where my children will be able to live or how they will be able to function and survive in this world.

41.    The FCC order did not adequately consider or reasonably respond to my comments or those of others who raised similar issues. Their decision to retain their existing rules entirely fail to resolve the problems I, my family and my children face in daily life as a result of constant non-consensual exposure to harmful radiation. I, my family and my children have been harmed by rules that do not adequately protect health and safety, and in fact directly allow continuous harm. This harm will continue to increase until the rules are changed to truly protect health and

JA_00304

**AFFIDAVIT OF JENNIFER BARANIN SUPPORT OF STANDING**

safety and take into account the needs of those who are or may become injured by electromagnetic radiation.

42.     This concludes my Affidavit, but as noted above I am also relying on the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter for the purpose of explaining why the particular facts described above demonstrate standing.

Jennifer Baran

SUBSCRIBED AND SWORN TO BEFORE ME this $\underline{4^{th}}$ day of $\underline{May}$ , 2020, to certify which witness my hand and official seal.

[Seal]

Notary Public in and for ___ _Oregon_ ___

OFFICIAL STAMP
CODY DON JOHNSON
NOTARY PUBLIC-OREGON
COMMISSION NO. 960971
MY COMMISSION EXPIRES APRIL 02, 2021

JA_00305

**Affidavit of Dr. Erica Elliot, MD in Support of Standing**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Children's Health Defense, Michele Hertz, )
Petra Brokken, Dr. David O. Carpenter, Dr. )
Paul Dart, Dr. Toril H. Jelter, Dr. Ann Lee, )       Case No: 20-1138
Virginia Farver, Jennifer Baran, Paul )
Stanley, M.Ed. )                            Petition for Review of Order by the Federal
Petitioners )                                  Communications Commission
) (FCC 19-126)
v. )
) (Consolidated with Case No. 20-1025)
Federal Communications Commission and )
United States of America, )
Respondents )

## AFFIDAVIT OF ERICA ELLIOTT IN SUPPORT OF STANDING

1.    My name is Dr. Erica Elliott. My address is 2300 W. Alameda #A-2, Santa Fe, New Mexico 87507. I am a medical doctor trained in both family practice and environmental medicine, with a private practice in Santa Fe, New Mexico. I am member of the Children's Health Defense.

2.    The purpose of this Affidavit is to provide Children's Health Defense's Article III standing to pursue the matter. I will provide some of the basic facts particular to my individual circumstances, but also rely on the Affidavits submitted by Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter to provide additional analytical and factual support for the proposition that I and the Children's Health Defense have each suffered an injury-in-fact traceable to the FCC Order that could be redressed by an order from this Court holding unlawful, vacating, enjoining, and/or setting aside the FCC Order and remanding the matter to the FCC for further consideration and action.

3.    I filed comments at the FCC in the proceedings below. I told them I am treating a "rapidly growing group of patients who have developed radio frequency hypersensitivity" and asked them to "make exposure limits more restrictive to avert a national health catastrophe."[1]

4.    The FCC Guidelines do not protect from long term exposure to non-thermal levels of RF radiation and completely ignore the harmful effects of the modulation and pulsation of these frequencies for wireless technology. The Guidelines ignore well established scientific evidence and the direct human evidence I see every day in my clinic.

5.    I understand that many people are becoming sick with Microwave Sickness from the wireless electricity meters, sometimes referred to a "smart meters," but we do not have them in Santa Fe. The New Mexico Public Regulation Commission ("New Mexico Commission"), has not yet approved a utility company's application to install them, based in part on concerns over potential health effects. The Hearing Examiner's Recommended Decision (adopted by the New

---

[1] *See* https://ecfsapi.fcc.gov/file/7520942888.pdf.

## AFFIDAVIT OF ERICA ELLIOTT IN SUPPORT OF STANDING

Mexico Commission on April 11, 2018), in one utility's application to install smart meters held that customers' concerns about health effects were legitimate and not groundless or unsubstantiated. This finding relied, in part on the testimony of Dafna Tachover, now with Children's Health Defense, who submitted written expert testimony on the subject. The New Mexico Public Regulation Commission, unlike the FCC, has accepted and validated peoples' concerns over health effects. More important, the New Mexico Public Commission made plain that accommodations are necessary and appropriate where an individual has a health concern and does not consent to be exposed to wireless radiation.[2]

6.      Unfortunately, smart meters are not the only potential source of nonconsensual RF radiation. In the last decade I have been seeing a rapidly growing number of patients, including children, who have developed serious symptoms related to exposure to radio frequencies (RF) and microwave radiation from various wireless sources and especially from cell towers. Many patients have developed Microwave Sickness (also known as Electromagnetic Sensitivity or Electromagnetic Hypersensitivity) from nonconsensual exposure to wireless radiation.

7.      For example, I have a patient who is a businesswoman who owned a high-end store just off the Plaza in downtown Santa Fe, New Mexico. She recently had to evacuate her longtime business because of the cell tower on the roof of a parking garage across the street from the business. The patient, along with her customers, complained of inability to think clearly, headaches, burning skin, and a sensation of internal vibrations. The patient hired an expert in RF emissions detection and mitigation who measured extremely high levels of radio frequencies radiation (levels which, however, are considered "safe" by the FCC) in her store coming from the cell tower. Both the RF specialist and I advised the patient to evacuate the premises.

8.      Another patient, Emily, a 64-year-old woman, contacted me a year ago, saying that she had developed insomnia, ringing in her ears, and the sensation that her heart was beating erratically. On exam, I discovered that Emily had developed atrial fibrillation. I referred her to a cardiologist who put her on medication. The patient continued to have symptoms that interfered with her quality of life. Emily's daughter came to Santa Fe to check on her mom. The daughter said that she felt bad in her mother's home, with a sense of anxiety and inability to sleep. When the daughter looked out the bedroom window, she saw a cell tower about 1500 feet away and wondered if the cell tower was the cause of her mother's symptoms. At my urging, I asked Emily to hire a specialist trained in both detecting elevated levels of RF radiation and methods for remediation of the problem. The specialist measured very elevated levels of RF radiation coming from the direction of the cell tower. Investigation revealed that several extra antennae had been added on a date that coincided with the onset of my patient's symptoms, including the atrial fibrillation.

9.      I have a child in my medical practice who was damaged shortly after birth from his vaccinations. The mother was able to stabilize his condition over time, but he continued to have

---

[2] The New Mexico Public Regulation Commission adopted its Examiner's recommended decision and denied a utility's request to deploy smart meters. The recommended decision is available at https://rtoinsider.com/wp-content/uploads/PNM-recommended-decision-3-18-18.pdf and the Commission Final Order is available at https://www.pnmresources.com/~/media/Files/P/PNM-Resources/rates-and-filings/15-00312-UT%20Final%20Order.pdf.

JA_00308

## AFFIDAVIT OF ERICA ELLIOTT IN SUPPORT OF STANDING

signs of brain inflammation where his behavior would regress from a five year old to a one or two year old in terms of his developmental milestones. The mother contacted a physician trained in environmental medicine, who suggested that she hire an expert to measure the home for elevated levels of RF radiation. The levels were high. Once the wireless radiation in the home was mitigated through by, among other things, shielding to block this undesired and non-consented radiation from outside the house, the child's behavior and cognitive function immediately improved.

10.    I emphasize that the radiation which made my patients sick were emitted at levels considered "safe" by the FCC. Numerous studies show that the FCC's "safe" levels can create the symptoms experienced by my patients. Non-thermal "FCC safe" levels, especially when the signal is pulsed and modulated, can cause a wide range of symptoms, including anxiety, headaches, "brain fog" (inability to think clearly), insomnia, auditory effects, a burning sensation on the skin, and severe exacerbation of chronic inflammatory illnesses. Many of these studies have been submitted to the docket below and the FCC's refusal to accept their conclusions and implications is a betrayal of the duty to not inflict harm on the consumers FCC is supposed to be protecting through regulation.

11.    I have many cases of patients that have ultimately been forced to leave their homes and jobs and go live in the wilderness as the last resort in order to get away from wireless radiation. The hardship these patients endure is tremendous. Their sickness is directly caused by the FCC's obsolete regulations that allow harmful emissions and fail to protect people's health. The FCC enthusiastic support of unchecked proliferation of wireless technology and infrastructure, its rejection of health concerns based on a claimed lack of evidence that this technology is harmful and its abject failure and refusal to require accommodation for those that get sick when exposed against their will is consigning a huge number of citizens to a lifetime of torture and misery. The FCC order below removes all hope of any relief from any source of authority.

12.    I have my own personal story about how microwave radiation affected me. In 2011, I suddenly was unable to sleep, even for a few minutes. I also felt like the inside of my body was vibrating and the sensation that my skin was burning. I noticed that when I went downstairs and to the other end of the house, I was able to sleep, and the strange sensations in my body disappeared. Because my symptoms were similar to my Microwave Sickened patients, I suspected that I might be exposed the high levels of microwave radiation from a cell tower. I hired an expert to come and measure the levels of microwave radiation in my home. He discovered that my neighbor had put up his own mini cell tower on his balcony that was only a few feet from my bedroom. The levels of radiation, while very high, were still within the FCC guidelines and are considered "FCC safe."

13.    The neighbor was a friend of mine. Although he knew nothing about the harmful effects of his antenna, he was willing to turn it off at night. The times he forgot to disconnect his antenna, I was unable to sleep, and all the symptoms returned. After a few months of this torment, my neighbor moved away, in search of a larger home to accommodate his rapidly growing home business. I was relieved. If he hadn't left, I would have had to undertake the cumbersome and expensive task of shielding my home. If that effort was not successful, which is often the case, I would have had to leave my home and look for a safe place to live. Such places are becoming almost impossible to find.

Page -3-

JA_00309

## AFFIDAVIT OF ERICA ELLIOTT IN SUPPORT OF STANDING

14.     Many patients come to me after having been misdiagnosed by doctors who have no training in environmental medicine or believe the FCC guidelines and are completely unaware off the science about the harmful effects of wireless technology. Often, those patients were given sleeping pills, anti-depressants, and anti-anxiety medications—without any relief of their symptoms. When these patients follow my recommendations to avoid exposure to wireless devices and radiation, their symptoms and overall health improve, although the symptoms typically return as soon as the patient is once again exposed. In these cases, it is clear from clinical evidence that the cause of their symptoms is RF and microwave radiation emitted by wireless devices and infrastructure. What I see in my practice clearly reflects what has been written in the extensive medical literature on the effects of non-thermal levels of radiation, including several from the US government and military.

15.     As each year that goes by, I get an increasing number of patients who have become ill from wireless RF and Microwave radiation. I predict that if measures are not taken to stop this trend, we will have a massive health crisis through our country. Scientists and health professionals have submitted an Appeal to the United Nations making the same assertion. In fact, they wrote that an epidemic already exists and inaction is no longer an option. The FCC guidelines provide a false sense of safety of wireless technology. This enables and encourages the proliferation of this technology, and it also gives safe harbor to those responsible for emissions. They cite to the FCC standards and claim their actions are lawful, so no accommodation is deserved or necessary. My patients being harmed as a result. Their lives are becoming a nightmare. When they seek relief, authorities quote the FCC's guidelines to deny my patients' rights and dismiss their desperate condition as imagined or feigned. The FCC's denial of that which is undeniable, and its willfully ignorant but active facilitation of extraordinary harm to many who suffer from exposure, must be ended.

16.     The public must be informed of the clear harm posed by this technology and radiation. The patients who already have been injured should have their rights to accommodation and relief acknowledged and enforced.

17.     The FCC order did not adequately consider or reasonably respond to my comments or those by others who raised similar issues. Their decision to retain their existing rules entirely fail to resolve the problems I and my patients face in daily life as a result of constant exposure to harmful radiation. I and my patients have been harmed by rules that do not adequately protect health and safety, and in fact directly allow continuous harm. This harm will continue until the rules are changed to truly protect health and safety and take into account the needs of those who are or may become injured by RF and Microwave based technology and radiation.

18.     I am a physician and must depend on organizations like the Children's Health Defense to advocate for change on my behalf and on behalf of my patients. I have known Dafna Tachover of the Children's Health Defense for years and I have been supportive of her work on our behalf on this hugely important public health issue. I can merely support them, as here.

19.     My primary concern is for my patients, including those who have yet to walk in the door but likely will if the FCC does not change its standards. I appear for them. But I also appear for myself, asserting my own personal interests. I am directly injured by the FCC order in two ways. First, as shown above, I have personally suffered from exposure that was within "FCC safe" limits. Second, the FCC's standards directly impact my professional practice. My patients'

## AFFIDAVIT OF ERICA ELLIOTT IN SUPPORT OF STANDING

constant nonconsensual exposure to "FCC safe" emissions frustrates my ability to ameliorate and heal my patients' injuries. The only certain cure is ending nonconsensual exposure.

20.    My Hippocratic oath[3] requires that I take all necessary steps to "prevent disease whenever I can, for prevention is preferable to cure." The AMA Code of Ethics also demands that I seek changes in legal requirements which are contrary to the best interests of the patient. Code of Medical Ethics Opinion 8.1 states that "While a physician's role tends to focus on diagnosing and treating illness once it occurs, physicians also have a professional commitment to prevent disease and promote health and well-being for their patients and the community."[4] Thus, I am clearly and individually injured by the FCC's authorization and encouragement of harmful radiation in several concrete ways, and my professional ethics require that I participate in efforts to solve this health problem. The FCC's failure and refusal to recognize the injuries it is causing me and my patients as part of the order below is a direct driver of further harm.

21.    If the Court reverses, vacates and remands the order, the FCC will finally have to craft standards that reduce or eliminate the harm. Changes to the FCC Guidelines that would address non-thermal levels and modulated, pulsed signals will safeguard my life and the lives of my patients. Acknowledgement of the risk the FCC has until now been denying will likely result in an overall reduction of the use and deployment of wireless technology until it is made safer, allowing me and my patients at least a small amount of space where we can better function. A remand that requires the FCC to address the situation of those who are already suffering and holding that accommodations should be granted to those who are already suffering and need to avoid nonconsensual exposure to wireless radiation, would significantly mitigate the harm.

22.    This concludes my Affidavit, but as noted above, I am also relying on the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. ToriJelter and Dr. David Carpenter for the purpose of explaining why the particular facts described above demonstrate standing.

*Erica Elliott MD*
ERICA ELLIOTT, MD

SUBSCRIBED AND SWORN TO BEFORE ME this 2 day of May, 2020, to certify which witness my hand and official seal.

> Official Seal
> ELLEN R KEMPER
> Notary Public
> State of New Mexico
> My Commission Expires 12/11/22

Notary Public in and for STATE OF NEW MEXICO, COUNTY OF SANTA FE

NOTARY PUBLIC COMMISSION EXP 12/11/22

*Ellen R Kemper*  ELLEN R KEMPER

[3] "A Modern Hippocratic Oath" by Dr. Louis Lasagna, Dean, School of Medicine at Tufts University, 1964.

[4] Full text available at https://www.ama-assn.org/delivering-care/ethics/health-promotion-and-preventive-care.

**Affidavit of Petra Broken in Support of Standing**

JA_00312

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

Children's Health Defense, Michele Hertz,
Petra Brokken, Dr. David O. Carpenter, Dr.
Paul Dart, Dr. Toril H. Jelter, Dr. Ann Lee,
Virginia Farver, Jennifer Baran, Paul
Stanley, M.Ed.
Petitioners

Case No: 20-70297

Petition for Review of Order
by the Federal Communications
Commission

v.

Federal Communications Commission and
United States of America,
Respondents

## AFFIDAVIT OF PETRA BROKKEN IN SUPPORT OF STANDING

1.      My name is Petra Brokken. My home address is 1031 Colby Street, Saint Paul, MN
55116. I am one of the named Petitioners in the above-captioned proceeding and I am a member
of Children's Health Defense.

2.      The purpose of this Affidavit is to provide evidence of my standing to pursue the matter.
I will provide some of the basic facts particular to my individual circumstances to show that I
have suffered an injury-in-fact traceable to the FCC Order that could be redressed by an order
from this Court holding unlawful, vacating, enjoining, and/or setting aside the FCC Order and
remanding the matter to the FCC for further consideration and action. I am also relying on the
Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter for the
purpose of explaining why the particular facts described above demonstrate standing.

3.      I am an attorney and a mother of two children. One of my two teenage daughters and I
have both developed Microwave Sickness from various wireless radiation sources at levels
permitted by the FCC, and which the FCC considers safe. Since both my daughter and I have
become ill, clearly those levels are not safe. We are part of the evidence so demonstrating.

4.      I filed comments at the FCC in the proceedings below and asked them to re-evaluate the
current radiofrequency (RF) standards to take into account the current state of science as to
biological effects. This would address adverse health effects from non-thermal levels of
radiation as the current guidelines, such as they are, only cover thermal effects. Since wireless
technology emits mostly non-thermal levels of radiation, the FCC guidelines currently are not
scientifically applicable.

5.      I asked the FCC to create a more biologically based standard so that the United States
could move to a safer technology. I also asked the FCC to consult with Dr. Carl Blackman,
formerly a scientist at the Environmental Protection Agency (EPA), to create a more biologically
based standard that takes into consideration not only the levels of radiation but also the pulsation
and the modulation used for this technology. Dr. Blackman worked for the EPA's lab that
specialized in studying the effects of microwave radiation before the lab was shut down without
explanation in 1986. In his paper, *Cell phone radiation: Evidence from ELF and RF studies*

**AFFIDAVIT OF PETRA BROKKEN IN SUPPORT OF STANDING**

*supporting more inclusive risk identification and assessment*, Carl Blackman reviews the top RF health effects and summarizes the many studies he conducted. *See* Exhibit 1.

6.      In this paper, he explains the importance of including the effects of modulation in public health standards. In section 1.2 of his paper, titled *Modulation as a critical element* he writes:

> **"Modulation signals are one important component in the delivery of EMF signals to which cells, tissues, organs and individuals can respond biologically."**

7.      I have personally spoken to Carl Blackman, and he explained that the 30 people working on the RF standards were told to stop investigating the biological effects of RF and microwave radiation, modulation and pulsation. The EPA was originally the agency responsible for creating standards for RF. Its efforts to create biologically based guidelines that address effects of long-term exposure to non-thermal, pulsed and modulated RF frequencies and radiation were frustrated. These efforts ended around 1996, at the time the Telecommunications Act was enacted, when oversight was given to the FCC, which is not a health or environmental agency. Dr. Blackman's lab showed that pulsed and modulated microwave frequencies at non-thermal levels create bio-effects. The EPA should have been allowed to go forward to publish their biological standards back in 1996. The EPA should have been involved in any standards or guidelines enacted by the FCC. Instead, the FCC ignored the EPA and its scientific research. The EPA has continued to assert that the FCC guidelines are not protective, and letters sent by the EPA to that effect are in the docket below.

8.      Because of the failure of the FCC guidelines to protect the public, my daughter and I have both been harmed for years from the biological effects of this technology. We have been forced to change how we live. We are not able to live a full life because we are hindered in our ability to go into the community near us as well as throughout the United States. Had the FCC worked with the EPA back in 1996 to come out with actual standards that are based on health and science, neither my daughter nor I would have been injured.

9.      I was harmed beginning in 2010, though it may already have been earlier from a cordless phone that I had near my bed. In 2010, I moved to a new home at the same time that I went back to work after a maternity leave. At that time, the new house had high levels of radiation from extreme radar, as it is less than 1.5 miles away from a major airport. There are also over 200 towers and antennas within a 2 mile radius of my home, including one large grouping of antennas close by the house. At the time we also had Wi-Fi at our home. When I went back to work, Wi-Fi was spreading through the office and the courthouse.

10.      My symptoms began with extreme fatigue. I was unable to stay awake after work, and often got into bed at 5:00 pm when I got home. I was unable to make dinner or be involved fully with my children. After the fatigue, I next developed brain fog, short-term memory loss, a prickling sensation on the top of my head, as well as shortness of breath and heart palpitations. The feelings of unease and irritability were also present. I have experienced blurry vision and eye pain.

11.      I did not understand why I was getting these symptoms and went to doctors for help. The doctors were not able to tell me where these symptoms were coming from. As time went on, I got worse. The symptoms occurred more frequently and with growing intensity. Eventually, I began to pass out in my home. One night I fainted repeatedly, falling and then getting up at least

JA_00314

AFFIDAVIT OF PETRA BROKKEN IN SUPPORT OF STANDING

six times. The final time was in the kitchen – I fell into a glass cake plate, which fell on the floor and shattered around me.

12.    It took me approximately a year to understand that it was the radiofrequency radiation from wireless sources that was making me ill. It was a tech person at work who suggested it may be the cause. One day, I felt ill again at work. Then, a group of us went to the suburbs for an employee lunch and sat outside. I felt much better. Then, back in the office in the afternoon, within a half hour I was ill again. I felt ill in front of my computer, and remembered that I had not felt ill in front of my old computer. I called my IT person, to ask for my old computer back, and told him how ill I felt in front of the new one, and he told me "I have heard about this, it is the Wi-Fi, just turn it off." When I did, I felt immediately better. In this case, my IT person knew more than my MD.

13.    After I realized the source of my symptoms was the wireless radiation, I was able to shield myself from the radiation at my home, to a reasonable degree. This has improved my health significantly. To shield myself in my home, I first bought canopies specially made for shielding, to put over every bed. Then, I painted the bedrooms with special shielding paint, and placed a window film over the glass in the windows. Then, I placed metal screening over the bedroom windows. This did not reduce the amount of radiation in the house to a degree that I could live there, so I replaced the siding of the home with metal, and then placed metal insulation in the attic as well. Of course, we hard-wired our home, pay extra for an opt-out for a smart water meter, had to shield the home from the smart electrical meter, and replace all telephones with landlines. More recently, we have replaced windows with new ones that at least partially block radiation. This has all come at some significant cost. My health has improved significantly from the shielding.

14.    At work, I have no choice but to be exposed to wireless radiation. My job has provided me with some minimal accommodations initially, which in the past two years have ended. Every day I make myself ill just to be able to work. I get headaches and have fatigue. Since I am a trial lawyer, when I am actually in a trial, I am exposed to the most radiation. I have had to wear a shielding scarf over my head to ward off the radiation. This scarf is made of fabric which contains metal fibers and as metal blocks radiation, these scarves provide some shielding. I have also worn a blue shielding coat with dress pants for trial. I look ridiculous. If I have been in trial, it is more than just headaches and fatigue; the old symptoms can start reoccurring. I am forced to work part time so that I do not get too sick.

15.    Ironically, though it was someone at work who alerted me to what was going on, I have been told at work that it was not a real condition, and that it was psychological. In the beginning, I got emails stating it was psychological, and little whispers about how I should go to therapy. To anyone who has experienced these symptoms, to be told that it is psychological, is laughable. I would only wish it were psychological. When I am around it, I feel ill. When I am not, I feel fine.

16.    Shielding my home from wireless allows me to feel pretty well in my home. The past few years, the radiation near my home has gone up, new wireless utility "smart" meters are in the neighborhood more and more, more towers have come in, and more wireless devices. Having places where I feel truly well becomes increasingly difficult. I dread the rollout of 5G, as the additional burden of even more radiation, combined with the new frequencies will likely mean that I will not be able to work. I dread this rollout for my daughter's sake as well.

JA_00315

**AFFIDAVIT OF PETRA BROKKEN IN SUPPORT OF STANDING**

17.    Radiation affects me in the community, not just at work. Everywhere I go, I constantly check to make sure that I am not sitting or standing under a Wi-Fi access point. I do not go out much, as I am unwilling to pay the physical price of feeling unwell just to go out to dinner. A few nights ago, I left a play during intermission, as I became ill from all of the cell phones. Because people often do not turn their cell phones off all of the way, but just turn off the sound, when I am in a large group of people, I will frequently become ill. It is difficult to travel, since almost all airlines have Wi-Fi. Most hotels and other accommodations have Wi-Fi. I can only stay at Air-bnbs where I can unplug the Wi-Fi, and even then, I need to go far out of my way to the country, as staying in a city is generally not possible.

18.    My daughter has been harmed from wireless radiation as well. At first, it was nosebleeds when she was at school. She had her nose cauterized, but it did not stop. The amount of blood was so extreme it was the most that the school nurse had ever seen come from a nose. She bled straight for an hour one day, with clots of blood as large as one inch and more. She also frequently got swollen clogged sinuses and a very stuffy nose when she was not ill.

19.    I asked her to try to keep track of when it happened and what was going on. First, she thought that the symptoms were simply random. Then she started having skin problems. Her hands would get cracks and dry out, and then would bleed. We first believed that this might be from dry weather and tried to handle the matter with skin cream. This did not work. One day she counted 16 bleeding cracks in her skin; the blood was running down her hand in rivulets.

20.    Then, one day, on a school trip, she sat at the front of the bus and felt ill. She had not been stuffed up, but suddenly was. Her hands became red and she felt head pain. She realized that on the return trip at the back of the bus the symptoms were not as severe. When she returned from the trip she told me what had happened. We asked what was different at the front of the bus and were told that there were two Wi-Fi routers there. She then began to realize that when she was somewhere with Wi-Fi, whether at a friend's home, at school, or in a coffee shop, she started to experience the symptoms. When she went under a cell tower while we were driving, she could feel pain in her head. I have now met other mothers whose children have the same exact symptoms, the nosebleeds, the head pain, the cracking and bleeding of the red hands, as well as the stuffy nose, from Wi-Fi at school.

21.    When we brought the issue to the attention of the school, they moved the access point to the hallway instead of in the classroom. Her symptoms improved, and although her hands would get red, and she had a chronic stuffy nose, her nosebleeds stopped. It is difficult to get an education when just being at school causes serious physical effects. I fear for her when she goes to college, as she will need to harm herself more to learn. I fear for her when she becomes an adult, as where will she be able to work? Where will she be able to go?

22.    I was lucky to find a family doctor trained in integrative medicine who was aware of this environmental condition. She was able to diagnose me some years after I developed symptoms, also assessed my daughter. She has had other patients with microwave sickness as well. See my diagnosis letter attached as Exhibit 1; my daughter's diagnosis letter attached as Exhibit 2.

23.    I personally know more and more people with this illness, including other attorneys, a couple of doctors, a teacher, a Judge in Minneapolis, and most recently, my appliance repairman. I am sad for the countless individuals who do not have access to a doctor who is educated on this condition, both because they may not know why they are ill, and because they may not be able to get a diagnosis or any accommodation. Many people have headaches or other symptoms of

**AFFIDAVIT OF PETRA BROKKEN IN SUPPORT OF STANDING**

microwave sickness, but unless they have been alerted to this issue, and experiment to see how they feel when they are not exposed, they will not realize it is the wireless radiation. We are a country whose individuals are sicker and sicker. Wireless radiation is one of the reasons. I have studied radiofrequency radiation extensively. There are not many studies on 5G, but the studies that do exist show it to be dangerous to the health of living things. If 5G is rolled out, I predict that our country will become even sicker, and our health care costs will go up significantly.

24.     Approximately a year ago, my daughter and I were working with Dafna Tachover to educate an elected official about the effects of wireless radiation in schools. My daughter wrote a letter about her experience which was provided to this elected official. In the letter, she explained how wireless technology had affected her life. She wrote that she did not like to talk to other children about how wireless technology affected her, "*because I know that most of them do not understand it.*" She stated that:

> *Around wifi now, my hands get a rash, and if I am around the wifi regularly, then they will crack and bleed. My hands get better on the weekends when I am not around wifi, and then when I go back to school I get the rash again. When I am away from wifi and cell towers, I feel great, and I have no headaches, no stuffiness, and no rashes.*

25.     The elected official declined to provide any help for children who are experiencing illness from wireless radiation in schools.

26.     If the FCC had created actual biological standards, my life would be different. I would have had the freedom to work full time. I would be able to travel freely with my family. I would not have had to spend a great deal of money for shielding from this radiation. Instead of feeling ill frequently, I would be able to enjoy the robust good health I had as a child. Further, my daughter would not have had to face the physical discomfort and symptoms from this radiation, as well as the psychological burden of knowing that others do not understand these symptoms.

27.     The FCC order did not adequately consider or reasonably respond to my comments or those of others who raised similar issues. Their decision to retain their existing rules entirely fails to resolve the problems my child and I face in daily life as a result of constant exposure to harmful radiation. My child and I have been harmed by rules that do not adequately protect health and safety, and in fact directly allow continuous harm. This harm will continue until the rules are changed to truly protect health and safety, and take into account the needs of those who are or may become injured by electromagnetic radiation. The fact that the FCC website was recently updated to state that there is no evidence that microwave sickness is an actual condition flies in the face of the science done by those like Carl Blackman who are part of the United States government, as well as thousands of other peer-reviewed studies from around the globe. It directly contradicts the evidence presented in the case below by many people who demonstrated they are suffering from exposure at "FCC safe" levels.

28.     This concludes my Affidavit, but as noted above I am also relying on the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter for the purpose of explaining why the particular facts described above demonstrate standing.

Petra Brokken

Page -5-

JA_00317

**AFFIDAVIT OF PETRA BROKKEN IN SUPPORT OF STANDING**

SUBSCRIBED AND SWORN TO BEFORE ME this 3 day of May, 2020, to certify which witness my hand and official seal.

[Seal]

LINDA S.S. DE BEER
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2025

Notary Public in and for Washington County, State of Minnesota.

JA_00318

**Affidavit of Angela Tsiang in Support of Standing**

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| Children's Health Defense, Michele Hertz, Petra Brokken, Dr. David O. Carpenter, Dr. Paul Dart, Dr. Toril H. Jelter, Dr. Ann Lee, Virginia Farver, Jennifer Baran, Paul Stanley, M.Ed.<br>  Petitioners<br><br>v.<br><br>Federal Communications Commission and United States of America,<br>  Respondents | ) ) ) ) ) ) ) ) ) ) ) ) | Case No: 20-1138<br><br>Petition for Review of Order by the Federal Communications Commission<br>(FCC 19-126)<br><br>(Consolidated with Case No. 20-1025) |

**AFFIDAVIT OF ANGELA TSIANG IN SUPPORT OF STANDING**

1.      My name is **ANGELA TSIANG**. I currently reside in Woodbury, Minnesota. I am a member of Children's Health Defense.

2.      The purpose of this Affidavit is to provide Children's Health Defense's Article III standing to pursue the matter. I will provide some of the basic facts particular to my individual circumstances, but also rely on the Affidavits submitted by Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter  to provide additional analytical and factual support for the proposition that I, my children and the Children's Health Defense have each suffered an injury-in-fact traceable to the FCC Order that could be redressed by an order from this Court holding unlawful, vacating, enjoining, and/or setting aside the FCC Order and remanding the matter to the FCC for further consideration and action.

3.      I filed comments at the FCC in the proceedings below and asked them to change their rules to address the concerns I raised. I filed comments on July 14, 2016 and again on September 26, 2016 in which I informed the FCC about the injury of my children from radiation which is considered safe by the FCC and asked the FCC to amend its guidelines.  I will explain our circumstances and how we have been impacted by the FCC order.

4.      I am a chemical and bio engineer, with a Bachelor of Science degree and my husband has a PhD in Chemical Engineering. I am a mother of two boys, currently ages 11 and 15, both of whom have been medically diagnosed with Electromagnetic Sensitivity, also known as Microwave Sickness, which means they experience adverse health effects when they are exposed to radiation from wireless devices and infrastructure.

5.      My oldest son developed severe symptoms of this condition for the first time in August 2013, when he was only 9 years old. My youngest son started to exhibit symptoms beginning in 2016 when he was 7 years old.

6.      I had worked for a US Fortune 500 company for 13 years in manufacturing engineering and in management in various industries, including electronics, pharmaceuticals, and dental health care.  I had planned to return to my career after both my children began school full-time.

**AFFIDAVIT OF ANGELA TSIANG IN SUPPORT OF STANDING**

However, when my oldest son became severely ill for inexplicable reasons one week after returning to school in August 2013, it was not possible because I had to spend all my time getting him medical attention.

7.      At that time, his symptoms were severe, persistent, and progressive (in other words they worsened over time).  He had severe headaches, sleeping problems, serious concentration difficulties, memory lapses, feelings of nervousness and stress for no identifiable cause, digestive problems, nosebleeds, and painful, eruptive skin rashes where his skin would swell, crack and bleed.

8.      He had a lot of absences from school for this illness.  The pain and suffering my son had to endure was overwhelming at times.  Our whole family was in turmoil as he deteriorated with neurological and physiological problems due to some mysterious cause that no doctor could identify.  I thought he had some mysterious fatal disease.  It was not for a year and half later, in 2015, that the cause was determined.

9.      In January 2014, although we still didn't know the cause for my oldest son's symptoms, we began treatment for his symptoms by a brilliant integrative physician who had helped my mother survive cancer.  Dr. Rita Ellithorpe, medical director of Tustin Longevity Center, was able to improve my son's symptoms significantly through nutritional protocols and supplementation.  However, though he improved, he continued to have symptoms and was not back to the way he was before he became sick in August 2013.

10.      In March 2015, by accident I discovered cell phone antennas hidden inside a ball field light pole next to my son's school.  Some maintenance workers were working on the light pole, and they had removed the covers that were normally in place which hid the antennas. I did not know that there was a cell tower next to the school, because it was camouflaged as a ball field light pole. It was really close to my son's classroom, and the windows of my son's classroom were directly facing the cell phone antennas.

11.      I was concerned about the cell tower antenna I discovered, and I went to the city hall to find more information.  I learned that there was an additional hidden cell tower next to that one, and that second tower had been upgraded to 4G LTE over the summer of 2013, right before my son became ill in August 2013 after returning to school.

12.      Then I remembered some past general advice from Dr. Ellithorpe.  She had recommended that we unplug cordless phones and Wi-Fi routers before going to bed at night.  At the time she said it, I didn't give it much consideration, because I had been taught in my science classes that the radiation emitted by wireless devices is non-ionizing radiation and therefore safe at non-thermal levels.

13.      I shared my discovery about the cell towers with Dr. Ellithorpe, asking if it is possible that it was the cause for my son's symptoms. She said it was possible that the symptoms my son had, the headaches, sleeping problems, nervousness, concentration and memory problems, digestion problems, nosebleeds, and eruptive skin rashes could have been triggered by the cell tower, because these symptoms were consistent with that of Microwave Sickness / Electro-Sensitivity, as reported by scientific studies on this subject, many of which are referenced by the

JA_00321

**AFFIDAVIT OF ANGELA TSIANG IN SUPPORT OF STANDING**

BioInitiative report.[1] My son did not have these symptoms and problems prior to August 2013, and they appeared suddenly after the cell tower upgrade.

14.      Then I learned that the first cell tower that I saw in March 2015 was also undergoing an upgrade to 4G LTE, which was the reason the maintenance workers were there. I was concerned about what would happen after the upgrade of this cell tower, which would be completed over the spring break. When my son returned to school in April 2015 after the spring break, he became ill again. All the symptoms he had before returned, but worse and we relived what happened two years ago in August 2013.

15.      The fact that the same symptoms he had in August 2013 worsened once he was back in school, and considering the upgrade of the cell tower, strengthened my conclusion that indeed the cause of his symptoms was the radiation.

16.      As a result, we disabled all the wireless devices in our home and we noticed a pattern in his symptoms. He would have symptoms while he was at school, but at home, after school or on the weekends they would improve, and during the summer (when he was not in school) the symptoms would disappear. When we would go to other places with high levels of wireless radiation, for example, a park with a cell tower, the airport or inside an airplane, his symptoms would worsen. There was no more doubt that my son's symptoms were being caused by the radiation from wireless devices and infrastructure.

17.      In May 2015, Dr. Ellithorpe officially diagnosed my oldest son with Electro-Sensitivity and requested that he transfer to a school without nearby cell towers. See Exhibit 1.

18.      In August 2015, he transferred to a new school, for the 6th grade, away from all his friends. His condition was much less severe at the new school.

19.      Even though this new school did not have a cell tower nearby, Wi-Fi laptops were used in the classroom and about half the kids had cell phones. The school gave my son accommodations by allowing him to use a desktop computer that was hardwired (meaning it was connecting to the internet with an ethernet cable and not by using a wireless Wi-Fi connection), allowed him to sit as far from the Wi-Fi access point as possible, and asked students in the classroom to shut off their cell phones.

20.      Because of my son's sickness from wireless technology, since 2015, our lives have not been the same. We do not travel much, and if we do, we drive as much as we can. We avoid large hotels and have to make special arrangements for accommodations where we can turn off Wi-Fi, such as staying at homes of family members.

21.      In 2016, my younger son started to exhibit the same symptoms as my oldest son around Wi-Fi at school, but to a lesser degree. Dr. Ellithorpe diagnosed him with Electro-Sensitivity in 2016 and requested accommodations. See Exhibit 2.

22.      In July 2016, we moved from California to Minnesota, and our new school district in Minnesota refused to accommodate my children for their Electro-Sensitivity. When denying my

---

[1] BioInitiative Report "color chart" of sample studies color coded by type of effect found filed in the docket below at https://ecfsapi.fcc.gov/file/7022311578.pdf. Conclusions of the report filed at the docket below at https://ecfsapi.fcc.gov/file/7520939954.pdf

**AFFIDAVIT OF ANGELA TSIANG IN SUPPORT OF STANDING**

children's right to be accommodated, the school district hid behind the FCC guidelines. My sons' condition was denied even though it was supported by a physician's diagnosis, and even though in 2002, the US Access Board recognized Electro-Sensitivity as disability under the ADA[2].

23.    When I met with school staff regarding my son's health problems from wireless radiation exposure and asked them to reduce Wi-Fi exposures at school, their answer was that their equipment meets FCC exposure guidelines, so they are not required to do anything.

24.    As a result, beginning September 2016, I started home-schooling both children for the first time. For social interaction, they would go to school for one to two hours, but they would have symptoms after going to school even for that short amount of time because they were not given accommodations.

25.    In the past few years, I have been in contact with Dafna Tachover of the Children's Health Defense (CHD"). Ms. Tachover is known for her work of advocating on behalf of those who became injured from wireless radiation and especially who have developed Microwave Sickness. She is also known for her work to limit the use of Wi-Fi in schools. I approached her to help us with our efforts to get accommodations for my children.

26.    Among other efforts, she initiated a meeting with a senior elected official, asking for his help to get accommodations for my children and for children of other families in Minnesota with similar affliction. She also has connected with doctors and solicited their help with this effort. After a few months of discussions, the elected official refused to help.

27.    The FCC's limits are only a maximum exposure level that were established in 1996, more than 20 years ago. These guidelines protect only against high exposures for a short period of time that would result in thermal damage, i.e. burns. The guideline is 1000 uW/cm2 (=1mW/cm2) for 30 minutes for 1500 MHz-100 GHz, which covers Wi-Fi and most cell phone frequencies (the exact level is frequency based).[3] This exposure limit does not protect against other biological effects from chronic exposures. Obviously, my children are at school for more than 30 minutes a day, and everyone who lives around cell towers are exposed for more than 30 minutes a day and science has shown that there are numerous adverse effects from long term exposure to non-thermal levels of pulsed and modulated RF and Microwave radiation.

28.    Because I am an engineer, I wanted to quantify the RF exposure levels from the cell towers at my children's school. What I found was that the RF exposure levels at school reached a maximum of 0.4 uW/cm2, well under the FCC exposure limit of 1000 uW/cm2. However, the RF exposure levels at home were below 0.0004 uW/cm2, which is 1000 times lower than what they were at school. So while my children's exposure at school was within the FCC limits, it was 1000 times higher than what they were exposed to at home because of the cell towers'

---

[2] ADA Accessibility Guidelines for Buildings and Facilities; Final Rule, September 2002: Electromagnetic Sensitivity, is considered a disability under the ADA "*if they so severely impair the neurological, respiratory or other functions of an individual that it substantially limits one of more of the individual's major life activities*" (p. 56353), filed below at https://www.fcc.gov/ecfs/filing/107132219121452.

[3] 47 C.F.R. §1.1310.

Page -4-

**AFFIDAVIT OF ANGELA TSIANG IN SUPPORT OF STANDING**

proximity to the school. I want to also point out that even at a lower signal level of 0.0004 uW/cm2 from a cell tower, cell phones can still receive transmissions from that cell tower and make calls; at 0.0004 uW/cm2, my cell phone exhibited a strong signal of 5 out of 6 bars. See Exhibit 3.  In addition, my son exhibited the same symptoms as reported in the BioInitiative Report at the RF exposure level of 0.4 uW/cm$^2$ and below,[4] which were headaches, sleeping problems, nervousness and concentration problems

29.     I am now working with the Children's Health Defense. I am assisting with this case and with follow-up of scientific developments. Further, with the growing sickness among children, the Children's Health Defense is being approached by a growing number of parents whose children developed Microwave Sickness. The parents are struggling and therefore, CHD has decided to allocate resources to develop a program to provide support for parents of children who have developed Microwave Sickness. Some of the parents are being referred to me because of my experience with my children.

30.     My children can no longer go to mainstream public schools that use Wi-Fi in the classroom unless they have accommodations such as connecting the computers in the classroom to the internet via wired connection instead of Wi-Fi. But our resident school district refuses to give any accommodation. It says all emissions within FCC guidelines are safe and no accommodation is due.

31.     We also cannot travel much and must limit going to public places, including parks with cell towers.  My sons' social lives are very limited and it has harmed their childhood, education, and pursuit of happiness. We have to shield our home from the public Wi-Fi hot spots coming from the street and the radiation from our neighbors' homes in order for my sons not to be sick in their own home.

32.     My husband is also an engineer, and he has a PhD.  Our children are very bright and have a lot to contribute to society.  We had hoped that our children would have a career in science, but how will they go to college when there are cell towers on every college campus and Wi-Fi in the classrooms and dorms?  What kind of job or future will they have in a world where wireless radiation has proliferated to unsafe levels?  Where will they live and how will they survive?

33.     Wireless technology within the FCC's thermal exposure limits has been deemed safe and allowed to proliferate ubiquitously with no concern for those sickened from chronic exposure. The only thing we can do to avoid exposures is to stay at home. But even that is becoming impossible especially now with the deployment of 5G "small cells" everywhere.

34.     My children were fine before August 2013, and our lives were normal before then.  We ask only for protective RF exposure limits that acknowledges non-thermal effects so my children can live normally and have their basic human rights restored.

35.     My family has never consented to being exposed chronically to harmful levels of wireless radiation, even those at or below FCC guidelines.

36.     We are law abiding, tax-paying, well-educated, upper middle class citizens of the U.S. We are supposed to have basic human and civil rights such as the right to live safely in our

---

[4] BioInitiative Report "color chart" of sample studies color coded by type of effect found: https://ecfsapi.fcc.gov/file/7022311578.pdf.

**AFFIDAVIT OF ANGELA TSIANG IN SUPPORT OF STANDING**

home, to have access to education, to go to public places like parks and travel freely, and to work and make a living. Never did I think that in this country, which alleges to stand for freedom, justice, and democracy, that my children would be made sick and lose their basic human rights because of government misfeasance.

37.     The FCC is a regulatory agency whose primary responsibility is to protect the citizens of this country, but instead it has furthered the financial interests of the industry it is supposed to regulate and neglected its responsibility to the citizens.  The FCC has not regulated the telecommunications industry impartially because of its strong ties to it.  This has been reported in *"Captured agency: How the Federal Communications Commission is dominated by the industries it presumably regulates"* by Norm Alster 2015, Harvard University[5] and in The Nation article from 2018, titled: "*How Big Wireless Made Us Think That Cell Phones Are Safe: A Special Investigation" and the subtitle: "The disinformation campaign—and massive radiation increase - behind the 5G rollout."*[6] For example, Tom Wheeler, the previous FCC chairman, was head of the telecommunications industry's lobbying organization CTIA, and Ajit Pai, the current FCC chairman, was a lead attorney at Verizon.

38.     The proper redress would be for the FCC to establish protective RF exposure limits applicable to chronic, non-thermal exposure situations. The FCC should do so by working with independent scientists and medical doctors who are knowledgeable about non-thermal effects from pulsed and modulated RF and Microwave based technologies and who have no funding from or affiliation with the telecommunications industry. They should not be guided or controlled by industry groups like the IEEE, NCRP, ICNIRP like it has been. The FCC must also clarify that compliance with FCC guidelines does not excuse any requirement to give accommodations to those who developed Microwave Sickness and experience symptoms after exposure at or below those guidelines, nor does it override any person's inherent right to object to nonconsensual exposure to radiation.

39.     I advised the FCC in my September 26, 2016 comments that "My children became sick from 4G LTE cell towers next to their school, and now we have to avoid cell towers. With the FCC plan to put MILLIONS of small cells on residential streets, my children will become more ill. Health effects of 5G should be studied, not ignored!"

40.     The FCC order did not adequately consider or reasonably respond to my comments or those of others who raised similar issues. Their decision to retain their existing rules entirely fails to resolve the problems I, my family and my children face in daily life as a result of constant exposure to harmful radiation. I, my family and my children have been harmed by rules that do not adequately protect health and safety, and in fact directly allow continuous harm.

41.     Even though many afflicted people informed the FCC that they were being denied accommodations based on compliance with the FCC guidelines, the FCC failed to address the issue. I have therefore suffered an injury-in-fact from the FCC order.

---

[5] https://ecfsapi.fcc.gov/file/109271312500258/2-Attachment%202%20-%20FCC%20Captured%20Agency-Harvard%20University.pdf.

[6] https://www.thenation.com/article/how-big-wireless-made-us-think-that-cell-phones-are-safe-a-special-investigation/.

**AFFIDAVIT OF ANGELA TSIANG IN SUPPORT OF STANDING**

42.    This harm will continue until the rules are changed to truly protect health and safety, take into account the needs of those who are or may become injured by electromagnetic radiation and clarify that compliance with the guidelines does not excuse any requirement to give accommodations to those with radiation sickness and experience symptoms after exposure at or below those guidelines. The FCC should hold that compliance with its guidelines does not override any individual's right to object to nonconsensual exposure to radiation.

43.    My injury would be redressed by an order from this Court holding unlawful, vacating, enjoining, and/or setting aside the FCC Order and remanding the matter to the FCC for further consideration and action. If the FCC guidelines are revised to prevent harm from exposure, my children's rights will be enforced, they will be able to go to school, to have a social life, to walk on the streets, fly and travel without becoming sick. They will be able to get higher education, have a job and have a home in which they can be safe were their brains work.

44.    When Dafna Tachover and I met with the elected official, we urged him to help protect my children and other children in Minnesota. My son wrote him a letter and in it he wrote:

> *"...I have had microwave sickness since I was 9 years old, and I am currently 14. My life was normal until I was 9, when I was in the fourth grade. When I went back to school in the fourth grade after summer was over, I got many health problems suddenly. I had bad headaches, but I didn't have headaches before. I could not sleep, even though I was very tired. I felt nervous all the time and my heart would pound, even though there was no reason for it. I got very bad allergies suddenly, and my nose was stuffed up all the time. Then I got a very bad rash that made it painful for me to use my hands for normal things, like writing and playing ball. I also could not concentrate on school work anymore. Things did not make sense to me anymore. I would read things over and over again, and I just could not understand what they were saying. Even doing simple tasks like getting ready in the morning took me a very long time to do, because I would stop constantly to think about what I had to do next. I also had a lot of nosebleeds for some unknown reason. I was not like this before. Going to school became very hard, because I did not feel well at all, and I could not concentrate. Life became hard.*
>
> *Now I am homeschooled most of the school day, and I go to school for only a couple hours....my new school wouldn't accommodate me, even though my doctors have written letters asking them to. The school just says what I am suffering from is not real, as if we are making this up. They have treated us badly. At school I am surrounded by other kids using cell phones constantly, and there's a Wi-Fi router in every classroom. When I went to school full-time, I was so miserable with headaches, rashes, concentration problems, and nervousness that I went back to homeschooling most of the day. Being new and not being able to go to school full-time, I have not made friends and I feel isolated. So when I go to school, I suffer, but when I am homeschooled, I feel lonely. Sometimes I get angry and sad that this has happened to us and other kids and adults, and now we cannot go to regular, everyday places that we should be able to go without getting sick."*

JA_00326

### AFFIDAVIT OF ANGELA TSIANG IN SUPPORT OF STANDING

*"I am in my first year in high school, but I am not able to experience it like other kids my age are able to. I wish that someday I will be able have a safe environment at school, with protection from Wi-Fi and cell towers so that my brother and I and other kids who developed microwave sickness can go to school. I also want the government to protect me and others like me who have microwave sickness so we can have a normal life, because this is a real problem.*

45.    I hope this Court will hear my son's plea and force the FCC to protect him and his rights.

46.    This concludes my Affidavit, but as noted above, I am also relying on the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter for the purpose of explaining why the particular facts described above demonstrate standing.



Angela Tsiang

SUBSCRIBED AND SWORN TO BEFORE ME this 2 day of May, 2020, to certify which witness my hand and official seal.

[Seal]
Micheee Estuer Borowig

Notary Public in and for Washington County
Minnesota

MICHELLE ESTHER BOROWICZ
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2025

Page -8-

JA_00327

**Affidavit of Dr. Ann Lee in Support of Standing**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Children's Health Defense, Michele Hertz, Petra )
Brokken, Dr. David O. Carpenter, Dr. Paul Dart, )
Dr. Toril H. Jelter, Dr. Ann Lee, Virginia Farver, )
Jennifer Baran, Paul Stanley, M.Ed. )          Case No: 20-1138
Petitioners )
 )          Petition for Review of Order by the Federal
v. )          Communications Commission
 )                      (FCC 19-126)
 )
Federal Communications Commission and )
United States of America, )          (Consolidated with Case No. 20-1025)
Respondents )
 )

**AFFIDAVIT OF ANN YEAWON LEE, MD IN SUPPORT OF STANDING**

1.      My name is Ann Yeawon Lee, MD. My home address is 904 Baines St., East Palo Alto, California, 94303. I am one of the named Petitioners in the above-captioned proceeding and I am a member of Children's Health Defense.

2.      The purpose of this Affidavit is to provide evidence of my standing to pursue the matter. I demonstrate herein that my son and I have suffered an injury-in-fact traceable to the FCC Order that could be redressed by an order from this Court holding unlawful, vacating, enjoining, and/or setting aside the FCC Order and remanding the matter to the FCC for further consideration and action. I will provide some of the basic facts particular to my individual circumstances, but also rely on the presentations contained in the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter, and Dr. David Carpenter to explain why the basic facts I present below demonstrate standing.

3.      I filed comments at the FCC in the proceedings below and described my son's condition. I asked the FCC to change their rules to address the concerns I raised. They refused and did not acknowledge my request.

4.      I am a physician. In 1998, I graduated from medical school at the University of Texas Health Science Center in San Antonio and completed Physical Medicine and Rehabilitation residency training at Loma Linda University Medical Center in 2003. Through my training, I became proficient in the use of electromagnetic modalities such as pulsed electromagnetic frequency therapy, including RF/microwave radiation modalities, and electromyography for therapeutic and diagnostic purposes. When used inappropriately and/or not within the standard of care, these modalities produce adverse physiological effects in the human body.[1, 2] Thousands of

---

[1]Braddom, Randall L. Physical Medicine &Rehabilitation(2nd Ed) Physical agent modalities. Philadelphia: W.B. Saunders Co., 2000, pages 440-458.

[2]Kloth LC, Interference current In Nelson RM, Currier DP (eds): Clinical Electrotherapy, Ed 2, Norwarlk, CT, Appleton & Lange, 1991.

## AFFIDAVIT OF DR. ANN LEE IN SUPPORT OF STANDING

peer-reviewed studies have shown that such radiation modalities can produce adverse biological events.[3]

5.    In May 2007, I delivered my first child, Justin Jeremiah Stephen, via caesarean section due to deceleration of his heart rate during labor. The baby's delivery was otherwise uneventful. Justin started attending daycare when he was four months old. He seemed to be a happy baby and young child, made friends easily, and his caregivers often commented to me about his good behavior. He did not have the temperament to voice his complaints or report any problems unless he was specifically asked about his thoughts or experiences. During Justin's infancy and young childhood I was working in North Kansas City, Missouri. We did not have a Wi-Fi router in our place of residence.

6.    In the fall of 2011, we moved to live in our home in California where we did have a Wi-Fi router. While the router was relatively far from Justin's room, both he and I started having difficulty falling asleep. My bedroom was above the living room where the router had been placed. At the time, I did not make the connection between our symptoms and our pulse-modulated microwave radiation exposure.

7.    In the summer of 2012, Justin presented for a routine physical examination with his family physician, Alexander Maldonado, MD, and was diagnosed with a heart murmur. Dr. Maldonado considered Justin's condition to be benign as Justin appeared asymptomatic and was able to participate in usual childhood activities. It occurred to me, however, after this physical finding that Justin did not tolerate prolonged physical activity that required exertion, such as running for over ten minutes.

8.    On September 10, 2012, Justin was evaluated by Michael Griffin, MD, a pediatric cardiologist, for further assessment of his heart murmur per Dr. Maldonado's referral. On his physical examination, Justin was found to have a 3/6 systolic murmur. Studies including an electrocardiogram and echocardiography were performed and read as normal. He was diagnosed with an "innocent murmur."

9.    In August 2012, Justin started kindergarten. Every day after school, I observed that he was unusually tired and sleepy.

10.    While Justin was in elementary school, I actively volunteered in the Parent Teacher Association and had advanced to the position of Secretary. I became aware that wireless devices were being used in the classroom, albeit less frequently for grades K-2. Chromebooks were more frequently used starting in 3rd grade.

11.    In August 2014, Justin started 2nd grade. Unbeknownst to me, a Wi-Fi router in the custodian's office on the adjacent wall of his classroom was transmitting pulse-modulated microwave radiation into his classroom. On the opposite side of his classroom's other wall, the

---

[3]Sage C. and Carpenter D., Eds., BioInitiative 2012: A Rationale for Biologically based Exposure Standards for Low-intensity Electromagnetic Radiation, Sage Associates, 2012. Filed below at https://ecfsapi.fcc.gov/file/7520957942.pdf.

## AFFIDAVIT OF DR. ANN LEE IN SUPPORT OF STANDING

3rd grade classroom had another Wi-Fi router where students were frequently accessing data using Chromebooks.

12.     In October 2014, Justin reported experiencing substernal chest pain, irregular heart rhythm, and dyspnea while jumping rope. After this event, he continued to report intermittent, brief episodes of shortness of breath, and chest discomfort that occurred 1-2 times per month, then progressively became more frequent to 1-2 times per week. Episodes were often associated with increased exertion and resolved, as best as I could understand from observation, and dissipate upon rest. At that time, I surmised Justin's heart condition causing the "innocent murmur" may be worsening. Utilizing my training as a physician, I decided to limit his exacerbating physical activities, as this is the usual practice of medicine. I did not consider that an exogenous factor might be involved to aggravate his chest pain episodes.

13.     In early April 2015, Justin's French tutor Hannah Joo suggested meeting in a conference room on the second floor of the newly built Mitchell Park Library in Palo Alto, California for lessons. After his first session, which lasted one hour, Ms. Joo reported to me that Justin expressed he was experiencing chest pain and chest pressure during the lesson.

14.     The following week, Justin reported to Ms. Joo that he had chest pain after only 30 minutes of being in the library classroom, causing the lesson to end abruptly.

15.     On the third week, he reported having chest pain after only 10 minutes in the library classroom. He also appeared mildly anxious. Each episode occurred during rest (that is, while sitting during lessons) and appeared to me to resolve when we exited the library. Furthermore, Justin would tell me, upon my query once in the car, that he had no more chest pain. I observed that he was no longer anxious and appeared comfortable in the car. I was unaware of the number of routers on the second floor of the library at the time.

16.     After Justin's third incident of reported chest pain, I suspected that something in the library may be causing his symptoms. I observed that there were at least seven Wi-Fi routers on the ceiling of the second floor of the library. By contrast, I saw only one Wi-Fi router on the first floor in the children's area. Justin had frequently visited the children's area and had not reported experiencing chest pain at any time there.

17.     In real life situations, Wi-Fi routers emit pulse-modulated microwave radiation, which can interfere with the radiation of other wireless devices.[4] Interference patterns of electromagnetic waves cause concentration of electrical current which can cause adverse

---

[4]de Miguel-Bilbao S. et. Al, Evaluation of electromagnetic interference and exposure assessment from s-health solutions based on Wi-Fi devices, Biomed Res Int. 2015;2015:784362.Cited in the record below by paper submitted at
https://ecfsapi.fcc.gov/file/109130755017293/Characterisation%20of%20personal%20exposure%20to%20environmental%20radiofrequency%20electromagnetic%20fields%20in%20Albacete%20(Spain)%20and%20assessment%20of%20risk%20perception.pdf.

JA_00331

**AFFIDAVIT OF DR. ANN LEE IN SUPPORT OF STANDING**

physiological effects in the human body.[5] Dr. Martin Pall's paper, <u>Wi-Fi is an important threat to human health</u>,[6] summarizes the effects and also many of the studies.

18.    My medical training in Physical Medicine and Rehabilitation includes application of magnetic and electrical currents for treatment of various maladies. Precautions are necessary when using modalities involving electromagnetic currents, whether in combination or near vital organs, due to the potential for adverse autonomic or physical responses in the human body.[7]

19.    On April 22, 2015, Justin revisited Michael Griffin MD for a cardiac evaluation. Repeat studies of electrocardiogram and echocardiography showed no abnormalities. Justin did not perform exertional activities during testing. Based on my medical training and experience, as well as my long observation, I suggested to Dr. Griffin that Justin's symptoms were due to wireless radiation exposure, by which I meant pulse-modulated microwave radiation.

20.    During this time, we avoided attending the Mitchell Park Library and other venues with high numbers of Wi-Fi routers and small cell towers. Justin did not report experiencing chest pain when such venues were avoided.

21.    In January 2016, when Justin was in 3rd grade, his elementary school participated in CAASPP testing, a standardized academic assessment initiated by the state of California. All 23 students in Justin's classroom accessed the online test through Wi-Fi using laptop computers. On the day of this test, Justin reported experiencing chest pain in his school classroom.

22.    In March 2016, Justin's school principal Katy Bimpson invited another parent and me to discuss adverse health effects of microwave radiation with Palo Alto Unified School District IT manager Derek Moore.

23.    On April 26, 2016, Justin's school principal provided accommodations for Justin's chest pain symptoms by allowing him to take the next CAASPP test in a different classroom. He reported no chest pain that day.

24.    Justin reported to me that he was starting to experience bullying from some of his classmates who made fun of him or would no longer play with himbecause he had required accommodation to take the CAASPP test. I wanted to ask for further accommodations for Justin, but he objected. It appeared to me that he considered requiring accommodations and separation from his classmates for being electrosensitive as being a disability and he did not want to be stigmatized by his peers. He also refused to be home-schooled.

---

[5] Kloth LC: <u>Interference current</u>, In Nelson RM, Currier DP (eds): Clinical Electrotherapy, Ed 2, Norwarlk, CT, Appleton & Lange, 1991.

[6] Martin L.Pall: <u>Wi-Fi is an important threat to human health</u>, Environmental Research Volume 164, July 2018, Pages 405-416. Filed below at
https://www.sciencedirect.com/science/article/pii/S0013935118303552via%3Dihub.

[7] Braddom, Randall L, <u>Physical Medicine & Rehabilitation</u>,2nd Edition, Physical agent modalities, Philadelphia: W.B. Saunders Co., 2000, page 455.

Page -4-

## AFFIDAVIT OF DR. ANN LEE IN SUPPORT OF STANDING

25.    As a mother and physician, I felt conflicted. I knew that overexposure of continuous microwave radiation from Wi-Fi would adversely affect his heart condition. However, I also knew that harassment from one's social circle due to bullying is not an uncommon cause for serious mental illness in young people which has led to cases of severe depression and suicide.[8]I was especially concerned because Justin's school is part of Palo Alto United School District which is infamous for depression and high rates of suicide among students.[9]

26.    After serious consideration, I decided to honor Justin's imploration and not request further accommodation for him. Rather, I relied upon my knowledge of health and physiology to protect Justin from the inevitable harm of Wi-Fi radiation with antioxidant supplements, nutrient-rich foods, and clothing that deflects radiation from key areas of his body including his head and mid-chest. By this time, we had also discarded our Wi-Fi router and wire-network connected all technological devices in our home in order to decrease his overall exposure. He is currently among the few students at his middle school with no cell phone.

27.    Because of his experience and desire to protect other children who may have similar adverse symptoms from overexposure to microwave radiation, Justin took courage to speak up against the expansion of environmentally toxic levels of wireless radiation that would result from 5G deployment.

28.    On June 2, 2017, Justin and I joined Dafna Tachover, now with the Children's Health Defense, in a meeting with the California Attorney General's office in an effort to encourage our elected officials to stop 5G deployment because we know this will lead to the proliferation of environmentally toxic levels of microwave radiation.

29.    On June 28, 2018, Justin presented a testimony at the California State Assembly in opposition to SB 649 – a bill that would have removed municipal government's authority and regulation of 5G "small cell" antenna placement in California neighborhoods. Justin had written his testimony in his own words with my assistance to correct grammatical errors. Upon review of his written statement, I was surprised and dismayed to realize the extent of his chest discomfort when he described his chest pain as feeling "like a volcano was erupting in [my] heart."[10] The following is a transcript of Justin's testimony:

> *Hello, my name is Justin Stephen and I am 10 years old. I want to speak up to ask that you vote against Senate Bill 649.Right now, I will tell you the story of how wireless radiation affects my life. We started to get familiar with the dangers of wireless radiation when I started taking French lessons at Mitchell Park Library. On the second floor where I took my lessons, there are seven wireless routers on the ceiling and many people using wireless laptops. It was there that I felt like a volcano was erupting in my heart. My mom took me to*

---

[8]Kim YS, Leventhal B: Bullying and suicide. A review.Int J Adolesc Med Health. 2008 Apr-Jun;20(2):133-54..

[9]https://www.mercurynews.com/2017/03/03/cdc-report-youth-suicide-rates-in-county-highest-in-palo-alto-morgan-hill/.

[10]https://www.youtube.com/watch?v=OgNLR9fQOX4

JA_00333

## AFFIDAVIT OF DR. ANN LEE IN SUPPORT OF STANDING

*the doctor and he did several tests on my heart. He said that everything was normal on my tests so he could not explain why I have my chest pain but this happens every time I go to Mitchell Park Library and even sometimes at school where we have wireless routers in the classrooms. We need to stop SB649 or more kids just like me will get affected. Thank you for listening.*

30.    In July 2017, I lobbied against SB 649 in the California legislature with Dafna Tachover and other advocates. Admittedly, I was very emotional that day because I felt I was fighting for my son's life and the future health of his generation. I have also spoken in several public venues, such as our local and regional PTA chapters, our school board, personal meetings with school officials, public meetings with city, regional, and state political leaders, as well as with public health officials.

31.    Measures such as SB 649 and current FCC rulings that preclude municipal government action to protect their citizens' health and safety do not serve the public's interest in general. That is a dire issue of itself. What is at stake is the unavoidable, negative, and dangerous health effect of non-stop, constant, and excessive wireless microwave radiation in the environment which causes public harm without consent. Because the FCC asserts that it has complete control over permitted emission levels, the FCC must assume responsibility for the injuries its guidelines have hitherto caused and for those that will follow.

32.    For example, research on human models have shown exposure to pulsed and modulated wireless radiation causes significant post-exposure cardiac RR interval changes with higher breathing rates,[11] which can occur with exertional activity from exercise. (RR interval is the time elapsed between two successive R-waves on an electrocardiogram (EKG). An EKG is a medical instrument capable of measuring cardiac responses of the autonomic nervous system. The finding reflected "persisting acute effects" of cordless phone handset emissions on the autonomic nervous system. Justin may have experienced such effects on his autonomic nervous system resulting symptomatically as chest pain.

33.    Elevated markers of oxidative stress in cardiac tissue after exposure to wireless radiation have been demonstrated in animal studies including specifically the frequency used for Wi-Fi, 2.45 GHz (which means it oscillates 2,450,000,000 times a second).[12,13,14]

---

[11]Béres S, et al, Cellular Phone Irradiation of the Head Affects Heart Rate Variability Depending on Inspiration/Expiration Ratio, In Vivo, 2018 Sep-Oct; 32(5):1145-1153. Filed below at https://ecfsapi.fcc.gov/file/1091330786203/Wireless%20radiation%20and%20EMF%20abstracts%20August%202016%20-%20August%202019%20Joel%20Moskowitz%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.pdf.

[12]Türker Y, et. al., Selenium and L-carnitine reduce oxidative stress in the heart of rat induced by 2.45-GHz radiation from wireless devices, Biol Trace Elem Res.2011 Dec;143(3):1640-50. Filed below at https://ecfsapi.fcc.gov/file/10916151357910/RF-Free-Radical-oxidative-effect%20Henry%20Lai%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.pdf page 110.

[13]Gumral N, et. al., The effects of electromagnetic radiation (2450 MHz wireless devices) on the heart and blood tissue: role of melatonin, Bratisl Lek Listy. 2016;117(11):665-671. Filed below at

### AFFIDAVIT OF DR. ANN LEE IN SUPPORT OF STANDING

34.     Exposure to wireless RFR exposure in pregnant rabbits caused remarkable elevation of cardiac enzymes CK and CK-MB,[15] which are common markers used in medical practice to assess for myocardial infarction.

35.     Long-term exposure to RFR wireless radiation caused an increase in the incidence of tumors of the heart and brain in RFR-exposed Sprague-Dawley rats. These tumors are of the same type of those observed in some epidemiological studies on cell phone users.[16]

36.     Electromagnetic sensitivity is a recognized disability under the Americans with Disabilities Act according to the federal Architectural and Transportation Barriers Compliance Board. The Background for its Final Rule Americans with Disabilities Act (ADA) Accessibility Guidelines for Buildings and Facilities; Recreation Facilities that was published in the Federal Register in September 2002:

> The Board recognizes that multiple chemical sensitivities and electromagnetic sensitivities may be considered disabilities under the ADA if they so severely impair the neurological, respiratory or other functions of an individual that it substantially limits one or more of the individual's major life activities.[17]

37.     The current FCC guideline is based on outdated studies that are no longer relevant in today's technologically advanced environment. The current FCC guideline precludes consideration of health effects from wireless radiation and thereby preempts my ability to protect my son who has electromagnetic sensitivity manifesting as chest pain. Modern peer-reviewed scientific studies, with results that have been repeatedly reproduced, have shown that long-term

---

https://ecfsapi.fcc.gov/file/1091330786203/Wireless%20radiation%20and%20EMF%20abstracts%20August%202016%20-%20August%202019%20Joel%20Moskowitz%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.pdf, p. 420.

[14]Ozguner F. et. al., Mobile phone-induced myocardial oxidative stress: protection by a novel antioxidant agent caffeic acid phenethyl ester, Toxicol Ind Health. 2005 Oct; 21(9):223-30. Filed below at https://ecfsapi.fcc.gov/file/10916151357910/RF-Free-Radical-oxidative-effect%20Henry%20Lai%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.pdf.

[15]Kismali G. et al, The influence of 1800 MHz GSM-like signals on blood chemistry and oxidative stress in non-pregnant and pregnant rabbits, Int J Radiat Biol. 2012 May;88(5):414-9. Filed below at https://ecfsapi.fcc.gov/file/10916151357910/RF-Free-Radical-oxidative-effect%20Henry%20Lai%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.pdf.

[16]Falcioni L. et al, Report of final results regarding brain and heart tumors in Sprague-Dawley rats exposed from prenatal life until natural death to mobile phone radiofrequency field representative of a 1.8 GHz GSM base station environmental emission, Environ Res. 2018 Aug;165:496-503. Filed below at https://ecfsapi.fcc.gov/file/1091330786203/Wireless%20radiation%20and%20EMF%20abstracts%20August%202016%20-%20August%202019%20Joel%20Moskowitz%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.pdf (p. 288.

[17] Architectural and Transportation Barriers Compliance Board. ADA Accessibility Guidelines for Recreation Facilities. 68 FR 56351 (Sept. 3, 2002), filed below at https://www.fcc.gov/ecfs/filing/107132219121452.

JA_00335

## AFFIDAVIT OF DR. ANN LEE IN SUPPORT OF STANDING

exposure to RF microwave radiation can cause adverse physiological responses and serious medical conditions such as cancer[18] including tumors of the heart.

38.      In order to protect my son and other American children who have electromagnetic sensitivity, it is necessary for the FCC to revise its guidelines and take into consideration the biological damage induced by long-term exposure to non-thermal RFR. It is necessary for the FCC to adopt guidelines which are biocompatible in order for Justin to have a chance at living a more normal daily routine, such as visiting the library and taking standardized testing in a public school without requiring special supplements, protective clothing, or special accommodations, or being worried that he will be bullied by his peers.

37.      The recent FCC order did not adequately consider or reasonably respond to comments of knowledgeable persons who cited similar health effects. FCC's decision to retain its existing public exposure guideline fails to address and resolve the cardiac condition induced by harmful microwave radiation that my son deals with daily, allowing constant exposure and long-term harm. This harm will continue until the rules are changed to truly protect health and safety, and to take into account the needs of those who are or may become injured by microwave radiation.

39.      This concludes my Affidavit, but I am also relying on the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter, and Dr. David Carpenter for the purpose of explaining why the particular facts described above demonstrate standing.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA  Ann Yeawon Lee, M.D.
COUNTY OF SANTA CLARA

SUBSCRIBED AND SWORN TO BEFORE ME this 19th day of May, 2020, to certify which witness my hand and official seal.

[Seal]

DEISY ZAMORA CHAVEZ
COMM. # 2286855
NOTARY PUBLIC-CALIFORNIA
SANTA CLARA COUNTY
MY COMM. EXP. APR. 28, 2023

Notary Public in and for California

[18]Falcioni L. et al, Report of final results regarding brain and heart tumors in Sprague-Dawley rats exposed from prenatal life until natural death to mobile phone radiofrequency field representative of a 1.8 GHz GSM base station environmental emission, Environ Res. 2018 Aug;165:496-503. Filed below at https://ecfsapi.fcc.gov/file/1091330786203/Wireless%20radiation%20and%20EMF%20abstracts%20August%202016%20-%20August%202019%20Joel%20Moskowitz%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.pdf (p. 288.

Page -8-

JA_00336

**Affidavit of Mary Adkins in Support of Standing**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Children's Health Defense, Michele Hertz, Petra Brokken, Dr. David O. Carpenter, Dr. Paul Dart, Dr. Toril H. Jelter, Dr. Ann Lee, Virginia Farver, Jennifer Baran, Paul Stanley, M.Ed. | ) ) ) ) ) | Case No: 20-1138 |
| Petitioners | ) | Petition for Review of Order by the Federal Communications Commission |
| | ) | (FCC 19-126) |
| v. | ) | |
| | ) | (Consolidated with Case No. 20-1025) |
| Federal Communications Commission and United States of America, | ) ) | |
| Respondents | ) | |

**AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

1.      My name is Mary Adkins. My home address is 78 White Falls Trail, Wakefield, RI 02879. I am a member of Children's Health Defense.

2.      The purpose of this Affidavit is to provide evidence of Children's Health Defense's Article III standing to pursue the matter. To do that I must show that I, as a member, would have Article III standing to proceed in my own name. I will provide some of the basic facts particular to my individual circumstances, but also rely on the presentations contained in the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter to explain why the basic facts I present below demonstrate that I have suffered an injury-in-fact traceable to the FCC Order that could be redressed by an order from this Court holding unlawful, vacating, enjoining, and/or setting aside the FCC Order and remanding the matter to the FCC for further consideration and action.

3.      I submitted comments to the FCC in Docket 13-84 on July 13, 2016.[1] My comments to the FCC opposed retention of current emission standards. I let the FCC know that my sons and I are debilitated by this radiation, and that – like my children and I – many individuals suffer from the effects of this radiation. I advised them that our health has already been devastated by wireless technology, and it was up to the FCC to end the injuries it was causing and for which it was and is responsible.

4.      I explained that wireless emissions encroach on every aspect of our lives; it blocks our access to housing, jobs, education, medical care, public utilities, and even the ability to buy food. I told them that my children, I and "people like us" have "nowhere left to hide and barely anyplace left in this country" where we "can safely live." "Torture is too kind of a word for the struggle that is our daily lives." I put the FCC on notice that keeping current guidelines and allowing continued proliferation would be a "death sentence for me and my children." The FCC paid no heed. It maintained its current guidelines, and as a result consigned me, my children and thousands like us to a life of pain, misery, torture, social isolation and hopelessness.

5.      I started working when I was 13 years old, was an athlete in high school and an excellent student throughout my academic years. I was a member of the National Honor Society, a Connecticut State Scholar and paid my own way through college with scholarships and my earnings. After graduating with my Bachelor's degree in Finance, I began a successful career

---

[1] The comments are available at
https://ecfsapi.fcc.gov/file/1071286941297/FCC%205G%20comments.txt.

with the Department of Defense (DoD). I started my career in Financial Management and Program Analysis and was later appointed Configuration Manager of the Mark 48 Advanced Capability Torpedo Program (both Test & Evaluation and Production phases). I also attained a Master's degree in Education, and became lead auditor of multidisciplinary audit teams in support of DoD Base Realignment and Closure (BRAC) efforts. I worked hard, traveled extensively, regularly enjoyed time with family and friends, and led a full and productive life. Then I started using a cell phone, with no idea of the dangers. I never gave wireless radiation a thought. That's when everything went horribly wrong.

My medical condition

6.      In early 2001 I had a horseback riding accident and broke my right humerus (upper arm bone). I had surgery (metal rod/pins installed) in March of that year to repair the humerus because the bone didn't heal. I was experiencing severe weakness and exhaustion, lost a tremendous amount of weight and developed heart palpitations. I went for an MRI as part of a search for explanations, but the Gadolinium (heavy metal) used in the contrast did not fully excrete for some reason. The gadolinium and other heavy metal deposits in my body, as well as the metal rod/pins in my arm and the metal fillings and crowns in my mouth, were acting as micro-antennas, concentrating and increasing reception of EMF radiation. Among other things this increases my specific absorption rate, and the radiation interacts with the metal material in my body to induce a current. A June 2017 review in the Journal of Computational and Theoretical Nanoscience collected the research on the topic.[2] I subsequently had my metal fillings and crowns removed, but the metallic medical implants and heavy metal deposits in my body still remain and cannot be removed or mitigated.

7.      I am therefore extraordinarily intolerant to radio frequency emissions. Radio frequency emissions cause me to have a sensation of burning skin, nausea, vertigo, ear pain, tinnitus, and joint pain. Upon exposure I almost immediately develop cognitive dysfunction, inability to focus, poor verbal expression, and migraine headaches, and suffer respiratory symptoms (profuse postnasal drip and cough) which often progresses to asthma and episodes of anaphylaxis. These symptoms appear ***consistently*** upon exposure to wireless radiation and begin dissipating as soon as the exposure ends. But these symptoms are progressive and become more overwhelming and debilitating with repeated exposure and because it has become almost impossible to avoid exposure. The long term after-effects of an exposure (insomnia, inflammation, pain, weakness, and more) can often last for several days.

8.      My health has been in a constant downward spiral due to never-ending, non-consensual exposure to radio frequency emissions at or equal to those allowed by the FCC guidelines. Despite all my qualifications, I am too ill to work. This will not change until I can avoid exposures for an extended period of time so I heal, and then find employment in a place that has no wireless radiation.

---

[2] M.H. Mat, M. Jusoh, H. Rahim, M.I. Yusoff, <u>A Brief Review of the EMF Interaction: Metal Implantation and Biological Tissues,</u> Journal of Computational and Theoretical Nanoscience 23(6):5565-5568 (2017), available at https://www.researchgate.net/publication/319202302_A_Brief_Review_of_the_EMF_Interaction_Metal_Implantation_and_Biological_Tissues/citation/download.

JA_00339

My children's medical condition

9.     ████, my oldest son, is a ████████ child. He has multiple medical problems including ADHD, a ████████████ food allergies, and multiple chemical sensitivities disorder. Multiple chemical sensitivities disorder is a clinical diagnosis where patients have physical, cognitive and ████████ when exposed to a wide range of environmental contaminants such as chemicals and certain foods. Some with this condition, like ████, also develop intolerance to electromagnetic radiation. ████ immune system and metabolism are also genetically compromised, so he is far more susceptible to viral and other infectious agents than most people.  In addition to adverse physical symptoms, in the presence of wireless radiation ████████████████████, memory, and cognitive abilities profoundly deteriorate.  My youngest son ████ is also a ████████. He too has multiple chemical sensitivity, as well as accelerated liver metabolism issues and methylation defects. He too requires a chemical-free environment. He is also, like his brother, extraordinarily intolerant to electromagnetic radiation and has consistently demonstrated an allergy to wireless radiation such as that generated by Wi-Fi, cell phones, and wireless utility meters. When exposed to this type of electromagnetic radiation, ████ immediately develops various negative symptoms, including increased breathing difficulties, sleep disruption, and learning impediments. His immune system degrades upon exposure and his respiratory functions begin to fail. Both children develop thick mucus in response to wireless radiation exposure, resulting in profuse sinus drainage that triggers chronic, severe coughing episodes and asthma.  Their sleep becomes impaired due to the interference with their breathing, and respiratory infections often develop as a result of the increased mucus production. These symptoms are so problematic that they substantially impair ████ and ████ ability to learn, work, breathe, and sleep. When exposed to this radiation, the respiratory symptoms, insomnia, neurological impacts, and fatigue that ensue interferes with their ability to learn and regularly attend school, engage in paid employment, or attend social activities.

10.     Several professionally-trained specialists have diagnosed our conditions many times over the years. Each expressly noted our special sensitivity to electromagnetic radiation and each prescribed careful, constant avoidance or at least minimization. Each has provided medical opinions for the specific purpose of delivery to various authorities and officials to support our medical need to not be exposed against our consent to wireless radiation in schools, in public meetings, in our neighborhood, and even in our own home. See Exhibits 1-19.

Efforts to avoid non-consensual exposure to FCC-approved wireless radiation

11.     All of our efforts to avoid non-consensual, harmful wireless radiation have been frustrated and most ultimately denied. Every time the authorities and officials involved expressly rejected our request based on the fact that the wireless radiation at issue was within the FCC's guidelines. To make matters worse, some authorities actively tried to force us to remain in areas they are purposefully flooding with wireless radiation. We are not even allowed to take self-defense measures. The FCC did this, and it refuses to take any action despite its supposed duty to ensure citizens' health and safety when they are exposed to FCC-authorized radiation from wireless transmitters and devices.

12.     We made every effort to follow our doctors' advice and prescriptions that we avoid exposure. We moved into a particular neighborhood explicitly and almost entirely because the homeowners' association restrictive covenants banned "radio reception equipment." A neighbor initially agreed to move his Wi-Fi router further away from our house and get rid of a smart

meter on his home because the radiation was intruding through our house. He later changed his mind and proceeded to reinstall the original offending meter plus two more despite our objection. The Homeowners' association refused to enforce the restrictive covenant despite my request (Exhibit 20), based in large part on the fact that the devices were FCC-approved and therefore "legal" and thus they had "no jurisdiction."

13.     We spent tens of thousands of dollars on medical bills and attempts to "radiation-proof" our home to minimize our exposure, but it was insufficient. We then asked for permission to erect external barriers outside the home, but the homeowner's association – which had previously refused to enforce the antenna covenant restriction – by that time had redlined the covenants (dropping the 'no antenna' restriction) and denied our request. They claimed the barrier was prohibited and implied legal action if we proceeded with our medically necessary modification to our property. (Exhibit 21). Things got so tense during this period one of our neighbors told us we should stop bothering them and that "people like [us] should go live in the woods."

14.     We managed to have electric, gas, and water "smart meters" removed from our own home but were then charged extra to replace them with "analog" meters. We continue to be charged an extra monthly fee for the privilege of not being involuntarily irradiated in our home. I tried to get state authorities to help with regard to the "opt out fee" and the neighbor's smart meters and' Wi-Fi, but they all refused because the devices were "FCC approved" and the emissions were all within FCC guidelines. The electric company expressly noted that their meters "comply with duly promulgated federal safety regulations and other RF emissions standards." Exhibit 22, p. 3. The state officials said only the FCC could grant us any relief regarding the radio emissions from my neighbor's smart meter and Wi-Fi. Exhibit 23.

15.     Our house that should have been our refuge has instead become a prison. Toxic wireless radiation floods the house, so we've had to evacuate the most saturated portions in order to marginally function.  We cannot stop it and no one will help because the FCC says it is all safe and everyone else tells us only the FCC has the power to end our real-life horror movie. If this does not stop the show will probably end with one or more of us dying as a result of the constant "FCC approved" emissions that continue to proliferate all around us.  We live in constant fear of what will happen next to drive us out for good, knowing there is literally nowhere else to go.

16.     My innocent children have suffered the most.  We've done our best to minimize exposure at home but it's often brutal for them in public. I asked the schools to provide accommodation, but they refused, again because the FCC authorized the devices on campus, and all the personal devices other children and school staff use are "FCC safe." They maintain this position even in the face of and despite our doctors' repeated written diagnoses and medical opinions (within Exhibits 1-19) that ▓▓▓▓ and ▓▓▓▓ have special conditions requiring that they avoid all exposure. We submitted "non-consent" forms specifically refusing permission for them to allow exposure of my children to radiation. Exhibit 24. The school responded that the wireless systems are "in accordance with the various regulations and guidelines adopted or recommended by the [FCC]." They rejected and refused to honor the non-consents and advised us they were planning to have 100% wireless coverage throughout the school. They also failed to do anything about personal wireless device usage by students or teachers. Exhibit 25. The schools even went so far as to require that certain ▓▓▓▓▓▓ children use wirelessly-connected devices. Exhibit 26. Take a moment to consider that. My ▓▓▓▓▓▓ child suffers from wireless radiation

poisoning. Their response was that he must be involuntarily exposed to the very toxic radiation that sickens him in order to access his public education.

17.     I finally had to remove both my children from public school because all of my efforts failed and they would be constantly exposed to non-consensual intolerable levels of radiation. I tried to find private schools, but they too were inundated with wireless radiation. I did find one private middle school for ████r that was "wireless reduced" for a short time. He thrived there. His grades were excellent, he had no ██████████████████, and he wasn't sick all the time anymore. But then he aged out and there were no wireless-reduced alternatives for either of my sons. So after I'd been unsuccessful in my efforts to obtain accommodation with the public schools and could find no suitable private schools, I had no choice but to home-school both children in our slightly less exposed home. They still suffered with certain key symptom exacerbation here at home, but less so than they would have suffered in school. The public school had diligently made "truancy" threats when my child was so sick from exposure in the public middle school that he couldn't regularly attend. When I enrolled ███████ in high school but couldn't send him at all due to their refusal to accommodate his disability they sent me a truancy letter trying to force me to return him back to their "care." Exhibit 27. I refused. ██████ was forced to complete his high-school level education at home, and █████ was forced to home school for both middle and high school.

18.     My family has been made sick for years thanks to FCC-approved 'safe' wireless technology and we are all getting worse due to our inability to escape these emissions. We have been impoverished by all the medical expenses and from the expense of our repeated efforts to protect ourselves. We've been rendered powerless and have become involuntarily isolated from society. We cannot shop, work, or access education without experiencing debilitating symptoms. We cannot go anywhere, but seclusion at home offers only a partial reduction in our pain and suffering as neighboring personal wireless devices, wireless utility meters, and related infrastructure encroach further and further upon our home, which is our only refuge. We cannot afford to move, but we may very well die here if we stay.

19.     Each of the examples above is about non-consensual exposure inflicted by people in authority who rely on FCC guidelines as a basis to deny accommodation or any other relief. My comments in the case below advised the FCC of my situation and asked for their help. They did nothing and pretended there is no problem. Their casual dismissal and rejection of our concerns, problems and requests without any discussion whatsoever has caused great consternation and a worsened feeling of hopelessness for me, my children and those who similarly suffer and also asked for assistance. The FCC is directly responsible for the harm and suffering that my children and I have endured for the last 19 years, and it has now refused to make it any better going forward.

20.     The FCC order did not adequately consider or reasonably respond to my comments or those of others who raised similar issues. Their decision to retain their existing rules and stay silent about the impact on my children and I and those like us failed to mention, much less resolve the problems my children and I face in daily life as a result of constant non-consensual exposure to harmful radiation and the abject refusal of the wireless companies, utility companies, schools and other public places to do anything about our affliction. My children and I have been harmed by continuation of the existing rules since they do not adequately protect health and safety, and in fact directly allow continuous harms to be inflicted on me, my children and many others who suffer similar conditions. There is a distinct chance one or more of us will eventually

die as a result of the continuous exposure to "FCC approved" and "FCC safe" emissions we are forced to suffer, without respite and without any way to make it stop. This harm will continue every day – indeed as wireless proliferation increases it will only get even worse – unless the rules are changed to truly protect health and safety, and take into account the needs of those who are or may become injured by electromagnetic radiation.

21.    If the Court vacates or remands and requires the FCC to more fully consider health issues in general and the particular needs of those who already suffer, then I, my family and those like us may have some hope. When the FCC creates biological-based standards, or at least rules that

its guidelines should not be used as a shield against requests for accommodation by those who can demonstrate sensitivity to exposure within their guidelines, the injuries caused by the FCC guidelines will finally be acknowledged and our suffering from non-consensual exposure to RF emissions will no longer be denied, ignored or ridiculed despite medical proof. Only then will the stigmatization and discrimination against us and others like us finally end, and only then will the public finally become aware of the potential for harm from wireless devices and be able to take steps to protect themselves and the environment. Maybe then we will have some hope of beginning to rebuild the lives that were stolen from me and my children. I can only hope we will survive that long.

22.    The FCC Order has caused great fear and a worsened feeling of hopelessness for those who suffer like my family. I learned about Children's Health Defense and reached out to them for help. They offer assistance and advocacy to those who suffer from disabling illness caused by wireless radiation. I am a member of the organization and finally feel like I belong to a community that understands the suffering my sons and I have endured and the challenges we face. Although the FCC's refusal to recognize the problem is quite disheartening, I and others at least have some hope that things may change; in the meanwhile, Children's Health Defense will be inundated by those who seek recognition, acceptance and help from the organization. It is clear that the FCC Order will impose great demands on Children's Health Defense above and beyond the cost of this case.

23.    This concludes my Affidavit, but as noted above I am also relying on the Affidavits of Dafna Tachover, Dr. Paul Dart, Dr. Toril Jelter and Dr. David Carpenter for the purpose of explaining why the particular facts described above demonstrate standing.

*Mary Adkins*

Mary Adkins

SUBSCRIBED AND SWORN TO BEFORE ME this 7th day of MAY, 2020, to certify which witness my hand and official seal.

[Seal]

Notary Public in and for Rhode Island

JA_00343

**EXHIBIT 1 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

JA_00344



6/10/08

To Whom It May Concern:

I am writing on behalf of my patient, ▮▮▮ Adkins, who is under my care for treatment of autistic spectrum disorder. ▮▮▮r has multiple chemical sensitivity (MCS) and extensive metabolic dysfunction that require modifications and accommodations in the school setting. The following are medical necessities and should be detailed in his Individualized Education Plan and 504 Plan.

▮▮▮r should only eat and drink foods provided from home, or foods pre-approved by his parents, for consumption at school due to extensive allergies and metabolic dysfunction. ▮▮▮ may require enzymatic support for digestion of certain foods at school, in which case his parents will provide the appropriate enzymes to the school nurse for administration. ▮▮▮ may occasionally require additional over-the-counter supplementation during the school day, in which case his parents will provide these supplements to the school nurse for administration. Administration of needed medication at school should be stated in Raiver's IEP and/or 504 Plan.

▮▮▮ requires a chemical-free learning environment due to accelerated Phase I liver metabolism and methylation defects. Areas that must be chemical-free include his classroom, cafeteria, hallways, bathrooms, and any other room(s) to which he is exposed (art, music, resource rooms, offices, etc). Provided below are guidelines that should be utilized in conjunction with a review process that includes ▮▮▮ parents in order to determine safe products for use in R▮▮▮ learning environment. This is not an all-inclusive list, and it would be impossible for any physician's office to compile a comprehensive list of every toxic, synthetic chemical currently in use today. However, ▮▮▮ parents, in consultation with our office, can reasonably determine products that are safe for use in ▮▮▮'s school environment. His parents should be the final review and approval point regarding the products selected for use in his school, and this should be clearly stated in ▮▮▮ IEP and 504 Plan. This would include but is not limited to products such as hand soaps, hand sanitizers, disinfectants, all-purpose cleaners, window cleaners, bathroom cleaners, degreasers, scouring powders, cream cleansers, paints, stains, rug shampoos, floor cleaners, floor waxes, and sealers.

The following toxic compounds are the ones most commonly found in commercial cleaning products and should not be used at R▮▮▮ school: nonionic nonylphenolethoxylate, phosphates, ammonia, alkalines, acids, butyl ethers, dichlorobenzene, chlorinated hydrocarbons, formaldehyde, acetone, benzene, chlorine, cresol, dyes, lead, sodium hydroxide (lye),

naphthalene, paradichlorobenzene, perchloroethylene (PERC), petroleum distillates, antibacterial agents, phenol, bleach (sodium hypochlorite or sodium hydroxide), tetrachloroethylene, toluene, xylene, synthetic fragrances and perfumes, petrochemical fragrance, heavy metals, chlorinated or brominated solvents, petroleum-based solvents, synthetic dyes, butyl cellusolve, diethanolamine (DEA), triethanolamine (TEA), ethylene glycol, monobutyl ether. Material Data Safety Sheets should state that there are no known hazardous ingredients. Products should not contain carcinogens, mutagens, or teratogens, should be non-corrosive, and should contain no aerosol propellants. Ingredients and terms to look for on product labels and ingredient lists that are generally regarded as safe (GRAS) include: natural fragrance (essential-oil based), non-petroleum based surfactants, no petroleum-based ingredients, biodegradable, enzyme-based, non-toxic, chlorine-free, phosphate-free, VOC-free or low-VOC, dye-free, odor-free, plant-based, and solvent-free.

Absolutely no pesticides, poisons, or chemical fertilizer products are safe for use anywhere in R███ school, including outdoor play areas. Pesticides include insecticides, herbicides, fungicides, antimicrobials, and chemicals that kill rodents. Disinfectants are EPA-registered pesticides that kill bacteria on surfaces (not in the air) and are therefore hazardous, with the exception of Sensible Life Benefect Broad Spectrum Disinfectant, which is a botanical, non-toxic, EPA-approved disinfectant.

As far as product recommendations, there are many safe, non-toxic cleaning products on the market today including those made by AFM Safechoice, Seventh Generation, Earth Friendly, Life Tree, Ecover, Bioshield, BioKleen, Bon Ami, Naturally Yours, Aubrey Organics, and Sensible Life Products (Benefect Broad Spectrum Disinfectant).

Thank you,

Nancy O'Hara, MD

**EXHIBIT 2 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

July 29, 2010

RECEIVED

AUG 2 3 2010

RE: ▮▮▮ Adkins

Dear School Administrator,

I am writing on behalf of ▮▮▮ Adkins who has been a patient of mine for the past few years. ▮▮▮ is a 12 year old with a history of multiple medical problems including asthma, ADHD, ▮▮▮▮▮▮▮▮▮▮, food allergies, and environmental allergies.

▮▮▮ was diagnosed with multiple chemical sensitivities by ▮▮▮▮▮▮▮▮▮ Children's Hospital several years ago. This disorder is a clinical diagnosis where patients have physical, cognitive, and ▮▮▮▮▮▮ when exposed to a wide range of environmental contaminants such as chemicals, certain foods, and electromagnetic radiation. The radiation can affect these hypersensitive children on a cellular level causing disruption of normal cell functions in the body. There is evidence to support that radiation from wireless devices can adversely affect levels of melatonin and heavy metal release in the body, both of which have been longstanding issues for ▮▮▮▮▮ ▮.

The main concern for ▮▮▮ is exposure to radiation through wireless networks and cell phones. ▮▮ ▮ ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮ His physical health is excellent when he avoids wireless devices, and he is more prone to recurring infections and asthma attacks when he is exposed to them. The parents have created a radiation free environment at home and he performs well in this situation.

My recommendation due to his complex medical problems and history is that ▮▮▮ be placed in a wireless free environment and not be exposed to Wi-Fi or cellular phones. If no school is available within a reasonable distance that is Wi-Fi free, at a minimum, he should be placed in classrooms that do not have access points, laptops, or wireless routers in them. Ideally he should be assigned to classrooms that are located far away as possible from such devices and he should only use hardwired computer connections. He also

JA_00348

should not be exposed to cellular phones that are transmitting and receiving signals. These safeguards should be accomplished in such a manner so as not to diminish his academic experience, limit his access, or socially isolate him from his peers. Since his medical history puts him at greater risk, taking these steps will support his need to be in a chemical and radiation free environment and this will allow him to function optimally.

I greatly appreciate your help with this issue. If you have any further questions, feel free to contact me directly.



**EXHIBIT 3 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

JA_00350

███████ ████ ███ ████ ███

██████ ████ ██████

████ ████

August 6, 2010                                                        AUG 2 3 2010

To Whom It May Concern:

I am writing regarding ████ Adkins (████████) and his current hypersensitivity issues surrounding electromagnetic fields. Kaiver has been under my holistic care for the last eighteen months. He presented with several medical diagnoses from his primary pediatrician as well as from specialist physicians. These diagnoses include: multiple chemical sensitivities, ████ █████████; Lyme disease, ADHD, asthma, environmental allergies, and food allergies.

Although some progress has been made in his treatment, there have been continued, consistent cognitive and behavioral issues, manifesting after the school day and especially on Fridays. Attempting to determine the cause of these issues we undertook observation over several months, especially during symptomatic times, using telephone/ face-to-face communication and interaction with ████: A constellation of symptoms occurred, including: poor concentration, forgetfulness regarding key concepts in basic functions, inability to verbally express himself, increased irritability and agitation, repeatedly stating "I need to relax," without being able to explain the stressor, vertigo, confusion as to dates/times, restlessness, and distractibility. A direct correlation was determined between an exacerbation of symptoms and Kaiver's exposure to wifi (computer days) at school and cell phones on the bus ride home.

████ sensitivities include electromagnetic radiation in addition to other environmental contaminants. ████ exposure to electromagnetic radiation is evidenced by his neurological, cognitive, and behavioral symptoms and were exacerbated on those days he was exposed to wifi in the school. The additional exposure to cell phones being in use on the school bus led to further deterioration of his condition upon arriving home from school.

Nearly five years ago the World Health Organization defined Electro-Hypersensitivity (EHS) as:

> ". . . a phenomenon where individuals experience adverse health effects while using or being in the vicinity of devices emanating electric, magnetic, or electromagnetic fields (EMFs). . . EHS is a real and sometimes a debilitating problem for the affected persons, while the level of EMF in their neighborhood is no greater than is encountered in normal living environments. Their exposures are generally several orders of magnitude under the limits in internationally accepted standards. " **(World Health Organization Fact Sheet no. 296. December 2005.)**

████ is in the school setting several hours per day, a most important environment for his educational, individual, and social development. Yet, his exposure to cell phones, wifi networks, and other electromagnetic fields is causing a deterioration of his

educational, physical, and psychological health. Times when he is out of these surroundings there is a marked increase in his overall health and well-being.

Creating a learning environment where ████ can continue to be integrated with his peers while being wireless-free would assist in supporting his growth and development without deterioration. Limiting his exposure and access to cell phones that are open and active, while not interrupting his educational and social interaction would also be helpful in facilitating the most favorable conditions for his educational experience.

Thank you in advance for your cooperation in this matter.


Sincerely,

**EXHIBIT 4 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

PHYS. 8-6-10 REPORT

| School Name & Address: | | Health Care Provider Name and |
|---|---|---|



## STATE OF RHODE ISLAND
## SCHOOL PHYSICAL FORM

Phone:

This form may substitute for any district-issued form. All districts must accept this form. General health examinations shall be documented in a standardiz with one copy available from the Rhode Island Department of Health or in any such format that captures the same fields of information [R16-21SCHO Sec

| Student Name: Last | First | Middle | Date of Birth | Sex |
|---|---|---|---|---|
| Adkins | | | | |

| Address: Street | Apt # | City | State | Zip Code | Home Ph |
|---|---|---|---|---|---|

PLEASE COMPLETE ALL INFORMATION BELOW (May attach immunization transcript).

**IMMUNIZATIONS**     Please enter dates in MM/DD/YYYY format

Date of PE 8/16/10    Height 47"/4    Weight 43/4    BP 156

Please note any health problem, chronic health condition or disability that may affect behavior or health at school:

**ASTHMA:** No ☐ Yes ☒    **DIABETES:** No ☒ Yes ☐    **OTHER** Lyme · gestational | Electrosensativity

**Significant Systems Findings:** Healthy/ Gluten Food allergies | Multiple chemical s

**ALLERGIES:** No ☐ Yes ☒ (Please explain) Gluten milk-nuts    **EPINEPHRINE AUTO-INJECTOR REQUIRED:** No ☐

**Treatment Plan:** _____

**MEDICATION (REQUIRED AT SCHOOL):** No ☐    Yes ☒ (Please list) Digestive Enzymes - Inhaler

**Other medication(s) that may affect behavior or health at school:** Albuterol as needed / Epi Pen for exposu

**RESTRICTIONS:** Can participate in physical education:   Fully ☒    With limitation ☐ _____

Can participate in sports.   Fully ☒    With limitation ☐ _____

| LEAD SCREENING (Required for children < 6 years of age only) Student is in compliance with lead screening requirements: Yes ☐ No ☐ | SCOLIOSIS SCREENING Yes ☐ No ☐ | VISION SCREENING (Children entering Kindergarten) ☐ Passed screening ☐ Screened and referred for comprehensive exam ☐ Referred for comprehensive exam, but not screened |
|---|---|---|
| TUBERCULOSIS (if required by school district) Date of TB test: | | Screening Date:   Comprehensive Date: |

JA_00354

**EXHIBIT 5 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



August 27, 2010

Client Name: ██████████
Date of birth ██████████

To Whom It May Concern:

I have known ██████ for many years. ████████████████ ██ ███████████.
██████████████████████████████████████████ ██ ██████████████████
██████████████████████ Examples would be a marked degradation in performance in the
presence of recently cleaned rugs, or lawns that had been treated with insect sprays or growth
retardants. He is also sensitive to the electrical signals produced by cell phone and by WiFi and
these also significantly impair his ██████ ██ ██████████ when in their presence.

I am strongly recommending that his educational environment be free of the sort of electrical
radiation produced by both cell phones and WiFi networks. In addition if possible it would be
very helpful if the fluorescent lighting be switched to that which uses 120 Hz ballast rather than
60 Hz ballast. He should not be exposed to chemicals in the class room or on school grounds.

If there are any questions please contact me.

Sincerely,

██████████████████████

██████████████
██████████████████████
██████████████

New Haven, CT

**EXHIBIT 6 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



November 1, 2010

RE: MARY ADKINS

To Whom It May Concern:

I am writing this letter on behalf of my patient Mary Adkins. Ms. Adkins is a patient under my care for environmental and electromagnetic sensitivities. When exposed to any type of WiFi, cell phone, computer, or other electromagnetic radiation, she experiences a multitude of symptoms including cognitive dysfunction, inability to focus, poor verbal expression, migraine headache, severe nausea, fatigue, and other functional impairments. Exposure to these forms of electronics can be severely debilitating and place significant limitations on her activities of daily living. I recommend a WiFi-free environment when Ms. Adkins attends meetings, conferences, or office visits. She requires the use of a personal radiation detector to avoid exposure.

Please feel free to contact me with any questions or concerns.

Sincerely,

Liz O'Dair, M.D.

LO:ed

**EXHIBIT 7 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

██████████████
████

██████
██████████
██████████

November 4, 2010

Client Name: ████████

To Whom It May Concern:

Mr. and Mrs. Adkins recently noted a resurgence of symptoms in ████ consistent with his past responses to wi fi radiation. Their observations were based on ████ history while attending schools that use wi fi and their experiences with wi fi in the home setting. ████ ████ ████ ████ ████
████ ████ ████ is consistent with what has been observed in the past when he attended schools that use wi fi Mrs. Adkins began documenting ████ s symptoms on September 30 when she first became concerned, then notified his pediatrician, the school principal, and myself. Mr. and Mrs. Adkins asked for my support in requesting a certified professional be allowed into the school to take radiation measurements because of ████ s decline.

Mr. and Mrs. Adkins report on Oct. 22 it was discovered the cafeteria access point had been turned on. They were later informed it had been on since Sept. 28, and this time frame exactly correlates with ████ deterioration. Mr. and Mrs. Adkins must now pursue a neurological evaluation for ████ to assess potential damage and I am in concurrence that a certified professional be allowed into the school to measure radiation levels. Based on recent events there is a medical need to obtain more information about ████ school setting to see whether levels exceed those that are scientifically established to cause biological effects. This information is necessary to safeguard ████ health.

Provided for your review is additional documentation from the medical and scientific literature that establishes biological effects at levels well below accepted industry standards and supports my recommendations for ████
████ displayed a rather unique and heightened sensitivity ████ Based on my own clinical observation of several hundred individuals ████ unable to tolerate frequencies that are normally not problematic for the average person.

Because of ████ s medical history and sensitivity level as well as his clear deterioration when exposed to wi fi, I again reiterate the need for him to be kept away from wireless devices in the school setting. There is also a medical need to establish the levels of radiation in ████ classrooms and other areas where he spends significant time during the school day. As in the case of an asthmatic child who is more sensitive to particulates in the air for example, EMF exposure that might be relatively benign for the general population obviously results in functional impairment for ████. Recent events appear to substantiate that wi fi radiation exacerbates his ADHD symptoms, significantly impairs ████, and substantially limits his ability to learn.

If there are any questions please contact me.

JA_00360

Sincerely,

███████████████

███████████████

New Haven, CT

Enclosed:

███████████████

Wireless Radiation in the Etiology and Treatment of ███████
Household Cordless phones trigger heart fluctuations-implications for wifi
Studies reporting biological effects of radiofrequency at low intensities
Professor Olle Johansson's list of authorities
References and Studies
Radio Wave packet

**EXHIBIT 8 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



March 18, 2011

RE: ████
DOB: ████
RE: ████ Adkins
DOB: ████

To Whom It May Concern:

I am writing on behalf of my patients, ████ ████ Adkins, who have been patients of mine for the past few years. These children suffer from very serious functional impairments and physical illness upon exposure to wireless radiation, such as that emitted by digital utility meters and "smart meters" that emit radiofrequency and/or microwave radiation.

It is imperative that the living environment of my patients be free of all forms of wireless radiation and that utility companies install only analog meters that do not emit radiofrequency or microwave signals in or around their home. These children experience symptoms such as atypical cystic fibrosis, asthma, immune dysfunction, ████ ████ ████ when exposed to this type of radiation. These symptoms are severe, debilitating, and can be life-threatening.

What may be viewed as acceptable levels of radiation exposure for the general population constitutes a health hazard to my patients because of their medical condition. If you have any further questions, feel free to contact me directly.



**EXHIBIT 9 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

February 15, 2012

RE: ████ Adkins
DOB █████

To Whom It May Concern:

I am writing on behalf of my patient, ████ Adkins ████ has consistently demonstrated an allergy to wireless radiation such as that generated by WiFi, cell phones, and wireless utility meters. When exposed to this type of electromagnetic radiation he experiences symptoms that substantially limit one or more major life activities, including breathing, sleeping, and learning as well as major bodily functions including functions of the immune system and respiratory functions.

When exposed to this type of radiation ████ develops thick mucus resulting in sinus drainage that triggers chronic, severe coughing episodes and asthma. His sleeping becomes impaired due to the coughing and asthma, and he develops respiratory infections as a result of increased mucus production. His symptoms are so problematic that they substantially impair his learning, breathing, and sleep. If exposed to this radiation, the respiratory symptoms and fatigue that ensue interfere with his ability to learn and regularly attend school.

████ requires a school environment that is free from this sort of radiation in order to prevent these symptoms and to allow him to function optimally both in and out of school. Accordingly, please provide him with the accommodations he requires in school so he can remain healthy and continue to safely access his education. This would apply to all academic as well as extracurricular activities that are available to other students, including but not limited to bussing, field trips, and school sponsored events both during and after school, or on weekends. Feel free to contact me with any questions.



**EXHIBIT 10 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



## STATE OF RHODE ISLAND
## SCHOOL PHYSICAL FORM

This form may substitute for any district-issued form. All districts must accept this form. General health examinations shall be documented in a standardized format with one copy available from the Rhode Island Department of Health or any such format that captures the same fields of Information (R16-21SCHO Section 8.4)

| Student Name: Last | First | | Middle | Date of Birth | Sex |
|---|---|---|---|---|---|
| Adkins | | | | | M |

| Address: Street | Apt # | City | | State | Zip Code | Home Phone |
|---|---|---|---|---|---|---|
| | | | | | | |

Immunization Exemption: ☐ Medical    ☐ Religious

☐ Hep B    ☐ DTaP    ☐ PCV    ☐ Polio    ☐ Hib    ☐ MMR    ☐ Varicella    ☐ Td/Tdap    ☐ Rotavirus    ☐ Hep A    ☐ Mening    ☐ HPV

### PHYSICAL EXAMINATION

Date of PE 8/23/12    Height 53'1/2"    Weight 60 lbs    BP 96/56

Please note any health problem, chronic health condition or disability that may affect behavior or health at school:

ASTHMA: No ☐ Yes ☐    DIABETES: No ☐ Yes ☐    OTHER: _____

Significant Systems Findings: Electro Hyper sensativity / Food sensativities / wheezing when ill

ALLERGIES: No ☐    Yes ☐ (Please explain) gluten, nuts, dog    EPINEPHRINE AUTO-INJECTOR REQUIRED: No ☐ Yes ☐    , chemical sensativities

Treatment Plan: _____

MEDICATION (REQUIRED AT SCHOOL): No ☐    Yes ☐ (Please list) _____

Other medication(s) that may affect behavior or health at school: _____

RESTRICTIONS: Can participate in physical education:    Fully ☐    With limitation ☐ _____

Can participate in sports:    Fully ☐    With limitation ☐ _____

| LEAD SCREENING (Required for children <6 years old) Student is in compliance with lead screening requirements: Yes ☐ No ☐ | SCOLIOSIS SCREENING Yes ☐ No ☐ | VISION SCREENING (Children entering Kindergarten) ✓ Passed Screening __ Screened & referred for comprehensive exam __ Referred for comprehensive exam, but not screened |
|---|---|---|

TUBERCULOSIS (If required by school district)    Date of TB test _____
Screening / Referral Date: _____    Comprehensive Exam Date: _____

HEALTH CARE PROVIDER SIGNATURE: _____    M.D. DATE: 8/23/12

PRINT NAME: _____

**EXHIBIT 11 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

August 28, 2012

To Whom It May Concern:

Re: ███ Adkins
DOB: ███

I am writing on behalf of my patient ████ ;. ███ has physical and mental impairments when exposed to radiation from wireless cellular networks. To avoid this radiation, he requires a school that is free of Wi-Fi, cell phones, and "smart" wireless utility meters and one that is not located in close proximity to a cellular tower or antenna.

The physical and mental impairments that result from wireless radiation exposure substantially limits ███ s ability to sleep, breathe, learn, read, concentrate, think communicate and write. Chronic radiation exposure substantially limits and impairs his respiratory, immunological and neurological functioning. For ███ prolonged exposure to wireless radiation produces severe ADHD, causes him to develop chronic sinus congestion which leads to infection and asthma, and █████████████

███████████████████████████████████████████████████████ These physical and mental impairments (ADHD, sinusitis, asthma, ███ insomnia, etc.) resulting from wireless radiation exposure are severe to the point they substantially limit many of ███ major life activities both at home and at school. When attending a school without Wi-Fi that also enforces a strict "no cell phone" policy (Cluny School), ███ experienced none of these health problems.

In accordance with the Americans with Disabilities Act and with the assistance of the Rhode Island Public Utilities Commission, the utility providers at Kaiver's home have accommodated his disability by providing the family with analog (non-wireless) utility meters. It is essential that Kaiver's school also accommodates his disability in order to insure his continued good health.

If his school district is unable to provide an environment that is completely free of wireless radiation, he should be transferred to the closest school (public or private) that can provide such an environment. Cell phone exposure on a bus must be avoided. If there is no such school available within a reasonable distance from his home, the school should provide home tutoring.

If you have any questions or concerns regarding this matter, do not hesitate to call the office.

Sincerely,

███████

███████

███

**EXHIBIT 12 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

JA_00370

**STATE OF RHODE ISLAND**
**SCHOOL PHYSICAL FORM**

Health Care Provider Name and Address:

This form may substitute for any district-issued form. All districts must accept this form. General health examinations shall be documented in a standardized format with one copy available from the Rhode Island Department of Health or in any such format that captures the same fields of information (R16-21SCHO Section 8.4)

| Student Name: Last | First | | Middle | Date of Birth | Sex |
|---|---|---|---|---|---|
| Adkins | | | | | M |

| Address: Street | | Apt # | City | State | Zip Code | Home Phone |
|---|---|---|---|---|---|---|

**PLEASE COMPLETE ALL INFORMATION BELOW (May attach immunization transcript).**

Immunization Exemption:  ☐ Medical     ☒ Religious

☐ Hep B   ☐ DTaP   ☐ PCV   ☐ Polio   ☐ Hib   ☐ MMR   ☐ Varicella   ☐ Td/Tdap   ☐ Rotavirus   ☐ Hep A   ☐ Mening   ☐ HPV

**PHYSICAL EXAMINATION**

Date of PE 8 30 12          Height 66 1/2"     Weight 122 lbs     BP 106/62

Please note any health problem, chronic health condition or disability that may affect behavior or health at school:

ASTHMA: No ☐ Yes ☐     DIABETES: No ☒ Yes ☐     OTHER:

Significant Systems Findings: Allergies / Wheezing when ill

ALLERGIES: No ☐ Yes ☒ (Please explain) gluten, dye, preservat...   EPINEPHRINE AUTO-INJECTOR REQUIRED: No ☐ Yes ☐

Treatment Plan: Casein, chemical sensativities   electromagnetic sensativ.— Avoid

MEDICATION (REQUIRED AT SCHOOL): No ☒     Yes ☐ (Please list)

Other medication(s) that may affect behavior or health at school:

RESTRICTIONS: Can participate in physical education:   Fully ☒     With limitation ☐

Can participate in sports:   Fully ☒     With limitation ☐

| LEAD SCREENING (Required for children < 6 years old) Student is in compliance with lead screening requirements: Yes ☐ No ☐ | SCOLIOSIS SCREENING Yes ☒ No ☐ | VISION SCREENING (Children entering Kindergarten) ___ Passed Screening ☒ Screened & referred for comprehensive exam 20/40 (B) ___ Referred for comprehensive exam, but not screened |
|---|---|---|
| TUBERCULOSIS (if required by school district) Date of TB | | Screening / Referral     Comprehensive Exam Date 8 30 12 |

ALTH CARE PROVIDER SIGNATURE:                     M.D. DATE: 8 30 12

PRINT NAME:

Revised 07-10

**EXHIBIT 13 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

# SOUTH KINGSTOWN SCHOOL DEPARTMENT
## *Pupil Personnel Services*

---

Name: ▮▮ ADKINS                Sex: _M_  D.O.B. ▮▮

Address: 7▮▮                    Town: _South Kingstown_  R.I.  Zip: _02879_

School: _South Kingstown H.S._  Grade: _9_  Teacher: _C Leaver_
                                    E-Mail: _CLeaveR@SKschools.NET_

Parent/Guardian: _Mary & William Adkins_ Telephone: (h) ▮:▮
                                    E-Mail: _____

---

Physician: ▮▮▮

Address: ▮▮▮  City/Town: _N.K_  State: _RI_  Zip: _02852_

Telephone: ▮  Fax: ▮  E-Mail: _____

---

*Must be completed by the physician for the medical condition(s) resulting in the need for homebound instruction:*
Professional advice is necessary in determining whether or not the above-named student is able to attend school. Please provide the specific information regarding the following:

Type of Illness/Injury: ▮▮▮
Date of availability of student for homebound instruction: _9/1/12_
Expected date of return to school: _____
What limitations or special conditions (if any) should be considered by school personnel in providing homebound services?
_He cannot be exposed to radiation from wireless devices_

I certify that the above named student is not medically able to attend school:

_9/12/12_                         _C. Braun_
DATE                              SIGNATURE OF PHYSICIAN

---

*Acknowledgement by Parent:*
I acknowledge this request and agree with the need for homebound instruction.  I will provide an environment conducive to learning, a responsible adult in the home, keep appointments, keep up with assignments, and advise school personnel of changes of my child's status.  By my signature on the Release of Information form, I give permission for the South Kingstown School Department to contact my physician to discuss homebound services.

_9/12/12_                         _Mary Adkins_
DATE                              SIGNATURE OF PARENT/GUARDIAN

---

*Homebound instruction is intended to be temporary.  Requests for homebound instruction extending beyond the original date projected for the return to school must be substantiated by an updated statement from the attending physician.*

**EXHIBIT 14 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



August 27, 2013

To Whom It May Concern:

I am writing this letter on behalf of ████ Adkins, my patient. He was seen today in the office and he is experiencing some ████████ recent changes in his classroom accommodations. With the introduction of wireless radiation into the classroom, he will not be able to attend school. He has experienced multiple transitions in his life over the past year and I feel it is best if his stressors be minimized. ██ ███████ ██ ███████ ██. I would recommend a consistent stable learning environment to minimize his anxiety and stress.

Sincerely,

**EXHIBIT 15 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



1/15/2016

Re: ▮▮▮ Adkins (▮▮▮▮▮▮)

To Whom It May Concern,

I am a licensed Physician and Surgeon in the State of Connecticut (# 021770).

▮▮▮▮ Adkins, who has been my patient since 4/9/2015, has disabling sensitivity to electromagnetic fields (EMF), including (but not limited to) pulsed electromagnetic fields (radio frequency/microwave) produced by cellular antennas, cell and cordless phones, wireless routers (WiFi), and wireless utility meters.

▮▮▮▮ develops destabilizing respiratory, neurological, cardiac, and immunological effects when exposed to RF/MW radiation due to underlying neurological and metabolic conditions that are exacerbated by EMF. Continuous exposure to such emissions in his home environment may cause him to experience unpredictable and potentially life-threatening symptoms. Both chronic, low level exposure situations and brief exposures of high enough intensity and/or duration cause substantial limitations to several of ▮▮▮▮ major life activities. Pulsed electromagnetic fields, in particular, consistently and dramatically worsen ▮▮▮ s condition and pose a danger to his health.

▮▮▮▮ complaints of worsening symptoms upon exposure to EMF are consistent with his medical history and double-blinded placebo controlled research. Such studies confirm RF/MW radiation causes increased risk of brain tumors and salivary gland tumors, increased cytotoxic activity of natural killer cells, mast cell increases, melatonin reduction, and heart rate variability, among numerous other biological effects.

In light of supporting research and given ▮▮▮▮ consistent adverse and disabling response to this sensitizing irritant, he must not be involuntarily exposed to any EMF emissions in his home that might trigger his symptoms. He cannot use and enjoy his dwelling and surrounding area in the presence of EMF emissions. ▮▮▮▮ requires accommodation to eliminate this sensitizing irritant from his home environment to the distance and extent that he no longer perceives these effects. Required accommodation includes the removal of all EMF-emitting invoicing tools for "common" utilities in or on his dwelling, and their replacement with mechanical, manually-read, non-digital, and non EMF radiation-emitting measuring tools. This medical accommodation includes eliminating EMF emissions from tools/devices located on properties immediately adjacent to my patient's dwelling.

**EXHIBIT 16 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



2/5/2016

Re: Mary Adkins (dob <span>█████</span>

To Whom It May Concern,

I am a licensed Physician and Surgeon in the State of Connecticut <span>█████</span>

Mary Adkins, who has been my patient since 3/24/2015, has disabling sensitivity to electromagnetic fields (EMF), including (but not limited to) pulsed electromagnetic fields (radio frequency/microwave) produced by cellular antennas, cell and cordless phones, wireless routers (WiFi), and wireless AMR/AMI "smart" utility meters.

Mary develops destabilizing respiratory, neurological, cardiac, and immunological effects when exposed to RF/MW radiation due to underlying neurological and metabolic conditions that are exacerbated by EMF. She also has a medical implant that is aggravated by RF EMF, causing her to experience severe pain. Continuous exposure to such emissions in her home environment may cause her to experience unpredictable and potentially life-threatening symptoms. Both chronic, low level exposure situations and brief exposures of high enough intensity and/or duration cause substantial limitations to several of Mary's major life activities. Pulsed electromagnetic fields, in particular, consistently and dramatically worsen Mary's condition and pose a danger to her health.

Mary's complaints of worsening symptoms upon exposure to EMF are consistent with her medical history and double-blinded placebo controlled research. Such studies confirm RF/MW radiation causes nerve pain, increased risk of brain tumors and salivary gland tumors, increased cytotoxic activity of natural killer cells, mast cell increases, melatonin reduction, and heart rate variability, among numerous other biological effects.

In light of supporting research and given Mary's consistent adverse and disabling response to this sensitizing irritant, she must not be involuntarily exposed to any EMF emissions in her home that might trigger her symptoms. She cannot use and enjoy her dwelling and surrounding area in the presence of EMF emissions. Mary requires accommodation to eliminate this sensitizing irritant from her home environment to the distance and extent that she no longer perceives these effects. Required accommodation includes the removal of all EMF-emitting invoicing tools for "common" utilities in or on her dwelling, and their replacement with mechanical, manually-read, non-digital, and non EMF radiation-emitting measuring tools. This medical accommodation includes eliminating EMF emissions from tools/devices located on properties immediately adjacent to my patient's dwelling.

Mary must also be provided with accommodations for her disabling sensitivity to EMF when accessing public or private facilities. All required accommodations/modifications will need to be determined by Mary on a case-by-case basis. Please feel free to contact me if further information is required.

**EXHIBIT 17 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

11/22/2016

To Whom It May Concern,

I am writing on behalf of my patient, Mary Adkins, who suffers from migraines, nausea, vertigo, fatigue, weakness, muscle spasms, insomnia, and other symptoms that are triggered by exposure to radio frequency (RF)/microwave radiation and certain other types of EMF. Chronic, low level exposure situations, as well as brief exposures of sufficient intensity, duration, or proximity to the source, cause Ms. Adkins to develop debilitating symptoms that substantially limit many of her major life activities.

Having reviewed scientific literature demonstrating adverse biological effects from non-ionizing radiation exposure and EMFs, and having ample evidence of these symptoms manifesting in my patient upon exposure, I concur with her previous medical providers that specific types of EMF and RF/microwave radiation substantially exacerbate Ms. Adkins' medical condition and thus must be avoided/eliminated to the greatest extent possible. It is imperative my patient receive accommodation of her condition so as to avoid triggering her painful and debilitating symptoms and potentially worsening her already disabling sensitivity to EMF.

Ms. Adkins' need for accommodation pertains to places of public accommodation (medical offices, retail establishments, etc.) as well as to her dwelling. In the case of her dwelling it is imperative to eliminate, to the greatest extent possible, any RF radiation/EMF from sources located both in and nearby her home (including, but not limited to, RF emissions and electrical transients produced by digital utility meters). This would include RF emissions and/or electrical transients from devices installed in or on neighboring homes, as well as from nearby wireless/cellular antennas, WiFi hotspots, etc. Such devices in too close proximity to Ms. Adkins' home may pose a barrier to access to her dwelling, and in such cases (as can only be determined by Ms. Adkins) my patient requires accommodation as it is often difficult if not impossible to effectively shield from such emissions when they originate from an external source. Historically this type of chronic, involuntary exposure scenario has led to substantial exacerbation of Ms. Adkins' symptoms and a marked deterioration of her health.

It is my medical recommendation that Ms. Adkins be provided with reasonable accommodations and/or modifications sufficient to avoid exacerbation of her symptoms so she can equally access both her home and public facilities. With proper accommodation and reduction/elimination of exposures, Ms. Adkins is relieved of unnecessary and painful suffering and can better prevent further deterioration to her already fragile health. Ms. Adkins is the one who can best determine her accommodation needs on a case-by-case basis.

**EXHIBIT 18 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



12/8/2016

To Whom It May Concern,

I am writing on behalf of my patient, ████ Adkins. ████ medical history indicates a clear correlation between his health and functioning and his exposure to EMF. Exposure in his home has increased substantially due to his neighbor's increased equipment and upgrades over a period of many months, and his condition has substantially worsened as a result. Any individual, government agency, or private entity that has the ability and the means to reduce the EMF emissions entering ████ home should take steps to do so immediately as this involuntary exposure constitutes ongoing injury to my patient. 

Please contact me if further information is required.



**EXHIBIT 19 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



10/3/2017

Re: ███ Adkins and Mary Adkins

To Whom It May Concern,

Both ███ and Mary are patients of mine, who have a severe form of electromagnetic frequency radiation sensitivity, which causes severe limitations in their lives, and debilitating and disabling symptoms which make it hard to function.

These problems have greatly worsened since the installation of smart electric meters in their neighborhood. Their attempts to get these meters removed have not been successful.

Because of the severity of their symptoms, I believe that they have no other remaining options but to move to a less EMF-saturated location.

Please contact me for further information if required.



**EXHIBIT 20 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

JA_00387



Village at Indian Lake
Board of Directors
191 Table Rock Road
Wakefield, RI 02879
27 August 2016

Mary Adkins
78 White Falls Trail
Wakefield, RI 02879



Ref:    (a) Email from Mary Adkin to the VAIL Board on 1 January 2016
        (b) Registered letter from VAIL Board to Mary Atkin on 7 January 2016
        (c) Email from Mary Adkin to the VAIL Board on 5 July 2016
        (d) Meeting with Mary & Bill Adkins on 25 August 2016
        (e) Meeting with █████ █████ s on 27 August 2016

Subj:   Issue of Radio Frequency (RF) Emissions from 80 White Falls Trail

All,

The Board has been addressing the issue of RF emissions from the █████ house since being contacted by Mary Atkins in reference (a). After some discussion, the Board made the determination that RF emissions is not an issue within the Board's purview. As stated in reference (b), "It is our opinion the RF emissions are not covered – implicitly or explicitly – under the VAIL Bylaws and Covenants".

This issue was raised again by Mary Atkins in reference (c) upon the arrival of a FiOS truck in the █████ driveway. Several emails from Mary followed, each increasing in tone and urgency. This culminated in a meeting at Mary's house with Bill Adkins in attendance (reference (d)).

Before the meeting the Board conferred with two lawyers and a representative of the RI Governor's Commission on Disabilities, who put us in touch with the organization responsible for the American's with Disabilities Act. None of these people/organizations felt the VAIL Community Association has jurisdiction in a dispute between two neighbors concerning issues occurring on private property where neither neighbor has broken the law.

In the meeting at the Adkin's house, Mary outlined her sensitivity to RF emissions and stated that she holds the █████ responsible for her family's health conditions; "I have a very sick child because of what he has done". The Board agreed to meet the █████' and offer to involve a third party mediator, which occurred the two days later (reference (e)).

The ███ stated they are by no means responsible for Mary's family health issues and are feeling harassed by Mary's insistence that they are. The ███ indicated the following:

- The RF emissions from their house are legal and they will not alter said emissions.
- They will not enter into mediation and request no further discussion about this matter
- They are seeking legal guidance to include, but not limited to, a Cease & Desist Order.

The Board has discussed the matter with both parties and feels it has exhausted its options and responsibilities regarding a dispute between neighbors. The Board considers their involvement in this matter closed.


Sincerely,



Michael Visich
VAIL President







cc: VAIL Records

JA_00389

**EXHIBIT 21 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

JA_00390



Village at Indian Lake
Board of Directors
191 Table Rock Road
Wakefield, RI 02879
2 August 2019

Mary Adkins
78 White Falls Trail
Wakefield, RI 02879

Ref:    E-mail from Mary Adkins to the Board on 22 July, 2019

Subj:   Modifications to your property

Mary,

       In your e-mail to the Board on 22 July 2019 at 7:55pm, you indicated your
intent to modify your property and provided both details and several representative
photos. The information you provided suggests this modification is ipso facto a fence.

- Section 14.B & C of the old Declaration of Covenants and Restrictions (DCR)
  state the Board has cognizance of "... accessory buildings, wall, fence...".

- Section 14.J of the newly approved Revised and Amended Declaration of
  Covenants and Restrictions (RADCR) states that no fence "...shall be erected,
  placed, or suffered to remain upon the Development nearer to any highway
  now existing or hereafter established than the front of the building...". Based
  on the information you provided, the fact pattern suggests that the fence you
  plan to install will be nearer to the road than the front of your home.

Section 14.B&C of the DCR prohibits any fence without Board approval and Section
14.J of the RADCR clearly prohibits fences in front yards. Therefore, to enforce and
comply with these VAIL governing documents – old & new – this letter is notice that
your request for modification is henceforth denied.


Thank you

Patrick McCarty, VAIL Secretary

**EXHIBIT 22 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

JA_00392



NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

Neal J. McNamara
*Partner*
T 401-454-1019
nmcnamara@nixonpeabody.com

One Citizens Plaza, Suite 500
Providence, RI 02903-1345
401-454-1000

January 6, 2015

Ms. Karen Lyons
Department of the Attorney General
Consumer Protection Unit
150 South Main Street
Providence, RI 02903

**RE: Mary Adkins Consumer Complaint**

Dear Ms. Lyons:

As you may know, this firm represents National Grid. We are in receipt of your letter requesting National Grid's response to the consumer complaint filed by Mary Adkins. As you state in your letter to Attorney Celia O'Brien of National Grid, Ms. Adkins "ultimately claims that she is being discriminated against because she is required to pay the 'opt-out charge' on her gas bill." This letter comprises National Grid's response to the allegations raised by Ms. Adkins. As set forth in more detail below, the Rhode Island Public Utilities Commission (the "PUC" or the "Commission"), not National Grid, is the proper party to bring such a consumer complaint against. Alternatively, even if National Grid were the proper party, which National Grid disputes, National Grid reserves the right to argue it has not discriminated against Ms. Adkins, under the Americans with Disabilities Act ("ADA") or otherwise.

**I.      The PUC is Charged with the Exclusive Power and Authority to Supervise and Regulate Companies Offering Public Utilities**

The Attorney General's website states that "The Consumer Protection Unit investigates and mediates consumer complaints concerning unfair and unlawful business practices and misleading advertising arising out of alleged violations of the Deceptive Trade Practices Act." That Act, at R.I.G.L. §6-13.1-1(6), defines "unfair methods of competition and unfair or deceptive acts or practices" to include a number acts and practices. However, the Act does not describe charging a fee provided for in a tariff approved by the PUC as an unfair method of competition or an unfair or deceptive act or practice.

Rather, R.I.G.L. Chapter 39-1-1 vests within the PUC the exclusive authority to supervise, regulate, and make orders governing the conduct of companies, such as National Grid, who provide certain utilities to the public. Specifically, the PUC is charged with overseeing that these companies provide "just and reasonable rates and charges for such services and supplies, *without unjust discrimination*, undue preferences or advantages, or *unfair*

January 6, 2015
Page 2

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

*or destructive competitive practices.*" R.I.G.L. 39-1-1(b). Thus, the PUC ultimately is responsible for determining whether companies, such as National Grid, are promoting the public interest, or acting against it.

## II.    The PUC Approved National Grid's "Opt Out" Tariff

In July 2012, National Grid filed with the PUC proposed amendments to its Electric Tariff (R.I.P.U.C. No. 2072) and Gas Tariff (NG-Gas No. 101). See Exhibit A: Report and Order of the Rhode Island Public Utilities Commission. These proposed amendments were in direct response to customers requesting removal of their Automated Meter Reading meters ("AMRs") in favor of manual read meters. Exhibit A. The customers were concerned with the alleged adverse health effects from the radio frequencies emitted by the AMRs. Exhibit A. National Grid's proposed amendments allowed customers to "opt out" of using the AMR meters, while National Grid would charge a one-time installation fee, along with a monthly opt out fee, in order to offset the labor costs associated with installing and manually reading the meters. Exhibit A.

On December 20, 2012, The Commission approved National Grid's Revised Tariffs (R.I.P.U.C. No. 2124 and R.I.P.U.C NG-GAS No. 101). Exhibit A. The Commission explicitly found that the proposed revisions (*lowering* the installation and monthly fees associated with opting out) struck "*an appropriate balance* between allowing customers with real concerns the ability to have their meters replaced while appropriately compensating the Company for the additional estimated costs." Exhibit A. Accordingly, the Commission approved the proposed amendments and ordered them into effect beginning January 1, 2013. Exhibit A.

## III.    Adkins' Complaint Should be Brought Against the PUC

As detailed above, the PUC has the exclusive authority to make orders governing the conduct of companies providing utilities to the public in Rhode Island. With that knowledge, National Grid brought its proposed amendments before the PUC, leaving it up to the PUC to decide whether the "opt out" fee was reasonable. The PUC, fully aware that these proposed amendments were brought in response to customers' concerns with alleged health risks associated with AMRs, stated that the opt out fee struck an appropriate balance between these concerns and National Grid's need to offset its additional labor costs. Thus, National Grid's enforcement of its opt out fee is in accordance with the approved Tariff. Accordingly, Adkin's complaint would be more appropriately brought against the PUC and the Tariff it approved, not with National Grid's compliance with the Tariff.

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

## IV.    Adkins May File a Complaint with the Department of Justice

Ms. Adkins alleges that National Grid violated the ADA, specifically 28 C.F.R. §§ 36.206, 36.301(c) and 36.302. To demonstrate a violation, she would first have to prove that she is an individual with a disability, as defined in 28 C.F.R. §36.104. Assuming that she could meet that burden, the rules specify that her remedy is either to commence a suit or file a complaint with the United States Department of Justice. 28 C.F.R. §36.501 et seq. The complaint form can be found at www.ada.gov/filing_complaint.htm. Her remedy is not to file a complaint with the Rhode Island Attorney General's office. I should note that counsel have been unable to locate one case that held that EMF sensitivity constitutes a disability under the ADA or any similar disability discrimination statute.

## V.    National Grid has not Discriminated Against Ms. Adkins

Alternatively, even if National Grid were a proper recipient of this complaint in this forum, which National Grid disputes, it still has not discriminated against Ms. Adkins. Ms. Adkins has not submitted any evidence that she or her family members have a disability as defined by 28 C.F.R. §36.104. Nor has she submitted any evidence as to the deleterious effects of the technology at issue on her and her family members. On the contrary, the use of AMRs, including the radio frequency ("RF") emissions from the AMRs, fully comply with federal safety regulations and other RF standards, and no state or federal regulatory body or health agency that has considered the health impact of these meters have found them to be unsafe. See Exhibit B: Maine Public Utilities Commission Examiners Report.

Very similar facts were recently brought before the Maine Supreme Judicial Court ("SJC") in Friedman v. Pub. Utilities Comm'n, 48 A.3d 794 (Me. 2012). The Plaintiffs in Friedman alleged that the "smart meters," similar to the AMRs here, posed serious health and safety risks. Id. at 798. The Maine SJC, however, refused to dismiss plaintiffs' claims against the local power company defendant because the Public Utilities Commission had not determined whether the smart meters posed any health or safety risks. Id. at 800-01. Thus, the Maine SJC remanded the case to the Public Utilities Commission, who then undertook a thorough investigation into the health and safety risks allegedly associated with these meters.

On March 25, 2014, the Maine Public Utilities Commission released an Examiners' Report along with the recommendation of the Commission Staff. Exhibit B. A quick summary of the Examiners' Report, contained in the first two pages, reveals:

- The RF emissions from Central Maine Power Company's ("CMP") smart meters and other AMI components comply with duly promulgated federal safety regulations and other RF emission standards;

January 6, 2015
Page 4

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

- No state, federal, or Canadian regulatory body or health agency that has considered the health impacts of smart meters (including Maine's Center for Disease Control and Prevention) has found smart meters to be unsafe;

- The scientific evidence presented in this proceeding is inconclusive with respect to the human health impacts from low-level RF emissions generally;

- There are no credible, peer-reviewed scientific studies in the record that demonstrate, or even purport to demonstrate, a direct human health risk specifically from smart meter RF emissions;

- The studies that have been presented in the record to demonstrate the risk to human health from exposure to RF-emitting devices are based on exposure to substantially higher levels of RF emissions than smart meters;

- The relative RF emission exposure from smart meters is significantly less than other commonly used RF-emitting electronic devices; and

- CMP's installation and operation of its smart meter system is consistent with federal and state energy policy and is a generally accepted utility practice throughout the country.

Thus, after thoroughly investigating and considering the alleged health effects of smart meters on humans, the Maine Public Utilities Commission determined that the use of smart metes is a "safe, reasonable, and adequate utility service as required by statute." Exhibit B. Accordingly, National Grid cannot have discriminated against Ms. Adkin's on the basis of an alleged disability stemming from exposure to such safe technology. Ms. Adkin's complaint is more appropriately one aimed at the Rhode Island PUC allowing National Grid's proposed amendment to its Tariffs. Therefore, her complaint should, if at all, be brought against the PUC.

For the foregoing reasons, National Grid respectfully requests that Ms. Adkins' complaint be dismissed in its entirety. Please contact me if you have any questions or need additional information.

Sincerely,

Neal J. McNamara

Encls.
NJM/ml

**EXHIBIT 23 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

Original Message ----------
> From: "Kogut, Thomas (DPUC)" <Thomas.Kogut@dpuc.ri.gov>
> To: Mary ███████████████
> Date: July 6, 2016 at 1:19 PM
> Subject: RE: RE: Urgent: Verizon disability-related matter--correction
>
> Hello Mary,
>
> On the issue of wireless router ownership both Verizon and Cox customers own their own. Verizon does offer a lease option for a monthly fee, but the router is the customer's property. I imagine a significant number of customers simply purchase the router with a one-time payment.
>
> The issue of ownership though has little bearing on your situation. Here we are specifically addressing an issue related to internet service which is under the jurisdiction of the FCC. As I am sure you're aware, the FCC also establishes parameters for frequencies, rf output and related technical requirements for a wide range of transmitting devices.  Our limited regulatory purview begins and ends at the cable television portion of and bundled service, and even then, it is limited by overriding FCC provisions.
>
> That said, you still have a situation that needs to be addressed.  While I may not have a regulatory solution, I was wondering whether it would make any sense for us to have a conference call with Bob Cooper (I saw him copied on an earlier e-mail) to see if he has any suggestions.
>
> - Tom Kogut
>
>
>
>
>
> -----Original Message-----
> From: Mary ███████████████
> Sent: Wednesday, July 06, 2016 10:26 AM
> To: Kogut, Thomas (DPUC) <Thomas.Kogut@dpuc.ri.gov>
> Subject: Fwd: RE: Urgent: Verizon disability-related

> ---------- Original Message ----------
> From: "Contente, Al (DPUC)" <Al.Contente@dpuc.ri.gov>
> To: Mary ███████████████
> Date: July 8, 2016 at 4:46 PM
> Subject: RE: Urgent National Grid Electric disability matter
>
> Ms. Adkins,
>
> I have reviewed you emails and consulted with our legal department. I understand that your neighbor is likely to install an AMR (automatic meter reading) meter or a smart-meter of some sort. I also have you letter from Dr. Shevin and understand that you have concerns about an additional source of radio frequencies from your neighbor.
>
> The Division reviewed the tariff advice filing National Grid made in 2012 when the PUC allowed the AMR opt-out provision for gas and electric customers, and I know Division staff has done meter research on your behalf with utility meters over the last few years.
>
> I did confirm today the meter recently installed at 80 White Falls Trail is indeed of the AMR type, but as the January 2015 letter to you from our attorney at the Attorney General's office submitted, the ADA does not give the RI Division of Public Utilities the jurisdiction to stop the utility from installing a meter that is not only certified by NGrid, registered by the FCC, but also installed in a manner inspected by the town's building official. We simply do not have the authority to prevent the utility company from operating within the rules that both the Commission and Division have in place at this time.
>
> Perhaps there are avenues you may to take so as to remedy this personal situation.
>
>
> Regards,
>
> Al Contente
>
> -----Original Message-----

---------- Original Message ----------
From: ccp █████████████████
To: MARY ADKINS ████████████████
Date: April 24, 2019 at 7:08 PM
Subject: Shillings response

Mary,
Here's Shillings's response to my latest email.


Ms. ████████

You need to take your complaint to the Federal Communications Commission, we don't regulate EMF. You also have the option of hiring an electrician to relocate your meter on a pedestal away from your house.



Respectfully,


Joseph Shilling

Rhode Island Division of Public Utilities

Public Utilities Engineering Specialist II

Phone: (401) 780-2121

Fax: (401) 941-4885



Mary Adkins, M.Ed.
*Former Rhode Island Regional Director, Citizens for Safe Technology*
*Former Configuration Manager, MK 48 ADCAP Torpedo Program, NUWCDIVNPT*

"The wheels of justice turn slowly, but grind exceedingly fine."

---------- Original Message ----------
From: "Shilling, Joseph (DPUC)" <Joseph.Shilling@dpuc.ri.gov>
To: MARY ADKINS
Date: December 2, 2019 at 9:30 AM
Subject: RE: [EXTERNAL] : Mary Adkins waveform distortions again??

Mary Adkins,

All complaints need to begin by the customer contacting National Grid directly. You may also contact
the Federal Communications Commission.


Respectfully,


Joseph Shilling

Rhode Island Division of Public Utilities

Public Utilities Engineering Specialist II

Phone: (401) 780-2121

Fax: (401) 941-4885




**From:** MARY ADKINS
**Sent:** Thursday, November 28, 2019 12:34 AM
**To:** Shilling, Joseph (DPUC) <Joseph.Shilling@dpuc.ri.gov>
**Subject:** [EXTERNAL] : waveform distortions again??


Dear Mr. Shilling,

JA_00401

**EXHIBIT 24 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

# NON-CONSENT FORM
## regarding wireless computer access and use

**Student's Name:** ███ ███ Adkins          **Grade:** 6

School: Broad Rock Middle School

Date: 6/10/10

Due to the over 2,000 published, peer-reviewed scientific studies that document the harmful biological effects to human health (especially to children) caused by exposure to non-thermal, non-ionizing radiation that is emitted by pulsed modulated signals from wireless devices, please note that I do <u>not</u> consent to my child, named above, using any computers serviced by wireless connections (Wi-Fi, WLAN, Bluetooth, etc.) while in school. Neither do I consent to my child remaining in the classroom or any other room while other students, teachers, or staff are using computers serviced by wireless connections or using other wireless devices. Other wireless devices would include (but is not limited to) cell phones, Smartphones, iPhones, iPads, Personal Digital Assistants, Blackberrys, DECT phones, etc. I do not consent to my child being in the proximity (same room) of personal wireless devices left in the "on" or "standby" mode but not currently in use, such as a personal cell phone kept in a teacher's or student's pocket with volume turned down. These devices are still broadcasting and receiving harmful signals as long as the power is on. Please note that at this time I do consent to my child using hardwired computers in school as long as they are not located in close proximity (same room or on an opposing wall) to a wireless computer. At this time I do consent to my child participating in lessons and doing schoolwork in a classroom that is free of non-thermal, non-ionizing radiation that is emitted by pulsed modulated signals from wireless devices. I request that any classwork my child may miss due to my non-consent be sent home in a timely manner so that my child can complete these assignments at home.

Signed by **parent(s) or legal guardian(s):**

Name: William Adkins , William R. Adkins

Address: 143 Peaked Rock Rd  Wakefield , RI 02879

Phone: 284-4530          Date: 6/10/10

Name: Mary Adkins          Mary Adkins

Address: 143 Peaked Rock Road    Wakefield, RI 02879

Phone: ███ ███          Date: 6/10/10

JA_00403

*to m. Humbyrd*
*9/7/10*

# NON-CONSENT FORM
### regarding wireless computer access and use

**Student's Name:** ▉▉▉▉▉▉▉▉▉▉  **Grade:** 7
(first and last, please print)

**School:** Curtis Corner Middle School

**Date:** 9/7/10

**To:** Michele Humbyrd  **Title/Position** Principal

Please note that I **DO NOT** CONSENT to my child, named above, using any computers serviced by wireless connections (Wi-Fi, WLAN, Bluetooth, etc.) while in school. I **DO NOT** CONSENT to my child being in a classroom or any other room with an active wireless Access Point, wireless computer, or other wireless device. I **DO NOT** CONSENT to my child being exposed in the classroom or the school to nonthermal, nonionizing radiofrequency radiation and microwave radiation from pulse-modulated Information Carrying Radio Waves (ICRWs) deployed by wireless devices within that classroom or elsewhere in the school. I **DO NOT** CONSENT to my child remaining in the classroom or any other room while others (students, teachers, staff) are using computers or devices served by wireless connections. This includes any wireless device left in the "on" or "standby" mode, such as cell phones, Blackberrys, iPads, Smartphones, etc.

Please note that at this time I **DO** CONSENT to my child using **hardwired computers** in school as long as they are not located in close proximity (same room or on an opposing wall) to a wireless computer or Access Point. I **DO** CONSENT to my child participating in lessons and doing schoolwork in a classroom that is **free** of nonthermal, nonionizing radiation from radiofrequency and microwave pulsed-modulated signals from wireless devices.

I would appreciate action in this regard.

**Please respond to: parent(s) or legal guardian(s) named below:**

**Name(s):** Mary Adkins     William Adkins

**Home address:** 143 Peaked Rock Road
Wakefield, RI 02879

**Home phone number(s)** ▉▉▉ - ▉▉ ▉▉ ▉▉

**Signature(s):** *Mary Adkins*   *William R. Adkins*

**cc:** _____

**EXHIBIT 25 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**

**SOUTH KINGSTOWN SCHOOL DEPARTMENT**
**CURTIS CORNER MIDDLE SCHOOL**
301 CURTIS CORNER ROAD, WAKEFIELD, RI 02879-2195

PHONE (401) 360-1333 FAX (401) 360-1334

**Michele Humbyrd, Ed. D.**
**Principal**

**Kathleen Egan**
**Assistant Principal**
**Tel. # 360-1368**

**Linda McCormack**
**School Counselor**
**Tel # 360-1395**
**Fax # 360-1399**

**Loren Hedman**
**School Counselor**
**Tel # 360-1395**
**Fax # 360-1399**

**Susan Darby, SNT**
**Nurse**
**Tel # 360-1341**

June 14, 2010

Dear Mr. & Mrs. Adkins:

We have received a copy of the non-consent form that you submitted on
June 10, 2010 regarding wireless computer access and use.

We want to make you aware that currently Curtis Corner Middle School has five
WI access points. They are located in the library, the computer lab room
(Rm. 201), the conference room (Rm. 404), the cafeteria, and the gym. These
points emit a low-level signal unless activated by a wireless device.
All Cisco and Linksys wireless products are evaluated to ensure that they conform
to the RF emissions safety limits adopted by agencies in the United States and
around the world. These evaluations are in accordance with the various
regulations and guidelines adopted or recommended by the Federal
Communications Commission (FCC)* and other worldwide agencies. We
anticipate that the school will have 100% wireless coverage in the future.

We would also like to make you aware that we are unable to monitor the mode of
personal wireless devices, such as cell phones, used by teachers and other
students.

Sincerely,

Michele Humbyrd
Principal

Kathleen Egan
Assistant Principal

JA_00406

**EXHIBIT 26 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



FW: Wireless

**Subject:** FW: Wireless
**From:** "Linda Paolillo" <lpaolillo@kingstonhill.org>
**Date:** 9/9/2013 1:37 PM
**To:** "Mary Adkins"

Hi Mary,

The IT department was able to start the install today and gave me the information regarding the equipment.

Attached is a picture of the two wireless access points we installed in first and fifth grade classrooms. They are Hewlett Packard model 420 access points. The third piece of equipment in the photo is the Power over Ethernet (PoE) switch to which they are connected. It is a hard wired switch and is not wireless.

The student is using an iPad with retina display (the most current version to date) with a keyboard using Bluetooth technology.

If you have any other questions, please let me know!

Linda Paolillo
Principal
Kingston Hill Academy
850 Stony Fort Road
Saunderston, RI 02874

lpaolillo@kingstonhill.org
401.783.8282
401.783.5656 (fax)

Check out our new official Kingston Hill Academy Facebook page!
https://www.facebook.com/pages/Kingston-Hill-Academy/52391019099168(

    IMG00320-20130909-1146.jpg

JA_00408

.less



Attachments:

fMG00323-20130909-1146.jpg                                    78.7 KB

JA_00409

**EXHIBIT 27 TO AFFIDAVIT OF MARY ADKINS IN SUPPORT OF STANDING**



**SOUTH KINGSTOWN SCHOOL DEPARTMENT**

**BROAD ROCK MIDDLE SCHOOL**

351 BROAD ROCK ROAD, WAKEFIELD, RI  02879

SHEILA SULLIVAN, PRINCIPAL

(401) 782-6223
FAX (401) 782-6282

March 31, 2010

Re:    Attendance for ▮▮▮▮ Adkins

Dear Parent/Guardian,

This letter is to remind you your child has accumulated at least 10 total absences and/or
tardies to this point in the school year. According to our current records, your child has
been absent **9 days** and tardy **2 times.** (Please note the enclosed printout.)

In our experience, students who do not attend classes regularly do not perform as well
as they should. Their scholastic achievement and growth are at risk. I am sure that you
recognize the importance of good attendance in scholastic success. The Attendance
Policy, as it appears in your child's planner, is on the reverse side of this letter. We
encourage you to review the policy with your child and to also note the consequences of
absences and tardies. Excessive absences/tardies may be cause for referral to the
district Truant Officer.

If we can be of assistance to you in this situation, please contact us at 782-6223.

Sincerely,

Sheila Sullivan
Principal

*sick all the time due to WiFi*

C:  Guidance
     Truant Officer

JA_00411

ROBERT B. McCARTHY
Principal

YW M. CRONIN
Assistant Principal

ROBERT E. YOUNG, JR.
Assistant Principal

ROSE MARIE MAJEIKA
Guidance Director

LINDA S. JENNINGS
School Nurse Teacher

TEL: 401-360-1000
FAX: 401-380-1455
TTY: 1-800-745-5555

I am writing to follow up on the 504 meeting which took place on Thursday, October 18, 2012. As you know, this meeting was a continuation of a prior meeting dated September 14, 2012. At the meeting on the 18th, the team reviewed correspondence from the School District's physician, Dr. Roger Fazio. Dr. Fazio wrote this correspondence after speaking with ▮▮ ▮▮▮▮ per a duly authorized release. The team also heard from you and your advocate and considered additional documentation you provided.

As a result of these multiple meetings, a consensus of the 504 team has determined that ▮▮▮▮'s 504 will not be modified to include accommodations related to your claim that he suffers from "electro-magnetic sensitivity". The team believes that, based upon all of the information available to them, this particular alleged ailment does not constitute a physical or mental impairment that substantially limits one or more major life activities. In addition, the accommodations you have requested, a wi-fi and cell phone free environment, are not reasonable accommodations. Such an accommodation would jeopardize the health and safety of staff and students throughout the high school and would have a negative educational impact to students and staff as well.

Of course, the remainder of the accommodations in ▮▮▮▮ 504 plan shall remain intact and are available to ▮▮▮ effective immediately once you return him to school. Please note that ▮▮▮▮r is enrolled in the South Kingstown public schools and a free and appropriate public education has been made available to him. Therefore, he must attend school pursuant to School Committee policy and Rhode Island law. The home instruction he was being provided while the District gathered medical information will cease on November 1, 2012. If you have any further questions or comments please feel free to contact me

Respectfully,

Kevin Cronin, Assistant Principal

Cc: Teresa Eagan, Director of Pupil Personnel

The South Kingstown School Department does not discriminate on the basis of age, sex, race, religion, national origin, or disability in accordance with applicable laws and regulations