United States Court of Appeals
for the
District of Columbia Circuit

| | | |
|---|---|---|
| Environmental Health Trust, *et al.,* | ) | |
| Petitioners | ) | No. 20-1025 |
| | ) | |
| | ) | |
| v. | ) | On Petition for Review |
| | ) | of an Order of |
| | ) | the Federal Communications |
| Federal Communications Commission | ) | Commission |
| and United States of America, | ) | |
| Respondents. | ) | |

---

**JOINT MOTION OF PETITIONERS IN CASE NO. 20-1025 FOR ATTORNEYS' FEES AND EXPENSES UNDER THE FEDERAL EQUAL ACCESS TO JUSTICE ACT**

Petitioners in Case No. 20-1025 ("EHT Petitioners") hereby jointly submit this Motion requesting that the Court enter an order awarding reasonable attorneys' fees of $174,347.25 based on 625.75 hours of work performed in connection with this action by attorneys and paralegals, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, *et seq.* ("EAJA"). The additional time required to prepare the instant Motion will be the subject of a supplemental filing should the Court grant the Motion.

This Motion is made on the grounds that EHT Petitioners have satisfied all requirements for an award of attorneys' fees under EAJA. It is based on the points and authorities contained herein; the October 5, 2021 Mandate in this action (Exhibit

1 to this Motion); the August 13, 2021 Opinion on the merits in this action, officially reported as *Envtl. Health Trust, et al. v. Fed. Communications Comm'n*, 9 F.4th 893 (D.C. Cir. 2021) (Exhibit 2 to this Motion); the Declaration of Edward B. Myers ("Myers Declaration") and all attachments thereto (Exhibit 3 to this Motion); the Declaration of Eric P. Gotting ("Gotting Declaration") and all attachments thereto (Exhibit 4 to this Motion); the other exhibits attached to this Motion; and all pleadings, records, and papers filed in this action deemed to be on file in this action, or of which the Court may take judicial notice at or before the time of the hearing of this Motion.

The counsel of record for EHT Petitioners has discussed the relief requested in this Motion with counsel of record for the Federal Communications Commission ("FCC" or "Respondents") in a good faith effort to determine whether a mutually-agreeable resolution could be obtained.  These parties were unable to reach a resolution prior to the filing of this Motion.  Counsel for co-petitioners in 20-1138 (consolidated) has indicated that they do not oppose this motion.

## **Procedural History**

The Telecommunications Act of 1996 directed the FCC "to prescribe and make effective rules regarding the environmental effects of radiofrequency emissions."  Pub. L. No. 104-104, § 704(b), 101 Stat. 56, 152 (1996).  In response, on August 1, 1996, the FCC adopted rules setting exposure limits for radiofrequency

("RF") emissions from communications user equipment (*e.g.*, cell phones, Internet of Things-equipped devices, and earth stations) and communications system infrastructure and technologies (*e.g.*, 5G antennas, cell phone towers, boosters, repeaters, Wi-Fi routers, and space stations), along with other "intentional radiators" (*e.g.*, "smart meters").    Report and Order, *Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, FCC 96-326, ET Docket No. 93-62 (rel. Aug. 6, 1996).  The purpose of the rules was to "protect the public and workers from exposure to potentially harmful RF fields." *Id*. at 1.

On March 27, 2013, the FCC opened a Notice of Inquiry to assess whether the 1996 regulations needed to be revised in order to protect human health and safety and the environment.    First Report and Order, Further Notice of Proposed Rulemaking, and Notice of Inquiry, *Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, FCC 13-39, ET Docket No. 13-84 (rel. Mar. 29, 2013).  Numerous persons (including but not limited to the EHT Petitioners) submitted substantial peer-reviewed scientific and medical evidence identifying serious public health, safety, and environmental risks from contemporary communications devices and technologies and documented why and how the 1996 regulations, substantially unchanged since their first promulgation, are inadequate to meet the FCC's statutory obligations.  The record below further demonstrated that a new generation of telecommunications devices

commonly referred to as 5G, once deployed and activated, will worsen the ill effects of RF emissions on the general population and the environment.

Notwithstanding this evidence of harm, the FCC declined in the proceeding below to revise the 1996 regulations. Resolution of Notice of Inquiry, Second Report and Order, and Memorandum Opinion and Order, *In the Matter of Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields; Reassessment of Federal Communications Commission Radiofrequency Exposure Limits and Policies; Targeted Changes to the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, FCC 19-126, ET Docket Nos. 03-137 and 13-84, 34 FCC Rcd 11687 (rel. Dec. 4, 2019), published at 85 Fed. Reg. 18,131 (Apr. 1, 2020) ("Order"). The Order terminated the agency's proceeding without a meaningful evaluation of the substantial body of scientific and medical evidence submitted into the administrative record.

The four EHT Petitioners, including Environmental Health Trust, Consumers for Safe Cell Phones, Elizabeth Barris, and Theodora Scarato, filed their Petition for Review of the Order with this Court on January 31, 2020 in Case No. 20-1025. The Petition for Review named both the FCC and the United States as Respondents. This case was eventually consolidated with a Petition for Review filed by the Children's Health Defense and others (collectively, "CHD"), which had been originally filed in

4

the Ninth Circuit and then transferred to this Court.  The EHT Petitioners and CHD Petitioners jointly briefed the case.

On August 13, 2021, the Court issued its decision in this matter wherein it determined that the FCC had "failed to provide a reasoned explanation for its determination that its guidelines adequately protect against the harmful effects of exposure to radiofrequency radiation unrelated to cancer."  The Court, even while applying a highly deferential standard of review, found the FCC's order arbitrary and capricious in its failure to address record evidence.   In particular, it found that the FCC had failed to offer an adequate explanation in regard to evidence indicating that exposure to RF radiation at levels below the agency's current limits causes a number of serious negative health and environmental effects.  The Court determined that such "failure undermines the Commission's conclusions regarding the adequacy of its testing procedures, particularly as they relate to children, and its conclusions regarding the implications of long-term exposure to RF radiation, exposure to RF pulsation or modulation, and the implications of technological developments that have occurred since 1996…"  In addition, the Court found the FCC arbitrary and capricious in its complete failure to acknowledge, let alone respond to, comments concerning the environmental harm caused by RF radiation.

The Court accordingly granted the petitions in part and remanded the matter to the FCC with a direction to the agency to provide a reasoned explanation for its

determination that its 1996 guidelines adequately protect against harmful effects of exposure to RF radiation unrelated to cancer. The Court specifically directed the FCC to: (i) provide a reasoned explanation for its decision to retain its testing procedures for determining whether cell phones and other portable electronic devices comply with the guidelines; (ii) address the impacts of RF radiation on children, the health implications of long-term exposure to RF radiation, the ubiquity of wireless devices, and other technological developments that have occurred since the Commission last updated its guidelines; and (iii) address the impacts of RF radiation on the environment.

__Argument__

For the reasons given below, EHT Petitioners have satisfied all requirements for an award of attorneys' fees under EAJA, and the claimed fees of $174,347.25 based on 625.75 hours of work by attorneys and paralegals are fair and reasonable. The Court should therefore award attorneys' fees to EHT Petitioners pursuant to EAJA. *See* 28 U.S.C. § 2412(d)(1)(a) ("[A] court *shall award* to a prevailing party other than the United States fees and other expenses.") (emphasis added).

### A.    The Equal Access To Justice Act Applies To This Action

Under EAJA, a court may award reasonable fees and expenses of attorneys and paralegals to the prevailing party in any civil action brought against the United States or any agency thereof. 28 U.S.C. § 2412(b). "The United States shall be

6

liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award."  Moreover, EAJA further provides:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses…incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

*See* 28 U.S.C. § 2412(d)(1)(A).  The term "fees and other expenses" is defined to include "reasonable attorney fees."  28 U.S.C. § 2412(d)(2)(A).

EAJA thus applies to this judicial review action because it is a civil action brought by the EHT Petitioners against the FCC, an agency of the United States, and against the United States itself.

### B.    Movants Are Eligible To Recover Fees Under EAJA

An individual with a net worth of $2 million or less, or the owner of a business or other organization worth $7 million or less and with no more than 500 employees may recover an award of attorneys' fees under EAJA.

The net worth calculation is based on subtracting total liabilities from total assets.  28 U.S.C. § 2412(d)(2)(B).  *City of Brunswick, Georgia v. United States*, 849 F.2d 501, 503 (11th Cir. 1988).

Additionally, nonprofits exempt from taxation under Section 501(c)(3) of the Internal Revenue Code ("IRC") are not subject to EAJA's size and net worth caps, provided they have less than 500 employees.  28 U.S.C. § 2412(d)(2)(B).

Neither Elizabeth Barris nor Theodora Scarato, the two individual petitioners in Case 20-1025, had a net worth over $2 million at the time the action was filed on January 31, 2020.  *See* Declaration of Cesar O Loya, EA (Exhibit 5 to this Motion) and Declaration of Debra Moses, CPA (Exhibit 6 to this Motion). Also, since their formation and continuously to this date, the two non-individual petitioners in Case 20-1025, have been nonprofits exempt from taxation under IRC Section 501(c)(3) and have never had more than 500 employees.  *See* Declaration of Cynthia Franklin (Exhibit 7 to this Motion) and Declaration of Devra Davis (Exhibit 8 to this Motion).

Therefore, the Movants all are eligible to recover an award of attorneys' fees.

## C.    This Motion Is Timely Filed

A party seeking an award of fees under EAJA must file an application within 30 days of final judgment.  28 U.S.C. § 2412(d)(1)(B).  Final judgment is a judgment that is final and not appealable…."  28 U.S.C. § 2412(d)(2)(G).

The Court issued its judgment and Opinion in this case on August 13, 2021. The FCC then had forty-five (45) days to appeal within the D.C. Circuit and ninety (90) days to appeal to the U.S. Supreme Court, which 90 days ran through November 11, 2021, at which time the Court's Judgment became a "final judgment" given the

FCC's lack of any appeal. *See* 28 U.S.C. § 2412(d)(2)(G); *Melkonyan v. Sullivan*, 501 U.S. 89, 95-96 (1991); *Al-Harbi v. Immigration and Naturalization Serv.*, 284 F.3d 1080, 1083-84 (9th Cir. 2002); Fed. R. App. Proc. 40; D.C. Circuit Rule 35; D. C. Circuit Handbook of Practice and Internal Procedures, Sections XIII(B) and XIII(C); Rule 13 of the Rules of the Supreme Court of the United States.

This Motion was therefore timely submitted within 30 days of the November 11, 2021 date on which this Court's Judgment became final and not appealable.

### D.   The Movants Are Prevailing Parties In This Action

Under EAJA, attorneys' fees are available to a "prevailing party" in the litigation. 28 U.S.C. § 2412(d)(1). In determining whether a litigant is a prevailing party, this Court applies a three-part test: (1) there must be a court-ordered change in the legal relationship of the parties; (2) the judgment must be in favor of the party seeking the fees; and (3) the judicial pronouncement must be accompanied by judicial relief. *Security Point Holdings, Inc. v. Transp. Sec. Admin.,* 836 F. 3d 32, 36 (D.C. Cir. 2016).

In order to satisfy this test, it is not necessary for the Court to direct a change in the losing party's primary conduct, *e.g.*, relief from a restriction, grant of a benefit, or imposition of a restriction on others. *Id.* at 37. Instead, it is sufficient if the "prevailing party is awarded some of the benefit sought in bringing suit and the matter is *final, i.e.*, the court order terminates the case on appeal. *Id.* at 38.

Furthermore, a remand to an administrative agency that terminates the case on appeal is sufficient to meet the prevailing party test.  *Id.* at 37-38; *Autor v. Pritzker,* 843 F.3d 994, 999 (D.C. Cir. 2016) (remand to agency constitutes final judgment necessary to sustain EAJA claim if the remand terminated the District Court's jurisdiction).

Thus, in *Security Point Holdings*, this Court vacated an order of the Transportation Security Administration for want of reasoned decision-making and remanded the case for further proceedings.  The Court found that the second and third criteria were clearly met and the only question requiring close examination was the first—whether the remand constituted a change in the legal relationship of the parties.  The Court carefully considered this question and determined that a remand constitutes a change in the legal relationship of the parties and is sufficient to confer "prevailing party" status if the remand achieves at least some of the benefit sought by petitioners in bringing the appeal and the Court has not retained jurisdiction over the case (*i.e.,* the remand has terminated the case on appeal).  *Security Point Holdings*, 836 F.3d at 36-39.

EHT Petitioners meet all three of the criteria set forth above.  As in *Security Point Holdings*, the Court in this proceeding has held that the Respondents have not provided a reasoned basis for the Order below (save on the question of cancer related to RF radiation) and has remanded the matter to the agency for further proceedings.

The judgment of the Court clearly is in favor of the EHT Petitioners and the relief granted—remand for further agency consideration—is the precise type of relief that the EHT Petitioners sought in prosecuting their appeal of the Order. *See* Pet'rs Final Joint Opening Br. at 65,102 (ECF 1870852); Pet'rs Final Joint Reply Br. at 6 (ECF 1870861). A party seeking to correct a procedural error in an agency's decision-making process is entitled to EAJA fees if, by appealing, it has secured that procedural relief regardless of the ultimate outcome of the case following remand. *Envtl. Defense Fund v. Reilly*, 1 F.3d 1254, 1257-58 (D.C. Cir. 1993).[1]

Thus, as in *Security Point Holdings*, the EHT Petitioners not only have clearly met the second and third criteria established by the Court, they also have satisfied the first of the *Security Point Holdings* criteria—a change in the legal relationship of the parties. The Court's judgment has changed the FCC's legal position because

---

[1] In *Environmental Defense Fund,* on joint motion of the parties, this Court vacated a rule change by the Environmental Protection Agency after petitioners appealed because EPA failed to conduct notice and comment, as required by the APA. Following remand, the EPA conducted notice and comment but ultimately implemented the same rule change that had formed the basis of the earlier appeal. In reviewing the EPA's opposition to the subsequent EAJA application, this Court ruled that the petitioners were prevailing parties notwithstanding the fact that the petitioners had secured procedural relief only and that the EPA ultimately had made the same rule change as before the appeal. *Id.* Similarly, in the instant case, the petitioners have secured the precise relief they sought—a directive to the agency to consider the comments that were filed below. It bears observing that the failure to take comments in *Environmental Defense Fund* is closely analogous to the failure in the instant case of the agency to consider comments that were filed. Both are violations of the APA that are remediable simply by remand regardless of the ultimate outcome following remand.

compliance by the FCC will require the FCC to consider the evidence submitted in the proceeding below that the agency previously did not consider either by re-opening the Notice of Inquiry proceeding that it previously terminated or establishing an entirely new proceeding for the purpose of addressing the issues identified by the Court. Moreover, in remanding the matter to the agency, the Court here (as in *Security Point Holdings*) has not retained jurisdiction over the matter and the appeal has been terminated. The change in legal relationship wrought by the Court's judgment and Opinion thus is *final* and the relationship between the parties has been unalterably changed.

### E.    The FCC's Position Was Not Substantially Justified

The FCC's decision to close the NOI and its position on appeal also were not "substantially justified." 28 U.S.C. § 2412(d)(1)(B). "The government bears the burden of establishing substantial justification." *Security Point Holdings*, 836 F.3d at 39 (citation omitted). Whether the FCC's position was "substantially justified" depends, in turn, on whether it "could satisfy a reasonable person" – *i.e.*, whether the position has a "reasonable basis both in law and fact." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). And the FCC must satisfy this burden both as to the underlying agency action, as well as the legal arguments made in defense. *Halverson v. Slater*, 206 F.3d 1205, 1208 (D.C. Cir. 2000). It cannot do so here.

This Court, in finding that the FCC's termination of the NOI was arbitrary and capricious, did not apply a standard level of deference under the APA. Rather, it made clear that the FCC was "entitled to a high degree of deference" because the decision was "akin to a refusal to initiate a rulemaking" and this matter "concern[ed] highly technical determinations of the kind courts are ill-equipped to second guess." 9 F.4th at 903. Yet even under this extreme level of deference, the Court still found that the FCC had failed to meet the bare minimum requirements of the APA – namely that the FCC failed to consider "relevant factors" or to adequately set forth its decision-making process. *Id.*; *see Security Point Holdings*, 836 F.3d at 40 (finding no substantial justification where the agency's "indifference seems sufficiently beyond normal 'arbitrary and capricious' agency action.").

As noted by the Court, Petitioners and others placed into the administrative record extensive comments containing over a thousand peer-reviewed studies and medical reviews casting doubt on whether the RF standards remained protective of human health (for impacts unrelated to cancer) and the environment. *See, e.g.,* 9 F.4th at 910 (noting that the "record contained substantial information and material from" numerous sources, including the American Academy of Pediatrics, medical associations, and thousands of physicians and scientists); Pet'rs Joint Opening Br. at 10-11 (Doc. #1856700). And in the opening brief, Petitioners alleged, *inter alia*,

that the FCC completely ignored much of this evidence, and at most did nothing more than offer conclusory statements in response. *Id.* at 62-63.

This Court agreed. Throughout the opinion, this Court characterized the FCC's approach as to risks unrelated to cancer and environmental harms as wholly lacking in any substance. For instance, it described the FCC's decision: (i) as failing to offer more than "mere conclusory statements" or failing to "respond to record evidence"; (ii) as being of "the conclusory variety"; (iii) as failing to "provide a reasoned explanation for brushing off record evidence addressing non-cancer-related health effects" involving children; (iv) as a "failure to discuss the implications of long-term exposure to RF radiation"; and (v) as lacking any "explanation as to *why*, in light of the studies in the record, its guidelines remain adequate." 9 F.4th at 903, 904, 908-909, 906 (emphasis in original). The Court concluded the FCC "said nothing at all in its order about any specific health effects unrelated to cancer" and "completely failed even to acknowledge, let alone respond to, comments concerning the impact of RF radiation on the environment." 9 F.4th at 907, 909; *see also* 9 F.4th at 907 (the FCC "cannot simply ignore evidence suggesting that a major factual predicate of its position may no longer be accurate").

In its opposition brief, the FCC put forth two main arguments – that it had reviewed the entire record and that it reasonably relied on the conclusions of the U.S. Food and Drug Administration ("FDA") and other agencies. *See, e.g.*, FCC Br. at

14

21.  Again, this Court found that these explanations fell well short of satisfying the APA.  For instance, the FCC pointed to statements underlying its decision claiming that the "vast majority of the filings were unscientific" and that Petitioners' studies "fail[ed] to make a persuasive case for revisiting" the RF standards.  9 F.4th at 907.  But the Court noted that "such…conclusory statement[s] cannot substitute for the minimal reasoning required at this stage."  *Id*.

Moreover, as to FCC's heavy reliance on the FDA, the Court characterized FDA's statements as "conclusory" and pointed out that there was "no articulation of the factual…bases" for FDA's conclusions.  9 F.4th at 905; *see also id.* (FDA's statements "represent a failure by the FDA to address the implication of Petitioners' studies").  The Court held that "[a]bsent explanation from the FDA as to how and why it reached its conclusions regarding those studies,…we have no basis on which to review the reasonableness of the Commission's decision to adopt the FDA's conclusions."  9 F.4th at 906.

Finally, the FCC's emphasis in its opposition brief on the purported silence of other agencies fared no better.  In rejecting this argument, the Court observed that "silence does not indicate why the expert agencies determined, in light of evidence suggesting to the contrary, that exposure to RF radiation levels below the Commission's current limits" does not pose a risk, and that "[s]ilence does not even

15

indicate whether the expert agencies made any such determination, or whether they considered any evidence in the record."  9 F.4th at 906.

All of this is to say that the FCC did not come close despite the Court's high degree of deference.  As to health risks unrelated to cancer and environmental harms, the decision to close the NOI constituted a wholesale failure to engage in any form of reasoned decision-making and was thus by any measure clearly unlawful.

**F.    The Requested Attorneys' Fees Are Fair And Reasonable**

Under EAJA, the reasonable hourly rate is based on "prevailing market rates for the kind and quality of services furnished," except that the rate is ordinarily capped at $125 per hour unless "an increase in the cost of living or a special factor…justifies a higher fee."  28 U.S.C. § 2412(d)(2)(A).  In this Motion, EHT Petitioners seek reasonable attorneys' fees at the standard $125 hourly rate set forth in EAJA, adjusted for cost-of-living increases in the Washington D.C. area, <u>or the actual billed rates where they were lower than the adjusted statutory rate,</u> in the total amount of $174,347.25.00, based on 625.75 hours of work by attorneys and paralegals.  This claim for attorneys' fees is based on the Lodestar formula, which is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hensley v. Eckerhart*, 461 U.S. 424, 433-35 (1983).

**1. The number of hours claimed in the Motion are fair and reasonable.**

The number of hours claimed in this Motion are fair and reasonable in accordance

16

with the Lodestar principles set forth in case law in light of: (i) the complexity of the case and length of the record, which required special expertise and additional learning in highly technical matters; (ii) the work performed (including, for example, researching and briefing the merits of the appeal, organizing and preparing the lengthy Joint Appendix (consisting of 26 volumes, 443 documents, and 10,572 pages); (iii) counsel's exercise of significant discretion to eliminate substantial attorney time that was conducted but not billed and is therefore not included within this claim for fees; and (iv) the excellent result obtained--remand of a previously closed FCC matter by which the Court has required the agency to either reopen the matter that it previously terminated or initiate a new matter and therein provide an examination of key issues central to public safety and health and the environment that the FCC failed to address in the Order.

In connection with the number of hours billed, it should be emphasized that the attorneys engaged in this matter have exercised utmost discretion to hold down their number of billed hours far below what might reasonably be expected for a case of the complexity of this one.  In particular, the attorneys used substantial discretion wherever reasonable when delegating work assignments to attorney associates and paralegals, thereby holding down the number of hours billed at higher rates.  *See* Myers Declaration at ¶ 8; Gotting Declaration at ¶¶ 22, 23.

**2. The standard EAJA billable rate of $125 per hour should be adjusted to reflect increased cost-of-living.** The cost-of-living in the Washington D.C. area, as documented in the Consumer Price Index, justifies fees in the range of $333 to $342 per hour over the course of the 13 months (January 2020-January 2021) for which Movants have incurred attorneys' fees in connection with this action. *See id.*; *see also* Attachment D to Myers Declaration and Attachment E to Gotting Declaration. This Court has reported that, as of 2004, it could find no case in which it had denied a cost-of-living adjustment. *Role Models of Am.*, 353 F.3d at 969.

Movants accordingly have calculated the appropriate cost-of-living adjustment to be applied in this action based on the Consumer Price Index for All Urban Consumers (CPI-U) for the Washington D.C. area. *See Porter v. Astrue*, 999 F.Supp. 2d 35, 37 (D.D.C. 2013). The formula used to calculate the cost-of-living adjustment is the current statutory rate ($125 per hour) multiplied by the average annual CPI-U for the year in which the fees were billed, divided by the baseline CPI-U when the statutory cap was enacted. The Movants set the baseline at November 1996. *See Haselwander v. McHugh*, 797 F.3d 1, 3 (D.C. Cir. 2015) (confirming use of yearly CPI-U for the Washington, D.C. area and a baseline of 100).

The cost-of-living adjustment results in hourly rates of $333 in 2020 and $342 in 2021. Please note, however, that this Motion seeks the actual billed rates where those were otherwise lower than the statutory adjusted rate. A more complete

rendering of the relevant calculations leading to those adjusted hourly rates is provided in the "Summary of Fee Calculations" (*See* Attachment C to Myers Declaration and Attachment D to Gotting Declaration).

    **3.  The hourly rates claimed by the Movants, as adjusted, are fair and reasonable given prevailing rates in the relevant legal market.**  The adjusted hourly rates sought by Movants are reasonable in light of the actual rates billed by the firms representing Movants and the prevailing market rates in the Washington D.C. area where this action occurred.  The law firm's customary hourly rates are presumptively reasonable and reflective of prevailing market rates.  *Laffey v. Northwest Airlines, Inc*., 746 F.2d 4, 24-24 (D.C. Cir. 1984) ("For private law firms, the prevailing market rate for the firm's services is presumptively found in the firm's customary billing rates."), *rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984).  But in this case, the actual billing rates both for Attorney Myers and the law firm were significantly discounted in light of the limited means of the clients and the broad public significance of the issues at stake.  Hence the actual billing rates were well below the presumptively reasonable prevailing market rates.  (*See* Myers Declaration at ¶ 21; Gotting Declaration at ¶ 28).  Moreover, because the rate claimed by Attorney Myers in this Motion is lower even than the statutorily permissible rate, and the same holds true for many of the actual billed rates claimed

by the law firm, the adjusted rates are necessarily fair and reasonable.  *See* Myers

Declaration at ¶ 19; Gotting Declaration at ¶ 28.

**4.  Movants are entitled to recovery for reasonable attorneys' fees totaling**

**$174,347.25.**  The table below summarizes the claimed adjusted hourly rates or

billed rates (where lower than the statutory adjusted rate), claimed hours, and total

fees claimed by year in this action.

| Year | Adjusted Hourly Rate or Billed Rate | Hours | Fees Claimed |
|------|-------------------------------------|-------|--------------|
| 2020 | $333<br>$325<br>$265<br>$200 | 225.75<br>135.75<br>6.25<br>245.75 | $75,174.75<br>$44,118.75<br>$1,656.25<br>$49,150.00 |
| 2021 | $342<br>$200 | 11.25<br>2.00 | $3,847.50<br>$400.00 |

These figures are supported by the Myers and Gotting Declarations (Exhibits

3 and 4, respectively), including by way of testimonial explanation, provision of the

actual billing statements reflecting the descriptions of services rendered and

associated hours worked, and submission of a summary performing the calculations

that lead to the figures reflected in the table above.

## <u>Conclusion</u>

Movants respectfully request that the Court grant this Motion and award to Movants the amount of $174,347.25 for a total of 625.75 hours of legal work as a recovery of reasonable attorneys' fees pursuant to the Equal Access to Justice Act.

Respectfully submitted,

<u>/s/ Edward B. Myers</u>
Law Office of Edward B. Myers
14613 Dehaven Court
North Potomac, MD 20878
301-294-2190
edwardbmyers@yahoo.com

*Counsel for Petitioners Environmental Health Trust, et al.*

Dated: December 10, 2021

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing complies with the formatting and type-volume restrictions of the rules of the U.S. Court of Appeals for the District of Columbia Circuit. The Motion was prepared in 14-point, double spaced, Times New Roman font, using the current version of Microsoft Word, in accordance with Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6). The Motion contains 4,791 words and therefore complies with Fed. R. App. P. 27(d)(2)(A).

/s/ Edward B. Myers

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 10, 2021, I electronically filed the forgoing

document with the Court by using the CM/ECF system. All parties to the case have

been served through the CM/ECF system.

<u>/s/ Edward B. Myers</u>

# Exhibit 1

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 20-1025**                                     **September Term, 2021**

**FCC-19-126**

**Filed On: October 5, 2021** [1916917]

Environmental Health Trust, et al.,

        Petitioners

    v.

Federal Communications Commission and
United States of America,

        Respondents

------------------------------

Consolidated with 20-1138

## **M A N D A T E**

In accordance with the judgment of August 13, 2021, and pursuant to Federal Rule of Appellate Procedure 41, this constitutes the formal mandate of this court.

                **FOR THE COURT:**
                Mark J. Langer, Clerk

        BY:    /s/
                Daniel J. Reidy
                Deputy Clerk

Link to the judgment filed August 13, 2021

# Exhibit 2



**User Name:** Edward Myers

**Date and Time:** Friday, December 10, 2021 5:54:00 AM EST

**Job Number:** 159621213

## Document (1)

1. Envtl. Health Trust v. FCC, 9 F.4th 893

   **Client/Matter:** -None-

   **Search Terms:** Envtl. Health Trust v. FCC, 9 F.4th 893

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

 Neutral

As of: December 10, 2021 10:54 AM Z

# Envtl. Health Trust v. FCC

United States Court of Appeals for the District of Columbia Circuit

January 25, 2021, Argued; August 13, 2021, Decided

No. 20-1025 Consolidated with 20-1138

## Reporter

9 F.4th 893 *; 2021 U.S. App. LEXIS 24138 **

ENVIRONMENTAL HEALTH TRUST, ET AL., PETITIONERS v. FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA, RESPONDENTS

**Prior History: [**1]** On Petitions for Review of an Order of the Federal Communications Commission.

Children's Health Def. v. FCC, 2020 U.S. App. LEXIS 13361 (9th Cir., Apr. 24, 2020)

In re Human Exposure to Radiofrequency Electromagnetic Fields et al., 34 F.C.C.R. 11687, 2019 FCC LEXIS 3622 (F.C.C., Dec. 4, 2019)

## Core Terms

radiation, exposure, limits, studies, notice, effects, levels, environmental, guidelines, health effects, regulations, agencies, cancer, rulemaking, radiofrequency, radio, terminate, scientific, carcinogenic, initiate, conclusory statement, dissenting opinion, deference, modify, cell phone, biological, unrelated, Horse, electronic, articles

## Case Summary

### Overview

HOLDINGS: [1]-In terminating a notice of inquiry regarding the adequacy of guidelines promulgated under NEPA for exposure to radiofrequency (RF) radiation, the Federal Communications Commission failed to provide a reasoned explanation for its determination that its guidelines adequately protected against the harmful effects of exposure to RF radiation unrelated to cancer. The Commission's order was arbitrary and capricious in its failure to respond to evidence that exposure to RF radiation at levels below the current limits could cause negative health effects unrelated to cancer; [2]-The Commission was not required to issue an environmental assessment or environmental impact statement under 42 U.S.C.S. § 4332(c) because there was no ongoing federal action regarding RF limits. The Commission had already published an assessment of the existing limits that satisfied NEPA's requirements.

### Outcome

Petitions granted in part; matter remanded.

## LexisNexis® Headnotes

Communications Law > ... > Regulated Entities > Telephone Services > Cellular Services

Communications Law > Overview & Legal Concepts > Theft of Services > Radio

Communications

*HN1*[⤓]  Telephone Services, Cellular Services

The Federal Communications Commission regulates various facilities and devices that transmit radio waves and microwaves, including cell phones and facilities for radio, TV, and cell phone communications. 47 U.S.C.S. §§ 301, 302a(a).

Business & Corporate
Compliance > ... > Environmental
Law > Assessment & Information
Access > Environmental Impact Statements

Environmental Law > Assessment & Information
Access > Audits & Site Assessments

Environmental Law > Assessment & Information
Access > Environmental Assessments

*HN2*[⤓]  Environmental & Natural Resources, Environmental Impact Statements

The National Environmental Policy Act (NEPA) and its implementing regulations require federal agencies to establish procedures to account for the environmental effects of their proposed actions. If an agency proposes a major Federal action that stands to significantly affect the quality of the human environment, the agency must prepare an environmental impact statement (EIS) that examines the adverse environmental effects of the proposed action and potential alternatives. 42 U.S.C.S. § 4332(C). Not every agency action, however, requires the preparation of a full EIS. If it is unclear whether a proposed action will significantly affect the quality of the human environment, 42 U.S.C.S. § 4332(C), the responsible agency may prepare a more limited environmental assessment (EA). 40 C.F.R. § 1501.5(a). An EA serves to briefly provide sufficient evidence and

analysis for determining whether to prepare an EIS or a finding of no significant impact. 40 C.F.R. § 1501.5(c)(1). Additionally, an agency may use categorical exclusions to define categories of actions that normally do not have a significant effect on the human environment and therefore do not require preparation of an environmental impact statement. 40 C.F.R. § 1500.4(a).

Business & Corporate
Compliance > ... > Environmental
Law > Assessment & Information
Access > Environmental Impact Statements

Environmental Law > Assessment & Information
Access > Audits & Site Assessments

Communications Law > Regulators > US Federal
Communications Commission > Authorities &
Powers

Environmental Law > Assessment & Information
Access > Environmental Assessments

*HN3*[⤓]  Environmental & Natural Resources, Environmental Impact Statements

To fulfill its obligations under the National Environmental Policy Act, the Federal Communications Commission has promulgated guidelines for human exposure to radiofrequency (RF) radiation. The guidelines set limits for RF exposure. Before the Commission authorizes the construction or use of any wireless facility or device, the applicant for authorization must determine whether the facility or device is likely to expose people to RF radiation in excess of the limits set by the guidelines. 47 C.F.R. § 1.1307(b). If the answer is yes, the applicant must prepare an environmental assessment (EA) regarding the likely effects of the Commission's authorization of the facility or device. § 1.1307(b).

Depending on the contents of the EA, the Commission may require the preparation of an environmental impact statement, and may subject approval of the application to a full vote by the Commission. If the answer is no, the applicant is generally not required to prepare an EA. 47 C.F.R. § 1.1306(a).

Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Standard of Review

*HN4*[🔽] **Standards of Review, Arbitrary & Capricious Standard of Review**

The arbitrary and capricious standard of the Administrative Procedure Act encompasses a range of levels of deference to the agency.

Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Standard of Review

Communications Law > ... > Orders & Hearings > Complaints & Charges > Procedural Matters

Communications Law > ... > Orders & Hearings > Judicial Review > Standards of Review

*HN5*[🔽] **Standards of Review, Arbitrary & Capricious Standard of Review**

The Federal Communications Commission's decision to terminate a notice of inquiry must be reasoned if it is to survive arbitrary and capricious review. As with other agency decisions not to engage in rulemaking, a court will overturn the Commission's decision if there is compelling cause, such as plain error of law or a fundamental change in the factual premises previously

considered by the agency. When an agency in the Commission's position is confronted with evidence that its current regulations are inadequate or the factual premises underlying its prior judgment have eroded, it must offer more to justify its decision to retain its regulations than mere conclusory statements. Rather, the agency must provide assurance that it considered the relevant factors, and it must provide analysis that follows a discernable path to which the court may defer.

Communications Law > Regulators > US Federal Communications Commission > Authorities & Powers

Communications Law > Overview & Legal Concepts > Theft of Services > Radio Communications

Communications Law > Regulators > US Federal Communications Commission > Jurisdiction

*HN6*[🔽] **US Federal Communications Commission, Authorities & Powers**

It is the Federal Communications Commission's responsibility to regulate radio communications, 47 U.S.C.S. § 301, and devices that emit radiofrequency radiation and interfere with radio communications, 47 U.S.C.S. § 302a(a), and to do so in the public interest, including in regard to public health. And the Administrative Procedure Act requires that Commission's decisions concerning the regulation of radio communications and devices be reasoned.

Administrative Law > Agency Rulemaking

*HN7*[🔽] **Administrative Law, Agency Rulemaking**

Agencies can be expected to respect the views of such

other agencies as to those problems for which those other agencies are more directly responsible and more competent. What the agency may not do, however, is rely on an outside expert's silence or conclusory statements in lieu of some reasoned explanation for its decision. And while it is certainly true that an agency's decision not to initiate a rulemaking at a time when other agencies see no compelling case for action may represent the sort of priority-setting in the use of agency resources that is least subject to second-guessing by courts, the same is true of most agency decisions not to initiate a rulemaking, Nevertheless, an agency's decision not to initiate a rulemaking must have some reasoned basis, and an agency cannot simply ignore evidence suggesting that a major factual predicate of its position may no longer be accurate.

Administrative Law > Agency Rulemaking > Informal Rulemaking

### *HN8*[ ]  Agency Rulemaking, Informal Rulemaking

An agency is not obliged to respond to every comment, only those that can be thought to challenge a fundamental premise.

Administrative Law > Judicial
Review > Reviewability > Preservation for Review

Administrative Law > Agency Adjudication > Review of Initial Decisions

### *HN9*[ ]  Reviewability, Preservation for Review

Just as post hoc rationales offered by counsel cannot fill in the holes left by an agency in its decision, neither can a dissenting opinion. When assessing the reasonableness of an agency's action, a court of appeals looks only to what the agency said at the time

of the action—not to its lawyers' post-hoc rationalizations.

Administrative Law > Agency Rulemaking

Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Standard of Review

### *HN10*[ ]  Administrative Law, Agency Rulemaking

One agency's unexplained adoption of an unreasoned analysis just compounds rather than vitiates the analytical void. Said another way, two wrongs do not make a right. The action agency must not blindly adopt the conclusions of the consultant agency, citing that agency's expertise. Rather, the ultimate responsibility for statutory compliance falls on the action agency.

Communications Law > Federal Acts > Federal Communications Act > Jurisdiction

Communications Law > ... > Orders & Hearings > Complaints & Charges > Procedural Matters

Communications Law > ... > Orders & Hearings > Judicial Review > Standards of Review

Communications Law > Regulators > US Federal Communications Commission > Jurisdiction

### *HN11*[ ]  Federal Communications Act, Jurisdiction

The Communications Act provides that a petition for reconsideration is a condition precedent to judicial review of questions of fact or law upon which the Federal Communications Commission has been afforded no opportunity to pass. 47 U.S.C.S. § 405(a). A court of appeals will accordingly only consider a

question raised before it if a reasonable Commission necessarily would have seen the question as part of the case presented to it.

Environmental Law > Assessment & Information Access > Audits & Site Assessments

Environmental Law > Assessment & Information Access > Environmental Assessments

### HN12[↓] Assessment & Information Access, Audits & Site Assessments

National Environmental Policy Act (NEPA) obligations attach only to proposals for major federal action. 42 U.S.C.S. § 4332(c). Once an agency has satisfied NEPA's requirements, it is only required to issue a supplemental assessment when there remains major federal action to occur. An agency's promulgation of regulations constitutes a final agency action that is not ongoing. Once an agency promulgates a regulation and complies with NEPA's requirements regarding that regulation, it is not required to conduct any supplemental environmental assessment, even if its original assessment is outdated.

Business & Corporate Compliance > ... > Environmental Law > Assessment & Information Access > Environmental Impact Statements

### HN13[↓] Environmental & Natural Resources, Environmental Impact Statements

The mere contemplation of certain action is not sufficient to require an impact statement under the National Environmental Policy Act (NEPA), because the contemplation of a project and the accompanying study thereof do not necessarily result in a proposal for major

federal action. Courts routinely dismiss NEPA claims in cases where agencies are merely contemplating a particular course of action but have not actually taken any final action at the time of suit.

**Counsel:** W. Scott McCollough argued the cause for petitioners. With him on the joint briefs were Edward B. Myers and Robert F. Kennedy, Jr.

Sharon Buccino was on the brief for amici curiae Natural Resources Defense Council and Local Elected Officials in support of petitioners.

Dan Kleiber and Catherine Kleiber, pro se, were on the brief for amici curiae Dan and Catherine Kleiber in support of peititioners.

James S. Turner was on the brief for amicus curiae Building Biology Institute in support of petitioners.

Stephen L. Goodman was on the brief for amicus curiae Joseph Sandri in support of petitioners.

Ashley S. Boizelle, Deputy General Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were Jonathan D. Brightbill, Principal Deputy Assistant Attorney General at the time the brief was filed, U.S. Department of Justice, Eric Grant, Deputy Assistant Attorney General at the time the brief was filed, Jeffrey Beelaert and Justin Heminger, Attorneys, Thomas M. Johnson, Jr., General Counsel at the time the brief was filed, Federal Communications Commission, Jacob M. Lewis, Associate **[**2]** General Counsel, and William J. Scher and Rachel Proctor May, Counsel. Richard K. Welch, Deputy Associate General Counsel, entered an appearance.

**Judges:** Before: HENDERSON, MILLETT and WILKINS, Circuit Judges. Opinion for the Court filed by Circuit Judge WILKINS. Opinion dissenting in part filed by Circuit Judge HENDERSON.

Opinion by: WILKINS

# Opinion

[*900] WILKINS, *Circuit Judge*: Environmental Health Trust and several other groups and individuals petition for review of an order of the Federal Communications Commission ("the Commission") terminating a notice of inquiry regarding the adequacy of the Commission's guidelines for exposure to radiofrequency radiation. The notice of inquiry requested comment on whether the Commission should initiate a rulemaking to modify its guidelines. The Commission concluded that no rulemaking was necessary. Petitioners argue that the Commission violated the requirements of the Administrative Procedure Act by failing to respond to significant comments. Petitioners also argue that the National Environmental Policy Act required the Commission to issue an environmental assessment or environmental impact statement regarding its decision to terminate its notice of inquiry.

We grant the petitions [**3] in part and remand to the Commission. The Commission failed to provide a reasoned explanation for its determination that its guidelines adequately protect against the harmful effects of exposure to radiofrequency radiation unrelated to cancer.

## I.

*HN1*[⬆] The Federal Communications Commission regulates various facilities and devices that transmit radio waves and microwaves, including cell phones and facilities for radio, TV, and cell phone communications. 47 U.S.C. §§ 301, 302a(a); *see EMR Network v. FCC*, 391 F.3d 269, 271, 364 U.S. App. D.C. 20 (D.C. Cir. 2004). Radio waves and microwaves are forms of

electromagnetic energy that are collectively described by the term "radiofrequency" ("RF"). Office of Eng'g & Tech., Fed. Commc'ns Comm'n, *OET Bulletin No. 56, Questions and Answers about Biological Effects and Potential Hazards of Radiofrequency Electromagnetic Fields* 1 (4th ed. Aug. 1999). The phenomenon of radio waves and microwaves moving through space is described as "RF radiation." *Id.*

We often associate the term "radiation" with the term "radioactivity." "Radioactivity," however, refers only to the emission of radiation with enough energy to strip electrons from atoms. *Id.* at 5. That kind of radiation is called "ionizing radiation." *Id.* It can produce molecular changes and damage biological [**4] tissue and DNA. *Id.* Fortunately, RF radiation is "non-ionizing," meaning that it is not sufficiently energetic to strip electrons from atoms. *Id.* It can, however, heat certain kinds of materials, like food in your microwave oven or, at sufficiently high levels, human body tissue. *Id.* at 6-7. Biological effects that result from the heating of body tissue by RF energy are referred to as "thermal" effects, and are known to be harmful. *Id.* Exposure to lower levels of RF radiation might also cause other, "non-thermal" biological effects. *Id.* at 8. Whether it does, and whether such effects are harmful, are subjects of debate. *Id.*

*HN2*[⬆] ] The National Environmental Policy Act ("NEPA") and its implementing regulations require federal agencies to "establish procedures to account for the environmental effects of [their] proposed actions." *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1032, 380 U.S. App. D.C. 102 (D.C. Cir. 2008) (per curiam). If an agency proposes a "major Federal action[]" that stands to "significantly affect[] the quality of the human environment," the agency must prepare an environmental impact statement ("EIS") that examines the adverse environmental effects of the proposed action and potential alternatives. 42 U.S.C. § 4332(C).

Not every agency action, however, requires the preparation of a full EIS. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503, 392 U.S. App. D.C. 316 (D.C. Cir. 2010). If it is unclear whether **[**5]** a proposed action will **[*901]** "significantly affect[] the quality of the human environment," 42 U.S.C. § 4332(C), the responsible agency may prepare a more limited environmental assessment ("EA"). *See* 40 C.F.R. § 1501.5(a). An EA serves to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. § 1501.5(c)(1). Additionally, an agency may use "categorical exclusions" to "define categories of actions that normally do not have a significant effect on the human environment and therefore do not require preparation of an environmental impact statement." 40 C.F.R. § 1500.4(a); *see also* 40 C.F.R. § 1501.4(a).

*HN3*[⬆️] To fulfill its obligations under NEPA, the Commission has promulgated guidelines for human exposure to RF radiation. *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 87 (2d Cir. 2000). The guidelines set limits for RF exposure. Before the Commission authorizes the construction or use of any wireless facility or device, the applicant for authorization must determine whether the facility or device is likely to expose people to RF radiation in excess of the limits set by the guidelines. 47 C.F.R. § 1.1307(b). If the answer is yes, the applicant must prepare an EA regarding the likely effects of the Commission's authorization of the facility or device. *Id.* Depending on the contents of the EA, the **[**6]** Commission may require the preparation of an EIS, and may subject approval of the application to a full vote by the Commission. Office of Eng'g & Tech., Fed. Commc'ns Comm'n, *OET Bulletin No. 65, Evaluating Compliance with FCC Guidelines for Human Exposure to Radiofrequency Electromagnetic Fields* 6 (ed. 97-01, Aug. 1997). If the answer is no, the applicant is

generally not required to prepare an EA. 47 C.F.R. § 1.1306(a).

The Commission last updated its limits for RF exposure in 1996. *Resolution of Notice of Inquiry, Second Report and Order, Notice of Proposed Rulemaking, and Memorandum Opinion and Order*, 34 FCC Rcd. 11,687, 11,689-90 (2019) ("2019 Order"); *see also* Telecommunications Act of 1996, Pub. L. No. 104-104, § 704(b), 110 Stat. 56, 152 (directing the Commission to "prescribe and make effective rules regarding the environmental effects of radio frequency emissions" within 180 days). The limits are based on standards for RF exposure issued by the American National Standards Institute Committee ("ANSI"), the Institute of Electrical and Electronic Engineers, Inc. ("IEEE"), and the National Council on Radiation Protection and Measurements ("NCRP"). *In re Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 11 FCC Rcd. 15,123, 15,134-35, 15,146-47 (1996). The limits are designed to protect against "thermal effects" of exposure to RF radiation, **[**7]** but not "non-thermal" effects. *EMR Network*, 391 F.3d at 271.

In March 2013, the Commission issued a notice of inquiry regarding the adequacy of its 1996 guidelines. *See Reassessment of Radiofrequency Exposure Limits & Policies, Notice of Inquiry*, 28 FCC Rcd. 3,498 (2013) ("2013 Notice of Inquiry"). The Commission divided its notice of inquiry into five sections. In the first section, it sought comment on the propriety of its exposure limits for RF radiation, particularly as they relate to device use by children. *Id.* at 3,575-80. In the second section, the Commission sought comment on how to better provide information to consumers and the public about exposure to RF radiation and methods for reducing exposure. *Id.* at 3,580-82. In the third section, the Commission sought comment on whether it should impose additional precautionary restrictions on devices and facilities that

are unlikely to expose people to RF radiation in excess of the limits set by the Commission's guidelines. *Id.* at [*902] 3,582-85. In the fourth and fifth sections, the Commission sought comment on whether it should change its methods for determining whether devices and facilities comply with the Commission's guidelines. *Id.* at 3,585-89.

The Commission [**8] explained that it was issuing the notice of inquiry in response to changes in the ubiquity of wireless devices and in scientific standards and research since 1996. *Id.* at 3,570. Specifically, the Commission noted that the IEEE had "published a major revision to its RF exposure standard in 2006." *Id.* at 3,572. The Commission also noted that the International Commission on Non-Ionizing Radiation Protection had published RF exposure guidelines in 1998 that differed somewhat from the Commission's 1996 guidelines, and was likely to release a revision of those guidelines "in the near future." *Id.* at 3,573. And the Commission noted that the International Agency for Research on Cancer ("IARC") had classified RF radiation as possibly carcinogenic to humans, and was likely to release a detailed monograph regarding that classification prior to the resolution of the notice of inquiry. *Id.* at 3,575 & n.385. The Commission invited public comment on all of these developments, but underscored that it would "work closely with and rely heavily—but not exclusively—on the guidance of other federal agencies with expertise in the health field." *Id.* at 3,571.

In December 2019, the Commission issued a final [**9] order resolving its 2013 notice of inquiry by declining to undertake any of the changes contemplated in the notice of inquiry. *See 2019 Order*, 34 FCC Rcd. at 11,692-97.

In January 2020, Petitioners Environmental Health Trust, Consumers for Safe Cell Phones, Elizabeth Barris, and Theodora Scarato timely petitioned this

Court for review of the Commission's 2019 final order. In February 2020, Petitioners Children's Health Defense, Michele Hertz, Petra Brokken, Dr. David O. Carpenter, Dr. Paul Dart, Dr. Toril H. Jelter, Dr. Ann Lee, Virginia Farver, Jennifer Baran, and Paul Stanley, M.Ed., timely petitioned the Ninth Circuit for review of the same order, and the Ninth Circuit transferred their petition to this Court pursuant to 28 U.S.C. § 2112. This Court consolidated the petitions. We have jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).

II.

Petitioners challenge the 2019 final order under NEPA and the Administrative Procedure Act ("APA"). We begin with the APA.

A.

Petitioners argue that the order is arbitrary and capricious and therefore must be set aside under 5 U.S.C. § 706(2)(A) for the following reasons: (1) the order fails to acknowledge evidence of negative health effects caused by exposure to RF radiation at levels below the limits set by the Commission's 1996 guidelines, [**10] including evidence of cancer, radiation sickness, and adverse effects on sleep, memory, learning, perception, motor abilities, prenatal and reproductive health, and children's health; (2) the order fails to respond to comments concerning environmental harm caused by RF radiation; (3) the order fails to discuss the implications of long-term exposure to RF radiation, exposure to RF pulsation or modulation (two methods of imbuing radio waves with information), and the implications of technological developments that have occurred since 1996, including the ubiquity of wireless devices and Wi-Fi, and the emergence of "5G" technology; (4) the order fails to adequately explain the Commission's refusal to modify

its procedures for determining whether cell phones comply with its RF limits; and (5) the order [*903] fails to respond to various "additional legal considerations," Pet'rs' Br. at 84.

Before discussing these arguments, and the Commission's responses to them, we clarify our standard of review. *HN4*[↑] The arbitrary and capricious standard of the Administrative Procedure Act "encompasses a range of levels of deference to the agency." *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4, 258 U.S. App. D.C. 397 (D.C. Cir. 1987). We completely agree with the dissenting opinion that the Commission's [**11] order is entitled to a high degree of deference, but because it is akin to a refusal to initiate a rulemaking, *see id.* at 4-5, and because it concerns highly technical determinations of the kind courts are ill-equipped to second-guess, *see Am. Radio Relay League, Inc., v. FCC*, 524 F.3d 227, 233, 390 U.S. App. D.C. 34 (D.C. Cir. 2008). So as to the governing law, the dissenting opinion and we are on the same page. *HN5*[↑] Nevertheless, the Commission's decision to terminate its notice of inquiry must be "reasoned" if it is to survive arbitrary and capricious review. *See Am. Horse*, 812 F.2d at 5; *Am. Radio*, 524 F.3d at 241. As with other agency decisions not to engage in rulemaking, we will overturn the Commission's decision if there is "compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency[.]" *Flyers Rights Educ. Fund, Inc. v. Fed. Aviation Admin.*, 864 F.3d 738, 743, 431 U.S. App. D.C. 150 (D.C. Cir. 2017) (quoting *WildEarth Guardians v. EPA*, 751 F.3d 649, 653, 409 U.S. App. D.C. 475 (D.C. Cir. 2014)). When an agency in the Commission's position is confronted with evidence that its current regulations are inadequate or the factual premises underlying its prior judgment have eroded, it must offer more to justify its decision to retain its regulations than mere conclusory statements. *See Am.*

*Horse*, 812 F.2d at 6; *Am. Radio*, 524 F.3d at 241. Rather, the agency must provide "assurance that [it] considered the relevant factors," and it must provide analysis that follows "a discernable path to which the court [**12] may defer." *Am. Radio*, 524 F.3d at 241.

i.

Under this highly deferential standard of review, we find the Commission's order arbitrary and capricious in its failure to respond to record evidence that exposure to RF radiation at levels below the Commission's current limits may cause negative health effects unrelated to cancer. (As we explain below, we find that the Commission offered an adequate explanation for its determination that exposure to RF radiation at levels below the Commission's current limits does not cause cancer.) That failure undermines the Commission's conclusions regarding the adequacy of its testing procedures, particularly as they relate to children, and its conclusions regarding the implications of long-term exposure to RF radiation, exposure to RF pulsation or modulation, and the implications of technological developments that have occurred since 1996, all of which depend on the premise that exposure to RF radiation at levels below its current limits causes no negative health effects. Accordingly, we find those conclusions arbitrary and capricious as well. Finally, we find the Commission's order arbitrary and capricious in its complete failure to respond to comments concerning environmental [**13] harm caused by RF radiation.

Petitioners point to multiple studies and reports, which were published after 1996 and are in the administrative record, purporting to show that RF radiation at levels below the Commission's current limits causes negative health effects unrelated to cancer, such as reproductive problems and neurological problems that span from effects on memory to motor abilities. *See, e.g.*, J.A.

3,068 (BIOINITIATIVE WORKING GROUP, BIOINITIATIVE REPORT (Cindy Sage & David O. Carpenter eds., 2012) (describing [*904] evidence that human sperm and their DNA are damaged by low levels of RF radiation)); J.A. 5,243 (Igor Yakymenko et al., *Oxidative Mechanisms of Biological Activity of Low-Intensity Radiofrequency Radiation*, ELECTROMAGNETIC BIOLOGY & MED., EARLY ONLINE, 1-16 (2015)); J.A. 5,259-69 (Henrietta Nittby et al., *Increased Blood-Brain Barrier Permeability in Mammalian Brian 7 Days After Exposure to the Radiation from a GSM-900 Mobile Phone*, 16 PATHOPHYSIOLOGY 103 (2009)); J.A. 5,320-68 (Henry Lai, *A Summary of Recent Literature on Neurobiological Effects of Radiofrequency Radiation, in* MOBILE COMMUNICATIONS AND PUBLIC HEALTH 187-222 (M. Markov ed., 2018)); J.A. 5,994-6,007 (Milena [**14] Foerster et al., *A Prospective Cohort Study of Adolescents' Memory Performance and Individual Brain Dose of Microwave Radiation from Wireless Communication*, 126 ENV'T HEALTH PERSPS. 077007 (July 2018)). Petitioners also point to approximately 200 comments submitted by individuals who advised the Commission that either they or their family members suffer from radiation sickness, "a constellation of mainly neurological symptoms that manifest as a result of RF[] exposure." Pet'rs' Br. at 30-31, 30 n.99.

The Commission argues that its order adequately responded to this evidence by citing the Food and Drug Administration ("FDA")'s determination that exposure to RF radiation at levels below the Commission's current limits does not cause negative health effects. The order cites three statements from the FDA. First, the order cites an FDA webpage titled "Do cell phones pose a health hazard?" that, as of December 4, 2017, stated that "[t]he weight of scientific evidence has not linked cell phones with any health problems." *2019 Order*, 34 FCC Rcd. at 11,692-93, 11,693 n.31. Second, the order cites a February 2018 statement from the Director of the

FDA's Center for Devices and Radiological Health [**15] advising the public that

> As part of our commitment to protecting the public health, the FDA has reviewed, and will continue to review, many sources of scientific and medical evidence related to the possibility of adverse health effects from radiofrequency energy exposure in both humans and animals and will continue to do so as new scientific data are published. Based on our ongoing evaluation of the issue, the totality of the available scientific evidence continues to not support adverse health effects in humans caused by exposures at or under the current radiofrequency energy exposure limits.

*Id.* at 11,695 n.42. Third, the order cites an April 2019 letter from the Director of the FDA's Center for Devices and Radiological Health that does not discuss non-cancer-related health effects but instead addresses a 2018 study by the National Toxicology Program that found that exposure to RF radiation emitted by cell phones may cause cancer in rodents. *2019 Order*, 34 FCC Rcd. at 11,692 & n.28. The letter explains that "[a]s a part of our ongoing monitoring activities, we have reviewed the results and conclusions of the recently published rodent study from the National Toxicology Program in the [**16] context of all available scientific information, including epidemiological studies, and concluded that no changes to the current standards are warranted at this time." Letter from Jeffrey Shuren, M.D., J.D., Dir., Ctr. for Devices & Radiological Health, Food & Drug Admin., Dep't of Health & Hum. Servs., to Julius Knapp, Chief, Off. Of Eng'g & Tech., FCC (April 24, 2019).

We do not agree that these statements provide a reasoned explanation for the Commission's decision to terminate its notice of inquiry. Rather, we find them to be of the conclusory variety that we have [*905] previously rejected as insufficient to sustain an agency's

refusal to initiate a rulemaking. In *American Horse*, this Court considered whether the Secretary of Agriculture had offered a satisfactory explanation under the APA of his refusal to institute rulemaking proceedings regarding the practice of deliberately injuring show horses by fastening heavy chains or similar equipment—referred to as "action devices"—to the horses' front limbs. 812 F.2d at 2. In response to the argument that a certain study presented facts that merited a new rulemaking, the Secretary offered the following two-sentence explanation:

6. I have reviewed studies **[**17]** and other materials, relating to action devices, presented by humane groups, Walking Horse industry groups, and independent institutions, including the study referred to in the Complaint.

7. On the basis of this information, I believe that the most effective method of enforcing the Act is to continue the current regulations.

*Id.* at 5. This Court found these "two conclusory sentences . . . insufficient to assure a reviewing court that the agency's refusal to act was the product of reasoned decisionmaking." *Id.* at 6. *American Horse* explained that the study at issue "may or may not remove a 'significant factual predicate' of the original rules' gaps[,]" and remanded to the Secretary to make that determination. *Id.* at 7.

Similarly, in *American Radio*, this Court considered whether the Commission had offered a satisfactory explanation for its decision to retain in its regulations a particular "extrapolation factor"—an estimate of the projected rate at which radio frequency strength decreases from a radiation-emitting source—despite studies submitted in a petition for reconsideration indicating that a different extrapolation factor would be more appropriate. 524 F.3d at 240-41. The Commission explained its decision **[**18]** by asserting that "[n]o new information has been submitted that would provide a convincing argument for modifying the extrapolation factor . . . at this time." *Id.* (internal alterations omitted). We rejected that explanation as conclusory and unreasoned. *Id.*

The statements from the FDA on which the Commission's order relies are practically identical to the Secretary's statement in *American Horse* and the Commission's statement in *American Radio*. They explain that the FDA has reviewed certain information— here, "all," "the weight," or "the totality" of "scientific evidence." And they state the FDA's conclusion that, in light of that information, exposure to RF radiation at levels below the Commission's current limits does not cause harmful health effects. But they offer "no articulation of the factual . . . bases" for the FDA's conclusion. *Am. Horse*, 812 F.2d at 6 (internal quotation marks omitted). In other words, they do not explain why the FDA determined, despite the studies and comments that Petitioners cite, that exposure to RF radiation at levels below the Commission's current limits does not cause harmful health effects. Such conclusory statements "cannot substitute for a reasoned explanation," for they **[**19]** provide "neither assurance that the [FDA] considered the relevant factors nor [do they reveal] a discernable path to which the court may defer." *Am. Radio*, 524 F.3d at 241. They instead represent a failure by the FDA to address the implication of Petitioners' studies: The factual premise—the non-existence of non-thermal biological effects—underlying the current RF guidelines may no longer be accurate.

When repeated by the Commission, the FDA's conclusory statements still do not substitute for the reasoned explanation that the APA requires. *HN6*[↑] It is the Commission's responsibility to regulate **[*906]** radio communications, 47 U.S.C. § 301, and devices that emit RF radiation and interfere with radio communications, *id.* § 302a(a), and to do so in the

public interest, including in regard to public health, *Banzhaf v. FCC*, 405 F.2d 1082, 1096, 132 U.S. App. D.C. 14 (D.C. Cir. 1968). Even the Commission itself recognizes this. *See 2019 Order*, 34 FCC Rcd. at 11,689 ("The Commission has the responsibility to set standards for RF emissions"); *2013 Notice of Inquiry*, 28 FCC Rcd. at 3,571 (explaining that the Commission opened the notice of inquiry "to ensure [it] [was] meeting [its] regulatory responsibilities" and that it would "work closely with and rely heavily—*but not exclusively*—on the guidance of other federal agencies with [**20] expertise in the health field" in order to "fully discharge[] [its] regulatory responsibility") (emphasis added). And the APA requires that Commission's decisions concerning the regulation of radio communications and devices be reasoned. The Commission's purported reasoning in this case is that it chose to rely on the FDA's evaluation of the studies in the record. Absent explanation from the FDA as to how and why it reached its conclusions regarding those studies, however, we have no basis on which to review the reasonableness of the Commission's decision to adopt the FDA's conclusions. Ultimately, the Commission's order remains bereft of any explanation as to *why*, in light of the studies in the record, its guidelines remain adequate. The Commission may turn to the FDA to provide such an explanation, but if the FDA fails to do so, as it did in this case, the Commission must turn elsewhere or provide its own explanation. Were the APA to require less, our very deferential review would become nothing more than a rubber stamp.

The Commission also argues that its order provided a reasoned explanation for its decision to terminate the notice of inquiry, despite Petitioners' evidence, by observing [**21] that "no expert health agency expressed concern about the Commission's RF exposure limits," and that "no evidence has moved our sister health and safety agencies to issue substantive policy recommendations for strengthening RF exposure regulation." *2019 Order*, 34 FCC Rcd. at 11,692. The silence of other expert agencies, however, does not constitute a reasoned explanation for the Commission's decision to terminate its notice of inquiry for the same reason that the FDA's conclusory statements do not constitute a reasoned explanation: silence does not indicate why the expert agencies determined, in light of evidence suggesting to the contrary, that exposure to RF radiation at levels below the Commission's current limits does not cause negative health effects unrelated to cancer. Silence does not even indicate whether the expert agencies made any such determination, or whether they considered any of the evidence in the record.

Our decision in *EMR Network* is not to the contrary. There, we rejected the argument that the Commission improperly delegated its NEPA duties by relying on input from other government agencies and non-governmental expert organizations in deciding whether to initiate [**22] a rulemaking to modify its RF radiation guidelines. 391 F.3d at 273. We found the Commission "not to have abdicated its responsibilities, but rather to have properly credited outside experts," and noted that "the FCC's decision not to leap in, at a time when the EPA (and other agencies) saw no compelling case for action, appears to represent the sort of priority-setting in the use of agency resources that is least subject to second-guessing by courts." *Id.* (citing *Am. Horse*, 812 F.2d at 4). We agree with the dissenting opinion that the Commission may credit outside experts in deciding whether to initiate a rulemaking to modify its RF radiation guidelines. *HN7*[⬆] To [*907] be sure, "[a]gencies can be expected to respect the views of such other agencies as to those problems for which those other agencies are more directly responsible and more competent." *City of Boston Delegation v. FERC*, 897 F.3d 241, 255, 437 U.S. App. D.C. 388 (D.C. Cir.

2018) (internal alteration and quotation marks omitted). What the Commission may not do, however, is rely on an outside expert's silence or conclusory statements in lieu of some reasoned explanation for its decision. And while it is certainly true that an agency's decision not to initiate a rulemaking at a time when other agencies see no compelling case for action may represent "the sort of [**23] priority-setting in the use of agency resources that is least subject to second-guessing by courts," *EMR Network*, 391 F.3d at 273, the same is true of most agency decisions not to initiate a rulemaking, *see Am. Horse*, 812 F.2d at 4-5. Nevertheless, an agency's decision not to initiate a rulemaking must have some reasoned basis, and an agency cannot simply ignore evidence suggesting that a major factual predicate of its position may no longer be accurate. *Id.* at 5.

Nor does *Cellular Phone Taskforce* help the Commission. There, the Second Circuit rejected the argument that the Commission was required to consult with the Environmental Protection Agency ("EPA") or other outside agencies before declining to modify its RF radiation guidelines in the face of new evidence regarding non-thermal effects caused by RF radiation. 205 F.3d at 90-91. In so holding, the Second Circuit found that "[i]t was fully reasonable for the FCC to expect the agency with primacy in evaluating environmental impacts to monitor all relevant scientific input into the FCC 's reconsideration, particularly because the EPA had been assigned the lead role in RF radiation health effects since 1970," and that the Commission was not required to "supply the new evidence to the other federal agencies with [**24] expertise in the area." *Id.* at 91. But the Second Circuit did not hold that the Commission could rely solely on the silence or unexplained conclusions of other federal agencies to justify its own inaction. It merely held that the Commission was not required to consult with outside agencies before declining to modify its RF radiation

guidelines. No party before us today questions the propriety of that holding.

Finally, the Commission argues that the Commission itself addressed the major studies in the record in its order terminating the notice of inquiry. Specifically, the Commission points to its statement that "[t]he vast majority of filings were unscientific." *2019 Order*, 34 FCC Rcd. at 11,694. Elsewhere, however, the order acknowledges that "the record include[d] some research information" and "filings that sought to present scientific evidence." *Id.* The order dismisses that research and evidence as "fail[ing] to make a persuasive case for revisiting our existing RF limits," *id.*, but again, such a conclusory statement cannot substitute for the minimal reasoning required at this stage, *Am. Radio*, 524 F.3d at 241. HN8[↑] And while "[a]n agency is not obliged to respond to every comment, only those that can be thought to challenge [**25] a fundamental premise," *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765, 341 U.S. App. D.C. 132 (D.C. Cir. 2000), the studies in the record to which Petitioners point *do* challenge a fundamental premise of the Commission's decision to terminate its notice of inquiry—namely, the premise that exposure to RF radiation at levels below the Commission's current limits does not cause negative health effects. But the Commission said nothing at all in its order about any specific health effects unrelated to cancer.

The Commission also points to its statement that "the record [does not] include actionable alternatives or modifications to the current RF limits supported by scientifically [*908] rigorous data or analysis." *2019 Order*, 34 FCC Rcd. at 11,692; *see also id.* at 11,694. Had the notice of inquiry focused exclusively on whether the Commission should modify its RF exposure limits, we might agree that the failure of any commenter to propose actionable modifications to the RF limits would have justified the Commission's decision to terminate

the notice of inquiry. But the notice of inquiry did not focus exclusively on whether the Commission should modify its RF exposure limits. Instead, it also sought comment on how to better provide information to consumers and the public about exposure **[\*\*26]** to RF radiation and methods for reducing exposure, and whether the Commission should impose additional precautionary restrictions on devices and facilities that are unlikely to expose people to RF radiation in excess of the Commission's limits. The Commission needed no actionable alternative to its current limits in order to provide additional information to the public or to impose precautionary restrictions in addition to its current limits. The failure of any commenter to propose actionable modifications to the Commission's RF exposure limits therefore does not justify the Commission's decision to terminate the notice of inquiry.

ii.

The Commission's failure to provide a reasoned explanation for its determination that exposure to RF radiation at levels below its current limits does not cause negative health effects unrelated to cancer renders the order arbitrary and capricious in three additional respects. First, it undermines the Commission's explanation for retaining its procedures for determining whether cell phones and other portable electronic devices comply with its RF limits. These procedures consist of testing the device against the head of a specialized mannequin, *2013 Notice* **[\*\*27]** *of Inquiry*, 28 FCC Rcd. at 3,586 n.434, and no more than 2.5 centimeters away from the body of the mannequin, *id.* at 3,588 n.447. Petitioners claim that the testing is inaccurate because of the space between the device and the mannequin's body. On this point, the Commission's order cites the "large safety margin" incorporated in its existing RF exposure limits as a justification for its refusal to modify these procedures to

include testing against the body. *2019 Order*, 34 FCC Rcd. at 11,696. Because the Commission's existing RF limits are overprotective, the order explains, the Commission need not worry about whether its testing procedures accurately detect devices that are likely to expose people to RF emissions in excess of the Commission's limits. *See id.* ("[E]ven if certified or otherwise authorized devices produce RF exposure levels in excess of Commission limits under normal use, such exposure would still be well below levels considered to be dangerous, and therefore phones legally sold in the United States pose no health risks."). As the Commission itself recognizes, this explanation depends on the premise that RF radiation does not cause harmful effects at levels below its current limits. *See* **[\*\*28]** *id.* at 11,696 n.49 ("We note that any claim as to the adequacy of the FCC required testing, certification, and authorization regime is no different than a challenge to the adequacy of the federal RF exposure limits themselves. Both types of claims would undermine the FCC 's substantive policy determinations."). The Commission's failure to provide a reasoned explanation for its determination that exposure to RF radiation at levels below its current limits does not cause negative health effects therefore renders inadequate the Commission's explanation for its refusal to modify its testing procedures.

Second, the Commission equally failed to provide a reasoned explanation **[\*909]** for brushing off record evidence addressing non-cancer-related health effects arising from the impact of RF radiation on children. Many commenters, including the American Academy of Pediatrics, urged the Commission to adopt limits that account for the use of RF-emitting devices by vulnerable children and pregnant women. *See, e.g.*, J.A. 4,533-34. In dismissing those concerns, the Commission again relied on a conclusory statement from the FDA that "[t]he scientific evidence does not show a danger to any

users of cell phones **[**29]** from RF exposure, including children and teenagers." *2019 Order*, 34 FCC Rcd. at 11,696. But, as we have already explained, such a conclusory and unexplained statement is not the "reasoned" explanation required by the APA. In addition, the Commission noted that the testing to determine compliance with its limits "represents a conservative case" for both adults and children. *Id.* at 11,696 n.50. Whether the testing of compliance with existing limits was conservative is not the point. The unanswered question remains whether low levels of RF radiation allowed by those existing limits cause negative health effects. So once again, the Commission's failure to provide a reasoned or even relevant explanation of its position that RF radiation below the current limits does not cause health problems unrelated to cancer renders its explanation as to the effect of RF radiation on children arbitrary and capricious.

Third, the Commission's failure to provide a reasoned explanation for its determination that exposure to RF radiation at levels below its current limits does not cause negative health effects unrelated to cancer renders inadequate the Commission's explanation for its failure to discuss the **[**30]** implications of long-term exposure to RF radiation, exposure to RF pulsation or modulation, or the implications of technological developments that have occurred since 1996, including the ubiquity of wireless devices and Wi-Fi, and the emergence of "5G" technology. In its brief, the Commission responds that it was not required to address these topics in its order because it "rationally concluded that the weight of scientific evidence does not support the existence of adverse health effects from radiofrequency exposure below the FCC's limits, regardless of the service or equipment at issue." Resp't's Br. at 45-46. (The Commission points out that "5G" cell towers, unlike traditional cell towers, are subject to its RF exposure limits.) Again, this explanation depends on the premise

that RF radiation does not cause harmful health effects at levels below the Commission's current limits, and will not suffice absent a reasoned explanation for the Commission's determination that that premise is correct.

iii.

In addition to the Commission's inadequate response to the non-cancer-related effects of RF radiation on human health, the Commission also completely failed even to acknowledge, let alone **[**31]** respond to, comments concerning the impact of RF radiation on the environment. That utter lack of a response does not meet the Commission's obligation to provide a reasoned explanation for terminating the notice of inquiry. The record contains substantive evidence of potential environmental harms. Most relevantly, the record included a letter from the Department of the Interior voicing concern about the impact of RF radiation from communication towers on migratory birds, *see* J.A. 8,379, 8,383-86. In the Department of the Interior's expert view, the Commission's RF radiation limits "continue to be based on thermal heating, a criterion now nearly 30 years out of date and inapplicable today." J.A. 8,383. "The [current environmental] problem," according to the Department of the **[*910]** Interior, "appears to focus on very low-level, non-thermal electromagnetic radiation." *Id.* Although the Commission has repeatedly claimed that it considered "inputs from [its] sister federal agencies[,]" *2019 Order*, 34 FCC Rcd. at 11,689, the Commission entirely failed to address the environmental harm concerns raised by the Department of the Interior. To be sure, the Commission could conclude that the link between RF radiation and **[**32]** environmental harms is too weak to warrant an amendment to its RF radiation limits. All we hold now is that the Commission should have said something about its sister agency's view rather than ignore it altogether. That lack of any reasoned explanation as to

environmental harms does not satisfy the requirements of the APA.

iv.

The dissenting opinion portrays this case as about the Commission's disregard of just five articles and one Department of Interior letter. Not so. The record contained substantial information and material from, for example, the American Academy of Pediatrics, J.A. 4,533; the Council of Europe, J.A. 4,242-44, 4,247-57; the Cities of Boston and Philadelphia, J.A. 4,592-99; medical associations, *see, e.g.*, J.A. 4,536-40 (California Medical Association); thousands of physicians and scientists from around the world, *see, e.g.*, J.A. 4,197-4,206 (letter to United Nations); J.A. 4,208-17 (letter to European Union); J.A. 5,173-86 (Frieburger Appeal by over one thousand German physicians); and hundreds of people who were themselves or who had loved ones suffering from the alleged effects of RF radiation, *see, e.g.*, J.A. 8,774-9,940; *see also* J.A. 4,218-39 (collecting statements **[**33]** from physicians and health organizations expressing concern about health effects of RF radiation).

The dissenting opinion then offers its own explanation as to why those select sources were not worth being addressed by the agency. This in-the-weeds assessment of scientific studies and assessments falls "outside our bailiwick[,]" Dissenting Op. at 10. More to the point, the Commission said none of what the dissenting opinion does. If it had and if those six sources fairly represented the credible record evidence seeking a change in Commission policy, that discussion likely would have sufficed. *HN9*[⬆] But just as *post hoc* rationales offered by counsel cannot fill in the holes left by an agency in its decision, neither can a dissenting opinion. *See Grace v. Barr*, 965 F.3d 883, 903, 448 U.S. App. D.C. 243 (D.C. Cir. 2020) ("[W]hen 'assessing the reasonableness of [an agency's action], we look only to what the agency said at the time of the [action]—not to its lawyers' post-hoc rationalizations.'") (second and third alterations in original) (quoting *Good Fortune Shipping SA v. Commissioner*, 897 F.3d 256, 263, 437 U.S. App. D.C. 403 (D.C. Cir. 2018)).

Instead, the Commission chose to hitch its wagon to the FDA's unexplained disinterest in some similar information. Importantly, the dissenting opinion does not dispute that the FDA's conclusory dismissal of that evidence **[**34]** ran afoul of our precedent in *American Horse* and *American Radio*. It just says that the deficiency in the FDA's analysis cannot be imputed to a second agency, and so the dissenting opinion would hold dispositive "the fact that the Commission and the FDA are, to state the obvious, distinct agencies." Dissenting Op. at 5.

They certainly are. But that does not amount to a legal difference here. While imitation may be the highest form of flattery, it does not meet even the low threshold of reasoned analysis required by the APA under the deferential standard of review that governs here. *HN10*[⬆] One agency's unexplained adoption of an unreasoned analysis just compounds rather than vitiates **[*911]** the analytical void. Said another way, two wrongs do not make a right. *Compare City of Tacoma v. FERC*, 460 F.3d 53, 76, 373 U.S. App. D.C. 117 (D.C. Cir. 2006) ("[T]he action agency must not blindly adopt the conclusions of the consultant agency, citing that agency's expertise. Rather, the ultimate responsibility for compliance with the [Endangered Species Act] falls on the action agency."), *and Ergon-West Virginia, Inc. v. EPA*, 896 F.3d 600, 612 (4th Cir. 2018) ("Although the EPA is statutorily required to consider the [Department of Energy]'s recommendation, it may not turn a blind eye to errors and omissions apparent on the face of the report, which [petitioner] **[**35]** pointed out and the EPA did not address in any meaningful way. In doing so, the

EPA 'ignore[d] important aspects of the problem.'") (internal citations omitted), *with Bellion Spirits, LLC v. United States*, No. 19-5252, 2021 U.S. App. LEXIS 23374, * 17 (D.C. Cir. Aug. 6, 2021) (approving consultation by the Alcohol and Tobacco Tax and Trade Bureau ("TTB") with the FDA where the TTB "did not rubberstamp FDA's analysis of the scientific evidence or delegate final decisionmaking authority to FDA," but instead "systematically evaluated and explained its reasons for agreeing with FDA's analysis of each scientific study" and "then made its own determinations" about the claims at hand).

**B**.

Petitioners' remaining challenges under the APA are unavailing.

Petitioners first argue that the Commission failed to respond to record evidence that exposure to RF radiation at levels below the Commission's current limits may cause cancer. Specifically, Petitioners argue the Commission failed to mention the IARC's classification of RF radiation as possibly carcinogenic to humans, and its 2013 monograph regarding that classification, on which the Commission's notice of inquiry specifically sought comment. Petitioners also argue that the Commission failed to adequately respond to two 2018 studies—the National Toxicology **[**36]** Program ("NTP") study and the Ramazzini Institute study—that found increases in the incidences of certain types of cancer in rodents exposed to RF radiation. Had these 2018 studies been available prior to the IARC's publication of its monograph, Petitioners assert, the IARC would have likely classified RF radiation as "probably carcinogenic," rather than "possibly carcinogenic." This is so, according to Petitioners, because the IARC will classify an agent as "possibly carcinogenic" if there is "limited evidence" that it causes

cancer in humans and animals, and as "probably carcinogenic" if there is "limited evidence" that it causes cancer in humans and "sufficient evidence" that it causes cancer in animals. In its 2013 monograph, the IARC found "limited evidence" that RF radiation causes cancer in humans and animals, and therefore classified RF radiation as "possibly carcinogenic." Int'l Agency for Rsch. on Cancer, *Non-Ionizing Radiation, Part 2: Radiofrequency Electromagnetic Fields*, 102 IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS 419 (2013) (emphases omitted). Petitioners assert that the NTP and Ramazzini Institute studies provide "sufficient evidence" that **[**37]** RF radiation causes cancer in animals. Therefore, according to Petitioners, had those studies been available prior to the IARC's publication of its monograph, the IARC would have found "limited evidence" that RF radiation causes cancer in humans and "sufficient evidence" that it causes cancer in animals, and would have accordingly classified RF radiation as "probably carcinogenic."

Although the Commission's failure to make any mention of the IARC monograph **[*912]** does not epitomize reasoned decision making, we find that the Commission's order adequately responds to the record evidence that exposure to RF radiation at levels below the Commission's current limits may cause cancer. In contrast to its silence regarding non-cancerous effects, the order provides a reasoned response to the NTP and Ramazzini Institute studies. It explains that the results of the NTP study "cannot be extrapolated to humans because (1) the rats and mice received RF radiation across their whole bodies; (2) the exposure levels were higher than what people receive under the current rules; (3) the duration of exposure was longer than what people receive; and (4) the studies were based on 2G and 3G phones and did not study **[**38]** WiFi or 5G." *2019 Order*, 34 FCC Rcd. at 11,693 n.33. And the order

cites a response to both studies published by the International Commission on Non-Ionizing Radiation Protection that provides a detailed explanation of various inconsistencies and limitations in the studies and concludes that "consideration of their findings does not provide evidence that radiofrequency EMF is carcinogenic." INT'L COMM'N ON NON-IONIZING RADIATION PROT., ICNIRP NOTE ON RECENT ANIMAL CARCINOGENESIS STUDIES 6 (2018), https://www.icnirp.org/cms/upload/publications/ICNIRPn ote2018.pdf ; *see also 2019 Order*, 34 FCC Rcd. at 11,693 n.34. Petitioners' contention that the IARC would have classified RF radiation as "probably carcinogenic" had the NTP and Ramazzini Institute studies been published earlier is speculative, particularly in light of the International Commission on Non-Ionizing Radiation Protection's evaluation of those studies. And the IARC monograph's classification of RF radiation as "possibly carcinogenic" is not so contrary to the Commission's determination that exposure to RF radiation at levels below its current limits does not cause cancer as to render that determination arbitrary or capricious. **[**39]**

Petitioners also argue that the Commission's order impermissibly fails to respond to various "additional legal considerations." Specifically, Petitioners argue that the order (i) ignores "express invocations of constitutional, statutory and common law based individual rights," including property rights and the rights of "bodily autonomy and informed consent"; (ii) fails to explain whether FCC regulation preempts rights and remedies under the Americans with Disabilities Act and the Fair Housing Act; (iii) does not assess the costs and benefits associated with maintaining the Commission's current limits; (iv) does not resolve the question of whether "those advocating more protective limits have to prove the existing limits are inadequate," or whether the Commission carries the burden of proving that its existing limits are adequate; and (v) overlooks that the

Supreme Court's decision in *Jacobson v. Massachusetts*, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905), "flatly requires that the Commission allow for some remedy for those who suffer from exposure." Pet'rs' Br. at 84-101.

These arguments are not properly before us. *HN11*[↑] The Communications Act provides that a petition for reconsideration is a "condition precedent to judicial review" of "questions of fact or **[**40]** law upon which the Commission . . . has been afforded no opportunity to pass." 47 U.S.C. § 405(a). We will accordingly only consider a question raised before us if "a reasonable Commission *necessarily* would have seen the question . . . as part of the case presented to it." *NTCH, Inc. v. FCC*, 841 F.3d 497, 508, 426 U.S. App. D.C. 309 (D.C. Cir. 2016) (quoting *Time Warner Ent. Co. v. FCC*, 144 F.3d 75, 81, 330 U.S. App. D.C. 126 (D.C. Cir. 1998)). Petitioners did not submit a petition for reconsideration to the Commission, and they point to no comments **[*913]** raising their "additional legal considerations" in such a manner as to necessarily indicate to the Commission that they were part of the case presented to it.

Although Petitioners assert that the "Cities of Boston and Philadelphia specifically flagged [the issue of whether FCC regulation preempts rights and remedies under the Americans with Disabilities Act and the Fair Housing Act] and sought clarification," Pet'rs' Br. at 86, they are incorrect. The Cities of Boston and Philadelphia merely observed that the Second Circuit's decision in *Cellular Phone Taskforce* did not address whether "'electrosensitivity' [is] a cognizable disability under the Americans with Disabilities Act," J.A. 4,598. And the Cities noted that "the FCC and its sister regulatory agencies share responsibility for adherence to the ADA," J.A. 4,598-99, **[**41]** and urged the Commission to "lead in advice to electrosensitive persons about prudent avoidance," J.A. 4,599. This did not put the

Commission on notice that the question whether FCC regulation preempts rights and remedies under the Americans with Disabilities Act and the Fair Housing Act was part of the case presented to it. Nor did a comment asserting that "[t]he telecommunications Act should not be interpreted to injure an identifiable segment of the population, exile them from their homes and their city, leave them no place where they can survive, and allow them no remedy under City, State or Federal laws or constitutions." J.A. 10,190. And Petitioners point to no comments that did a better job of flagging their other "additional legal considerations" for the Commission. The Commission therefore did not have an opportunity to pass on these arguments, so we may not review them. 47 U.S.C. § 405(a).

## C.

Petitioners also argue that NEPA required the Commission to issue an EA or EIS regarding its decision to terminate its notice of inquiry.

Petitioners are wrong. The Commission was not required to issue an EA or EIS because there was no ongoing federal action regarding its RF limits. The Commission already **[**42]** published an assessment of its existing RF limits that "'functionally' satisfied NEPA's requirements 'in form and substance.'" *EMR Network*, 391 F.3d at 272 (quoting *Cellular Phone Taskforce*, 205 F.3d at 94-95). *HN12*[⬆] NEPA obligations attach only to "proposals" for major federal action. *See* 42 U.S.C. § 4332(c); *see also* 40 C.F.R. § 1502.5. Once an agency has satisfied NEPA's requirements, it is only required to issue a supplemental assessment when "there remains major federal action to occur." *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1242, 436 U.S. App. D.C. 236 (D.C. Cir. 2018) (internal quotation marks omitted) (quoting *Marsh v. Ore. Nat'l Res. Council*, 490 U.S. 360, 374, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989)). An

agency's promulgation of regulations constitutes a final agency action that is not ongoing. *Id.* at 1243. Once an agency promulgates a regulation and complies with NEPA's requirements regarding that regulation, it is not required to conduct any supplemental environmental assessment, *even if* its original assessment is outdated. *Id.* at 1242. Such is the case here. As we explained in *EMR Network* in response to the argument that new data required the Commission to issue a supplemental environmental assessment of its RF guidelines under NEPA, "the regulations having been adopted, there is at the moment no ongoing federal action, and no duty to supplement the agency's prior environmental inquiries." 391 F.3d at 272 (internal quotation marks and citation omitted).

That the Commission voluntarily initiated **[**43]** an inquiry to "determine whether there is a need for reassessment of the **[*914]** Commission radiofrequency (RF) exposure limits and policies" does not change the analysis. *2013 Notice of Inquiry*, 28 FCC Rcd. at 3,501. *HN13*[⬆] As the Supreme Court explained long ago, "the mere contemplation of certain action is not sufficient to require an impact statement" under NEPA, *Kleppe v. Sierra Club*, 427 U.S. 390, 404, 96 S. Ct. 2718, 49 L. Ed. 2d 576 (1976) (internal quotation marks omitted), because, as in this case, "the contemplation of a project and the accompanying study thereof do not necessarily result in a proposal for major federal action," *id.* at 406. *See also Pub. Citizen v. Off. of U.S. Trade Representatives*, 970 F.2d 916, 920, 297 U.S. App. D.C. 287 (D.C. Cir. 1992) ("In accord with *Kleppe*, courts routinely dismiss NEPA claims in cases where agencies are merely contemplating a particular course of action but have not actually taken any final action at the time of suit.") (collecting cases). Were the Commission to propose revising its RF exposure guidelines, it might be required to prepare NEPA documentation. But since the Commission for now has

not proposed to alter its guidelines, it need not yet conduct any new environmental review.

III.

For the reasons given above, we grant the petitions in part and remand to the Commission to provide a reasoned explanation for its determination that its guidelines **[**44]** adequately protect against harmful effects of exposure to radiofrequency radiation unrelated to cancer. It must, in particular, (i) provide a reasoned explanation for its decision to retain its testing procedures for determining whether cell phones and other portable electronic devices comply with its guidelines, (ii) address the impacts of RF radiation on children, the health implications of long-term exposure to RF radiation, the ubiquity of wireless devices, and other technological developments that have occurred since the Commission last updated its guidelines, and (iii) address the impacts of RF radiation on the evironment. To be clear, we take no position in the scientific debate regarding the health and environmental effects of RF radiation—we merely conclude that the Commission's cursory analysis of material record evidence was insufficient as a matter of law. As the dissenting opinion indicates, there may be good reasons why the various studies in the record, only some of which we have cited here, do not warrant changes to the Commission's guidelines. But we cannot supply reasoning in the agency's stead, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87-88, 63 S. Ct. 454, 87 L. Ed. 626 (1943), and here the Commission has failed to provide any reasoning to **[**45]** which we may defer.

*So ordered*.

**Dissent by:** KAREN LECRAFT HENDERSON (In Part)

# Dissent

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting in part: "[A] court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). We thus must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974)). I believe my colleagues' limited remand contravenes these first principles of administrative law. Because I would deny the petitions in full, I respectfully dissent from Part II.A.i.-iv. and Part III of the majority opinion.

I.

It is important to emphasize how deferential our standard of review is here—where, first, an agency's decision to terminate a notice of inquiry without initiating a rulemaking occurred after the agency opened the inquiry on its own and, second, **[*915]** the inquiry involves a highly technical subject matter at the frontier of science. As the majority recognizes, "[t]he arbitrary and capricious standard of the Administrative Procedure Act 'encompasses a range of levels of deference to the agency.'" Maj. Op. 8 (quoting *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4, 258 U.S. App. D.C. 397 (D.C. Cir. 1987)). The majority further acknowledges that the Federal Communications Commission's (Commission or FCC) "order is entitled to a high degree of **[**46]** deference." *Id.* at 9. And our precedent also makes plain that "[i]t is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking." *WWHT, Inc. v. FCC*, 656 F.2d 807, 818, 211 U.S. App. D.C. 218 (D.C. Cir. 1981); *see also Cellnet Commc'n, Inc. v. FCC*, 965 F.2d 1106, 1111, 296 U.S. App. D.C. 144 (D.C. Cir.

1992) ("an agency's refusal to initiate a rulemaking is evaluated with a deference so broad as to make the process akin to non-reviewability"). For the reasons that follow, I believe the Commission's order does not fit those rarest and most compelling circumstances.

**A.**

We have held that research articles containing tentative conclusions do not provide a basis for disturbing an agency's decision not to initiate rulemaking. *See EMR Network v. FCC*, 391 F.3d 269, 274, 364 U.S. App. D.C. 20 (D.C. Cir. 2004). Nevertheless, the majority rejects reaching the same conclusion here regarding the petitioners' assertion that radiofrequency (RF) radiation exposure below the Commission's limits can cause negative health effects unrelated to cancer. To do so, it relies on five research articles in an over 10,500-page record. *See* Maj. Op. at 10-11.[1]

A close inspection of the five research articles confirms that they also "are nothing if not tentative." *EMR Network*, 391 F.3d at 274. The Foerster article concludes "[o]ur findings *do not provide conclusive evidence* of causal effects and should be interpreted **[**47]** *with caution* until confirmed in other populations." Joint Appendix (J.A.) 6,006 (Milena Foerster et al., *A Prospective Cohort Study of Adolescents' Memory Performance and Individual Brain Dose of Microwave Radiation from Wireless Communication*, 126 ENV'T HEALTH PERSPS. 077007

(July 2018)) (emphases added).[2] The Lai article provides a similarly murky picture of the current science. *See* J.A. 5,320-68 (Henry Lai, *A Summary of Recent Literature (2007-2017) on Neurological Effects of Radiofrequency Radiation, in* MOBILE COMMC'NS & PUB. HEALTH 187-222 (M. Markov ed., 2018)). In summarizing the results of human studies on the behavioral effects of RF radiation, the Lai article lists 31 studies that showed *no significant* behavioral effects compared to 20 studies that showed behavioral effects. *See* J.A. 5,327-32. Moreover, of the 20 studies that showed a behavioral effect, at least four found behavioral *improvements*, not negative health effects.

Even the Yakymenko article, which asserts that 93 of 100 peer-reviewed studies found low-intensity RF radiation induces **[*916]** oxidative effects in biological systems, fails to address the critical issue—whether RF radiation below the Commission's **[**48]** current limits can cause negative health effects. *See* J.A. 5,243-58 (Igor Yakymenko et al., *Oxidative Mechanisms of Biological Activity of Low-Intensity Radiofrequency Radiation*, ELECTROMAGNETIC BIOLOGY & MED., EARLY ONLINE, 1-16 (2015)). Specifically, the Yakymenko article discusses the International Commission on Non-Ionizing Radiation Protection's (ICNIRP) recommended RF exposure limit—a specific absorption rate of 2 W/kg. *See* J.A. 5,243-44. But the ICNIRP's recommended RF exposure limit is significantly higher than the Commission's current limit—0.08 W/kg averaged over the whole body and a peak spatial-average of 1.6 W/kg

---

[1] "The record in an informal rulemaking proceeding is 'a less than fertile ground for judicial review' and has been described as a 'sump in which the parties have deposited a sundry mass of materials.'" *Pro. Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1220-21, 227 U.S. App. D.C. 312 (D.C. Cir. 1983) (quoting *Nat'l Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1052, 196 U.S. App. D.C. 124 (D.C. Cir. 1979)).

[2] *See also* J.A. 5,995 ("[T]he health effects of [exposure to radiofrequency electromagnetic fields (RF-EMFs)] are still unknown. . . . [T]o date studies addressing this topic have produced inconsistent results."); J.A. 6,005 ("Although we found decreases in figural memory, some experimental and epidemiological studies on RF-EMF found *improvements* in working memory performance.") (emphasis added).

over any 1 gram of tissue. *See* 47 C.F.R. § 1.1310(c). Accordingly, it is uncertain how many, if any, of the referenced peer-reviewed studies were conducted at RF radiation levels below the Commission's current limits.[3]

Given this record, I believe we should have arrived at the same conclusion we did in *EMR Network*—"nothing in th[e]se studies so strongly evidenc[es] risk as to call into question the Commission's decision to maintain a stance of what appears to be watchful waiting." *EMR Network*, 391 F.3d at 274. "An agency is not obliged to respond to every comment, only those that can be thought to challenge a **[**49]** fundamental premise." *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765, 341 U.S. App. D.C. 132 (D.C. Cir. 2000). A review of the five articles on which the majority opinion relies makes plain that the articles do not challenge a fundamental premise of the Commission's order. Instead, it "cherry-pick[s] the factual record to reach [its] conclusion." *Ortiz-Diaz v. U.S. Dep't of Hous. & Urb. Dev.*, 867 F.3d 70, 79, 432 U.S. App. D.C. 82 (D.C. Cir. 2017) (Henderson, J., concurring in the judgment).

My colleagues assert that "[t]he dissenting opinion portrays this case as about the Commission's disregard of just five articles." Maj. Op. 22. But their attempt to "turn the tables" plainly fails. It is they who chose the five articles, *see* Maj. Op. 10-11, to rely on as the basis for their remand, *see id.* at 15 ("the Commission's order remains bereft of any explanation as to why, *in light of the studies in the record*, its guidelines remain adequate") (emphasis altered); *id.* at 18 ("*the studies in the record* to which Petitioners point *do* challenge a fundamental premise of the Commission's decision to terminate its notice of inquiry") (first emphasis added). I discuss the five articles *only* to demonstrate that the

studies "are nothing if not tentative." *EMR Network*, 391 F.3d at 274. Because the studies on which the majority relies plainly are tentative, they do not challenge a fundamental premise of the Commission's **[**50]** decision and therefore cannot provide the basis for the majority's limited remand under our precedent.[4]

**B**.

I reach the same conclusion regarding the majority's remand of the petitioners' environmental harm argument. *See* Maj. Op. 21-22. The majority relies on a 2014 letter from the U.S. Department of the Interior (Interior) to the U.S. Department of Commerce about, *inter alia*, the impact of communications towers on migratory birds. But the Interior letter itself concedes that "[t]o date, no independent, **[*917]** third-party field studies have been conducted in North America on impacts of tower electromagnetic radiation on migratory birds." J.A. 8,383.

Moreover, the petitioners did not raise the Interior letter in the environmental harm section of their briefs. "We apply forfeiture to unarticulated [legal and] evidentiary theories not only because judges are not like pigs, hunting for truffles buried in briefs or the record, but also because such a rule ensures fairness to both parties." *Jones v. Kirchner*, 835 F.3d 74, 83, 425 U.S. App. D.C. 302 (D.C. Cir. 2016) (alteration in original) (citation omitted). And finally, the environmental harm studies on which the petitioners *did* rely "are nothing if not

---

[3] The BioInitiative Report the majority opinion cites is hardly worth discussing because the self-published report has been widely discredited as a biased review of the science.

[4] The majority's hand wave to other record information, *see* Maj. Op. 22-23, does not carry the day. Rather than provide "substantial information," *id.* at 22, the cited material consists primarily of letters expressing generalized concerns about RF limits worldwide.

tentative." *EMR Network*, 391 F.3d at 274.[5]

## C.

More importantly, the majority's limited remand runs afoul of our precedent on this precise subject matter. In *EMR Network*, the petitioner asked "the Commission to initiate an inquiry on the need to revise [its] regulations to address the non-thermal effects" of RF radiation. 391 F.3d at 271. In denying the petition, we concluded "the [Commission]'s decision not to leap in, at a time when the [Environmental Protection Agency (EPA)] (and other agencies) saw no compelling case for action, appears to represent the sort of priority-setting in the use of agency resources that is least subject to second-guessing by courts." *Id.* at 273.

This time around, the majority faults the Commission for the U.S. Food and Drug Administration's (FDA) allegedly "conclusory statements" in response to the Commission's 2013 notice of inquiry. *See* Maj. Op. 14. The crux of the majority's position is that "[t]he statements from the FDA on which the Commission's order relies are practically identical to the Secretary's statement in [**52] *American Horse* and the

Commission's statement in *American Radio*." *Id.*[6] But the analogy to *American Horse* and *American Radio* does not hold water. The majority's Achilles' heel is the fact that the Commission and the FDA are, to state the obvious, distinct agencies.

In *American Horse*, the appellant relied on the results of a study commissioned by the U.S. Department of Agriculture (Agriculture) to support its request for revised Agriculture regulations. *Am. Horse*, 812 F.2d at 2-3. The study found that devices Agriculture had declined to prohibit caused effects falling within the statutory definition of the condition known as "sore";[7] and the Congress had charged Agriculture to eliminate the practice of soring show horses. *Am. Horse*, 812 F.2d at 2-3. Against this backdrop, we found the Agriculture Secretary's "two conclusory sentences [dismissing the need to revise agency regulations] . . . insufficient to assure a reviewing court that the agency's refusal to act was the product of reasoned decisionmaking." *Id.* at 6. But an agency [*918] head's terse dismissal of his own agency's study is not the case here. First, as noted *supra*, there is no conclusive study in the record, much less one commissioned by the agency whose regulations are being considered [**53] for revision. Instead, the record contains dozens of highly technical studies from various sources—the credibility and findings of which we are ill-equipped to evaluate. And crucially, unlike in *American Horse*, the Commission requested the opinion of the FDA—the agency charged

---

[5] *See, e.g.*, J.A. 5,231 (Albert Manville, II, *A Briefing Memorandum: What We Know, Can [**51] Infer, and Don't Yet Know about Impacts from Thermal and Non-Thermal Non-Ionizing Radiation to Birds and Other Wildlife* 2 (2016)) ("the direct relationship between electromagnetic radiation and wildlife health continues to be complicated and in cases involving non-thermal effects, still unclear"); J.A. 6,174 (Ministry of Env't & Forest, Gov't of India, *Report on Possible Impacts of Communication Towers on Wildlife Including Birds and Bees* 4 (2011)) ("exact correlation between radiation of communication towers and wildlife, are not yet very well established").

[6] *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 390 U.S. App. D.C. 34 (D.C. Cir. 2008).

[7] *See* 15 U.S.C. § 1821(3) ("The term 'sore' when used to describe a horse means that [as a result of any substance or device used on a horse's limb] such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving . . . .").

with "establish[ing] and carry[ing] out an electronic product radiation control program," 21 U.S.C. § 360ii(a)—studied that opinion and explained why it relied thereon in making its decision.

Similarly, in *American Radio*, the studies summarily dismissed by the FCC were studies the FCC sought to evaluate *itself*; we remanded for the FCC to explain why it failed to do so. *See Am. Radio*, 524 F.3d at 241. Moreover, *American Radio* addressed the reasoning underlying the FCC's *promulgation* of a rule, an action subjected to far less deference than an agency's decision not to initiate a rulemaking.[8]

I believe the Commission reasonably relied on the conclusions of the FDA, the agency statutorily charged with protecting the public from RF radiation. *See* 21 U.S.C. § 360ii(a) (FDA "shall establish and carry out an electronic product radiation control program designed to protect the public health and safety from electronic product radiation").[9] Our precedent **[\*\*54]** is well-settled

---

[8] *See, e.g., ITT World Commc'ns, Inc. v. FCC*, 699 F.2d 1219, 1245-46, 226 U.S. App. D.C. 67 (D.C. Cir. 1983), *rev'd on other grounds*, 466 U.S. 463, 104 S. Ct. 1936, 80 L. Ed. 2d 480 (1984) ("Where an agency promulgates rules, our standard of review is diffident and deferential, but nevertheless requires a searching and careful examination of the administrative record to ensure that the agency has fairly considered the issues and arrived at a rational result. Where, as here, an agency chooses *not* to engage in rulemaking, our level of scrutiny is even more deferential . . ." (emphasis in original) (footnotes and internal quotations omitted)).

[9] *See also In re Guidelines for Evaluating the Env't Effects of Radiofrequency Radiation*, 11 FCC Rcd. 15,123, 15,130 ¶ 18 (1996) ("The FDA has general jurisdiction for protecting the public from potentially harmful radiation from consumer and industrial devices and in that capacity is expert in RF exposures that would result from consumer or industrial use of hand-held devices such as cellular telephones.").

that "[a]gencies can be expected to 'respect [the] views of such other agencies as to those problems' for which those 'other agencies are more directly responsible and more competent.'" *City of Bos. Delegation v. FERC*, 897 F.3d 241, 255, 437 U.S. App. D.C. 388 (D.C. Cir. 2018) (second alteration in original) (quoting *City of Pittsburgh v. Fed. Power Comm'n*, 237 F.2d 741, 754, 99 U.S. App. D.C. 113 (D.C. Cir. 1956)). That is precisely what the Commission did here.

The Commission's *2013 Notice of Inquiry* explained that the Commission intended to rely on, *inter alia*, the FDA to determine whether to reassess its own RF exposure limits. *See In re Reassessment of Fed. Commc'ns Comm'n Radiofrequency Exposure Limits & Policies*, 28 FCC Rcd. 3,498, 3,501 ¶ 6 (2013) (*2013 Notice of Inquiry*) ("Since the Commission is not a health and safety agency, we defer to other organizations and agencies with respect to interpreting the biological research necessary to determine what [RF radiation] levels are safe."). And the Commission has consistently deferred to expert health and safety agencies in this context. *See id.* at 3,572 ¶ 211 (RF exposure limits adopted in 1996 "followed recommendations received from the [EPA], the [FDA], and other federal health and safety agencies").[10]

**[\*919]** The Commission was true to its word. On March 22, 2019, it asked the FDA if changes to the RF

---

[10] *See also In re Guidelines for Evaluating the Env't Effects of Radiofrequency Radiation*, 12 FCC Rcd. 13,494, 13,505 ¶ 31 (1997) ("It would be impracticable for us to independently evaluate the significance of studies purporting to show biological effects, determine if such effects constitute a safety hazard, and then adopt stricter standards that [sic] those advocated by federal health and safety agencies. This is especially true for such controversial issues as non-thermal effects and whether certain individuals might be 'hypersensitive' or 'electrosensitive.'").

exposure limits were warranted by the current scientific research.[11] On April 24, 2019, the **[\*\*55]** FDA responded:

> FDA is responsible for the collection and analysis of scientific information that may relate to the safety of cellphones and other electronic products. . . . As we have stated publicly, . . . the available scientific evidence to date does not support adverse health effects in humans due to exposures at or under the current limits, and . . . the FDA is committed to protecting public health and continues its review of the many sources of scientific literature on this topic.

J.A. 8,187 (Letter from Jeffrey Shuren, M.D., J.D., Dir., Ctr. for Devices and Radiological Health, U.S. Food & Drug Admin., Dep't of Health & Hum. Servs., to Julius Knapp, Chief, Off. of Eng'g & Tech., U.S. Fed. Commc'ns Comm'n (April 24, 2019)).[12] In my view, the

---

[11] *See* J.A. 8,184 (Letter from Julius Knapp, Chief, Off. of Eng'g & Tech., U.S. Fed. Commc'ns Comm'n, to Jeffrey Shuren, M.D., J.D., Dir., Ctr. for Devices and Radiological Health, U.S. Food & Drug Admin. (March 22, 2019)) ("Given that existing studies are continually being evaluated as new research is published, and that the work of key organizations such as [the Institute of Electrical and Electronics Engineers] and ICNIRP is continuing, we ask FDA's guidance as to whether any changes to the standards are appropriate at this time.").

[12] *See also Statement from Jeffrey Shuren, M.D., J.D., director of the FDA's Center for Devices and Radiological Health on the recent National Toxicology Program draft report on radiofrequency energy exposure*, FOOD & DRUG ADMIN. (Feb. 2, 2018), https://www.fda.gov/news-events/press-announcements/statement-jeffrey-shuren-md-jd-director-fdas-center-devices-and-radiological-health-recent-national (Since 1999, "there have been hundreds of studies from which to draw a wealth of information about these technologies which have come to play an important role in our everyday lives.

Commission, relying on the FDA, reasonably concluded no changes to the current RF exposure limits were warranted at the time. *See In re Reassessment of Fed. Commc'ns Comm'n Radiofrequency Exposure Limits & Policies*, 34 FCC Rcd. 11,687, 11,691 ¶ 10 (2019) (*2019 Order*).

Simply put, the Commission's reliance on the FDA is reasonable "[i]n the face **[\*\*56]** of conflicting evidence at the frontiers of science." *See Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 90 (2d Cir. 2000). The majority takes issue with what it categorizes as "conclusory statements." Maj. Op. 14. But the Supreme Court's "*State Farm* [decision] does not require a word count; a short explanation can be a reasoned explanation." *Am. Radio*, 524 F.3d at 247 (Kavanaugh, J., dissenting in part). Brevity is even more understandable if the agency whose rationale is challenged relies **[\*920]** on the agency the Congress has charged with regulating the matter.

Granted, "[w]hen an agency in the Commission's position is confronted with evidence that its current regulations are inadequate or the factual premises underlying its prior judgment have eroded, it must offer more to justify its decision to retain its regulations than mere conclusory statements." Maj. Op. 9. But the majority opinion rests on an inaccurate premise—the Commission was not confronted with evidence that its

---

Taken together, all of this research provides a more complete picture regarding radiofrequency energy exposure that has informed the FDA's assessment of this important public health issue, and given us the confidence that the current safety limits for cell phone radiation remain acceptable for protecting the public health. . . . I want to underscore that based on our ongoing evaluation of this issue and taking into account all available scientific evidence we have received, we have not found sufficient evidence that there are adverse health effects in humans caused by exposures at or under the current radiofrequency energy exposure limits.").

regulations are inadequate nor have the factual premises underlying its RF exposure limits eroded. Sifting through the record's technical complexity is outside our bailiwick. If the record here establishes one point, however, it is that there is no scientific consensus regarding the "non-thermal" effects, [**57] if any, of RF radiation on humans. More importantly, the FDA, not the Commission, made the allegedly "conclusory statements" with which the majority takes issue and I believe the Commission adequately explained why it relied on the FDA's expertise.[13]

_____

[13] The majority asserts that "[o]ne agency's unexplained adoption of an unreasoned analysis just compounds rather than vitiates the analytical void." Maj. Op. 24. As set out *supra*, however, the Commission adequately explained its reliance—for the past 25 years—on the FDA's RF exposure expertise. Plus, after a review of "hundreds of studies," the FDA's conclusion is far from unreasoned. *See supra* note 12. And the two cases to which the majority points are inapposite. *See* Maj. Op. 24 (citing *City of Tacoma v. FERC*, 460 F.3d 53, 76, 373 U.S. App. D.C. 117 (D.C. Cir. 2006), and *Ergon-West Virginia, Inc. v. EPA*, 896 F.3d 600, 612 (4th Cir. 2018)). Importantly, unlike these petitions, neither case involves a decision not to initiate a rulemaking. As noted, inaction is reviewed under an especially deferential standard. It would be inappropriate to apply precedent using a less deferential standard to modify the standard applicable here. And finally, the Commission did not "blindly adopt the conclusions" of the FDA. *See City of Tacoma*, 460 F.3d at 76. Nor did it "turn a blind eye to errors and omissions apparent on the face of" the FDA's conclusions. *See Ergon-West Virginia*, 896 F.3d at 612.

The majority's citation to *Bellion Spirits, LLC v. United States*, No. 19-5252, 2021 U.S. App. LEXIS 23374 (D.C. Cir. Aug. 6, 2021), is even further afield. First, *Bellion Spirits* addressed a "statutory authority" question—it did not apply arbitrary and capricious review, much less the especially deferential standard applicable to a decision not to initiate a rulemaking. *See Bellion Spirits*, 2021 U.S. App. LEXIS 23374, *15. Second, to the extent *Bellion Spirits* is remotely relevant, I believe it supports my position. There, the Alcohol and

As in *EMR Network*, the record does not "call into question the Commission's decision to maintain a stance of what appears to be watchful waiting." 391 F.3d at 274. To hold otherwise begs the question: what was the Commission supposed to do? It has no authority over the level of detail the FDA provides in response to the Commission's inquiry. It admits that it does not have the expertise "to interpret[] the biological research necessary to determine what [RF radiation] levels are safe." *2013 Notice of Inquiry*, 28 FCC Rcd. at 3,501 ¶ 6. The Commission opened the *2013 Notice of Inquiry* "as a matter of good government" despite its "continue[d] . . . confidence in the current [RF] exposure limits." *Id.* at 3,570 ¶ 205. If it *had* reached a conclusion contrary to the FDA's, it most likely would have been attacked as *ultra vires*. For us to require the Commission to, [**58] in effect, "nudge" the FDA stretches both our jurisdiction as well as its authority beyond recognized limits.

Accordingly, I respectfully dissent from the limited remand set forth in Part II.A.i.-iv. and Part III of the majority opinion.[14]

_____

End of Document

_____

Tobacco Tax and Trade Bureau "consulted with [the] FDA on a matter implicating [the] FDA's expertise and then considered that expertise in reaching its own final decision." 2021 U.S. App. LEXIS 23374, *17, [W] at 14. Again, in my view, the Commission did the same thing.

[14] Although I join Part II.B. of the majority opinion, I do not agree with the majority's aside, contrasting the Commission's purported silence regarding non-cancerous effects and its otherwise reasoned response. *See* Maj. Op. 26. As explained *supra*, I believe the Commission reasonably relied on the FDA's conclusion that RF radiation exposure below the Commission's limits does not cause negative health effects—cancerous or non-cancerous.

# Exhibit 3

**United States Court of Appeals**
**for the**
**District of Columbia Circuit**

| | | |
|---|---|---|
| Environmental Health Trust, *et al.,* | ) | |
|   Petitioners | ) | No. 20-1025 |
| | ) | |
| | ) | |
|      v. | ) | On Petition for Review |
| | ) | of an Order of |
| | ) | the Federal Communications |
| Federal Communications Commission | ) | Commission |
| and United States of America, | ) | |
|   Respondents. | ) | |

---

**DECLARATION OF EDWARD B. MYERS**
**IN SUPPORT OF JOINT MOTION OF PETITIONERS IN**
**CASE NO. 20-1025 FOR ATTORNEYS' FEES AND EXPENSES UNDER**
**THE FEDERAL EQUAL ACCESS TO JUSTICE ACT**

I, Edward B. Myers, declare as follows:

1.      I am an attorney admitted to practice before this Court.  I am a member of the bars of the District of Columbia and Maryland.  This declaration is based upon my personal knowledge.

2.      This Declaration is submitted in support of "Joint Motion of Petitioners in Case No. 20-1025 for Attorneys' Fees and Expenses Under the Federal Equal Access to Justice Act" ("Motion").  I am familiar with and have reviewed the standards for claiming fees under EAJA and base Petitioners' Motion and this Declaration on such standards.

**Relevant Experience and Background**

3.      I received a B.A. from Gettysburg College in 1973 and a J.D. from the University of Notre Dame Law School in 1977.

4.      I have been practicing federal administrative and environmental law for more than forty (40) years.  A true and correct copy of my current resume is appended to this declaration (Attachment A).  As reflected therein, I have spent a considerable part of my career drafting decisions for federal agencies, including the Federal Energy Regulatory Commission and the U.S. Department of Energy, in order to ensure that the decisions of those agencies complied with the Administrative Procedure Act (APA) and the National Environmental Policy Act (NEPA).  Additionally, in 2014—2015, I led an interdisciplinary team of attorneys, financial advisors, and real estate professionals in the successful transfer of Naval Petroleum Reserve No. 2, aka "Teapot Dome", to a private entity subject to a conservation easement for the benefit of Native American Tribes.  This transaction required extensive pre-transfer actions to ensure it was conducted in full compliance with NEPA and the National Historic Preservation Act (NHPA).  These experiences, among others, contributed to my understanding of the legal issues raised by the action of the Federal Communications Commission (FCC) in the Order appealed in the current case.

5.    In 2018, I intervened *pro se* before this Court in *Blackfeet Tribe, et al. v. Federal Communications Commission and United States of America*, Case No. 18-1184, *et al*.  That appeal challenged, among other things, a determination by the FCC that the deployment of so-called "small wireless facilities" was not subject either to NEPA or the NHPA.  I worked closely on the appeal with one of the petitioners, the Natural Resources Defense Council (NRDC), and I contributed to and joined with the NRDC in the briefs filed in the case. My principal contribution related to the handling of issues raised under the APA.  Subsequently, this Court granted the petitions for review in part and vacated and remanded the FCC's order in part.  *United Keetoowah Band of Cherokee Indians in Oklahoma, et al. v. FCC*, 933 F.3d 728 (DC Cir. 2019).  The principal basis for the Court's remand involved the failure of the FCC to comply with the APA.

6.    Commencing in 2019, I became legal advisor to the Environmental Health Trust (EHT) in matters before the Federal Communications Commission.

### Fees Sought For This Action

7.    In January 2020, the Environmental Health Trust and other Petitioners in Case No. 20-1025 (the "Clients") retained me to represent them in the current matter.  Also in January 2020, I retained the law firm of Keller & Heckman LLP (the "law firm") to assist me.  Keller & Heckman provided additional expert legal support in matters pertinent to this case, including the FCC's regulation of

radiofrequency emissions, appellate practice, and various administrative law issues.  See Declaration of Eric P. Gotting (Exhibit 4 to this Motion).

8.      I was/am the billing attorney for all matters billed to the Clients in this matter.  As the billing attorney, I have reviewed and continue to review the billing statements submitted to the Clients, including my own billing statements and those generated by the law firm.   I have exercised and continue to exercise billing judgment to reduce and/or eliminate certain time recorded prior to submitting the billing statements to the Clients.  All fees incurred by the Clients in this matter have been fair, reasonable, and appropriate.

9.      The fees charged for attorney time and the time of other personnel for the matter have been and are based on the experience and expertise of each timekeeper, and are competitive with comparable firms doing similar legal work. Throughout the matter, each attorney and other timekeeper has kept contemporaneous records of time spent.  Billing has been and is recorded for each quarter of an hour spent on the matter.  Both the amount of time spent and a description of the work performed have been and are recorded.

10.      Prior to the filing of the instant Motion, I reviewed the billing statements submitted thus far to the Clients and the following additional reductions and adjustments were made to arrive at the total number of hours and related fees claimed for recovery under this Motion:

4

     i.     Certain billing entries (and the associated numbers of hours) were eliminated based on a good faith understanding of what items the courts typically do and do not grant as recoverable under EAJA.

     ii.     Content within specific time entries that reflected information protected by the attorney-client privilege or the work product doctrine was redacted.

     iii.     Other content within billing statements that was irrelevant to the determination of the instant Motion was redacted.

11.    Attached to this Declaration as Attachment B are true and correct copies of the itemized billing statements that I rendered for work that I personally performed for this matter.  The billing statements for work performed by the law firm are attached to the Declaration of Eric P. Gotting.  These two sets of billing statements contain time for which the Clients seek recovery of fees incurred, as redacted and otherwise adjusted as described above, for work performed from January 2020 through January 2021.

12.    The services rendered and time expended on providing the services identified in Attachment B and in the law firm's billing statements attached to the Declaration of Eric P. Gotting were fair, reasonable, and appropriate in connection with obtaining the very successful result on the Petition for Review in this matter, which required extensive preparation and briefing, and involved, among other

things: preparing the Petition for Review and Protective Petition for Review;
preparing the Statement of Issues and Docketing Statement (including an
addendum establishing standing for each Petitioner); reviewing an unusually
lengthy administrative record consisting of well over one thousand (1,000)
scientific, technical, and medical studies and reports regarding the impacts of
radiofrequency radiation on human health and safety and the environment; drafting
and filing the petitioners' joint opening and reply briefs in concert with counsel for
Children's Health Defense, *et al.* in Case No. 20-1138, which had been
consolidated with this matter by order of the Court; preparing the Joint Appendix
and supplement thereto; reviewing *amicus* briefs; preparing declarations in support
of standing; and preparing counsel for oral argument.

13.    I am the senior attorney in connection with the matter and have supervised
and managed all aspects of the work performed, and was responsible for delegating
work to other attorneys.  247.75 hours of my time is currently being claimed
(which the Clients have incurred at a rate of $200 per hour over the course of the
matter).  The additional time required to prepare the instant Motion will be the
subject of a supplemental filing.

14.    In order to handle the action in the most cost-effective manner, I assigned
certain tasks, as appropriate, to the following two attorneys at Keller & Heckman:
Albert Catalano (who practiced law at and before the FCC for more than 30 years)

and to Eric P. Gotting (a former U.S. Department of Justice trial attorney who has practiced litigation for 25 years and has considerable experience in federal administrative litigation and in practice before federal appellate courts.  See Declaration of Eric P. Gotting.  Several other associates and legal assistants at the law firm whose time is being claimed have assisted in a substantive way in the matter as needs have arisen by such things as conducting legal research, reviewing the administrative record, and assisting the preparation and editing of the various briefs and materials for filing.  See Declaration of Eric P. Gotting for the specific identification of other personnel employed by the law firm in this matter.  Various of these personnel also have performed work related to seeking recovery of fees under EAJA leading to the instant Motion as well, including legal research pertaining to EAJA, reviewing and redacting billing statements reflecting fees claimed, and preparing other related materials.

15.    The time claimed for legal fees pursuant to the Motion does not include time spent on issues on which the Petitioners were unsuccessful on appeal or time spent by counsel for CHD.  Specifically, pursuant to a negotiated division of labor between the various Petitioners' counsel in this matter, including counsel for CHD, the undersigned, along with the law firm, were primarily responsible for and accordingly prepared initial drafts of those sections of Petitioners' Joint Opening Brief and Joint Reply Brief dealing with the following issues, among others, on

7

which Petitioners were successful: standing; standard of review; the impact of radiofrequency radiation on children; various radiofrequency (RF) exposure routes (*e.g.,* 5G, cell phones), and RF health risks (*e.g.,* reproductive, neurological); the questionable testing procedures employed by the FCC for cell phone devices and equipment; the failure of the FCC to examine the environmental consequences of radiofrequency radiation; and, more generally, the failure of the FCC to examine pertinent evidence in the administrative record but, instead, to dwell on conclusory evidence provided by third parties, including the Food and Drug Administration.

16.    The following abbreviations are used in the Attachment B time sheets: "AC" refers to Albert Catalano; "CF" refers to Cynthia Franklin, President of Consumers for Safe Cell Phones (CSCP); "CHD" refers to Children's Health Defense; "DD" refers to Devra Davis, President of Environmental Health Trust (EHT); "EG" refers to Eric Gotting; "KH" refers to Keller and Heckman, LLP; "LB" refers to Elizabeth Barris; and "TS" refers to Theodora Scarato.  Additionally, the Attachment B time sheets refer to Cindi Peck--Ms. Peck was retained by the petitioners to compile a searchable data base consisting of all items in the administrative record; and to the principal representatives of CHD in Case No. 20-1138, including Scott McCollough ("Scott M") and Dafna Tachover ("Dafna T").

17.    In sum, the following total hours drawn from Attachment B are currently being claimed for work that I personally performed: 247.75 hours.  The total hours

performed by the law firm for work performed that I reviewed as lead billing attorney are 378 hours in total for attorneys and paralegals. See Declaration of Eric P. Gotting.

18.    The hourly rate applied to the time claimed in the current Motion for the work that I personally performed is $200 (see Attachment B to this Declaration) and, for work performed by the law firm, range from $265 (paralegals) to $333 (partners) for work performed in 2020 and $342 (partners) for work performed in 2021.

19.    The instant Motion only seeks fees at the EAJA statutory rate of $125 per hour, plus an upward adjustment for cost-of-living increases, for work performed by the law firm. My billed rate of $200 per hour operates as a ceiling on the EAJA claim for work that I personally performed. This is well-below the statutory rate adjusted for cost-of-living increases allowed under EAJA. Attachment C hereto is the true and correct calculation of the fees claimed (with relevant bases stated), including the appropriate cost-of-living adjustment in the Washington DC area by year. No discount applied to any of the attached billing statements would, if applied on a percentage basis to any individual timekeeper's rate, affect the recoverable hourly rate claimed in the instant Motion for any hour of billable time claimed.

20.    The cost-of-living adjustments have been calculated based on the Consumer Price Index for All Urban Consumers (CPI-U) for the Washington DC area. Attachment D hereto is a true and correct copy of CPI-U data for the year 2020 and the first half of 2021, which was obtained from the Bureau of Labor Statistics website at https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexannualandsemiannual_table.htm

21.    I am familiar with the hourly billing rates customarily charged by private sector attorneys and other law firm personnel possessing a similar level of experience and expertise as those performing work in this matter. Based on my personal knowledge of the District of Columbia legal market (and the Washington DC area generally), the billing rates reflected for each timekeeper on the aforementioned billing statements are at or below market rates for comparable attorneys and/or law firms.

22.    As reflected in Attachment C (the information to which I further attest), 625.75 hours for attorneys and paralegals are currently being claimed at the various statutory rates that have been adjusted to reflect cost-of-living increases in the Washington DC area or lower actual billed rates, for a total claim of $174,347.25, excluding time not yet invoiced to the Clients in connection with seeking recovery of fees under EAJA in the matter (which the Clients will have the option to recover

by filing a supplemental request for additional fees incurred that have not yet been invoiced once briefing on the Motion is concluded and fees are awarded).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed December 10, 2021, at Frederick, MD.


/s/Edward B. Myers

# Attachment A
# Resume of Edward B. Myers

**EDWARD B. MYERS**
**3012 Old Annapolis Trail**
**Frederick, MD 21071**
**(717) 752-2032**
**edwardbmyers@yahoo.com**

## Employment History

**2019—Present: Law Office of Edward B. Myers.** Legal counsel to Environmental Health Trust regarding actions of Federal Communications Commission.

**2017—2019: Law Office of Edward B. Myers.** Regulatory counsel to U.S. Department of Energy on a contract basis regarding imports and exports of liquefied natural gas (LNG).

**2006—2017: Attorney-Advisor, U.S. Department of Energy (DOE), Program Counsel, Office of Fossil Energy (FE).** Responsibilities:

- **Liquefied Natural Gas (LNG) Imports and Exports:** Lead DOE counsel in all matters involving LNG imports and exports. Principal author of several precedential opinions and orders authorizing controversial exports of domestically produced LNG; legal advisor to the Secretary, DOE senior staff, FE, and outside counsel on the proper interpretation of complex legal standards and agency rules regarding such imports and exports.

- **Hurricane Sandy Emergency Response Team:** DOE legal advisor on an interagency team responding to Hurricane Sandy, including representatives from DOE, the Maritime Administration, and the Department of Homeland Security; drafted documents in a compressed time period to support an emergency release of petroleum products from the Northeast Home Heating Oil Reserve and waiver of the Jones Act.

- **President's Interagency Task Force on Carbon Capture and Storage.** DOE legal advisor on the President's Interagency Task Force on Carbon Capture and Storage; wrote and edited substantial portions of the Task Force's August 2010 Report to

the President.

- **Transfer of Teapot Dome.** In 2014—2015, I supervised interdisciplinary team of attorneys, financial advisors, and engineers; successfully transferred Naval Petroleum Reserve No. 3 (Teapot Dome) to a private entity subject to a conservation easement for the benefit of Native American Tribes; responsible to ensure compliance with National Environmental Policy Act and National Historic Preservation Act.

**2006—2011: Legal Counsel, DOE Loan Guarantee Program Office (LGPO).** Conducted due diligence review and term sheet negotiations for loan guarantees to innovative energy technology projects, including AREVA gas centrifuge nuclear fuel enrichment technology; Nordic Windpower USA's two-bladed wind power turbine technology; and Sage Electrochromics' innovative technology for electrochromic windows.

**1995—2006: Law Office of Edward B. Myers, LLC, Washington, DC.** Legal counsel to natural gas companies; administrative litigation and business counseling pertaining to matters before the Federal Energy Regulatory Commission (FERC) and related appellate litigation before various United States Courts of Appeals.

**1993—1995: Senior Attorney, Jones, Day, Reavis & Pogue, Washington, DC.** Legal counsel to local gas distribution companies and interstate natural gas pipelines in administrative litigation before FERC and the California Public Utilities Commission; contributed to and edited a volume entitled The Energy Policy Act of 1992 (Matthew Bender: 1993); this volume was later published as part of Energy Law and Transactions, a multi-volume treatise.

**1988—1993: Counsel, Orange and Rockland Utilities, Incorporated, Pearl River, NY.** Energy regulatory counsel for natural gas and electric utility administrative litigation before the FERC; supervised a contract negotiating team in the acquisition of low sulfur coal supplies and rail transportation services.

**1984—1988: Attorney, later Assistant General Counsel, Interstate Natural Gas Association of America (INGAA), Washington, DC.** Legal counsel on a host of regulatory and financial issues pertaining to interstate natural gas pipeline operations; represented INGAA in appellate litigation before various United States Courts of Appeals on review of FERC opinions and orders.

**1978—1984: Attorney-Advisor and Presiding Officer, Office of Opinions and Review, Federal Energy Regulatory Commission, Washington, DC.** Reviewed contested initial decisions; researched and examined relevant laws, standards, and cases; prepared legal memoranda with options for FERC action; presented conclusions and recommendations at FERC public meetings; drafted FERC opinions and orders; sat as a hearing officer presiding over appeals from Department of Energy rulings under the Emergency Petroleum Allocation Act.

## Bar Affiliations

- District of Columbia and Maryland; U.S. District Court for the District of Columbia, U.S. Courts of Appeal for the Third Circuit, the Fourth Circuit, the Fifth Circuit, the Tenth Circuit, the Federal Circuit, and the District of Columbia Circuit; and the U.S. Court of Appeals for Veterans Claims.

## Professional Certifications

- August 2008: Contracting Officer's Representative, Management Concepts, Inc.

- Arbitration and Mediation training—NASD and District of Columbia Department of Human Rights and Minority Business Development.

## Education

- 1977, *Juris Doctor*, University of Notre Dame Law School, Notre Dame, IN.

- Editor, <u>Notre Dame Journal of Legislation</u>
- Research Director, Legislative Research Service
- Environmental Law Essay Contest, First Prize
- Notre Dame Summer Program, Imperial College, University of London

- 1973, Bachelor of Arts, *magna cum laude*, Gettysburg College, Gettysburg, PA.

### ***Pro Bono* Activities**

- 2019—Present: Legal counsel to Environmental Health Trust

- 1995—2000: Attorney Volunteer, *Pro Bono* Veterans Consortium—appellate litigation before the United States Court of Appeals for Veterans Claims and the United States Court of Appeals for the Federal Circuit.

### **Awards**

**2015—US Department of Energy, General Counsel's Award.** For excellence in legal work.

**2014— US Department of Energy, Secretary's Award.** Highest civilian award issued by Secretary of Energy in recognition of work performed in connection with international trade in liquefied natural gas (LNG).

# Attachment B

# Itemized Billing Statement

# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
**edwardbmyers@yahoo.com**

BILLING STATEMENT
(February 2020)

<u>SERVICES</u>

| DATE | ACTIVITY | HOURS |
|------|----------|-------|
| 1/29 | Drafted Petition for Review | 2.25 |
| 1/29 | Call with KH attorneys to review standing issues | 1.00 |
| 1/30 | Edited Petition for Review | 1.00 |
| 1/31 | Meeting with Devra Davis and KH attorneys; addressed standing issues; and finalized and filed Petition for Review | 2.00 |
| ███ | ████████████████████████████ | ███ |
| 2/12 | Reviewed order of court (DC Circuit) re scheduling and upcoming filings | .25 |
| 2/13 | Reviewed record in FCC docket with Theodora Scarato | 1.00 |
| 2/18-19 | Reviewed record in FCC docket with Theodora Scarato | 2.00 |
| ███ | ████████████████████████████ | ███ |
| 2/27-28 | Drafted and emailed Client Update | 2.5 |
| 2/29 | Response to questions from Liz Barris re Client Update | 0.75 |



# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
**edwardbmyers@yahoo.com**

BILLING STATEMENT
(March 2020)

<u>SERVICES</u>

| DATE | ACTIVITY | HOURS |
|---|---|---|
| 3/1 | Composed/sent emails to FCC counsel re deferred appendix | .50 |
| 3/2 | Reviewed emails/phone call with KH re drafting list of filings by Clients | .75 |
| ██ | ████████████████████████████ | ██ |
| ██ | ████████████████████████████ | ██ |
| ██ | ████████████████████████████ | |
| 3/4-3/5 | Working with KH and Clients to finalize docketing statement, statement of issues, and standing representations | 2.25 |
| 3/6 | Exchanged emails with KH re narrowing the issues to NOI Termination; filed docketing materials in DC Circuit | .75 |
| ██ | ████████████████████████████ | ██ |
| ██ | ████████████████████████████ | |
| ██ | ████████████████████████████ | ██ |
| ██ | ████████████████████████████ | ██ |
| 3/16 | ████████ notified DC Cir. re declining mediation | ~~1.00~~ 0.25 |
| 3/18 | Calls with KH re case status and strategy | 1.00 |

██████████  ████

██████████  ████

# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
**edwardbmyers@yahoo.com**

BILLING STATEMENT
(April 2020)

SERVICES

| DATE | ACTIVITY | HOURS |
|------|----------|-------|
| 4/1 | Call with KH re FR notice | 0.5 |
| 4/2 | Legal research—filing of supplemental/protective petitions for review | 2.0 |
| 4/3 | Call with KH re filing supplemental/protective petition for review | 1.0 |
| 4/7 | ▮▮▮▮▮▮▮▮▮▮ discussed standing issues; and need for me to call Court re filing supplemental/protective petition for review | ~~1.0~~ 0.50 |
| 4/8 | Call with KH re possibility of moving to bifurcate the NOI termination issue and supplemental/protective petition for review | 0.75 |
| 4/10 | Call with Cindi Peck re data base preparation (0.5); Legal research re APA ▮▮▮▮ (2.0) | ~~2.5~~ 1.50 |
| 4/13 | Call with Theodora re data base (0.5); Call with KH re contacting FCC (0.5); Call to FCC counsel (0.5); Call with Cindi Peck re data base (0.5). | 2.0 |
| 4/17 | Call to FCC counsel re extension of briefing schedule | 0.5 |
| 4/22 | Call to FCC counsel re extension of briefing schedule (0.5); Call with KH re brief content and structure, standing issues, and affidavits (1.0); Emailed FCC counsel proposing a joint motion re briefing extension (0.5). | 2.0 |
| 4/23 | Reviewed and revised draft motion from KH seeking extension of briefing schedule | 1.75 |
| 4/25 | Call with KH re briefing extension ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ | ~~1.00~~ 0.50 |
| 4/27 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Call with Cindy Franklin re affidavit (0.5); | ~~1.75~~ 0.50 |

| 4/28 | Call with KH re briefing (1.0) ██████████ | ~~2.75~~ 1.00 |
| | ████████████████ | |
| 4/29 | Call with KH re standing issues and affidavits | 0.5 |
| 4/30 | ███████████████ | ~~1.5~~ 0.50 |
| | ██████ Call with Liz Barris re affidavit (0.5) | |



# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
**edwardbmyers@yahoo.com**

BILLING STATEMENT
(May 2020)

SERVICES

| DATE | ACTIVITY | HOURS |
|------|----------|-------|
| 5/1 | Call with Scott M re briefing schedule per email from FCC counsel | 0.5 |
| | Emails and call with Cindy Franklin re taxonomy and "on the body" testing issue | 1.0 |
| 5/2 | Emails with KH (Catalano and Gotting) re administrative record; review of spreadsheet from KH | 0.5 |
| 5/4 | Emails with KH (Gotting) re division of issues with CHD | 0.5 |
| | Email to Scott M re motion for revised briefing schedule | 0.25 |
| 5/5 | Emails with KH (Gotting) and Scott M re division of issues with CHD | 0.75 |
| | Call with Scott M re briefing division of issues | 1.0 |
| | Reviewed draft motion to extend briefing schedule | 0.5 |
| | Emails with Cindi Peck re data base | .25 |
| 5/6 | Emails with Cindi Peck re data base | .25 |
| | Email and call with KH (Catalano) re brief; review of filings in administrative record re cell phone testing | 1.0 |
| | ███████████████ | ███ |
| | Review of email from Scott M with proposed division of briefing responsibilities; email to KH (Gotting) re same | 1.5 |
| 5/7 | Calls with KH re brief; discussed standing issues/content of brief (NTP, etc.) | 1.0 |
| 5/8 | ████████████████████████ | ███ |
| | With KH, drafted email to Scott M re filing of a joint brief; reviewed Scott's response | .75 |
| | Distributed Court order granting extension of briefing schedule | .25 |
| 5/9 | Call with Scott M re filing of a joint brief | .5 |
| | Emails with Cindi Peck re data base and Alaska S.Ct. RF decision | .25 |
| 5/11 | █████████████████████████ | ███ |

| | | | |
|---|---|---|---|
| | Call with KH (Catalano and Gotting) re affidavits; email to Devra Davis re contents of her affidavit ▮ | 1.25 ▮ |
| 5/12 | Call with Scott M, Dafna T, and KH (Gotting) re briefing assignments, content, and structure ▮<br><br>Emails with clients re integrity of FCC's online data | ~~1.5~~ 0.5<br><br>.5 |
| 5/13 | Call with Scott M, Dafna T, and KH (Gotting) re briefing assignments, content, and structure ▮ | 1.5 |
| 5/15 | Email to Catherine Kleiber re: potential amicus brief | .5 |
| 5/16 | ▮<br>Reviewed Moskowitz 13-84 submission from 2013<br>Call with George Klabin | ▮<br>2.0<br>1.0 |
| 5/17 | Email to KH (Gotting) re certified index of record and EAJA; research re same<br>Emails with CHD (Scott M and Dafna T) re sharing of data base when completed and proposed credit-sharing agreement | 1.0<br><br>.25 |
| 5/18 | Emails and Call with KH (Catalano and Gotting) re our brief ▮<br>Review of EWG/Public Citizen brief in CTIA case ▮<br><br>▮<br><br>Email with Theodora Scarato re intergovernmental letters in administrative record<br>Review of Scott M's draft Standard of Review section ▮ | 1.0<br><br>~~1.25~~ 0.5 ▮<br><br>▮<br><br>.25<br>.5 ▮ |
| 5/19 | Research administrative record ▮<br>Email and review of arguments from Catherine Kleiber re amicus brief<br>Email to Theodora Scarato to schedule call and outline research assignment ▮<br>▮ | 2.0 ▮<br>.5<br><br>.25<br><br>▮<br>▮ |
| 5/20 | ▮<br>▮<br>▮<br>▮ (oom) with clients re case status | ▮<br>▮<br><br>▮<br>1.0 |

| | | | |
|---|---|---|---|
| | | Call with Cindy Franklin and KH (Gotting) re research assignment (cell phone testing) | .75 |
| | | ███████████████████ | ██ |
| | | ██████████ | ██ |
| | | ████████████████ | █ |
| | | ████ | |
| | 5/21 | Call with Theodora Scarato and KH (Gotting) re research assignments (children/bees and trees) | .75 |
| | | Research re certified index of record; email re same | .5 |
| | | ███████████████ | |
| | | Email re agency letters in administrative record | .25 |
| | | ██████████ | █ |
| | 5/22 | Call with Theodora Scarato re brief and her assignment | 1.25 |
| | | Emails with clients re case status | .5 |
| | | ██ ██████████████ | |
| | 5/25 | Drafting affidavit for Theodora Scarato; emailed same to Theodora. | 2.5 |
| | | Email to Cindy Franklin re her affidavit | .25 |
| | 5/26 | Email to Cindy Franklin responding to questions about her research assignment | .25 |
| | | Compiled inter-agency (federal only) correspondence in administrative record and emailed to KH (Catalano) | 2.0 |
| | 5/27 | Legal research re standing issue | 2.0 |
| | 5/28 | Tutorial re data base | 1.5 |
| | 5/29 | Legal research re standing issue | 1.0 |
| | 5/31 | Drafting affidavit for CSCP; emails re same | 1.0 |
| | | Legal research re standing issue | 1.0 |

# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
[edwardbmyers@yahoo.com](mailto:edwardbmyers@yahoo.com)

BILLING STATEMENT
(June 2020)

## SERVICES

| DATE | ACTIVITY | HOURS |
|------|----------|-------|
| 6/1 | Drafting affidavit for TS and emails re same | 2.5 |
|  | Call with KH and emails re case and briefs | 0.5 |
| 6/2 | Drafting affidavit for CF and emails re same | 2.5 |
|  | Revising draft affidavit for TS | 1.0 |
|  | Review of record references to children (prepared by TS) | .75 |
| 6/3 | Drafting affidavit for LB and emails re same | 1.75 |
|  | Emails re additional affidavits/amicus briefs with CHD | .25 |
|  | ██████████████████████████ | ██ |
|  | Revising draft affidavit for TS | 1.0 |
| 6/4 | Review of draft APA Standard of Review section of brief | 1.0 |
|  | Emails and call with KH re redacting confidential material in affidavits/case strategy | .25 |
|  | Emails to LB re draft affidavit | .25 |
|  | Email to CHD re absorption of emissions in children's brains | .25 |
| 6/5 | Calls with Scott M (CHD) and Bill Scher (FCC) re briefing schedule/extension of time | 1.0 |
|  | Call with TS re affidavit | 0.5 |
|  | Drafting motion to increase word count | 2.0 |
|  | Call to Scher (FCC) and emails with KH re motion to increase word count | 0.5 |
| 6/6 | ██████████████████████████ | ██ |
|  | Emails with KH and CHD re extension of time and increased word count motions | .25 |
|  | Review of CHD draft motion to extend time | 0.5 |
|  | Drafting LB affidavit and emailed same to LB for review | .75 |
| 6/7 | Drafted motion to increase word count | 2.0 |
| 6/8 | Calls with Scott M (CHD) and Bill Scher (FCC) re briefing schedule/extension of time and email re same to KH | 0.5 |

| | | |
|---|---|---|
| | Revised and circulated final draft motion to increase word count | 1.0 |
| | Calls and emails with LB re her affidavit | 0.5 |
| | Emails re data base searches | 0.5 |
| 6/10 | Case research on FCC website—review of comments | 1.25 |
| | Filed petitioners' joint motion to increase word count | .25 |
| 6/11 | ████████████████ | ██ |
| | Call with LB re affidavit | .5 |
| | Email to clients re clerk's order suspending procedural dates | .25 |
| 6/14 | Case research—review of comments | 1.0 |
| ████ | ████████████████████████████ | ████ |
| | ████████████ | |
| 6/19 | Call with Scott M (CHD) re briefing | .75 |
| | Review of TS edits to her draft affidavit | .75 |
| | Emailed questions re data base | 0.5 |
| 6/21 | Began review of draft DD affidavit | 2.0 |
| 6/22 | Further revised and emailed DD draft affidavit | .50 |
| 6/23 | ████████████████████ | ██ |
| | Emails with Scott M (CHD) re brief | .25 |
| ████ | ██████████████████████████ | ██ |
| ████ | ██████████████████ | |
| 6/26 | Case research—review of comments—emailed KH re same | 1.25 |
| 6/28 | █████████████████████ | ██ |
| | Emails with DD and KH re use of data base responding to email from Cindi Peck | 0.5 |
| 6/29—6/30 | Drafted and emailed KH list of comments in record on bees and trees and children | 2.0 |
| 6/30 | Call to DC Cir. re case status | .25 |
| | ████████████████████████ | ██ |

# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
**edwardbmyers@yahoo.com**

BILLING STATEMENT
(July 2020)

<u>SERVICES</u>

| DATE | ACTIVITY | HOURS |
|------|----------|-------|
| ██ | ███████████████████ ████████████████████ ████████████ | ██ |
| 7/2 | Circulated Clerk's Order re briefing schedule and length of briefs | 0.5 |
| 7/3 | Call with EG and emails re case and briefs, ████████ testing and Wi-Fi sections of opening brief; emails from CHD counsel and EG re exchange of draft sections of brief ████████████ | ~~1.0~~ 0.5 |
| 7/4 | Drafting brief sections for Children, Testing, and Environment ("Bees and Trees") | 3.5 |
| 7/5 | Drafting brief sections for Children, Testing, and Environment ("Bees and Trees") ████████ | ~~2.75~~ 2.25 |
| 7/6 | Drafting brief sections for Children, Testing, and Environment ("Bees and Trees") ██████████ ████████████ | ~~2.5~~ 2.25 |
| 7/7 | Drafting brief sections for Children, Testing, and Environment ("Bees and Trees"); emails re same and ██ ████████████ Administrative Procedure Act, and multiple antennas in each phone | ~~2.0~~ 1.75 |
| 7/8 | Drafting brief sections for Children, Testing, and Environment ("Bees and Trees"); emailed draft Bees and Trees section to EG/AC | 2.0 |
| 7/9 | Revised section on Children and emailed to EG/AC; revised section on Testing ████████████ ██████ | ~~4.25~~ 4.00 |

| 7/11 | Emailed draft brief section on Testing ██████ ████████████████ ████████ | ~~.50~~ .25 |
|------|------|------|
| 7/12 | Call with EG and emails re case and briefs, esp. Children section of brief; revised and emailed Testing and Bees and Trees sections | 2.0 |
| 7/13 | Call with EG and AC re brief and coordination with counsel for CHD; email to counsel for CHD | 1.0 |
| 7/14 | Circulated draft brief sections for Children, Testing, and Bees and Trees to CHD | .25 |
| ██ | ████████████████████████████ ████████████████████████ | ██ |
| 7/16 | Call with EG, counsel for CHD, and DT re brief and case strategy; ████████████ drafting affidavit for CSCP (Franklin) | ~~5.0~~ 4.5 |
| 7/17 | Drafting affidavits for clients; emailed draft CSCP affidavit to EG; email from AC attaching language for brief re reproductive harm ██████████ ████████████████ ██████████ | ~~8.5~~ 5.0 |
| 7/18 | Emailed comments on CHD's draft sections to EG/AC; completed and emailed draft affidavit for TS to EG | 4.5 |
| 7/19 | Completed and emailed draft affidavit for LB to LB and EG/AC | 4.0 |
| 7/20 | Call with EG and emails re scheduling calls with clients to review draft affidavits; ████████████ ████████████████████ emails with CSCP and TS re contents of brief | ~~0.5~~ 0.25 |
| 7/21 | Calls with DT and counsel for CHD; revised Childrens section of brief ████████████████ ██████ | ~~4.0~~ 2.75 |
| 7/22 | Calls and emails with EG re affidavits and standing issues; revised and emailed draft affidavits for DD and TS to TS; email from and to LB/EG re LB's affidavit ██████ ████████████████████████████ | ~~8.5~~ 4.75 |
| 7/23 | Calls and emails with EG and TS re affidavits, esp. TS affidavit and LB affidavit re reliance on Dr. Heuser; review of draft brief sections from KH and CHD and emailed same | 5.5 |
| 7/24 | Revised draft brief; calls and emails with EG and counsel for CHD re same | 5.5 |
| 7/25 | Revised draft brief; emailed same; emails to clients re draft affidavits | 4.5 |
| 7/26 | Revising draft brief and numerous emails re same | 6.0 |

| 7/27 | Revising draft brief and emails with EG and clients re same; call with EG re same | 5.25 |
|------|-----------------------------------------------------------------------------------|------|
| 7/28 | Revising draft brief and emails with EG and clients re same; call with EG re same; revised DD affidavit | 5.75 |
| 7/29 | Revising draft brief and emails with EG and clients re same; revised DD affidavit; finalized and filed opening brief for petitioners | 8.0 |
| ██ | ████████████████████ ████████████████ | ██ |



# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
**edwardbmyers@yahoo.com**

BILLING STATEMENT
(August 2020)

<u>SERVICES</u>

| DATE | ACTIVITY | HOURS |
|------|----------|-------|
| 8/3 | Prepared list of corrections for opening brief ███████ ████████████████████ ████████████ | ~~2.0~~ 1.75 |
| 8/4 | Call with EG and CHD counsel re corrected brief ████████ ██████████ | ~~0.5~~ 0.25 |
| 8/5 | Call with EG and CHD counsel re corrected brief | 0.75 |
| 8/7 | Call with EG re EHT edits to brief and reviewed amicus briefs | 1.5 |
| 8/10 | Call with EG re edits for corrected brief | .75 |
| 8/11 | Call with EG re edits for corrected brief | .5 |
| 8/13 | Call with EG re edits for corrected brief | .5 |
| 8/14 | Emails and call with EG re edits for corrected brief | .5 |
| 8/31 | Emails with TS re preparation of joint appendix | .25 |



# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
**edwardbmyers@yahoo.com**

BILLING STATEMENT
(September 2020)

<u>SERVICES</u>

| DATE | ACTIVITY | HOURS |
|---|---|---|
| ██████ | ████████████████████████ ██████ | ██ |
| 910-9/14 | Prepared Joint Appendix designations | 2.75 |
| 9/18 | Call with EG re Joint Appendix | 0.5 |
| ██████ | ████████████████████████ ████████████████████████ ██████ | ██ |
| 9/23 | Review FCC brief and call with EG re drafting reply brief; review of issues list prepared by EG | 2.5 |
| 9/24 | Completed Joint Appendix designations and preparation of materials and emailed four zip files containing same to counsel for CHD ██████████████ | ~~4.0~~ 3.0 |
| 9/27 | Drafted detailed issue/topics summary for reply brief and call with EG re same | 2.5 |
| 9/28 | Emailed detailed summary of reply brief to clients | .25 |
| 9/30 | Call with EG re reply brief strategy | .5 |
| 8/31 | Emails with TS re preparation of joint appendix | .25 |

# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
edwardbmyers@yahoo.com

BILLING STATEMENT
(September 2020)

<u>SERVICES</u>

| DATE | ACTIVITY | HOURS |
|------|----------|-------|
| 10/2 | Revised detailed outline of reply brief; emailed and called EG re same; correspondence with TS re same; correspondence with CF re testing section | 2.5 |
| 10/6 | Call with EG re EHT edits to reply brief; drafting three sections of reply brief | 5.0 |
| 10/7 | Completed drafting three reply brief sections and emailed same; edited one section in response to comments from EG | 3.5 |
| 10/8 | ███████████████████████████████████ draft reply brief sections (standard of review) | ~~2.5~~ 1.5 |
| 10/10 | Call with EG re reply brief | 0.75 |
| 10/12 | Review of record and emailed recommendation re OSHA position; correspondence with EG and counsel for CHD re active link references in reply brief | 1.0 |
| 10/13 | Review of EG edits to reply brief; emails and calls re same; revising draft motion for extension of time to file reply brief and correspondence with counsel for CHD and FCC counsel re same | 2.75 |
| 10/14 | Revising draft sections of reply brief and emails re same | 3.0 |
| 10/15 | Reviewed EG's EMR footnote and correspondence re same | .25 |
| 10/16 | Identification of materials for statutory addendum and emails re same; email to CHD re reference to Pong comments; reviewed and prepared comments on draft reply brief and correspondence with EG re same | 1.75 |
| 10/17 | Incorporated edits from clients for reply brief and emails re same; emails with CHD counsel re statutory addendum | 2.75 |
| 10/18 | Continued editing reply brief and transmitted to CHD counsel | 4.0 |
| 10/19 | Additional minor edits to reply brief and email re same | .75 |

1

| 10/26 | Review of draft motion to extend deadline for filing Joint Appendix and emails with FCC counsel, EG, and CHD counsel re same | .5 |
| 11/1 | Emails re content of Joint Appendix | .75 |
| 11/2 | Review of draft Joint Appendix | 2.0 |
| 11/3 | Emails with CHD re content of Joint Appendix | .75 |
| 11/5 | Prepared and emailed table correlating footnotes from material in the opening brief that the EHT team contributed with the Joint Appendix | 1.25 |
| 11/10 | Emails re need to file supplement to Joint Appendix and contents of same | .5 |
| 11/20 | Emails re need to file motion to accompany supplement to Joint Appendix; and review of draft motion re same | .75 |



# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
**edwardbmyers@yahoo.com**

BILLING STATEMENT
(December 2020)

<u>SERVICES</u>

| DATE | ACTIVITY | HOURS |
|------|----------|-------|
| █ | ███████████████████ | █ |
| █ | ██████████████████ | █ |
| █ | ██████████████████ | █ |
| █ | █████████████ | █ |
| █ | ██████████████ | █ |
| █ | ███████████████ | █ |
| █ | ████████████ | █ |

# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
**edwardbmyers@yahoo.com**

BILLING STATEMENT
(January 2021)

<u>SERVICES</u>

| DATE | ACTIVITY | HOURS |
|---|---|---|
| ███████████████████ | | █████ |
| ████ | ████████████ | ████ |
| | | |
| 01/24 | Oral argument prep with counsel for CHD | 0.5 |
| 01/25 | Oral argument | 1.5 |



# Attachment C
# Calculation of Fees

## <u>SUMMARY OF FEE CALCULATIONS</u>

**Cost of Living Adjustment**

Using the Consumer Price Index for All Urban Consumers (CPI-U) for the

Washington D.C. area, the cost of living adjustment was calculated as follows:

- Formula = Statutory cap x CPI-U (annual average)/CPI-U (baseline)[1]

- 2020 rate = $125 x 267.157/100 = $333 per hour

- 2021 rate = $125 x 273.603/100 = $342 per hour[2]

**Fees Requested**

The fees requested in the instant Motion were calculated as follows:

- For attorneys billing more than the statutory rate (as adjusted for cost of

  living), we multiplied the adjusted statutory rate by the total hours.

- For attorneys and paralegals billing less than the statutory rate (as

  adjusted for cost of living), we multiplied the actual billed rate ($325 and

  $265, respectively) by the total hours.

- For Edward Myers, who billed below the adjusted statutory rate, we

  multiplied the actual billed rate ($200) by the total hours.

---

[1] *See Haselwander v. McHugh*, 797 F.3d 1, 3 (D.C. Cir. 2015) (confirming use of yearly CPI-U for the Washington, D.C. area and a baseline of 100).

[2] Because the 2021 annual average CPI-U is not available, we applied the semi-annual average for the first half of 2021.

The following summarizes the total hours and amounts sought per partner,

associate, and paralegal based on the above approach:

Eric P. Gotting 2020: 193.25 hours x $333 = $64,352.25
Eric P. Gotting 2021: 11.25 hours x $342 = $3,847.50
Albert Catalano 2020: 32.5 hours x $333 = $10,822.50
Javaneh Tarter: 76 hours x $325 = $24,700.00
Taylor Johnson: 31.75 hours x $325 = $10,318.75
John Gustafson: 22 hours x $325 = $7,150.00
Kathleen Slattery Thompson: 6 hours x $325 = $1,950.00
Jackson Wheeler: 6.25 hours x $265 = $1,656.25

**Keller and Heckman Sub-Total = $124,797.25**

Edward Myers: 247.75 hours x $200 = $49,550

**Total (Keller and Heckman & Myers) = $174,347.25**

**Attachment D**

**Consumer Price Index for All Urban Consumers**

**(CPI-U) for 2020 and First Half of 2021**



**U.S. BUREAU OF LABOR STATISTICS**

Bureau of Labor Statistics > Data Tools

## Mid-Atlantic Information Office

Search Mid-Atlantic Regi | Go

Mid-Atlantic Home          Mid-Atlantic Geography          Mid-Atlantic Subjects          Mid-Atlantic Archives          Contact Mid-Atlantic

Bureau of Labor Statistics > Geographic Information > Mid-Atlantic > Table

### Summary of annual and semi-annual indexes

**Consumer Price Indexes for All Urban Consumers (CPI-U), U.S. city average and selected metropolitan areas, annual average and percent change, 2010-2020 (1982-84=100)**

| Year | U.S. city average | | Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | | Washington-Arlington-Alexandria, DC-VA-MD-WV | | Baltimore-Columbia-Towson, MD | |
|---|---|---|---|---|---|---|---|---|
| | Annual average | Percent change | Annual average | Percent change | Annual average | Percent change | Annual average | Percent change |
| 2010 | 218.056 | 1.6 | 227.715 | 2.0 | | | | |
| 2011 | 224.939 | 3.2 | 233.809 | 2.7 | | | | |
| 2012 | 229.594 | 2.1 | 238.097 | 1.8 | | | | |
| 2013 | 232.957 | 1.5 | 240.900 | 1.2 | | | | |
| 2014 | 236.736 | 1.6 | 244.050 | 1.3 | | | | |
| 2015 | 237.017 | 0.1 | 243.858 | -0.1 | 250.664 | | 240.662 | |
| 2016 | 240.007 | 1.3 | 245.290 | 0.6 | 253.422 | 1.1 | 244.039 | 1.4 |
| 2017 | 245.120 | 2.1 | 248.423 | 1.3 | 256.221 | 1.1 | 248.638 | 1.9 |
| 2018 | 251.107 | 2.4 | 251.563 | 1.3 | 261.445 | 2.0 | 253.392 | 1.9 |
| 2019 | 255.657 | 1.8 | 256.621 | 2.0 | 264.777 | 1.3 | 256.887 | 1.4 |
| 2020 | 258.811 | 1.2 | 258.923 | 0.9 | 267.157 | 0.9 | 259.476 | 1.0 |

**Consumer Price Indexes for Urban Wage Earners and Clerical Workers (CPI-W), U.S. city average and selected metropolitan areas, annual average and percent change, 2010-2020 (1982-84=100)**

| Year | U.S. city average | | Philadelphia-Camden-Wilmington, PA-DE-NJ-MD | | Washington-Arlington-Alexandria, DC-VA-MD-WV | | Baltimore-Columbia-Towson, MD | |
|---|---|---|---|---|---|---|---|---|
| | Annual average | Percent change | Annual average | Percent change | Annual average | Percent change | Annual average | Percent change |
| 2010 | 213.967 | 2.1 | 227.746 | 2.2 | | | | |
| 2011 | 221.575 | 3.6 | 234.363 | 2.9 | | | | |
| 2012 | 226.229 | 2.1 | 239.026 | 2.0 | | | | |
| 2013 | 229.324 | 1.4 | 241.759 | 1.1 | | | | |
| 2014 | 232.771 | 1.5 | 245.163 | 1.4 | | | | |
| 2015 | 231.810 | -0.4 | 245.689 | 0.0 | 246.491 | | 239.742 | |
| 2016 | 234.076 | 1.0 | 246.440 | 0.5 | 249.076 | 1.0 | 242.646 | 1.2 |
| 2017 | 239.051 | 2.1 | 249.635 | 1.3 | 252.067 | 1.2 | 247.431 | 2.0 |
| 2018 | 254.146 | 2.5 | 252.226 | 1.0 | 257.865 | 2.3 | 251.938 | 1.8 |
| 2019 | 249.222 | 1.7 | 256.887 | 1.8 | 260.554 | 1.0 | 255.003 | 1.2 |
| 2020 | 252.248 | 1.2 | 260.058 | 1.2 | 263.072 | 1.0 | 257.776 | 1.1 |

**Consumer Price Indexes for All Urban Consumers (CPI-U), U.S. city average and selected metropolitan areas, Semiannual average and percent change, 2011-2021 (1982-84=100)**

| Year | Half | U.S. city average | | | Philadelphia-Camden-Wilmington, PA-DE-NJ-MD | | | Washington-Arlington-Alexandria-DC-VA-MD-WV | | | Baltimore-Columbia-Towson, MD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Semi-annual average | Percent change from-- | | Semi-annual average | Percent change from-- | | Semi-annual average | Percent change from-- | | Semi-annual average | Percent change from-- | |
| | | | year ago average | previous average | | year ago average | previous average | | year ago average | previous average | | year ago average | previous average |
| 2011 | 1st | 223.598 | 2.8 | 2.3 | 232.290 | 2.3 | 1.7 | | | | | | |
| | 2nd | 226.280 | 3.5 | 1.2 | 235.328 | 3.1 | 1.3 | | | | | | |
| 2012 | 1st | 228.850 | 2.3 | 1.1 | 236.756 | 1.9 | 0.6 | | | | | | |
| | 2nd | 230.338 | 1.8 | 0.7 | 239.437 | 1.7 | 1.1 | | | | | | |
| 2013 | 1st | 232.366 | 1.5 | 0.9 | 240.282 | 1.5 | 0.4 | | | | | | |
| | 2nd | 233.548 | 1.4 | 0.5 | 241.518 | 0.9 | 0.5 | | | | | | |
| 2014 | 1st | 236.384 | 1.7 | 1.2 | 243.519 | 1.3 | 0.8 | | | | | | |

USCA Case #20-1138      Document #1926368      Filed: 12/10/2021      Page 95 of 165

| Year | Half | U.S. city average | | | Philadelphia-Camden-Wilmington, PA-DE-NJ-MD | | | Washington-Arlington-Alexandria-DC-VA-MD-WV | | | Baltimore-Columbia-Towson, MD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Semi-annual average | Percent change from-- | | Semi-annual average | Percent change from-- | | Semi-annual average | Percent change from-- | | Semi-annual average | Percent change from-- | |
| | | | year ago average | previous average | | year ago average | previous average | | year ago average | previous average | | year ago average | previous average |
| | 2nd | 237.088 | 1.5 | 0.3 | 244.582 | 1.3 | 0.4 | | | | | | |
| 2015 | 1st | 236.265 | -0.1 | -0.3 | 243.609 | 0.0 | -0.4 | 249.828 | | | 240.162 | | |
| | 2nd | 237.769 | 0.3 | 0.6 | 244.107 | -0.2 | 0.2 | 251.500 | | 0.7 | 241.161 | | 0.4 |
| 2016 | 1st | 238.778 | 1.1 | 0.4 | 244.286 | 0.3 | 0.1 | 253.049 | 1.3 | 0.6 | 242.483 | 1.0 | 0.5 |
| | 2nd | 241.237 | 1.5 | 1.0 | 246.295 | 0.9 | 0.8 | 253.795 | 0.9 | 0.3 | 245.595 | 1.8 | 1.3 |
| 2017 | 1st | 244.076 | 2.2 | 1.2 | 247.946 | 1.5 | 0.7 | 255.332 | 0.9 | 0.6 | 247.885 | 2.2 | 0.9 |
| | 2nd | 246.163 | 2.0 | 0.9 | 248.901 | 1.1 | 0.4 | 257.110 | 1.3 | 0.7 | 249.391 | 1.5 | 0.6 |
| 2018 | 1st | 250.089 | 2.5 | 1.6 | 250.713 | 1.1 | 0.7 | 260.903 | 2.2 | 1.5 | 252.401 | 1.8 | 1.2 |
| | 2nd | 252.125 | 2.4 | 0.8 | 252.413 | 1.4 | 0.7 | 261.987 | 1.9 | 0.4 | 254.382 | 2.0 | 0.8 |
| 2019 | 1st | 254.412 | 1.7 | 0.9 | 255.020 | 1.7 | 1.0 | 264.252 | 1.3 | 0.9 | 256.485 | 1.6 | 0.8 |
| | 2nd | 256.903 | 1.9 | 1.0 | 258.221 | 2.3 | 1.3 | 265.301 | 1.3 | 0.4 | 257.288 | 1.1 | 0.3 |
| 2020 | 1st | 257.557 | 1.2 | 0.3 | 258.042 | 1.2 | -0.1 | 265.954 | 0.6 | 0.2 | 258.891 | 0.9 | 0.6 |
| | 2nd | 260.065 | 1.2 | 1.0 | 259.804 | 0.6 | 0.9 | 268.359 | 1.2 | 0.9 | 260.061 | 1.1 | 0.5 |
| 2021 | 1st | 266.236 | 3.4 | 2.4 | 264.826 | 2.6 | 1.9 | 273.603 | 2.9 | 2.0 | 265.048 | 2.4 | 1.9 |
| | 2nd | | | | | | | | | | | | |

**Consumer Price Indexes for Urban Wage Earners and Clerical Workers (CPI-W), U.S. city average and selected metropolitan areas, semiannual average and percent change, 2011-2021 (1982-84=100)**

| Year | Half | U.S. city average | | | Philadelphia-Camden-Wilmington, PA-DE-NJ-MD | | | Washington-Arlington-Alexandria, DC-VA-MD-WV | | | Baltimore-Columbia-Towson, MD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Semi-annual average | Percent change from-- | | Semi-annual average | Percent change from-- | | Semi-annual average | Percent change from-- | | Semi-annual average | Percent change from-- | |
| | | | year ago average | previous average | | year ago average | previous average | | year ago average | previous average | | year ago average | previous average |
| 2011 | 1st | 220.196 | 3.2 | 2.7 | 232.661 | 2.5 | 1.9 | | | | | | |
| | 2nd | 222.954 | 3.9 | 1.3 | 236.066 | 3.3 | 1.5 | | | | | | |
| 2012 | 1st | 225.581 | 2.4 | 1.2 | 237.664 | 2.2 | 0.7 | | | | | | |
| | 2nd | 226.878 | 1.8 | 0.6 | 240.389 | 1.8 | 1.1 | | | | | | |
| 2013 | 1st | 228.812 | 1.4 | 0.9 | 241.144 | 1.5 | 0.3 | | | | | | |
| | 2nd | 229.837 | 1.3 | 0.4 | 242.375 | 0.8 | 0.5 | | | | | | |
| 2014 | 1st | 232.639 | 1.7 | 1.2 | 244.487 | 1.4 | 0.9 | | | | | | |
| | 2nd | 232.902 | 1.3 | 0.1 | 245.839 | 1.4 | 0.6 | | | | | | |
| 2015 | 1st | 231.167 | -0.6 | -0.7 | 245.038 | 0.2 | -0.3 | 245.614 | | | 239.221 | | |
| | 2nd | 232.453 | -0.2 | 0.6 | 245.332 | -0.2 | 0.1 | 247.368 | | 0.7 | 240.263 | | 0.4 |
| 2016 | 1st | 232.901 | 0.8 | 0.2 | 245.460 | 0.2 | 0.1 | 248.725 | 1.3 | 0.5 | 241.341 | 0.9 | 0.4 |
| | 2nd | 235.251 | 1.2 | 1.0 | 247.421 | 0.9 | 0.8 | 249.427 | 0.8 | 0.3 | 243.951 | 1.5 | 1.1 |
| 2017 | 1st | 237.974 | 2.2 | 1.2 | 249.203 | 1.5 | 0.7 | 251.268 | 1.0 | 0.7 | 246.860 | 2.3 | 1.2 |
| | 2nd | 240.128 | 2.1 | 0.9 | 250.067 | 1.1 | 0.3 | 252.866 | 1.4 | 0.6 | 248.003 | 1.7 | 0.5 |
| 2018 | 1st | 244.157 | 2.6 | 1.7 | 251.531 | 0.9 | 0.6 | 257.330 | 2.4 | 1.8 | 251.161 | 1.7 | 1.3 |
| | 2nd | 246.136 | 2.5 | 0.8 | 252.921 | 1.1 | 0.6 | 258.401 | 2.2 | 0.4 | 252.715 | 1.9 | 0.6 |
| 2019 | 1st | 248.012 | 1.6 | 0.8 | 255.184 | 1.5 | 0.9 | 260.244 | 1.1 | 0.7 | 254.576 | 1.4 | 0.7 |
| | 2nd | 250.432 | 1.7 | 1.0 | 258.589 | 2.2 | 1.3 | 260.865 | 1.0 | 0.2 | 255.430 | 1.1 | 0.3 |
| 2020 | 1st | 250.794 | 1.1 | 0.1 | 258.893 | 1.5 | 0.1 | 261.528 | 0.5 | 0.3 | 257.149 | 1.0 | 0.7 |
| | 2nd | 253.703 | 1.3 | 1.2 | 261.223 | 1.0 | 0.9 | 264.616 | 1.4 | 1.2 | 258.403 | 1.2 | 0.5 |
| 2021 | 1st | 260.389 | 3.8 | 2.6 | 266.097 | 2.8 | 1.9 | 270.440 | 3.4 | 2.2 | 262.413 | 2.0 | 1.6 |
| | 2nd | | | | | | | | | | | | |

U.S. BUREAU OF LABOR STATISTICS  Mid-Atlantic Information Office  1835 Market Street  Suite 1946  Philadelphia, PA 19103

Telephone:1-215-597-DATA (or 3282)  www.bls.gov/regions/mid-atlantic  Contact Mid-Atlantic Region

# Exhibit 4

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

ENVIRONMENTAL HEALTH TRUST,  )
CONSUMERS FOR SAFE CELL      )
PHONES, ELIZABETH BARRIS, AND )
THEODORA SCARATO,            )
                             )
       Petitioners,          )
                             )
v.                           )
                             )
THE FEDERAL COMMUNICATIONS    )
COMMISSION,                  )
                             )
      and                   )
                             )
THE UNITED STATES OF AMERICA, )
                             )
      Respondents.          )
_____)

## DECLARATION OF ERIC P. GOTTING
## IN SUPPORT OF JOINT MOTION OF PETITIONERS IN
## CASE NO. 20-1025 FOR ATTORNEYS' FEES AND EXPENSES UNDER
## THE FEDERAL EQUAL ACCESS TO JUSTICE ACT

I, Eric P. Gotting, declare as follows:

1.      I am an attorney licensed to practice in the District of Columbia and

Maryland.  I am also admitted to practice before this Court, as well as other federal

district and circuit courts of appeal across the country, including the United States

Court of Appeals for the Second, Fourth, Seventh, Eighth, Ninth, Tenth, and

Eleventh Circuits, as well as the United States District Court for the District of

1

Columbia, District of Maryland, Eastern District of Michigan, Western District of

Michigan, and Southern District of New York.  I have also been admitted to appear

*pro hac vice* or as a government attorney in a number of other courts, both at the

state and federal level.  This declaration is based upon my personal knowledge.

2.      This declaration is submitted in support of the "Joint Motion of

Petitioners in Case No. 20-1025 for Attorneys' Fees and Expenses Under the

Federal Equal Access to Justice Act."  *See* 28 U.S.C. § 2412 ("EAJA").  I have

reviewed the standards for claiming fees and expenses under EAJA and base

Petitioners' joint motion and this declaration on such standards.

### Relevant Background and Experience

3.      I received a B.S. from the University of Michigan, School of Natural

Resources and Environment, *with distinction*, in 1991, and a J.D. from the

University of Michigan Law School in 1996.

4.      I am a former Trial Attorney at the United States Department of

Justice, Environmental Torts Section, Civil Division (1999-2004), where I litigated

and defended toxic tort cases under the Federal Tort Claims Act.

5.      I am currently a partner in the litigation and environmental practice

groups at Keller and Heckman LLP (2011-present), and a former associate and

partner in the litigation and environmental practice groups at Winston & Strawn

LLP (1996-1999, 2004-2011).

6.    I have 25 years of experience as a litigator and regulatory lawyer.  I have tried cases to verdict and argued appeals before both state and federal appellate courts.  Throughout my career, I have advised and represented clients in all aspects of administrative law, including challenges to statutes and regulations under the U.S. Constitution and the Administrative Procedure Act ("APA"), enforcement actions and other administrative litigation, and government investigations, both civil and criminal.

7.    As part of my litigation and environmental practice, I have extensive experience in matters involving environmental and human exposures to potentially hazardous substances and conditions, including radiological exposures.  This work has included gaining familiarity in various scientific and technical issues, including toxicology, epidemiology, health physics, and other health and safety matters.

8.    Particularly relevant to the instant case, I served as lead counsel in *Montgomery Co., Md. v. FCC*, Case No. 19-70147 (9th Cir.), in which a municipality challenged under the APA and on other grounds an FCC order intended to accelerate the roll-out of 5G transmitters in public rights-of-way because the order was adopted before the agency had completed its 2013 Notice of Inquiry ("NOI") health and safety review of the 1996 radiofrequency exposure ("RF") standards.  The Ninth Circuit eventually deemed that litigation moot after the FCC closed the NOI, *see Resolution of Notice of Inquiry, Second Report and*

*Order, Notice of Proposed Rulemaking, and Memorandum Opinion and Order*, ET Docket Nos. 03-137, 13-84, and 19-226, FCC 19-126 (December 4, 2019) ("Order"), the very order challenged by Petitioners in the instant case.

9.      A copy of my firm online bio is appended hereto as Attachment A.

## Nature and Scope of Work

10.      This matter required Petitioners' counsel, including myself, to become familiar with numerous technical and public health and safety issues.  These included: (i) the basic science and physics underlying radiological exposures and, specifically, RF emissions from telecommunications equipment and facilities; (ii) conclusions of major studies and research regarding the health and safety risks of RF exposures; (iii) the nature and scope of various RF exposure sources, such as 5G installations, cell towers, and cell phones; (iv) cell phone and wireless device RF testing protocols; (v) disease causal mechanisms, including oxidative stress and the significance of RF modulation/pulsation/peak exposures; (vi) disease endpoints, such as reproductive harms, neurological damage, radiation sickness, and prenatal/perinatal complications in children; and (vii) environmental harms.

11.      This case also required Petitioners' counsel to review an extensive administrative record consisting of not only numerous public comments (e.g., including several thousand scientific studies) submitted since 2013 regarding the FCC's reconsideration of the RF standards and related matters, but also a long

history of statutory and regulatory developments, as well as related litigation, involving FCC's RF standards going back to the 1980s and 1990s. *See*, *e.g.*, Pet'rs Br. at 7-11 (Doc. #1856700).

12.    The services rendered in this case required substantial preparation and briefing, and involved, among other things: preparing the Petition for Review and a Protective Petition for Review; preparing the statement of issues and docketing statement (including an addendum establishing standing for each non-profit and individual Petitioner); drafting various procedural motions; reviewing an extensive administrative record; drafting opening and reply briefs, including final versions following the submission of the joint appendix; compiling various portions of the joint appendix (which consisted of 26 volumes and over 10,000 pages), including numerous RF health and safety studies; preparing four Petitioner declarations demonstrating standing; reviewing *amicus curiae* briefs; coordinating brief drafting and administrative record review with co-petitioners; and preparing co-petitioners' counsel for oral argument.

**Timekeeper Professionals**

13.    In addition to myself, I am familiar with the background and qualifications of the other Keller and Heckman professionals who billed time to this case. Below are brief summaries for each timekeeper, as well as their standard billing rates and the rates that were billed in this case. Keller and Heckman

5

reduced its standard billing rates for most professionals in this case, and for some
significantly, as Petitioners were non-profit organizations and individuals.

14.    **Eric Gotting** – My background and qualifications are summarized
above.  I served as lead counsel in this case (along with co-petitioners' counsel,
Scott McCullough), was responsible for the day-to-day management of the case,
and was primarily responsible for drafting Petitioners' sections of the opening brief
and reply.  Standard rate ($655); Billed rate ($425).

15.    **Albert Catalano** – Mr. Catalano formerly served as counsel to the
firm's telecommunications practice group.  He had over 30 years of experience in
the regulatory and legislative arenas involving telecommunications law.  He was
also a former legal counsel to the FCC.  In this case, Mr. Catalano advised on
FCC's regulation of RF, FCC's general rulemaking and regulatory procedures, and
technical/scientific issues regarding RF.  Standard rate ($540); Billed rate ($425).
See Catalano firm bio appended hereto as Attachment B.

16.    **Javaneh Nekoomaram** – Ms. Nekoomaram formerly served as an
associate in the firm's environmental and occupational health and safety practice
groups.  She is a 2012 law school graduate and had extensive experience in health
and safety regulatory issues, as well as administrative law and agency rulemaking
challenges.  Prior to joining Keller and Heckman, she served for three years as
Counsel for the American Coatings Association.  In the instant matter, Ms.

6

Nekoomaram primarily reviewed and analyzed the extensive administrative record and conducted legal research. Standard rate ($410); Billed rate ($325).

17.    **John Gustafson** – Mr. Gustafson is an associate in the firm's environmental and occupational health and safety practice groups. He is a 2016 law school graduate who, before joining the firm, clerked on the Maryland Court of Special Appeals. He has relevant litigation experience in state and federal courts, at both the trial and appellate levels, as well as defending against federal agency enforcement actions. In this case, Mr. Gustafson mainly conducted legal research. Standard rate ($350); Billed rate ($325).

18.    **Taylor Johnson** – Mr. Johnson is an associate in the firm's environmental and occupational health and safety practice groups. He is a 2018 law school graduate and, before joining the firm, worked at the state level on energy and environmental legislative and policy issues. In this matter, Mr. Johnson primarily conducted legal and procedural research. Standard rate ($325); Billed rate ($325).

19.    **Kathleen Slattery Thompson** – Ms. Thompson is an associate in the firm's telecommunications practice group. She is a 2013 law graduate. In this case, Ms. Thompson reviewed and analyzed the extensive administrative record. Standard rate ($375); Billed rate ($325).

20.    Keller and Heckman also relied on the services of Jackson Wheeler, a litigation paralegal.  Standard rate ($265); Billed rate ($265).

### Billing Practices In This Matter

21.    The fees charged by the firm were based on the experience and expertise of each timekeeper and, based on my knowledge of the D.C. market, are competitive with (and, indeed, often much lower than) comparable firms doing similar legal work.  Each professional kept contemporaneous records of time billed and set forth a description of work performed for each time entry.  All fees incurred by Petitioners in this matter have been fair, reasonable, and appropriate, and were billed in furtherance of obtaining an excellent and successful result.

22.    The firm endeavored to litigate this case in the most efficient manner possible.  For example, as Mr. Myers detailed in his declaration, Keller and Heckman and co-petitioners' counsel split-up responsibility for legal and factual issues and filed joint opening and reply briefs.  This approach significantly reduced any duplication of work.  Moreover, we relied extensively on work done by our own clients, most of whom have substantial expertise in RF matters, including their review of the administrative record and analysis of various technical and scientific issues.  None of this work was billed.  Finally, we strived to assign tasks to the lowest billing professional based on the nature and complexity of work.

23.    In recognition of the non-profit and individual status of Petitioners, the firm also conducted a substantial portion of the work in this case *pro bono*. None of that work is reflected in the firm's invoices.

**Fees Requested Under EAJA**

24.    Prior to filing the instant motion, we reviewed the billing statements that were submitted to Mr. Myers and Petitioners to date and made the following additional reductions and adjustments to arrive at the total number of hours and related fees currently claimed for reimbursement (see Attachment C):

a.    We redacted tasks that were related to issues on which Petitioners were not successful (e.g., claims under the National Environmental Policy Act and cancer) and those issues which Petitioners considered but did not ultimately pursue in the litigation.

b.    We redacted work on issues not directly related to the merits of the case, including time spent on matters involving: (i) co-petitioners' original petition for review filed in the Ninth Circuit, the FCC's motion to transfer the matter to the D.C. Circuit, an amicus brief filed by Petitioners in the Ninth Circuit regarding this issue, and 28 U.S.C. § 2112 generally; and (ii) internal administrative matters.

c.    In our discretion, we further reduced hours for certain entries (*see* strike-outs and reduced hour notations).

25.    In requesting attorneys' fees, we have endeavored to only seek hours related to successful claims and time related to the overall success of the litigation. The following summarizes the hours billed per partner, associate, and paralegal which are claimed in the underlying motion (*see* Attachment D):

> Eric Gotting – 204 hours
> Al Catalano – 32 hours
> Javaneh Nekoomaram – 76 hours
> Taylor Johnson – 31.75 hours
> John Gustafson – 22 hours
> Kathleen Slattery Thompson – 6 hours
> Jackson Wheeler (paralegal) – 6.25 hours
> **Total – 378 hours**

26.    The instant motion only seeks fees at the EAJA statutory rate of $125 per hour, plus an upward adjustment for cost-of-living increases <u>or</u> the actual billed rate in the event that it was lower than the adjusted statutory rate. We are not seeking any other hourly rate enhancements. Attachment D hereto is the true and correct calculation of the fees claimed (with relevant bases stated), including the appropriate cost-of-living adjustment in the Washington area.

27.    The cost-of-living adjustments were calculated based on the Consumer Price Index for All Urban Consumers (CPI-U) for the Washington area. Attachment E hereto is a true and correct copy of CPI-U data for the years 2020 and 2021, which was obtained from the Bureau of Labor Statistics website at https://tinyurl.com/b7me3r2v.

28.     As reflected in Attachment D, we are seeking a total of $124,797.25, excluding time claimed by Mr. Myers for work he completed on this case ($49,550) and time not yet invoiced to Petitioners in connection with seeking recovery of fees under EAJA in this matter (which Petitioners will have the option to recover by filing a supplemental request for additional fees).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  December 10, 2021

_____

Eric P. Gotting

11

# Attachment A

# Eric Gotting Bio



# Eric P. Gotting

Partner
Washington, DC



gotting@khlaw.com

PHONE NUMBER +1 202.434.4269

FAX NUMBER +1 202.434.4646

Eric Gotting represents Keller and Heckman's clients in litigation and related matters, specializing in complex civil and appellate matters, internal investigations, and regulatory compliance. With an extensive background in environmental law, he has expanded his practice over the years to cover many of Keller and Heckman's industry sectors and regulatory areas. Eric is a former Am Law 50 litigation partner and U.S. Department of Justice, Civil Division, Trial Attorney.

Eric's practice spans a broad range of legal issues, including administrative and constitutional law, agency enforcement actions, toxic torts, product liability, general business litigation, and regulatory advice. He works with a diverse set of industries, including chemicals, plastics, pesticides, fuels and pipelines, food and packaging, consumer goods, telecommunications, and e-cigarettes.

As a litigator, Eric has tried cases to verdict and argued appeals before federal and state courts across the country. His experience includes class actions, mass tort litigation, AAA arbitrations, and agency proceedings. Eric has also litigated challenges to federal and state statutes, regulations, and orders. He has particular expertise involving the Administrative Procedure Act (APA), the Dormant Commerce Clause, the First Amendment, the Due Process Clause, and federal preemption. He has also filed amicus briefs in litigation involving regulatory issues facing a variety of industry sectors.

Outside the courtroom, Eric has assisted clients in federal and state enforcement actions, internal investigations, and regulatory compliance. Relevant matters have involved chemical and pesticide control, hazardous waste, pipeline safety, the Clean Air Act, the Clean Water Act, occupational safety and health, Superfund cost-recovery actions, the Food, Drug and Cosmetic Act, the Chemical Weapons Convention, and the Freedom of Information Act (FOIA). He has also conducted extensive internal corporate investigations regarding potential regulatory compliance and litigation-related liabilities, including toxic torts, product liability, consumer fraud, and commercial contract disputes.

For his toxic tort clients, Eric has defended claims involving all environmental media, including drinking water, soil, groundwater, and air. He has worked with, and defended against, experts in numerous scientific and business-related fields, including toxicology, geochemistry, hydrogeology, structural engineering, neuropsychology, health physics, survey techniques, statistics, real estate appraisal, and environmental remediation. He has extensive experience litigating toxic tort cases involving claims of personal injury and property damage from alleged exposures to volatile and semi-volatile compounds, specialty chemicals, pesticides, gasoline, radioactive waste, and heavy metals.

Eric has provided pro bono services throughout his career, working with groups such as the Legal Counsel for the Elderly and serving as appointed counsel in federal habeas and 1983 prisoner cases.

## Representative Matters

- Defended a specialty chemical manufacturer in a $50 million action filed by a municipality alleging that chemicals, including DDT, were disposed of at a former manufacturing plant and contaminated or threatened to contaminate public drinking water supplies

- Represented a chemical company in a state action filed by 150 plaintiffs alleging various insecticides and pesticides applied at a research facility drifted onto nearby properties, allegedly causing cancer, other personal injuries, and property damage

- Defended owner of underground storage tanks against a real estate developer who alleged $10 million in damages stemming from petroleum contamination of soil and groundwater

- Challenged an Indiana statute governing the manufacture and distribution of consumer products on constitutional and statutory grounds

- Challenged a Federal Communications Commission order regulating the deployment of 5G facilities and small cells in public rights-of-way under the APA and the National Environmental Policy Act (NEPA).

- Defended a pipeline company in an administrative enforcement hearing before the Pipeline and Hazardous Materials Safety Administration.

- Represented a paper company in an administrative appeal before the Food and Drug Administration involving the approval of a product under the Tobacco Control Act.

- Filed an amicus brief on behalf of a coalition of agricultural and commodity interests in support of a suit challenging Vermont's GMO labeling law

- Filed an amicus brief for a coalition of food companies in a lawsuit opposing the Securities and Exchange Commission's (SEC) conflict minerals reporting regulation.

- Conducted an extensive internal investigation for a global chemical company involving potential soil and groundwater contamination stemming from alleged chemical releases at multiple manufacturing facilities located across several states.

- Conducted an internal investigation for a foreign chemical manufacturer regarding potential supply chain liability involving contaminated intermediate products.

- Prepared multiple chemical company clients for facility inspections under the Chemical Weapons Convention.

- Counseled numerous chemical manufacturers on compliance with the SEC's conflict minerals reporting regulation.

## Professional Affiliations

- American Bar Association, Pesticide, Chemical Regulation, and Right-to-Know Committee (Past Membership Co-Chair)

## Education

University of Michigan, B.S., 1991, *with distinction, Environmental Science and Policy*

University of Michigan Law School, J.D., 1996

## Bar Admissions

District of Columbia
Maryland

# Attachment B

# Al Catalano Bio



Albert Catalano was a Telecommunications Counsel at Keller and Heckman who retired in 2020. He had 30 years of experience in telecommunications regulatory and legislative matters, domestic and international joint ventures, litigation, and transactions involving communications, properties, and investments.

Mr. Catalano's practice focused on 5G/small cells, public safety, broadband and wireless communications. He frequently advised clients in matters related to FirstNet and the Nationwide Public Safety Broadband Network. He was experienced in spectrum relocation proceedings, FCC auctions, international and domestic satellite issues, equipment certifications, enforcement issues, technology transfer and licensing.

Prior to entering private practice, Mr. Catalano served as legal counsel with the Federal Communications Commission on wireless communications, information transfer, technology developments, licensing issues and international satellite matters. Mr. Catalano represented the Private Radio Bureau in enforcement proceedings before Administrative Law Judges. He participated in major rulemaking proceedings involving spectrum and regulations dealing with commercial, private, and public safety operations.

Mr. Catalano worked with foreign partners and governments in the Netherlands, Russia, Italy, and other countries.

**Education***: St. John's University (B.S. 1975, *magna cum laude*); Temple University Beasley School of Law (J.D., 1978).

**Admissions:** District of Columbia; New York; Pennsylvania

**Memberships:** American Bar Association; Association of Public-Safety; Communications Officials (APCO); Federal Communications Bar Association; International Municipal Lawyers Association

# Attachment C

# Redacted Keller & Heckman Bills

# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

| | |
|---|---|
| 1001 G Street, N.W.<br>Suite 500 West<br>Washington, D.C. 20001<br>*Tel* 202.434.4100<br>*Fax* 202.434.4646<br>*Tax I.D.* 52-0743156 | WIRES TO:<br>Citibank N.A.<br>1101 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004<br>Account Number: **9250405308**<br>Routing Number: 254070116 |

Law Offices of Edward B. Myers
Edward B. Myers, Attorney
14613 Dehaven Court
North Potomac, MD 20878

| | |
|---|---|
| Invoice Number | 10104665 |
| Invoice Date | February 21, 2020 |
| Client Number | ED17917.00001 |

For Professional services rendered through February 7, 2020

Matter Name: General

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| 30-Jan-20 | EPG | Review T. Johnson research re standing; review J. Nekoomaram notes re potential petitioners; correspondence with E. Myers and A. Catalano re same; review admin record re same | 2.00 | |
| 30-Jan-20 | AJC | Call with J. Moskowitz re electro sensitivity issue re standing; conference call with E. Myers, E. Gotting, T. Scarato, C. Franklin re standing issue; review FCC docket re standing issue | 2.00 | |
| 31-Jan-20 | EPG | Review and edit petition for review; conferences with A. Catalano, E. Myers, and J. Nekoomaran re same | 1.00 | |
| 31-Jan-20 | AJC | Meeting with E. Myers, D.Davis re standing issue for petition for review; work with E. Myers on finalizing petition for review | 2.00 | |



COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
*Tel* 202.434.4100
*Fax* 202.434.4646
*Tax I.D.* 52-0743156

WIRES TO:
Citibank N.A.
1101 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Account Number: **9250405308**
Routing Number: 254070116

Law Offices of Edward B. Myers
Edward B. Myers, Attorney
14613 Dehaven Court
North Potomac, MD 20878

| | |
|---|---|
| Invoice Number | 10105408 |
| Invoice Date | March 12, 2020 |
| Client Number | ED17917.00001 |

For Professional services rendered through February 29, 2020

Matter Name: General



| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| 21-Feb-20 | AJC | Email E. Myers re potential mediation notice | 0.25 | |
| 25-Feb-20 | AJC | Call E. Myers re; database, mediation issues; | ~~1.00~~ 0.25 | |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

KELLER AND HECKMAN LLP
*Serving Business through Law and Science®*

Client Number    ED17917
Matter Number    00001

Invoice Number    10105408
Invoice Date    March 12, 2020
Page Number    2

# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

| | |
|---|---|
| 1001 G Street, N.W. | WIRES TO: |
| Suite 500 West | Citibank N.A. |
| Washington, D.C. 20001 | 1101 Pennsylvania Avenue, N.W. |
| *Tel* 202.434.4100 | Washington, D.C. 20004 |
| *Fax* 202.434.4646 | Account Number: **9250405308** |
| *Tax I.D.* 52-0743156 | Routing Number: 254070116 |

| | | |
|---|---|---|
| Law Offices of Edward B. Myers | Invoice Number | 10106402 |
| Edward B. Myers, Attorney | Invoice Date | April 13, 2020 |
| 14613 Dehaven Court | Client Number | ED17917.00001 |
| North Potomac, MD 20878 | | |

For Professional services rendered through March 31, 2020

Matter Name: General

| Date | Prof. | Description | Hours | Amount |
|---|---|---|---|---|
| 01-Mar-20 | EPG | Prepare DC Circuit filings (e.g., statement of issues, docketing statement); correspondence with E. Myers and A. Catalano re same | 2.00 | ■ |
| 02-Mar-20 | KST | Work on Chart of Comments in ET DK. Nos. 13-84 and 03-137 | 1.00 | ■ |
| 03-Mar-20 | KST | Continue work on Chart of Comments in ET DK. Nos. 13-84 and 03-137 | 4.00 | ■ |
| 03-Mar-20 | TDJ | Research re "Statement of Issues" and docketing statements requirements in D.C. Circuit Court of Appeals; pull relevant examples and e-mail to E. Gotting re same | 1.25 | ■ |
| 03-Mar-20 | JBG | Review current litigation posture with E. Gotting; begin reviewing litigation briefs and other related materials | 1.25 | ■ |
| 04-Mar-20 | EPG | Draft DC Circuit filings; research and review case law re Statement of Issues and standing; conferences and correspondence with A. Catalano and E. Myers re same | ~~7.50~~ 1.00 | ■ |
| 04-Mar-20 | AJC | Review comments in docket re standing and statement of interest issues; | ~~1.25~~ 0.25 | ■ |
| 04-Mar-20 | KST | Finalize Spreadsheet of Filings in 13-84 and 03-137; respond to inquiries re same | 1.00 | ■ |
| 04-Mar-20 | TDJ | e-mail to E. Gotting re same; continue research re "Statement of Issues" and docketing statements requirements in D.C. Circuit Court of Appeals; pull relevant examples and e-mail to E. Gotting re same | ~~1.50~~ 0.50 | ■ |
| 05-Mar-20 | EPG | Draft standing addendum and Statement of Issues; review case law re same; conferences and correspondence with E. Myers and A. Catalano | ~~3.50~~ 0.50 | ■ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

KELLER AND HECKMAN LLP
*Serving Business through Law and Science®*

| | | | |
|---|---|---|---|
| Client Number | ED17917 | Invoice Number | 10106402 |
| Matter Number | 00001 | Invoice Date | April 13, 2020 |
| | | Page Number | 2 |

| Date | Prof. | Description | Hours | Amount |
|---|---|---|---|---|
| 05-Mar-20 | AJC | Call E. Myers, E. Gotting re docketing statement/procedural issues for Court filing; research judicial review issue for petition for review status | 1.50 | ■ |
| 05-Mar-20 | TDJ | Research re docketing statement requirements applicable to standing; e-mail to E. Gotting re same | 2.25 | ■ |
| ███████ | | | | ███████ |
| 06-Mar-20 | EPG | Edit and finalize DC Circuit filings; conferences and correspondence with E. Myers re same | ~~2.50~~ 0.50 | ■ |
| 06-Mar-20 | AJC | Emails E. Myers, E. Gotting re statement of issues/procedural filings and related issues | 1.00 | ■ |
| ███████ | | | | ███████ |
| 16-Mar-20 | AJC | review and revise mediation statement | ~~1.25~~ 0.25 | ■ |
| 17-Mar-20 | AJC | Email E. Myers re mediation response | 0.25 | ■ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

Keller and Heckman LLP
*Serving Business through Law and Science®*

| Client Number | ED17917 | Invoice Number | 10106402 |
| Matter Number | 00001 | Invoice Date | April 13, 2020 |
| | | Page Number | 3 |



COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

| | |
|---|---|
| 1001 G Street, N.W. | WIRES TO: |
| Suite 500 West | Citibank N.A. |
| Washington, D.C. 20001 | 1101 Pennsylvania Avenue, N.W. |
| *Tel* 202.434.4100 | Washington, D.C. 20004 |
| *Fax* 202.434.4646 | Account Number: **9250405308** |
| *Tax I.D.* 52-0743156 | Routing Number: 254070116 |

| | | |
|---|---|---|
| Law Offices of Edward B. Myers | Invoice Number | 10107496 |
| Edward B. Myers, Attorney | Invoice Date | May 14, 2020 |
| 14613 Dehaven Court | Client Number | ED17917.00001 |
| North Potomac, MD 20878 | | |

For Professional services rendered through April 30, 2020

Matter Name: General

| Date | Prof. | Description | Hours | Amount |
|---|---|---|---|---|
| 01-Apr-20 | EPG | Conference with E. Myers and A. Catalano re Fed. Reg. notice | 0.50 | ███ |
| 01-Apr-20 | EPG | Review Fed. Reg. notice; correspondence with A. Catalano re same | 0.25 | ███ |
| ████ | ████ | ██████████ | ████ | ███ |
| 03-Apr-20 | TDJ | Begin legal research re protective petitions for review; correspond with E. Gotting re same | 0.75 | ███ |
| ████ | | | | |
| 06-Apr-20 | AJC | Review Federal Register Notice re NPRM part of FCC's 12/4/19 Order; emails E. Myers, E. Gotting re same; emails E. Myers, E. Gotting re DC Circuit briefing schedule and related strategy issues | 0.50 | ███ |
| 06-Apr-20 | TDJ | Finish legal research re protective petitions for review; correspond with E. Gotting re same | 2.25 | ███ |
| 07-Apr-20 | EPG | Conference with E. Myers and A. Catalano re petition for review and case strategy | ~~2.00~~ 0.25 | ███ |
| 07-Apr-20 | AJC | Conference with E. Gotting re updates and strategy issues; call E. Myers, E. Gotting re DC Circuit briefing schedule, Supplemental or Protective Petition in DC Circuit and related 28(j) letter, ██████████ ██████████ review protective petition for review in response to federal register notice | ~~1.00~~ 0.75 | ███ |
| 08-Apr-20 | EPG | Edit and finalize protective petition for review and supplemental authorities letter ██████████ | ~~0.75~~ 0.25 | ███ |
| 08-Apr-20 | AJC | Conference call E. Myers, E. Gotting re protective petition and related strategy | 0.50 | ███ |

KELLER AND HECKMAN LLP
*Serving Business through Law and Science®*

| | |
|---|---|
| Client Number    ED17917 | Invoice Number    10107496 |
| Matter Number    00001 | Invoice Date    May 14, 2020 |
| | Page Number    2 |

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| | | ████████████████████████ | | |
| 09-Apr-20 | EPG | Edit and finalize protective petition for review | 0.75 | █ |
| | | ████████████████████████ | | |
| 21-Apr-20 | JSN | Correspond with E. Gotting re legal research; review Dec. 2019 FCC memorandum opinion and order | 0.25 | █ |
| 22-Apr-20 | EPG | Conference with E. Myers and A. Catalano re motion to extend and case strategy; draft motion to extend | 3.00 | █ |
| 22-Apr-20 | AJC | Emails/call E. Myers, E. Gotting re procedural issues, strategy and briefing schedule | 0.75 | █ |
| 22-Apr-20 | JSN | Conference with E. Gotting re legal research on standing; review FCC Dec. 2019 order | 0.75 | █ |
| 23-Apr-20 | EPG | Draft and edit joint motion to extend deadlines; ██████████████ ████████ correspondence with E. Myers re same | ~~3.00~~ 2.75 | █ |
| 23-Apr-20 | AJC | Review motion to extend briefing in DC Circuit | 0.50 | █ |
| 24-Apr-20 | EPG | Edit and finalize motion to extend; correspondence with E. Myers re same; review standing case law re organizational injury | 3.00 | |
| 24-Apr-20 | JSN | Research case law re criteria to satisfy individual standing to sue agency when agency sets health and safety standard or exposure standard and individual argues the standard is inadequate | 0.50 | █ |
| 25-Apr-20 | EPG | Conference with E. Myers and A. Catalano re case strategy; conference with J. Nekoomaram re review of administrative record | ~~3.25~~ 0.50 | █ |

**KELLER AND HECKMAN LLP**
*Serving Business through Law and Science®*

| | |
|---|---|
| Client Number    ED17917 | Invoice Number    10107496 |
| Matter Number    00001 | Invoice Date    May 14, 2020 |
| | Page Number    3 |

| Date | Prof. | Description | Hours | Amount |
|---|---|---|---|---|
| 25-Apr-20 | JSN | Research case law re criteria to satisfy individual standing to sue agency when agency sets health and safety standard or exposure standard and individual argues the standard is inadequate; summarize case law for E. Gotting; conference with E. Gotting re researching FCC docket | 3.50 | █ |
| 26-Apr-20 | EPG | Review case law re standing and APA | 2.00   ~~6.25~~ | █ |
| | | ███████████████████████████████ | | █ |
| 27-Apr-20 | JBG | Strategize with E. Gotting re D.C. Circuit brief contents; begin conducting related research re standing | 1.50 | █ |
| 28-Apr-20 | EPG | Conference with E. Myers and A. Catalano re strategy; reveiw case law re standing | 1.50 | █ |
| 28-Apr-20 | EPG | ████████████████████████ review case law re organizational standing | ~~1.00~~ 0.50 | █ |
| | | ███████████████████████████████ | | |
| 28-Apr-20 | JBG | Research D.C. Circuit and Supreme Court case law regarding injury-in-fact Article III standing requirements, specifically, case law addressing standing of plaintiffs who had existing injuries at the time they brought suit to challenge an agency's failure to fulfill its statutory obligation to consider a subject during rulemaking that could have redressed plaintiffs' injuries | 1.25 | |
| | | ███████████████████████████████ | | |
| 29-Apr-20 | JSN | Review 2013 RF docket comments re cell phones | 1.00 | █ |
| 29-Apr-20 | JBG | Continue researching standing issues related to client FCC petition | 2.00 | █ |
| 30-Apr-20 | EPG | Conference with E. Myers, A. Catalano and EHT; review case law re standing; draft task list for opening brief | ~~4.00~~ 2.00 | |
| 30-Apr-20 | AJC | Call with E. Myers, E. Gotting, D. Davis, T. Scarato, E. Manitiply re RF issues in FCC proceedings; emails E. Myers. E. Gotting on court order re briefing; conference E. Gotting re same | 1.00 | █ |
| 30-Apr-20 | TDJ | Research re Agency entirely failing to address an issue; call with E. Gotting re same | 2.25 | █ |
| 30-Apr-20 | JSN | Review 2013 RF docket comments re cell phones and create spreadsheet ███████████████████████ | ~~3.50~~ 3.00 | █ |



Kᴇʟʟᴇʀ ᴀɴᴅ Hᴇᴄᴋᴍᴀɴ LLP
*Serving Business through Law and Science®*
Client Number    ED17917
Matter Number    00001

Invoice Number    10107496
Invoice Date    May 14, 2020
Page Number    4

# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

| | |
|---|---|
| 1001 G Street, N.W. | WIRES TO: |
| Suite 500 West | Citibank N.A. |
| Washington, D.C. 20001 | 1101 Pennsylvania Avenue, N.W. |
| *Tel* 202.434.4100 | Washington, D.C. 20004 |
| *Fax* 202.434.4646 | Account Number: **9250405308** |
| *Tax I.D.* 52-0743156 | Routing Number: 254070116 |

| | |
|---|---|
| Law Offices of Edward B. Myers | Invoice Number        10108559 |
| Edward B. Myers, Attorney | Invoice Date        June 12, 2020 |
| 14613 Dehaven Court | Client Number        ED17917.00001 |
| North Potomac, MD 20878 | |

Email: edwardbmyers@yahoo.com

For Professional services rendered through May 31, 2020

Matter Name: General

| Date | Prof. | Description | Hours | | Amount |
|---|---|---|---|---|---|
| 01-May-20 | EPG | Review cases re standing and APA; correspondence with E. Myers and A. Catalano re strategy | | ~~3.25~~ 1.00 | ▪ |
| 01-May-20 | AJC | Emails E. Myers, E. Gotting re briefing schedule; conference with E. Gotting re same | | 0.50 | ▪ |
| 01-May-20 | JBG | Continue researching case law re Article III standing in factually similar circumstances; draft email summary to E. Gotting re the same | | 1.50 | ▪ |
| 01-May-20 | TDJ | Finish research re agency entirely failing to address an issue; email to E. Gotting re same | | 1.25 | ▪ |
| 02-May-20 | EPG | Review individual standing cases | 1.00 | ~~3.50~~ | ▪ |
| 03-May-20 | EPG | Review case law re final agency action and deferred regulations; review case law re individual standing | | ~~3.75~~ 1.50 | ▪ |
| 04-May-20 | EPG | Review motion to extend deadlines; correspondence with E. Myers re same; correspondence with E. Myers re division of briefing responsibilities; conferences with J. Gustafson and T. Johnson re research assignments (prudential standing and final agency action); review case law re final agency action | | 4.50 | ▪ |
| 04-May-20 | AJC | Emails E. Myers, E. Gotting re briefing issues; review administrative record re cell phones | | 0.50 | ▪ |
| ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ | | | | | |
| 04-May-20 | JBG | Confer with E. Gotting re prudential standing concerns and needed research; begin research on the same | | 1.00 | ▪ |
| 04-May-20 | TDJ | Begin research re NOIs and final agency action; call with E. Gotting re same | | 0.50 | ▪ |
| 05-May-20 | EPG | Review 2019 and 2013 NOIs for comments re final agency action; | 1.00 | ~~3.50~~ | ▪ |
| 05-May-20 | AJC | Emails E. Myers, E. Gotting re briefing schedule and strategy; review administrative records re cell phones | | 1.00 | ▪ |
| 05-May-20 | JBG | Continue researching Supreme Court and D.C. Circuit case law re prudential standing | | 1.00 | ▪ |
| 05-May-20 | TDJ | Finish research re NOIs and final agency action; email to E. Gotting re same | | 1.75 | ▪ |
| 05-May-20 | JSN | Research cases re criteria for hard look doctrine under NEPA and case law where agency failed to comply with NEPA for not taking a hard look at relevant issues for environmental assessment; summarize research for E. Gotting | | 3.50 | ▪ |
| 06-May-20 | EPG | Review proposed CHD outline; draft response | | 2.50 | ▪ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

KELLER AND HECKMAN LLP
*Serving Business through Law and Science®*

| | | |
|---|---|---|
| Client Number | ED17917 | |
| Matter Number | 00001 | |

| | |
|---|---|
| Invoice Number | 10108559 |
| Invoice Date | June 12, 2020 |
| Page Number | 2 |

| Date | Prof. | Description | Hours | Amount |
|---|---|---|---|---|
| 06-May-20 | AJC | Review administrative record re cell phone issues; call E. Myers re cell phone issues | 1.00 | ■ |
| 06-May-20 | JBG | Continue researching prudential standing and its intersection with the Hobbs Act in federal circuit courts; draft summary of all prudential research for E. Gotting | 4.50 | ■ |
| 07-May-20 | EPG | Conference with E. Myers re brief and amicus; review T. Johnson NOI and final agency order research | 2.50 | ■ |
| 07-May-20 | AJC | Review briefing and related amicus issues; call E. Myers, E. Gotting re same review administrative record re cell phone issues | 1.00 | ■ |
| 07-May-20 | TDJ | Continue research re NOIs and final agency action; continue research re agency failing to address an issue entirely; correspond with E. Gotting re same | 2.75 | ■ |
| 08-May-20 | EPG | Edit draft briefing outline and correspondence with S. McCollough | 0.50 | ■ |
| 08-May-20 | AJC | Review briefing schedule order; emails E. Myers, E. Gotting re briefing schedule and amicus issues | 0.25 | ■ |
| 08-May-20 | TDJ | Finish research re NOIs and final agency action; finish research re agency failing to address an issue entirely; correspond with E. Gotting re same | 1.25 | ■ |
| 11-May-20 | EPG | Conference with E. Myers and A. Catalano re case strategy | 0.75 | ■ |
| 11-May-20 | AJC | Call E. Myers re strategy; call E. Myers, E. Gotting re briefing and strategy | 0.50 | ■ |
| 12-May-20 | EPG | Conferences with E. Myers and CHD re brief | 1.25 | ■ |
| 12-May-20 | AJC | Conference with E. Gotting re briefing issues; review administrative record issues re cell phones | 1.00 | ■ |
| 13-May-20 | EPG | Conference with CHD and E. Myers re case strategy and briefing  0.50  ~~1.25~~ | | ■ |
| 13-May-20 | AJC | Conference with E. Gotting re briefing and strategy | 0.25 | ■ |
| 14-May-20 | AJC | Review cell phone issues | 0.50 | ■ |
| 18-May-20 | EPG | Conference with E. Myers and A. Catalano re case strategy; ■ ■ conference with J. Nekoomaram re delegation research | ~~1.75~~  0.50 | ■ |
| 18-May-20 | AJC | Conference E. Gotting re briefing; call E. Myers, E. Gotting re briefing, amicus issues, strategy, emails E. Myers re amicus issues and briefing; review cell phone issues in RF Termination Order | 0.75 | ■ |
| 18-May-20 | JSN | Conference with E. Gotting re legal research | 0.50 | ■ |
| 19-May-20 | EPG | Conferences with E. Myers re case management and record review; conference with J. Nekoomaram re same; review deferred appendix rules and correspondence with S. McCollough re same | 2.00 | ■ |
| 19-May-20 | JSN | Conference with E. Gotting re discussions with C. Franklin and T. Scarato re searching FCC docket; research federal cases that address when FCC can defer to another agency | 1.25 | ■ |
| 20-May-20 | EPG | Conference with C. Franklin and E. Myers re cell phone testing and database | 0.75 | ■ |
| 20-May-20 | AJC | Review FCC RF Order and related administrative record issues re cell phones; emails E. Myers, E. Gotting re amicus and briefing issues | 1.25 | ■ |
| 20-May-20 | JSN | Review FCC docket search website; conference with E. Myers, E. Gotting and C. Franklin re strategy for reviewing comments in FCC docket | 1.00 | ■ |
| 21-May-20 | EPG | Conference with E. Myers and T. Scarato re admin record | 1.25 | ■ |
| 21-May-20 | AJC | Review FCC RF Order and administrative record re cell phone issues | 1.25 | ■ |
| 21-May-20 | JSN | Conference with T. Scarato, E. Myers and E. Gotting re strategy for reviewing FCC docket and arguments in brief;  research federal cases that address when FCC can defer to another agency | 2.25 | ■ |
| 22-May-20 | AJC | Review FCC RF Termination Order and related cell phone issues in administrative record from government agencies and industry groups supporting FCC | 1.00 | ■ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

KELLER AND HECKMAN LLP
*Serving Business through Law and Science®*

| Client Number | ED17917 |
| Matter Number | 00001 |

| Invoice Number | 10108559 |
| Invoice Date | June 12, 2020 |
| Page Number | 3 |

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| 22-May-20 | JSN | Research federal cases that address when FCC can defer to another agency and what level of scrutiny FCC should apply when it considers another agency's scientific assessment in its decision-making; summarize research and send to E. Gotting | 3.75 | █████ |
| 26-May-20 | EPG | Review case law re sub-delegation issue | 1.00 ~~3.75~~ | █████ |
| 26-May-20 | AJC | Review agency correspondence to FCC; emails E. Myers re same | 0.75 | █████ |
| 27-May-20 | EPG | Review case law re subdelegation and abdication; conference with J. Nekoomaram re same; review C. Franklin spreadsheet re cell phone testing | 3.25 | █████ |
| 27-May-20 | AJC | Review federal agency correspondence and reports re RF and cell phones issues | 1.00 | █████ |
| 27-May-20 | JSN | Conference with E. Gotting re legal research | 0.50 | █████ |
| 28-May-20 | EPG | Correspondence with co-counsel re citation conventions; review C. Franklin cell testing documents and outline brief section | ~~3.25~~ 1.00 | █████ |
| 28-May-20 | AJC | Standing, non-thermal and study issues; review same issues; review FDA filings and statements | 1.00 | █████ |



| 29-May-20 | EPG | Review case law re APA standards | 1.00 ~~3.00~~ | █████ |
| 29-May-20 | JSN | Review case law where court analyzes whether agency has improperly abdicated duties by relying on outside party assessment; summarize research for E. Gotting | 3.25 | |
| 30-May-20 | EPG | Review CHD standard of review section and supporting case law | 2.50 | █████ |
| 31-May-20 | EPG | Review case law cited by CHD re standard of review; correspondence with E. Myers re standing issues and analysis | ~~5.50~~ 1.50 | |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

# KELLER AND HECKMAN LLP
*Serving Business through Law and Science®*

1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
*Tel* 202.434.4100
*Fax* 202.434.4646
*Tax I.D.* 52-0743156

WIRES TO:
Citibank N.A.
1101 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Account Number: **9250405308**
Routing Number: 254070116

Law Offices of Edward B. Myers
Edward B. Myers, Attorney
14613 Dehaven Court
North Potomac, MD 20878

| | |
|---|---|
| Invoice Number | 10109815 |
| Invoice Date | July 21, 2020 |
| Client Number | ED17917.00001 |

Email: edwardbmyers@yahoo.com

For Professional services rendered through June 30, 2020

Matter Name: General

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| 01-Jun-20 | EPG | Review case law re APA and standard of review; conference with E. Myers and A. Catalano re case strategy (standing, briefing) | 2.00 | ▮ |
| 01-Jun-20 | AJC | Conference E. Gotting re administrative record issues for FDA statements; call E. Gotting, E. Myers re standing and briefing issues | 0.50 | ▮ |
| 02-Jun-20 | EPG | Outline standard of review section (APA) | 1.25 | ▮ |
| 02-Jun-20 | AJC | Research FCC authority to rely on FDA materials outside the FCC docket | 0.50 | ▮ |
| 03-Jun-20 | EPG | Conference with E. Myers re ▮ standing; draft standing of review section | ~~2.50~~ 2.00 | ▮ |
| 03-Jun-20 | AJC | Review agency and APA issues re cell phone issue | 0.50 | ▮ |
| 04-Jun-20 | EPG | Conferences with CHD counsel and E. Myers re case strategy; review case law on abdication of agency responsibilities | 1.50 | ▮ |
| 04-Jun-20 | AJC | Review APA standards for agency review and reliance on information from another agency | 0.50 | ▮ |
| 04-Jun-20 | JSN | ▮ correspond with E. Gotting re legal research on cases where agency improperly abdicates duties to another party | ~~2.00~~ 0.25 | ▮ |
| 05-Jun-20 | EPG | Review case law re abdicating responsibility and sub-delegation | 1.25 | ▮ |
| 05-Jun-20 | JSN | Conference with E. Gotting re legal research; review additional cases that addressed whether agency inappropriately abdicated its responsbilities by relying on another party's scientific assessment ▮ | ~~2.00~~ 0.25 | ▮ |
| 05-Jun-20 | JBG | Research case law addressing agency citation of publicly available websites not otherwise included in the agency's administrative record under the Administrative Procedure Act | 0.75 | ▮ |
| 06-Jun-20 | EPG | Review case law and outline section re sub-delegation | 1.75 | ▮ |
| 07-Jun-20 | EPG | Review and edit motions to extend brief word counts and scheduling order deadlines ▮ | ~~2.50~~ 0.50 | ▮ |
| 08-Jun-20 | JBG | Continue researching Administrative Procedure Act case law in federal circuit courts; summarize findings for E. Gotting | 2.50 | ▮ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

KELLER AND HECKMAN LLP
*Serving Business through Law and Science®*

Client Number    ED17917
Matter Number    00001

Invoice Number    10109815
Invoice Date    July 21, 2020
Page Number    2

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| 09-Jun-20 | AJC | Legal research re APA and third party reliance issues | 0.50 | █ |
| 10-Jun-20 | AJC | Legal research re APA and website issues; conference E. Gotting re same | 0.50 | |
| 11-Jun-20 | AJC | Research APA issue on use of websites and administrative record | 0.25 | |
| 12-Jun-20 | AJC | Research APA issues re website of third party agency | 0.25 | █ |
| 12-Jun-20 | JBG | Research district court cases re agency obligation under the Administrative Procedure Act to direct stakeholders to publicly available documents used as a basis for a proposed rule | 1.50 | |
| 15-Jun-20 | JBG | Continue researching district court cases re agency obligations to cite publicly available information used in rulemaking under the APA | 1.50 | █ |
| 16-Jun-20 | EPG | Review case law re agency failure to cite information used for rulemaking | 2.50 | █ |
| 16-Jun-20 | AJC | Research administrative record re third party websites; emails E. Myers, E. Gotting re administrative record issues | 0.50 | |
| 16-Jun-20 | JBG | Conclude APA research; summarize findings re the same and submit to E. Gotting | 1.75 | |
| 17-Jun-20 | EPG | Review case law re publicly available sources and administrative record | 1.75 | █ |
| 18-Jun-20 | AJC | Review NOI and RF Order re FDA website issue | 0.50 | █ |
| 18-Jun-20 | JSN | Conference with E. Gotting re legal research; review 2019 order and FDA-related sources cited in footnotes; search for each cited source in administrative docket | 2.75 | |
| 21-Jun-20 | EPG | Review case law re administrative record and APA; review administrative record re references to websites; correspondence with A. Catalano and J. Nekoomaram re same | 1.75 | █ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

KELLER AND HECKMAN LLP
*Serving Business through Law and Science®*

| | |
|---|---|
| Client Number     ED17917 | Invoice Number      10109815 |
| Matter Number     00001 | Invoice Date        July 21, 2020 |
| | Page Number         3 |

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| 22-Jun-20 | EPG | Draft section re administrative record and compliance with notice and comment procedures███████████████ | ~~2.25~~ 1.25 | ██ |
| 22-Jun-20 | AJC | Review FDA website research and issues | 0.25 | |
| 22-Jun-20 | JSN | Review websites cited to in FCC order and locate websites in FCC administrative docket; conference with library staff re reviewing archive of websites; review archive of websites to see if they were available at the time they were cited in FCC order ██████████████████████████████ | ~~3.75~~ 1.00 | ██████ |
| 23-Jun-20 | EPG | Conference with A. Catalano re administrative record issues; research publicly available information issues | 2.50 | ████ |
| 23-Jun-20 | AJC | Draft section of cellphone issues for brief; conference with E. Gotting re same ████████████████████████████████████████████████████████ | 0.50 | ████ |
| 24-Jun-20 | JSN | Conference with E. Gotting re new legal research ██████████████████████████████ | 0.75 | ███ |
| 25-Jun-20 | AJC | Draft brief section on cell phones ████████████████████████████████████████████████████████ | 0.25 | ██ |
| 29-Jun-20 | AJC | Draft brief section re ce;; phones ████████████████████████████████ | 1.50 | ██ |
| 29-Jun-20 | JSN | ████████████████████████ conference with E. Gotting re legal arguments; research case law where court finds that agency must still satisfy statutory obligation to address certain issues in rulemaking even if commenters do not provide specific proposals or alternatives; | ~~2.00~~ 0.25 | ███ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

KELLER AND HECKMAN LLP
*Serving Business through Law and Science®*

| | | |
|---|---|---|
| Client Number | ED17917 | |
| Matter Number | 00001 | |

| | |
|---|---|
| Invoice Number | 10109815 |
| Invoice Date | July 21, 2020 |
| Page Number | 4 |

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| 30-Jun-20 | EPG | Correspondence with E. Myers re children argument ██████ ██████████ | ~~2.25~~ 0.25 | ████ |
| 30-Jun-20 | AJC | Draft section for brief re cell phones; review related issues in administrative record | 1.00 | ████ |
| 30-Jun-20 | JSN | Research case law where court finds that agency must still satisfy statutory obligation to address certain issues in rulemaking even if commenters do not provide specific proposals or alternatives; draft summary of research for E. Gotting | 3.50 | ████ |



# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

| | |
|---|---|
| 1001 G Street, N.W. | WIRES TO: |
| Suite 500 West | Citibank N.A. |
| Washington, D.C. 20001 | 1101 Pennsylvania Avenue, N.W. |
| *Tel* 202.434.4100 | Washington, D.C. 20004 |
| *Fax* 202.434.4646 | Account Number: **9250405308** |
| *Tax I.D.* 52-0743156 | Routing Number: 254070116 |

| | |
|---|---|
| Law Offices of Edward B. Myers | Invoice Number      10111445 |
| Edward B. Myers, Attorney | Invoice Date      August 31, 2020 |
| 14613 Dehaven Court | Client Number      ED17917.00001 |
| North Potomac, MD 20878 | |

Email: edwardbmyers@yahoo.com

For Professional services rendered through July 31, 2020

Matter Name: General

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| | | ███████████████████ | | |
| 06-Jul-20 | JDW | Docketing important dates to the attention of litigation team | 0.25 ~~2.00~~ | █ |
| | | ███████████████████ | | |
| 08-Jul-20 | JSN | review administrative record re NEPA comments<br>Search FCC docket for 2013 Notice of Inquiry and comments identified by E. Gotting and provide citations | 0.75 | █ |
| 09-Jul-20 | EPG | Draft section re regulatory history; review legislative history, administrative record, and case law re same | 2.50 | █ |
| | | ███████████████████ | | |
| 11-Jul-20 | EPG | Edit drafts re APA standard of review, ████ and statement of the case; review A. Catalano cell phone draft; correspondence with E. Myers and A. Catalano re same | ~~2.00~~<br>1.00 | █ |
| 12-Jul-20 | EPG | Review administrative record re 5G; review and edit children's section; correspondence and conferences with E. Myers and A. Catalano re coordinating with co-counsel | 2.00 | █ |
| 13-Jul-20 | EPG | Conference with J. Nekoomaram re 5G administrative record; review and edit testing section; conference with E. Myers and A. Catalano re brief; review administrative record re 5G background | 2.25 | █ |
| 13-Jul-20 | JSN | Correspond with E. Gotting re review of administrative docket for recent 5G comments from stakeholders | 0.50 | █ |
| 14-Jul-20 | EPG | Draft 5G section; correspondence with E. Myers and A. Catalano re brief | 2.50 | █ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

**KELLER AND HECKMAN LLP**
*Serving Business through Law and Science®*

| | |
|---|---|
| Client Number     ED17917 | |
| Matter Number     00001 | |

| | |
|---|---|
| Invoice Number | 10111445 |
| Invoice Date | August 31, 2020 |
| Page Number | 2 |

| Date | Prof. | Description | Hours | Amount |
|---|---|---|---|---|
| 14-Jul-20 | JSN | Correspond with E. Gotting re citations to the FCC record; conference with FCC help desk re searching FCC comment docket based on ID number; review ID numbers and correlation between documents and dockets | 1.00 | ██ |
| 15-Jul-20 | EPG | Edit cellular phone ████ section; conferences with CHD counsel re brief editing, etc.; review administrative record and studies re 5G and MMWs | ~~2.25~~ 1.75 | ██ |
| 15-Jul-20 | JSN | Review administrative record for comments on 5G health risks; summarize comments in spreadsheet; confirm certain studies are in administrative record | 3.75 | ██ |
| 16-Jul-20 | EPG | Review 5G research and studies for brief section; conference with CHD re brief | 2.00 | ██ |
| 16-Jul-20 | JSN | Review administrative record for comments on 5G health risks; summarize comments in spreadsheet; confirm certain studies are in administrative record | 3.00 | ██ |
| 17-Jul-20 | EPG | Draft and edit 5G section; review administrative record re same ████ | ~~2.00~~ 1.00 | ██ |
| 17-Jul-20 | JSN | Research briefs submitted in FCC cases and review methods for citing to administrative record; send research to E. Gotting | 1.00 | ██ |
| 18-Jul-20 | EPG | Review CHD draft brief; outline joint brief | 2.00 | ██ |
| 19-Jul-20 | EPG | Assemble joint brief; draft email to CHD re joint brief and editing suggestions; draft statement of jurisdiction | 2.00 | ██ |
| 20-Jul-20 | EPG | Conference with E. Myers re brief strategy; ████████ ████ review standing case law; outline legal argument section | ~~2.50~~ 1.50 | ██ |
| 20-Jul-20 | JSN | Review scientific studies in FCC docket and pull documents for E. Gotting | 1.25 | ██ |
| 21-Jul-20 | EPG | ████████ conferences and correspondence with counsel re joint brief | ~~4.00~~ 0.25 | ██ |
| 21-Jul-20 | JSN | Conference with E. Gotting re redactions to affidavits regarding health effects of RF and reviewing DC Circuit rules | 0.25 | ██ |
| 22-Jul-20 | EPG | Review standing case law; edit petitioner declarations; correspondence and conferences with E. Myers re same | 2.50 | ██ |
| 22-Jul-20 | JSN | Review DC Circuit rules re privacy redactions and submitting brief and appendices under seal ████ | ~~2.75~~ 0.50 | ██ |
| ██████████████████████████████ | | | | ██ |
| 24-Jul-20 | EPG | Review and edit joint brief drafts; conferences with CHD counsel re same; conferences and correspondence with E. Myers re same; edit declarations | 1.50 | ██ |
| ██████████████████████████████ | | | | |
| 25-Jul-20 | EPG | Review and edit declarations; review case law re prudential standing; edit joint brief re same | 3.75 | ██ |
| 26-Jul-20 | EPG | Edit and review joint brief sections; correspondence with EHT and CHD counsel re same | 4.00 | ██ |
| 26-Jul-20 | JSN | Review brief and create spreadsheet with citations, locate and provide links to cited sources in the FCC docket | 2.50 | ██ |
| 27-Jul-20 | EPG | Edit joint brief; conferences with EHT and E. Myers re same | 4.00 | ██ |

KELLER AND HECKMAN LLP
*Serving Business through Law and Science*®

| Client Number | ED17917 | Invoice Number | 10111445 |
|---|---|---|---|
| Matter Number | 00001 | Invoice Date | August 31, 2020 |
| | | Page Number | 3 |

| Date | Prof. | Description | Hours | Amount |
|---|---|---|---|---|
| 27-Jul-20 | TDJ | Citation check for D.C. Circuit Brief; emails and calls with E. Gotting re same | 4.00 | ▮ |
| 27-Jul-20 | JSN | Conference with E. Gotting and litigation team re inserting citations, cite checking and assembling brief; cite check brief; conference with E. Gotting re citations | 5.25 | ▮ |
| 27-Jul-20 | JDW | Review brief and start to build Table of Contents and Table of Authorities | 3.75 | ▮ |
| 28-Jul-20 | EPG | Edit final joint brief; conferences and correspondence with E. Myers, EHT, and CHD | 4.50 | ▮ |
| 28-Jul-20 | TDJ | Begin work on addendum for D.C. Circuit Brief | 0.75 | ▮ |
| 28-Jul-20 | JSN | Conference with A. Catalano re citations; review revisions to citations with assistants and include them in brief; work with E. Gotting to check and revise citations throughout brief | 5.00 | ▮ |
| | | | | |
| 29-Jul-20 | EPG | Edit and finalize FCC brief; conferences and correspondence with E. Myers and CHD counsel re same | 10.00 | ▮ |
| 29-Jul-20 | JSN | Revise brief; work on table of contents for brief | 1.50 | ▮ |
| 29-Jul-20 | TDJ | Finish work on addendum for D.C. Circuit Brief | 1.25 | ▮ |



COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

| | |
|---|---|
| 1001 G Street, N.W. | WIRES TO: |
| Suite 500 West | Citibank N.A. |
| Washington, D.C. 20001 | 1101 Pennsylvania Avenue, N.W. |
| *Tel* 202.434.4100 | Washington, D.C. 20004 |
| *Fax* 202.434.4646 | Account Number: **9250405308** |
| *Tax I.D.* 52-0743156 | Routing Number: 254070116 |

| | | |
|---|---|---|
| Law Offices of Edward B. Myers | Invoice Number | 10112392 |
| Edward B. Myers, Attorney | Invoice Date | September 30, 2020 |
| 14613 Dehaven Court | Client Number | ED17917.00001 |
| North Potomac, MD 20878 | | |

Email: edwardbmyers@yahoo.com

For Professional services rendered through August 31, 2020

Matter Name: General

| Date | Prof. | Description | Hours | Amount |
|---|---|---|---|---|
| 04-Aug-20 | EPG | Conference with E. Myers and CHD counsel re corrected brief and addendum; review E. Myers proposed edits | 3.25 | ██████ |
| 05-Aug-20 | EPG | Conference with E. Myers re corrected version; correspondence with CHD counsel re same | 0.75 | ████ |
| ██████ | | | | |
| 10-Aug-20 | EPG | Review and address needed edits to corrected version; conferences with E. Myers re same | 2.00 | ████ |
| ██████ | | | | |
| 12-Aug-20 | EPG | Work on corrected brief issues; correspondence with E. Myers and CHD counsel re same | 2.50 | ████ |
| 13-Aug-20 | EPG | Conference with E. Myers re edits to master brief | 0.25 | ████ |
| 14-Aug-20 | EPG | Edit final corrected version; conferences and correspondence with E. Myers re same | 1.50 | ████ |
| 14-Aug-20 | TDJ | Proof and cite check table of contents for final brief | 1.50 | ████ |
| 14-Aug-20 | JDW | Finishing Table of Authorities for edited brief | 2.25 | |





COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

KELLER AND HECKMAN LLP
*Serving Business through Law and Science®*
Client Number     ED17917
Matter Number     00001

Invoice Number                    10112392
Invoice Date          September 30, 2020
Page Number                              2

# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

| | |
|---|---|
| 1001 G Street, N.W. | WIRES TO: |
| Suite 500 West | Citibank N.A. |
| Washington, D.C. 20001 | 1101 Pennsylvania Avenue, N.W. |
| *Tel* 202.434.4100 | Washington, D.C. 20004 |
| *Fax* 202.434.4646 | Account Number: **9250405308** |
| *Tax I.D.* 52-0743156 | Routing Number: 254070116 |

| | | |
|---|---|---|
| Law Offices of Edward B. Myers | Invoice Number | 10112833 |
| Edward B. Myers, Attorney | Invoice Date | October 14, 2020 |
| 14613 Dehaven Court | Client Number | ED17917.00001 |
| North Potomac, MD 20878 | | |

Email: edwardbmyers@yahoo.com

For Professional services rendered through September 30, 2020

Matter Name: General

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| | | | | |
| 14-Sep-20 | EPG | Conference with PA team re joint appendix; review E. Myers designations re same | 0.25 | ■ |
| 14-Sep-20 | JSN | Conference with E. Gotting re joint appendix, review and revisions to citations; conference with T. Johnson re same | 0.50 | ■ |
| 14-Sep-20 | TDJ | Bluebook citations for Joint Appendix | 1.75 | ■ |
| 15-Sep-20 | JSN | Conference with T. Johnson re citations for joint appendix; review documents and create citations for sources for joint appendix | 2.25 | ■ |
| 15-Sep-20 | TDJ | Bluebook citations for Joint Appendix | 1.50 | ■ |
| 16-Sep-20 | TDJ | Finish bluebook citations for Joint Appendix; email to E. Gotting re same | 2.75 | ■ |
| 16-Sep-20 | JSN | Review and revise citations for joint appendix with T. Johnson | 1.00 | |
| 18-Sep-20 | EPG | Review Joint Appendix citations and documents; conference with E. Myers re same | 2.75 | ■ |
| 23-Sep-20 | EPG | Review FCC opposition brief; conference with E. Myers re same; outline briefing strategy | 3.00 | ■ |
| 24-Sep-20 | JSN | Conference with E. Gotting re reviewing sources cited to in FCC brief | 0.25 | ■ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE

INVOICE DUE UPON RECEIPT

Keller and Heckman LLP

*Serving Business through Law and Science®*

Client Number     ED17917

Matter Number     00001

Invoice Number     10112833
Invoice Date      October 14, 2020
Page Number       2

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| | | | | |
| 27-Sep-20 | JSN | Review FCC brief and list all FCC sources cited in brief; review 2013 and 2019 NOIs and administrative record; create spreadsheet explaining if each source is cited by FCC in the NOIs, if they are included in the administrative record, and whether proposition FCC makes for each source is the same as it is used in NOIs or in the administrative record | 2.00 | |
| | | | | |
| 28-Sep-20 | JSN | Review FCC brief and list all FCC sources cited in brief; review 2013 and 2019 NOIs and administrative record; create spreadsheet explaining if each source is cited by FCC in the NOIs, if they are included in the administrative record, and whether proposition FCC makes for each source is the same as it is used in NOIs or in the administrative record | ~~5.75~~ 2.00 | |
| | | | | |
| 29-Sep-20 | JSN | Review FCC brief and list all FCC sources cited in brief; review 2013 and 2019 NOIs and administrative record; create spreadsheet explaining if each source is cited by FCC in the NOIs, if they are included in the administrative record, and whether proposition FCC makes for each source is the same as it is used in NOIs or in the administrative record | 2.50 | |
| 30-Sep-20 | EPG | Conference with E. Myers re brief strategy; review FCC footnote analysis spreadsheet; conference with J. Nekoomaram re same; correspondence with E. Myers re same | 2.50 | |
| 30-Sep-20 | JSN | Review and revise spreadsheet analyzing FCC cited documents and whether sources are in administrative record; conference with E. Gotting re legal research for cases where agency relies on statements made in proposed rule but not final rule | 1.75 | |



# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

| | |
|---|---|
| 1001 G Street, N.W. | WIRES TO: |
| Suite 500 West | Citibank N.A. |
| Washington, D.C. 20001 | 1101 Pennsylvania Avenue, N.W. |
| *Tel* 202.434.4100 | Washington, D.C. 20004 |
| *Fax* 202.434.4646 | Account Number: **9250405308** |
| *Tax I.D.* 52-0743156 | Routing Number: 254070116 |

| | | |
|---|---|---|
| Law Offices of Edward B. Myers | Invoice Number | 10115495 |
| Edward B. Myers, Attorney | Invoice Date | December 30, 2020 |
| 14613 Dehaven Court | Client Number | ED17917.00001 |
| North Potomac, MD 20878 | | |

Email: edwardbmyers@yahoo.com

For Professional services rendered through November 30, 2020

Matter Name: General

| Date | Prof. | Description | Hours | Amount |
|---|---|---|---|---|
| | | ███████████████████████████ | | |
| 02-Oct-20 | EPG | Conference with E. Myers re brief outline and strategy | 1.00 | █ |
| | | ███████████████████████████ | | |
| 03-Oct-20 | EPG | Draft reply brief; review case law re standard of review | 4.00 | █ |
| 04-Oct-20 | EPG | Draft reply brief; review case law re standard of review; correspondence with E. Myers re same | 5.00 | █ |
| 05-Oct-20 | EPG | Draft reply brief; review case law re standard of review; review correspondence from CHD counsel | 3.25 | █ |
| 05-Oct-20 | JSN | ████████████████ conference with E. Gotting re legal research; review 2019 Resolution of Notice of Inquiry to see if FCC discussed if decisions were based on agency priorities or resources | ~~1.25~~ 0.25 | █ |
| 05-Oct-20 | TDJ | Legal research for E. Gotting re agencies denying rule-making petitions; email to E. Gotting re same | 1.00 | █ |
| 06-Oct-20 | EPG | Review EHT edits to reply brief; conference with E. Myers re same; edit reply brief re standard of review; review case law re same; review notes re sub-delegation doctrine and correspondence with E. Myers re same | 4.00 | █ |
| | | ███████████████████████████ | | |
| 07-Oct-20 | EPG | Review and edit Section III cell phone argument; correspondence with E. Myers re same | ~~4.50~~ 2.00 | █ |
| 08-Oct-20 | EPG | Draft standard of review section; conference with E. Myers re same | ~~2.25~~ 1.50 | █ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE

INVOICE DUE UPON RECEIPT

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| 09-Oct-20 | JSN | Conference with E. Gotting re legal research; review references in final order and determine if sources are in administrative record; email summary to E. Myers; research whether agency denial of petition for rulemaking or decision to not modify rule constitutes a new final rule under the APA; send research to E. Gotting | 2.50 | █████ |
| ████████ | | | | |
| 13-Oct-20 | EPG | Edit E. Myers reply brief sections; conferences with E. Myers re same; conferences re extension | 3.00 | █████ |
| 13-Oct-20 | JSN | Conference with E. Gotting re status of draft of brief | 0.25 | █████ |
| 14-Oct-20 | EPG | Review reply drafts for testing and children and environment; correspondence with E. Myers re same | 3.50 | █████ |
| 14-Oct-20 | JSN | Conference with E. Gotting re reviewing brief citations; cite check brief | 2.50 | █████ |
| 14-Oct-20 | TDJ | Cite check standard of review ████████ sections of brief on FCC case; email to E. Gotting re same | ~~1.25~~ 0.50 | █████ |
| ████████ | | | | |
| 15-Oct-20 | JSN | Cite check brief | 0.75 | █████ |
| 16-Oct-20 | EPG | Review and edit draft reply brief; review FDA jurisdiction over electronics and correspondence with CHD counsel re same; conference with E. Myers re Shuren statements; ████████ review cell phone testing issue re normal conditions | ~~3.50~~ 2.50 | █████ |
| 16-Oct-20 | JSN | Review and pull documents from administrative record for E. Gotting | 1.00 | █████ |
| 17-Oct-20 | EPG | Edit draft reply brief based on E. Myers, client and associate comments; correspondence and conferences with E. Myers re same | 4.50 | █████ |
| 19-Oct-20 | EPG | Review and edit final draft; correspondence and conferences with E. Myers; correspondence with CHD counsel | 4.50 | █████ |
| 29-Oct-20 | EPG | Correspondence with E. Myers re appendix; review FRAP and DC Cir. rules and handbook re same | 0.50 | █████ |
| 02-Nov-20 | EPG | Review Joint Appendix index; conference with E. Myers re same | 0.50 | █████ |
| 05-Nov-20 | EPG | Conferences with E. Myers re citations in final briefs | 0.75 | █████ |
| 10-Nov-20 | EPG | Correspondence with E. Myers re supplemental appendix and citation forms | 0.25 | █████ |
| 11-Nov-20 | EPG | Review, edit final opening and reply briefs; correspondence with E. Myers and CHD counsel re same | 3.25 | █████ |
| 12-Nov-20 | EPG | Correspondence with E. Myers re joint appendix and final briefs | 0.25 | █████ |
| 13-Nov-20 | EPG | Conference with E. Myers re joint appendix | 1.00 | █████ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
*Tel* 202.434.4100
*Fax* 202.434.4646
*Tax I.D.* 52-0743156

WIRES TO:
Citibank N.A.
1101 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Account Number: **9250405308**
Routing Number: 254070116

| | |
|---|---|
| Law Offices of Edward B. Myers | |
| Edward B. Myers, Attorney | |
| 14613 Dehaven Court | |
| North Potomac, MD 20878 | |

| | |
|---|---|
| Invoice Number | 10115547 |
| Invoice Date | January 25, 2021 |
| Client Number | ED17917.00001 |

Email: edwardbmyers@yahoo.com

For Professional services rendered through December 31, 2020

Matter Name: General

| Date | Prof. | Description | Hours | Amount |
|---|---|---|---|---|



COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

# KELLER AND HECKMAN LLP

*Serving Business through Law and Science®*

| | |
|---|---|
| 1001 G Street, N.W. | WIRES TO: |
| Suite 500 West | Citibank N.A. |
| Washington, D.C. 20001 | 1101 Pennsylvania Avenue, N.W. |
| *Tel* 202.434.4100 | Washington, D.C. 20004 |
| *Fax* 202.434.4646 | Account Number: **9250405308** |
| *Tax I.D.* 52-0743156 | Routing Number: 254070116 |

| | |
|---|---|
| Law Offices of Edward B. Myers | Invoice Number        10117031 |
| Edward B. Myers, Attorney | Invoice Date    February 17, 2021 |
| 14613 Dehaven Court | Client Number    ED17917.00001 |
| North Potomac, MD 20878 | |

Email: edwardbmyers@yahoo.com

For Professional services rendered through January 31, 2021

Matter Name: General

| Date | Prof. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| | | █████████████ | | |
| 11-Jan-21 | EPG | Outline oral argument question and responses re arbitrary and capricious review; correspondence with E. Myers re same | 0.25 | ██ |
| | | █████████████ | | |
| 14-Jan-21 | EPG | Conferences with CHD counsel and E. Myers re oral argument strategy | 1.00 | |
| 15-Jan-21 | EPG | Participate in moot court; review ███ standing notes for moot court | 1.00 ~~3.00~~ | |
| | | █████████████ | | |
| 21-Jan-21 | EPG | Review and edit CHD counsel opening statement; review and edit CHD standing chart; conference with E. Myers re same; correspondence with CHD counsel re same | 1.00 | ██ |
| 22-Jan-21 | EPG | Attend moot court | 3.00 | ██ |
| 24-Jan-21 | EPG | Review and edit opening statement; correspondence with EHT and CHD teams re same | 2.00 | ██ |
| 25-Jan-21 | EPG | Attend oral argument; post argument conferences | 1.50 | ██ |
| 26-Jan-21 | EPG | Review FCC letter to the court re FDA committee and interagency task force; correspondence with E. Myers re same | 1.00 | ██ |
| 27-Jan-21 | EPG | Review draft response letters to FCC post oral argument section; correspondence and conferences with E. Myers and CHD counsel | 0.50 | ██ |

COSTS INCURRED BUT NOT INCLUDED ON THIS INVOICE WILL BE SUBMITTED AT A LATER DATE
INVOICE DUE UPON RECEIPT

# Attachment D

# Summary of Fee Calculations

# SUMMARY OF FEE CALCULATIONS

**Cost of Living Adjustment**

Using the Consumer Price Index for All Urban Consumers (CPI-U) for the

Washington D.C. area, the cost of living adjustment was calculated as follows:

- Formula = Statutory cap x CPI-U (annual average)/CPI-U (baseline)[1]

- 2020 rate = \$125 x 267.157/100 = \$333 per hour

- 2021 rate = \$125 x 273.603/100 = \$342 per hour[2]

**Fees Requested**

The fees requested in the instant Motion were calculated as follows:

- For attorneys billing more than the statutory rate (as adjusted for cost of

  living), we multiplied the adjusted statutory rate by the total hours.

- For attorneys and paralegals billing less than the statutory rate (as

  adjusted for cost of living), we multiplied the actual billed rate (\$325 and

  \$265, respectively) by the total hours.

- For Edward Myers, who billed below the adjusted statutory rate, we

  multiplied the actual billed rate (\$200) by the total hours.

---

[1] *See Haselwander v. McHugh*, 797 F.3d 1, 3 (D.C. Cir. 2015) (confirming use of yearly CPI-U for the Washington, D.C. area and a baseline of 100).

[2] Because the 2021 annual average CPI-U is not available, we applied the semi-annual average for the first half of 2021.

The following summarizes the total hours and amounts sought per partner,

associate, and paralegal based on the above approach:

Eric P. Gotting 2020: 193.25 hours x $333 = $64,352.25
Eric P. Gotting 2021: 11.25 hours x $342 = $3,847.50
Albert Catalano 2020: 32.5 hours x $333 = $10,822.50
Javaneh Tarter: 76 hours x $325 = $24,700.00
Taylor Johnson: 31.75 hours x $325 = $10,318.75
John Gustafson: 22 hours x $325 = $7,150.00
Kathleen Slattery Thompson: 6 hours x $325 = $1,950.00
Jackson Wheeler: 6.25 hours x $265 = $1,656.25

**Keller and Heckman Sub-Total = $124,797.25**

Edward Myers: 247.75 hours x $200 = $49,550

**Total (Keller and Heckman & Myers) = $174,347.25**

# Attachment E

# Summary of Annual and Semi-Annual Indexes

**U.S. BUREAU OF LABOR STATISTICS**

Bureau of Labor Statistics > Data Tools

## Mid-Atlantic Information Office

Search Mid-Atlantic Regi [Go]

Mid-Atlantic Home　　　Mid-Atlantic Geography　　　Mid-Atlantic Subjects　　　Mid-Atlantic Archives　　　Contact Mid-Atlantic

Bureau of Labor Statistics > Geographic Information > Mid-Atlantic > Table

## Summary of annual and semi-annual indexes

**Consumer Price Indexes for All Urban Consumers (CPI-U), U.S. city average and selected metropolitan areas, annual average and percent change, 2010-2020 (1982-84=100)**

| Year | U.S. city average | | Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | | Washington-Arlington-Alexandria, DC-VA-MD-WV | | Baltimore-Columbia-Towson, MD | |
|---|---|---|---|---|---|---|---|---|
| | Annual average | Percent change | Annual average | Percent change | Annual average | Percent change | Annual average | Percent change |
| 2010 | 218.056 | 1.6 | 227.746 | 2.0 | | | | |
| 2011 | 224.939 | 3.2 | 233.809 | 2.7 | | | | |
| 2012 | 229.594 | 2.1 | 238.097 | 1.8 | | | | |
| 2013 | 232.957 | 1.5 | 240.900 | 1.2 | | | | |
| 2014 | 236.736 | 1.6 | 244.050 | 1.3 | | | | |
| 2015 | 237.017 | 0.1 | 243.858 | -0.1 | 250.664 | | 240.662 | |
| 2016 | 240.007 | 1.3 | 245.290 | 0.6 | 253.422 | 1.1 | 244.039 | 1.4 |
| 2017 | 245.120 | 2.1 | 248.423 | 1.3 | 256.221 | 1.1 | 248.638 | 1.9 |
| 2018 | 251.107 | 2.4 | 251.563 | 1.3 | 261.445 | 2.0 | 253.392 | 1.9 |
| 2019 | 255.657 | 1.8 | 256.621 | 2.0 | 264.777 | 1.3 | 256.887 | 1.4 |
| 2020 | 258.811 | 1.2 | 258.923 | 0.9 | 267.157 | 0.9 | 259.476 | 1.0 |

**Consumer Price Indexes for Urban Wage Earners and Clerical Workers (CPI-W), U.S. city average and selected metropolitan areas, annual average and percent change, 2010-2020 (1982-84=100)**

| Year | U.S. city average | | Philadelphia-Camden-Wilmington, PA-DE-NJ-MD | | Washington-Arlington-Alexandria, DC-VA-MD-WV | | Baltimore-Columbia-Towson, MD | |
|---|---|---|---|---|---|---|---|---|
| | Annual average | Percent change | Annual average | Percent change | Annual average | Percent change | Annual average | Percent change |
| 2010 | 213.967 | 2.1 | 227.746 | 2.2 | | | | |
| 2011 | 221.575 | 3.6 | 234.363 | 2.9 | | | | |
| 2012 | 226.229 | 2.1 | 239.026 | 2.0 | | | | |
| 2013 | 229.324 | 1.4 | 241.759 | 1.1 | | | | |
| 2014 | 232.771 | 1.5 | 245.163 | 1.4 | | | | |
| 2015 | 231.810 | -0.4 | 245.689 | 0.0 | 246.491 | | 239.742 | |
| 2016 | 234.076 | 1.0 | 246.440 | 0.5 | 249.076 | 1.0 | 242.646 | 1.2 |
| 2017 | 239.051 | 2.1 | 249.635 | 1.3 | 252.067 | 1.2 | 247.431 | 2.0 |
| 2018 | 254.146 | 2.5 | 252.226 | 1.0 | 257.865 | 2.3 | 251.938 | 1.8 |
| 2019 | 249.222 | 1.7 | 256.887 | 1.8 | 260.554 | 1.0 | 255.003 | 1.2 |
| 2020 | 252.248 | 1.2 | 260.058 | 1.2 | 263.072 | 1.0 | 257.776 | 1.1 |

**Consumer Price Indexes for All Urban Consumers (CPI-U), U.S. city average and selected metropolitan areas, Semiannual average and percent change, 2011-2021 (1982-84=100)**

| Year | Half | U.S. city average | | | Philadelphia-Camden-Wilmington, PA-DE-NJ-MD | | | Washington-Arlington-Alexandria-DC-VA-MD-WV | | | Baltimore-Columbia-Towson, MD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Percent change from-- | | | Percent change from-- | | | Percent change from-- | | | Percent change from-- | |
| | | Semi-annual average | year ago average | previous average | Semi-annual average | year ago average | previous average | Semi-annual average | year ago average | previous average | Semi-annual average | year ago average | previous average |
| 2011 | 1st | 223.598 | 2.8 | 2.3 | 232.290 | 2.3 | 1.7 | | | | | | |
| | 2nd | 226.280 | 3.5 | 1.2 | 235.328 | 3.1 | 1.3 | | | | | | |
| 2012 | 1st | 228.850 | 2.3 | 1.1 | 236.756 | 1.9 | 0.6 | | | | | | |
| | 2nd | 230.338 | 1.8 | 0.7 | 239.437 | 1.7 | 1.1 | | | | | | |
| 2013 | 1st | 232.366 | 1.5 | 0.9 | 240.282 | 1.5 | 0.4 | | | | | | |
| | 2nd | 233.548 | 1.4 | 0.5 | 241.518 | 0.9 | 0.5 | | | | | | |
| 2014 | 1st | 236.384 | 1.7 | 1.2 | 243.519 | 1.3 | 0.8 | | | | | | |
| | 2nd | 237.088 | 1.5 | 0.3 | 244.582 | 1.3 | 0.4 | | | | | | |

| Year | Half | U.S. city average Semi-annual average | Percent change from-- year ago average | Percent change from-- previous average | Philadelphia-Camden-Wilmington, PA-DE-NJ-MD Semi-annual average | Percent change from-- year ago average | Percent change from-- previous average | Washington-Arlington-Alexandria, DC-VA-MD-WV Semi-annual average | Percent change from-- year ago average | Percent change from-- previous average | Baltimore-Columbia-Towson, MD Semi-annual average | Percent change from-- year ago average | Percent change from-- previous average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2015 | 1st | 236.265 | -0.1 | -0.3 | 243.609 | 0.0 | -0.4 | 249.828 | | | 240.162 | | |
| | 2nd | 237.769 | 0.3 | 0.6 | 244.107 | -0.2 | 0.2 | 251.500 | | 0.7 | 241.161 | | 0.4 |
| 2016 | 1st | 238.778 | 1.1 | 0.4 | 244.286 | 0.3 | 0.1 | 253.049 | 1.3 | 0.6 | 242.483 | 1.0 | 0.5 |
| | 2nd | 241.237 | 1.5 | 1.0 | 246.295 | 0.9 | 0.8 | 253.795 | 0.9 | 0.3 | 245.595 | 1.8 | 1.3 |
| 2017 | 1st | 244.076 | 2.2 | 1.2 | 247.946 | 1.5 | 0.6 | 255.332 | 0.9 | 0.6 | 247.885 | 2.2 | 0.9 |
| | 2nd | 246.163 | 2.0 | 0.9 | 248.901 | 1.1 | 0.4 | 257.110 | 1.3 | 0.7 | 249.391 | 1.5 | 0.6 |
| 2018 | 1st | 250.089 | 2.5 | 1.6 | 250.713 | 1.1 | 0.7 | 260.903 | 2.2 | 1.5 | 252.401 | 1.8 | 1.2 |
| | 2nd | 252.125 | 2.4 | 0.8 | 252.413 | 1.4 | 0.7 | 261.987 | 1.9 | 0.4 | 254.382 | 2.0 | 0.8 |
| 2019 | 1st | 254.412 | 1.7 | 0.9 | 255.020 | 1.7 | 1.0 | 264.252 | 1.3 | 0.9 | 256.485 | 1.6 | 0.8 |
| | 2nd | 256.903 | 1.9 | 1.0 | 258.221 | 2.3 | 1.3 | 265.301 | 1.3 | 0.4 | 257.288 | 1.1 | 0.3 |
| 2020 | 1st | 257.557 | 1.2 | 0.3 | 258.042 | 1.2 | -0.1 | 265.954 | 0.6 | 0.2 | 258.891 | 0.9 | 0.6 |
| | 2nd | 260.065 | 1.2 | 1.0 | 259.804 | 0.6 | 0.7 | 268.359 | 1.2 | 0.9 | 260.061 | 1.1 | 0.5 |
| 2021 | 1st | 266.236 | 3.4 | 2.4 | 264.826 | 2.6 | 1.9 | 273.603 | 2.9 | 2.0 | 265.048 | 2.4 | 1.9 |
| | 2nd | | | | | | | | | | | | |

**Consumer Price Indexes for Urban Wage Earners and Clerical Workers (CPI-W), U.S. city average and selected metropolitan areas, semiannual average and percent change, 2011-2021 (1982-84=100)**

| Year | Half | U.S. city average Semi-annual average | Percent change from-- year ago average | Percent change from-- previous average | Philadelphia-Camden-Wilmington, PA-DE-NJ-MD Semi-annual average | Percent change from-- year ago average | Percent change from-- previous average | Washington-Arlington-Alexandria, DC-VA-MD-WV Semi-annual average | Percent change from-- year ago average | Percent change from-- previous average | Baltimore-Columbia-Towson, MD Semi-annual average | Percent change from-- year ago average | Percent change from-- previous average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 1st | 220.196 | 3.2 | 2.7 | 232.661 | 2.5 | 1.9 | | | | | | |
| | 2nd | 222.954 | 3.9 | 1.3 | 236.066 | 3.3 | 1.5 | | | | | | |
| 2012 | 1st | 225.581 | 2.4 | 1.2 | 237.664 | 2.2 | 0.7 | | | | | | |
| | 2nd | 226.878 | 1.8 | 0.6 | 240.389 | 1.8 | 1.1 | | | | | | |
| 2013 | 1st | 228.812 | 1.4 | 0.9 | 241.144 | 1.5 | 0.3 | | | | | | |
| | 2nd | 229.837 | 1.3 | 0.4 | 242.375 | 0.8 | 0.5 | | | | | | |
| 2014 | 1st | 232.639 | 1.7 | 1.2 | 244.487 | 1.4 | 0.9 | | | | | | |
| | 2nd | 232.902 | 1.3 | 0.1 | 245.839 | 1.4 | 0.6 | | | | | | |
| 2015 | 1st | 231.167 | -0.6 | -0.7 | 245.038 | 0.2 | -0.3 | 245.614 | | | 239.221 | | |
| | 2nd | 232.453 | -0.2 | 0.6 | 245.332 | -0.2 | 0.1 | 247.368 | | 0.7 | 240.263 | | 0.4 |
| 2016 | 1st | 232.901 | 0.8 | 0.2 | 245.460 | 0.2 | 0.1 | 248.725 | 1.3 | 0.5 | 241.341 | 0.9 | 0.4 |
| | 2nd | 235.251 | 1.2 | 1.0 | 247.421 | 0.9 | 0.8 | 249.427 | 0.8 | 0.3 | 243.951 | 1.5 | 1.1 |
| 2017 | 1st | 237.974 | 2.2 | 1.2 | 249.203 | 1.5 | 0.7 | 251.268 | 1.0 | 0.7 | 246.860 | 2.3 | 1.2 |
| | 2nd | 240.128 | 2.1 | 0.9 | 250.067 | 1.1 | 0.3 | 252.866 | 1.4 | 0.6 | 248.003 | 1.7 | 0.5 |
| 2018 | 1st | 244.157 | 2.6 | 1.7 | 251.531 | 0.9 | 0.6 | 257.330 | 2.4 | 1.8 | 251.161 | 1.7 | 1.3 |
| | 2nd | 246.136 | 2.5 | 0.8 | 252.921 | 1.0 | 0.6 | 258.401 | 2.2 | 0.4 | 252.715 | 1.9 | 0.6 |
| 2019 | 1st | 248.012 | 1.6 | 0.8 | 255.184 | 1.5 | 0.9 | 260.244 | 1.1 | 0.7 | 254.576 | 1.4 | 0.7 |
| | 2nd | 250.432 | 1.7 | 1.0 | 258.589 | 2.2 | 1.3 | 260.865 | 1.0 | 0.2 | 255.430 | 1.1 | 0.3 |
| 2020 | 1st | 250.794 | 1.1 | 0.1 | 258.893 | 1.5 | 0.1 | 261.528 | 0.5 | 0.3 | 257.149 | 1.0 | 0.7 |
| | 2nd | 253.703 | 1.3 | 1.2 | 261.223 | 1.0 | 0.9 | 264.616 | 1.4 | 1.2 | 258.403 | 1.2 | 0.5 |
| 2021 | 1st | 260.389 | 3.8 | 2.6 | 266.097 | 2.8 | 1.9 | 270.440 | 3.4 | 2.2 | 262.413 | 2.0 | 1.6 |
| | 2nd | | | | | | | | | | | | |

U.S. BUREAU OF LABOR STATISTICS  Mid-Atlantic Information Office  1835 Market Street  Suite 1946  Philadelphia, PA 19103

Telephone:1–215–597-DATA (or 3282)  www.bls.gov/regions/mid-atlantic  Contact Mid-Atlantic Region

# Exhibit 5

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| ENVIRONMENTAL HEALTH TRUST, *et al.*, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Case No. 20-1025 (L) |
| FEDERAL COMMUNICATIONS COMMISSION, *et al.*, | ) ) ) | |
| Respondents. | ) ) ) | |

## DECLARATION OF CESAR O LOYA, EA

1.      I, CESAR O LOYA, EA, hereby state, under penalty of perjury, that the following information is true to my knowledge, information, and belief:

2.      I received my Bachelor of Science degree in Business Management from the California State University Northridge in 2010 and my Federal Enrolled Agent Licensure in 2014.  I have over 15 years of experience in accounting, tax, and financial advising.

3.      I founded the firm of Prime Tax & Consulting, Inc. in 2013 and remain a principal in the firm.  My business address is 1301 W. Magnolia Blvd., Burbank CA 91506.

1

4.    This declaration is submitted in support of the request of Elizabeth Barris for attorneys fees under the Equal Access to Justice Act in the above-captioned matter.

5.    I have worked with Ms. Barris as tax preparer for several years and am familiar with her financial status.  In connection with the preparation of this declaration, I received and reviewed additional financial information regarding Ms. Barris.  All of the information I requested was received and included in my review.  Based on this information, I prepared a compilation financial statement to calculate Ms. Barris' assets, liabilities, and net worth. This compilation report is commonly employed in the preparation of financial statements for individuals.  Based on my review and analysis, I conclude that, subtracting total liabilities from total assets, Ms. Barris' net worth was was less than $2,000,000.00 as of January 31, 2020, the date the above-captioned action was filed.  In my opinion, use of generally accepted accounting principles would not materially alter this conclusion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 12/09 , 2021 at 1:35pm .

Cesar Loya, EA

# PrimeTax

*Prime Tax & Consulting Inc.*
*1301 W Magnolia Blvd.  Burbank, CA 91506*
*Phone: (818) 842-0392 | Fax: (818) 842-7237*

December 1, 2021

ATTACHMENT TO DECLARATION OF
ELIZABETH BARRIS

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

BALANCE SHEET

JANUARY 31, 2020

**ASSETS**
CASH IN BANK                                                    $1,568.00

CHARLES SCHWAB INVESTMENT ACCOUNT                              $20,109.00

PERSONAL BELONGINGS                                            $1,226.00

**TOTAL ASSETS**                                               $22,903.00

**LIABILITIES**

CREDIT CARDS                                                   $13,404.00

**TOTAL LIABILITIES**                                         $13,404.00

**TOTAL NET WORTH**                                           **$9,499.00**
(ASSETS – LIABILITIES)

PREPARED BY _____
        CESAR O LOYA EA (TAX ACCOUNTANT/ENROLLED AGENT) LIC#113496

*Income Tax   •   Notary Public   •   Real Estate   •   Insurance*
*www.primetaxinc.com*

# Exhibit 6

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ENVIRONMENTAL HEALTH ) | |
| TRUST, *et al.*, ) | |
| ) | |
|     Petitioners, ) | |
| ) | |
| v. ) | Case No. 20-1025 (L) |
| ) | |
| FEDERAL COMMUNICATIONS ) | |
| COMMISSION, *et al.*, ) | |
| ) | |
|     Respondents. ) | |
| ) | |

### DECLARATION OF DEBRA MOSES, CPA

1.    I, Debra Moses, hereby state, under penalty of perjury, that the

following information is true to my knowledge, information, and belief:

2.    I received my Bachelor of <u>science</u> degree in Accounting from

the <u>University of Maryland</u> in 1977 and my CPA certificate approximately in 1984.

I have over 35 years of experience in accounting, tax, and financial advising.

3.    I founded the accounting firm of Osterman, Pollack, and Moses, LLC,

in 1999 and remain a principal in the firm.  My business address is 4340 East West

Highway, Suite 201, Bethesda, MD 20814.

4.    This declaration is submitted in support of the request of Theodora

Scarato for attorneys fees under the Equal Access to Justice Act in the above-

captioned matter.

5.    I have worked with Ms. Scarato and her family as tax preparer for several years and am familiar with Ms. Scarato's financial status. In connection with the preparation of this declaration, I received and reviewed additional financial information regarding Ms. Scarato. All of the information I requested was received and included in my review. Based on the information, I prepared a compilation financial statement to calculate Ms. Scarato's assets, liabilities and net worth. This compilation report is recognized by the American Institute of Certified Public Accountants and is commonly employed by certified public accountants in the preparation of financial statements for individuals. Based on my review and analysis, I conclude that, subtracting total liabilities from total assets, Ms. Scarato's net worth was less than $2,000,000 as of January 31, 2020, the date the above-captioned action was filed. In my opinion, use of generally accepted accounting principles would not materially alter this conclusion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on   December 8, 2021 at Bethesda, MD.

Debra Moses, CPA

# OSTERMAN, POLLACK & MOSES, LLC
## CERTIFIED PUBLIC ACCOUNTANTS

### INDEPENDENT ACCOUNTANT'S COMPILATION REPORT

Theodora M. Scarato
Social Worker
Potomac, Maryland

Theodora M. Scarato is responsible for the accompanying statement of assets and liabilities – income tax basis, as of January 30, 2020. We have performed a compilation engagement in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the AICPA. We did not audit or review the financial statement nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by management. Accordingly, we do not express an opinion, a conclusion, nor provide any form of assurance about whether the financial statements are in accordance with the income tax basis of accounting.

The financial statement is prepared in accordance with the income tax basis of accounting, which is a basis of accounting other than accounting principles generally accepted in the United States of America.

The owner has elected to omit the statement of changes in net assets – income tax basis, and substantially all the disclosures ordinarily included in financial statements prepared in accordance with the income tax basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the statement of changes in net assets – income tax basis. Accordingly, the financial statement is not designed for those who are not informed about such matters.

*Osterman, Pollack & Moses, LLC*

December 6, 2021

# THEODORA M. SCARATO

## STATEMENT OF FINANCIAL CONDITION

### JANUARY 30, 2020

**ASSETS**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 12,984 |
| Personal Property | | 5,000 |
| Retirement Fund - SEP and ROTH IRA | | 122,316 |
| Real estate (market value - 50% ownership) | | |
|    personal residence - 10604 Trotters Lane | | 450,000 |
|    other real estate -6 Hillside Road | | 107,500 |
| College Funds -  529 plan | | 150,448 |
| Coverdale Funds - educational savings | | 13,175 |
| | | |
|     Total Assets | $ | 861,423 |

**LIABILITIES**

| | | |
|---|---|---:|
| Current debt - credit card | $ | 7,800 |
| Mortgages | | |
|    personal residence (50% ownership) | | 85,978 |
|    other real estate (50% ownership) | | 69,125 |
| | | |
|     Total Liabilities | | 162,903 |

**NET WORTH**

| | | |
|---|---|---:|
| | | 698,520 |
|     Total Liabilities and Net Worth | $ | 861,423 |

See independent accountant's compilation report.

# Exhibit 7

## United States Court of Appeals

### for the

### District of Columbia Circuit

| | | |
|---|---|---|
| Environmental Health Trust, *et al.,*<br>Petitioners | ) ) ) ) | No. 20-1025 |
| v. | ) ) ) | On Petition for Review<br>of an Order of<br>the Federal Communications |
| Federal Communications Commission<br>and United States of America,<br>Respondents. | ) ) ) | Commission |

## DECLARATION OF CYNTHIA FRANKLIN

1.    I, Cynthia Franklin, hereby state, under penalty of perjury, that the

following information is true to my knowledge, information, and belief:

2.    Consumers for Safe Cell Phones (CSCP) is a non-profit organization that

promotes the safe use of cellular technology.

3.    I founded CSCP in August, 2011 and have been its chief executive officer

without interruption since its founding.

4.    CSCP is a "public charity" under section 501(c)(3) of the Internal Revenue

Code.  CSCP's status under section 501(c)(3) is verified by information posted on

the Federal government's website at:

https://apps.irs.gov/app/eos/detailsPage?ein=452969623&name=Consumers%20for%20Safe%20Cell%20Phones&c
ity=Bellingham&state=WA&countryAbbr=US&dba=&type=CHARITIES,%20DETERMINATIONLETTERS,%20
EPOSTCARD,%20REVOCATION&orgTags=CHARITIES&orgTags=DETERMINATIONLETTERS&orgTags=E
POSTCARD&orgTags=REVOCATION

6.    CSCP has never employed more than two or three employees at any given

time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2021

Cynthia Franklin, President
Consumers for Safe Cell Phones

# Exhibit 8

# United States Court of Appeals

## for the

## District of Columbia Circuit

| | | |
|---|---|---|
| Environmental Health Trust, *et al.*,<br>　Petitioners | )<br>)<br>)<br>) | No. 20-1025 |
| v. | )<br>)<br>) | On Petition for Review<br>of an Order of<br>the Federal Communications |
| Federal Communications Commission<br>and United States of America,<br>　Respondents. | )<br>)<br>) | Commission |

## DECLARATION OF DEVRA LEE DAVIS, PhD, MPH

1.　I, Devra Lee Davis, hereby state, under penalty of perjury, that the following information is true to my knowledge, information, and belief:

2.　The Environmental Health Trust (EHT) is a non-profit scientific and educational organization that I founded in 2007 to address environmental health issues relating to my past work in environmental epidemiology and toxicology.

3.　I have been the chief executive officer of EHT without interruption since its founding.

4.　EHT is a "public charity" under section 501(c)(3) of the Internal Revenue Code. EHT's status under section 501(c)(3) is reflected in the attached copy of its 2019 Form 990 tax return.

5.     Additional information confirming EHT's status under section 501(c)(3) is

publicly available information posted on the Federal government's website at:

https://apps.irs.gov/app/eos/detailsPage?ein=207498107&name=Environme

ntal%20Health%20Trust&city=Teton%20Village&state=WY&countryAbbr

=US&dba=&type=CHARITIES,%20DETERMINATIONLETTERS,%20C

OPYOFRETURNS&orgTags=CHARITIES&orgTags=DETERMINATION

LETTERS&orgTags=COPYOFRETURNS

6.     EHT has never employed more than fifteen employees at any given time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____11/29/2021_____, 2021


_____
Devra Lee Davis, President
Environmental Health Trust