Nos. 20-1025, 20-1138

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ENVIRONMENTAL HEALTH TRUST, ET AL.,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Motions for Attorneys' Fees

## RESPONDENTS' OPPOSITION TO MOTIONS FOR
## ATTORNEYS' FEES UNDER 28 U.S.C. § 2412

## INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 27, respondents Federal Communications Commission (Commission or FCC) and United States of America hereby oppose the motions for attorneys' fees filed in the above-captioned cases by petitioners Environmental Health Trust, *et al.* (EHT) and Children's Health Defense, *et al.* (Children's Health), under the Equal Access to Justice Act, 28 U.S.C. § 2412, *et seq.* (EAJA). As set forth below, an award of fees is not authorized in this case because

the government's position was "substantially justified." *Id.* at § 2412(d)(1)(A). Even if a fee award were available, the amounts claimed by petitioners (totaling about $358,000) are excessive and should be reduced by at least fifty percent.

## BACKGROUND

**1**. The history of this litigation is set forth in the panel's opinion. *Environmental Health Trust v. FCC*, 9 F.4th 893, 900-02 (D.C. Cir. 2021). Briefly, the Commission's rules specify limits for human exposure to radiofrequency emissions from FCC-authorized equipment above which environmental analysis is required. 47 C.F.R. §§ 1.1307, 1.1310.[1] The Commission adopted the limits in 1996, relying on the views of federal health and safety agencies. In *EMR Network v. FCC*, 391 F.3d 269, 274 (D.C. Cir. 2004), this Court affirmed the agency's refusal to reconsider the limits in response to new scientific studies, finding nothing in the studies "so strongly evidencing risk as to call into question the

---

[1] At high levels, radiofrequency exposure can heat body tissue, producing "thermal" effects. The FCC's limits are set well below the levels that laboratory studies have shown can produce potentially harmful thermal effects. This case involved a challenge based on the assertion – which is disputed – that there are harmful "non-thermal" effects.

Commission's decision to maintain a stance of what appears to be watchful waiting."

**2**. In 2013, the FCC initiated an inquiry regarding the radiofrequency exposure limits. *Notice of Inquiry*, 28 FCC Rcd 3498 ¶¶ 205-52 (2013) (*Inquiry*). "We continue to have confidence in the current exposure limits," the FCC explained, but "given the fact that much time has passed since the Commission last sought comment on exposure limits, as a matter of good government, we wish to develop a current record by opening a new docket with this [*Inquiry*]." *Id.* ¶ 205. The Commission stated that it would continue to "rely heavily — but not exclusively — on the guidance of other federal agencies with expertise in the health field." *Id.* ¶ 210.

The Commission terminated its inquiry in 2019. *Resolution of Notice of Inquiry*, 34 FCC Rcd 11687 ¶¶ 10-16 (2019) (*Order*). The Food and Drug Administration (FDA) advised the Commission that "'the totality of the available scientific evidence continues to not support adverse health effects in humans caused by exposures at or under the current radiofrequency energy exposure limits.'" *Id.* n.42 (quoting *Statement from Jeffrey Shuren, M.D., J.D., director of the FDA's Center*

*for Devices and Radiological Health on the recent National Toxicology Program draft report on radiofrequency energy exposure* (Feb. 2, 2018)).

**3.a.** On review, in a 2-1 decision, a panel of this Court held that the FCC "failed to provide a reasoned explanation for its determination that its guidelines adequately protect against the harmful effects of exposure to radiofrequency radiation unrelated to cancer." *EHT*, 9 F.4th at 900. The Court held, however, that the Commission responded adequately to evidence that radiofrequency exposure at levels below the FCC's limits may cause cancer. *Id.* at 911-12. The Court also rejected petitioners' National Environmental Policy Act challenges and their other Administrative Procedure Act (APA) challenges. *Id.* at 912-14.

As to non-cancer-related effects, the panel majority acknowledged that the FCC was entitled to rely on "outside experts" like the FDA "in deciding whether to initiate a rulemaking to modify its RF [radiofrequency] radiation guidelines." *Id.* at 906. The majority found, however, that the FDA's statements in support of the safety of the Commission's guidelines were "conclusory" and therefore could not supply the "reasoned explanation" in support of the FCC's decision that the APA requires. *Id.* at 905. Absent such an explanation from the FDA,

the majority stated, the FCC "must turn elsewhere" for the explanation required by law "or provide its own explanation." *Id.* at 906.

The majority further held that the lack of a reasoned explanation as to non-cancer-related health effects "undermines the Commission's conclusions regarding the adequacy of its testing procedures, particularly as they relate to children, and its conclusions regarding the implications of long-term exposure to RF radiation, exposure to RF pulsation or modulation, and the implications of technological developments that have occurred since 1996." *Id.* at 903; *id.* at 908-09. Those conclusions "depend on the premise that exposure to RF radiation at levels below its current limits causes no negative health effects." *Id.* at 903.

Finally, highlighting "a letter from the Department of the Interior voicing concern about the impact of RF radiation from communication towers on migratory birds," the majority held that the FCC "completely failed even to acknowledge, let alone respond to, comments concerning the impact of RF radiation on the environment." *Id.* at 909.

**b.** The panel majority declined to vacate the *Order* (the relief that petitioners had requested). Instead, the majority remanded the matter to the FCC for the agency "to provide a reasoned explanation for its

determination that its guidelines adequately protect against harmful effects of exposure to radiofrequency radiation unrelated to cancer." *Id.* at 914. In doing so, the majority emphasized that "we take no position in the scientific debate regarding the health and environmental effects of RF radiation." *Id.* "[T]here may be good reasons why the various studies in the record … do not warrant changes to the Commission's guidelines." *Id.*

**c.** Judge Henderson dissented from the majority's decision to remand. Emphasizing the "tentative" nature of the evidence before the Commission, Judge Henderson would have adhered to the conclusion this Court reached in *EMR Network* – that "nothing" in the record "so strongly evidenc[es] risk as to call into question the Commission's decision to maintain a stance of what appears to be watchful waiting." *Id.* at 916 (Henderson, J., dissenting) (quoting *EMR Network*, 391 F.3d at 274). In Judge Henderson's view, "the Commission, relying on the FDA, reasonably concluded no changes to the current RF exposure limits were warranted at the time." *Id.* at 919 (Henderson, J., dissenting).

# ARGUMENT

## I.    A FEE AWARD IS NOT AUTHORIZED BECAUSE THE GOVERNMENT'S POSITION WAS SUBSTANTIALLY JUSTIFIED.

**A**. EAJA does not permit a fee award if "the court finds that the position of the United States was substantially justified." 28 U.S.C. § 2412(d)(1)(A). The government's position was substantially justified here.

"To establish substantial justification, the government need not establish that it was correct—indeed, since the movant is established as a prevailing party it could never do so—but only that its position is one that 'a reasonable person could think ... correct, that is, [that the position] has a reasonable basis in law and fact.'" *Air Transp. Ass'n of Canada v. FAA*, 156 F.3d 1329, 1332 (D.C. Cir. 1998) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). "A finding that an agency acted arbitrarily and capriciously within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), does not preclude the Government from demonstrating that the agency's actions and its conduct in litigation were 'substantially justified.'" *Wilkett v. ICC*, 844 F.2d 867, 871 (D.C. Cir. 1988). *See Taucher v. Brown-Hruska*, 396 F.3d 1168, 1174 (D.C. Cir.

2005) ("a loss on the merits does not mean that legal arguments advanced in the context of our adversary system were unreasonable").

"In some circumstances, a judgment as to the adequacy of the agency's explanation is not only one on which reasonable minds can and frequently do differ, but it is also logically unrelated to whether the underlying agency action is justified under the organic statute." *Fed. Election Comm'n v. Rose*, 806 F.2d 1081, 1088 (D.C. Cir. 1986); *Wilkett*, 844 F.2d at 871 ("an agency's failure to provide an adequate explanation for its actions … may not warrant a finding that an agency's action lacked substantial justification under applicable statutes or regulations.").

**B.** To determine whether the government's position was substantially justified, courts look to "objective indicia" of reasonableness, as well as "the actual merits" of the government's position. *Pierce*, 487 U.S. at 569. Both support a finding that the Government's position was substantially justified here.

**1**. In the first place, the government's position was supported by the only available circuit precedent – *EMR Network. See Taucher*, 396 F.3d at 1178 (government's position was substantially justified where "the

only circuit authority—although arguably distinguishable—had *upheld* the provision in the face of a First Amendment challenge.").

In *EMR Network,* this Court upheld the FCC's 2003 decision not to initiate an inquiry into whether to retain its radiofrequency limits based on the Environmental Protection Agency's (EPA) determination that the limits posed no danger to human health. 391 F.3d at 273-74. The Court reasoned that "the FCC's decision not to leap in, at a time when the EPA (and other agencies) saw no compelling case for action, appears to represent the sort of priority-setting in the use of agency resources that is least subject to second-guessing by courts." *Id.* at 273.

There, as here, the studies submitted by critics of the limits were "nothing if not tentative." *Id.* at 274. "Given this record," Judge Henderson concluded, "we should have arrived at the same conclusion we did in *EMR Network*—'nothing in th[e]se studies so strongly evidenc[es] risk as to call into question the Commission's decision.'" *EHT*, 9 F.4th at 916 (quoting *EMR Network*, 391 F.3d at 274). *See also Cellular Phone Task Force v. FCC,* 205 F.3d 82,90-91 (2d. Cir. 2000) (upholding FCC's reliance on EPA and other expert agencies in initially promulgating radiofrequency guidelines).

**2**. Further, the APA standards governing the sufficiency of the FCC's "reasoned explanation," 9 F.4th at 904, do not admit of mechanical application. *Taucher*, 396 F.3d at 1178 (government's position was substantially justified where the distinction on which the plaintiffs' theory rested was difficult to apply). To be sure, the FCC's explanation was not extensive – it consisted of seven paragraphs in total. *See Order*, 34 FCC Rcd at 11692-97 ¶¶ 10-16. But "'a short explanation can be a reasoned explanation.'" *EHT*, 9 F.4th at 919 (Henderson, J., dissenting) (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 247 (D.C. Cir. 2008) (Kavanaugh, J., dissenting in part)). And on that score, all judges on the panel agreed that the FCC adequately explained its decision as to the cancer-related effects of radiofrequency exposure. *Id.* at 911-12.

Even as to the non-cancer-related effects for which the Court found the FCC's explanation lacking, "the FDA, not the Commission, made the ... 'conclusory statements' with which the majority [took] issue." *Id.* at 920 (Henderson, J., dissenting).[2] Nor did the majority fault the FCC for

---

[2] EHT petitioners emphasize the language that the majority used in concluding that the FCC failed to adequately explain its decision. EHT Motion at 14. But eligibility for EAJA fees does not turn "on the

relying on the FDA's expertise. *Id.* at 906 ("We agree with the dissenting opinion that the Commission may credit outside experts in deciding whether to initiate a rulemaking to modify its RF radiation guidelines."). And as Judge Henderson noted, the FCC had no power to force the FDA to give a more detailed explanation of its supporting conclusions. *Id.* at 920 (Henderson, J., dissenting) (the FCC lacks "authority over the level of detail the FDA provides in response to the Commission's inquiry").

The majority noted that petitioners "point[ed] to multiple studies and reports … purporting to show that RF radiation at levels below the Commission's current limits causes negative health effects unrelated to cancer, such as reproductive problems and neurological problems that span from effects on memory to motor abilities." *Id.* at 903. But the fact that the studies were, as Judge Henderson observed, at most "tentative," *id.* at 916 (Henderson, J., dissenting), combined with the FDA's expert advice that "the totality of the available scientific evidence continues to not support adverse health effects in humans," *Order*, 34 FCC Rcd at 11694 ¶ 12 n.42 (quoting Feb. 2, 2018 Statement from Jeffrey Shuren),

---

particular words a particular merits panel uses to describe the Government's position." *Halverson v. Slater*, 206 F.3d 1205, 1212 (D.C. Cir. 2000).

presented a substantial factual basis for supposing that the FCC had not failed to address the "credible record evidence." *EHT*, 9 F.4th at 910; *see Taucher*, 396 F.3d at 1177 (difficult and fact-specific nature of inquiry was "particularly weighty when reviewing the reasonableness of the government's position").[3]

**3**. Finally, Judge Henderson's dissent from the majority's holding, further supports the conclusion that the government's position—although it did not prevail—had a reasonable basis in fact and law. *Griffith v. Comm'r of Soc. Sec.*, 987 F.3d 556, 565 (6th Cir. 2021) (relying in part on "'objective indicia of reasonableness,' such as Judge Rogers's thoughtful dissent,'" in affirming the government's position was substantially justified) (quoting *Pierce*, 487 U.S. at 569)). In Judge Henderson's view, "[i]f the record here establishes one point . . . it is that

---

[3] The majority also faulted the FCC for failing to address "comments concerning the impact of RF radiation on the environment." *EHT*, 9 F.4th at 909. The majority relied on a letter from the Department of the Interior to the Department of Commerce "voicing concern about the impact of RF radiation from communication towers on migratory birds." *Id.* But as Judge Henderson pointed out, that letter (which was not addressed to the FCC and not relied on in the petitioners' argument) conceded that "no independent, third-party . . . studies have been conducted in North America on impacts of tower electromagnetic radiation on migratory birds." *Id.* at 916-17 (Henderson, J., dissenting) (cleaned up).

there is no scientific consensus regarding the 'non-thermal' effects, if any, of RF radiation on humans." 9 F.4th at 920. Judge Henderson therefore concluded that, "'[i]n the face of conflicting evidence at the frontiers of science,'" the FCC reasonably relied on the FDA in deciding not to revisit its radiofrequency guidelines. *EHT*, 9 F.4th at 919 (quoting *Cellular Phone Taskforce*, 205 F.3d at 90 ).

In sum, the FCC's explanation for its decision to not initiate a rulemaking to revisit its radiofrequency guidelines—though found by the panel majority to be insufficient to satisfy the APA—was nonetheless "justified to a degree that could satisfy a reasonable person." *Pierce*, 487 U.S. at 565. Accordingly, because the government's position was substantially justified, a fee award is not authorized under EAJA.

## II. THE FEES CLAIMED ARE EXCESSIVE.

Even if petitioners are entitled to awards of EAJA fees, they have the burden to establish the reasonableness of their fee requests. *Role Models America, Inc. v. Brownlee*, 353 F.3d 962, 970 (D.C. Cir. 2004). In this case, petitioners claim fees totaling about $358,000. The fee amounts claimed by petitioners should be reduced by at least fifty percent because (1) they are based on excessive hours, (2) the time entries reflect other

deficiencies including inadequate documentation and improper billing entries, and (3) petitioners achieved only limited success.

**A.** It is well settled that the Court should "disallow time spent in duplicative, unorganized, or otherwise unproductive effort." *Envtl. Def. Fund, Inc. v. Reilly*, 1 F.3d 1254, 1258 (D.C. Cir. 1993) (internal quotation marks omitted).

Here, Children's Health petitioners claim a total of 792.7 hours of attorney time. Children's Health Motion, McCullough Decl. ¶ 28. EHT petitioners claim a total of 619.5 hours of attorney time. EHT Motion Ex. 3, Myers Decl. ¶ 17; *id.* Ex. 4, Gotting Decl. ¶ 25. Taken together, petitioners claim a total of 1,412 hours —approximately thirty-five 40-hour weeks—of attorney time. Granted, the agency proceeding generated a voluminous record, and the challenged decision implicates controverted scientific matters. But petitioners filed a single joint opening brief of a little less than 16,000 words and a single joint reply brief of a little less than 8,000 words. Moreover, although the issues were sufficiently novel that the result was unclear, petitioners' legal arguments—that the FCC failed to adequately explain its decision and was required to conduct an Environmental Impact Statement or

Environmental Assessment—were relatively straightforward. It should not have taken even inexperienced attorneys (which these attorneys do not claim to be) anywhere near the more than two-thirds of a year of attorney time they spent to handle the appellate proceedings here. *See Cooper v. U.S. R.R. Bd.* , 24 F.3d 1414, 1417-18 (D.C. Cir. 1994).

**B.** In addition, petitioners' "'[s]upporting documentation must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended.'" *Role Models*, 353 F.3d at 970  (quoting *In re Olson*, 884 F.2d 1415, 1428 (D.C. Cir. 1989)(per curiam)).

Many of petitioners' time records lack adequate detail. For example, EHT petitioners' lead attorney billed six hours on July 26, 2020, for "[r]evising draft brief and numerous emails re same," and 35 total hours between July 24 and 29 for the same activities with only the slightest variations in description. EHT Motion Ex. 3, Att. B; *see* Children's Health Motion, McCollough Decl., Att. D at 8 (billing 9.4 hours for "working on brief" on July 3 and 4, 2020). "Such generic entries are inadequate to meet a fee applicant's heavy obligation to present well-documented claims." *Role Models*, 353 F.3d at 971

(internal quotation marks and citations omitted). Children's Health

petitioners' time records also lump together multiple tasks, "making it

impossible to evaluate their reasonableness." *Role Models*, 353 F.3d at

971. For example, they bill for 24 hours of attorney time over two days

with the same description: "finish brief, including addendum and

standing materials; convs w/ client and EHT; final drafting and

approval." Children's Health Motion, McCollough Decl., Att. D at 9 .

This lack of detail prevents verification of petitioners' claims that

they deducted time spent on unsuccessful arguments, *see* EHT Motion

Ex. 3, Myers Decl. ¶ 15; *id.*, Ex. 4, Gotting Decl. ¶ 25; Children's Health

Motion, McCollough Decl. ¶ 20, and that they did not duplicate efforts.

EHT Motion Ex. 3, Decl. of Edward B. Myers ¶ 15 (referencing "a

negotiated division of labor between the various Petitioners' counsel in

this matter"); *see New Jersey v. EPA*, 703 F.3d 110,  115 (D.C. Cir. 2012)

("the records regarding these activities lack the specificity needed … to

assure us that no duplication occurred between Movants' efforts and

those of the petitioners."); *Role Models*, 353 F.3d at 972 ("Duplication of

effort is another basis on which [the] hours seem excessive.") (cleaned

up). Moreover, some of the details that petitioners do provide suggest

that they did duplicate efforts. *See* McCollough Decl., Att. D at 9 (billing about 60 hours of time between July 21 and 27, 2020, to review consolidated draft joint opening brief and, *inter alia*, "locate redundant parts" and reduce the draft's length); *id.* at 11 (billing about 58.1 hours of attorney time between October 10 and 15, 2020, for work consolidating draft joint reply brief sections and reducing length).

**C.** Petitioners' time records also include tasks that do not warrant reimbursement. For example, EHT petitioners' lead attorney billed 1.5 hours for a "[t]utorial" regarding an unidentified "data base." EHT Motion Ex. 3, Att. B. Children's Health petitioners billed four hours of attorney time to "[r]eceive, analyze, and explain panel opinion to clients," Children's Health Motion, McCollough Decl., Att. D at 14, but they have "not explained how these tasks helped [them] prevail in [their] appeal." *Role Models*, 353 F.3d at 973. In addition, Children's Health petitioners billed: 29.6 hours of attorney time for work on the Joint Appendix, tables and indices, McCollough Decl., Att. D at 12; *see Role Models*, 353 F.3d at 973 ("We do not understand why attorney or even legal assistant skills were required for this job."); 18.8 hours of attorney time for work correcting the opening brief after filing,

McCollough Decl., Att. D at 10; and 2.9 hours to "[p]rovide client primer on Ad law principles." *Id.* at 6.

**D.** Finally, in determining the amount of fees, the Court must "'assess the extent of [the litigant']s success'" and "'award only that amount of fees that is reasonable in relation to the results obtained.'" *SecurityPoint Holdings, Inc. v. TSA*, 836 F.3d 32, 41 (D.C. Cir. 2016) (quoting *Hensley*, 461 U.S. at 440). Although petitioners "won a significant victory"—an opinion remanding in part the challenged *Order*—the results "fall short of matching [their] efforts." *Id.* By Children's Health's own count, the Court found remand unnecessary for seven "of the fifteen reasoned decisionmaking arguments pressed by the Petitioners," "rejected a NEPA procedural argument and found that five Petitioner-suggested failures had not been adequately preserved below and were therefore not properly before the Court." Children's Health Motion, McCullough Decl. ¶¶ 18-19. Even as to the arguments on which petitioners prevailed, the Court did not grant them the full relief they requested. *See EHT*, 9 F.4th at 914 (remanding to the Commission for the agency to provide a reasoned explanation for its decision rather than vacating, as petitioners had requested). In addition to failing to

provide sufficient detail for verification of their claims that they deducted time spent on unsuccessful arguments, *see* pg. 16 *supra*, petitioners did not reasonably support their claims by identifying the percentage by which they reduced their overall bills before seeking fees.

For these reasons, even if petitioners are entitled to EAJA fees, the amounts awarded should be reduced by at least fifty percent.

## CONCLUSION

The motion for attorneys' fees should be denied, or if not denied, reduced by at least fifty percent.

Dated:  January 14, 2022

Respectfully submitted,

/s/  William J. Scher

Todd Kim
    *Assistant Attorney General*

Justin D. Heminger
    *Attorney*

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

P. Michele Ellison
    *Acting General Counsel*

Jacob M. Lewis
    *Acting Deputy General Counsel*

William J. Scher
    *Counsel*

FEDERAL COMMUNICATIONS
    COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

    ☒   this document contains <u>3,613</u> words, *or*

    ☐   this document uses a monospaced typeface and contains ____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐   this document has been prepared in a monospaced spaced typeface using _____ with _____.

<u>/s/  *William J. Scher*</u>
William J. Scher
*Counsel for Respondent*
*Federal Communications Commission*