**United States Court of Appeals
for the
District of Columbia Circuit**

| | | |
|---|---|---|
| Environmental Health Trust, *et al.,* | ) | |
|   Petitioners | ) | No. 20-1025 |
| | ) | |
| | ) | |
|     v. | ) | On Petition for Review |
| | ) | of an Order of |
| | ) | the Federal Communications |
| Federal Communications Commission | ) | Commission |
| and United States of America, | ) | |
|   Respondents. | ) | |

## REPLY IN SUPPORT OF JOINT MOTION OF PETITIONERS IN CASE NO. 20-1025 FOR ATTORNEYS' FEES AND EXPENSES UNDER THE FEDERAL EQUAL ACCESS TO JUSTICE ACT AND SUPPLEMENTAL REQUEST FOR FEES

The EHT Petitioners submit this Reply to the Respondents' (collectively the "FCC") opposition to the motion for attorneys' fees filed under the Equal Access To Justice Act ("EAJA"), and also make a supplemental request for reasonable attorneys' fees associated with the preparation of the EAJA motion.

## I.     The FCC's Position Was Not Substantially Justified

The FCC does not deny the EHT Petitioners are eligible to recover fees or are prevailing parties. Rather, it maintains that fees should not be awarded because the FCC's position was substantially justified in issuing the challenged Order (*see* 34 FCC Rcd. 11687, 2019 WL 6681944 (Dec. 4, 2019)) closing the Notice of Inquiry ("NOI") and on appeal. The FCC's argument fails on numerous grounds.

1.      The FCC's heavy reliance on *EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004) ("*EMR*"), is misplaced.  *EMR* involved an agency decision warranting even more deference than applied in this case, *Envtl. Health Trust v. FCC*, 9 F.4th 893 (D.C. Cir. 2021) ("*EHT*"), and thus is not controlling.

In *EHT*, the FCC closed the NOI without initiating a rulemaking.  This required a substantive decision on the merits based on an extensive scientific record.  The FCC stated in the NOI that it had "open[ed] a science-based examination of the efficacy, currency, and adequacy" of the RF limits and acknowledged a "great deal" of new research "warranting a comprehensive examination."[1] *Id*.  In terminating the NOI six years after it began gathering information, the FCC affirmatively concluded the record evidence did not indicate the current standards were "insufficient to protect human safety," that more restrictive exposure limits would "produce any tangible benefit to human health," or that there is any "causal link between wireless device use and cancer or other illnesses."  2019 WL 6681944, at *4-5.  The very nature of the NOI thus required some level of explanation and reasoning, something beyond mere conclusory statements so this Court and the public could be assured the FCC engaged in reasoned decision-making.  *EHT*, 9 F.4th at 903, 906-07; *Am. Horse Protection Ass'n, Inc. v. Lyng*, 812 F.2d 1, 6 (D.C. Cir. 1987).

---

[1] 28 FCC Rcd. 3498, 3570-71, 2013 WL 1304134, at *68-69 (March 29, 2013).

In stark contrast, the FCC in *EMR* had not progressed to the same decision-making point; rather, *EMR* centered around a petition asking the FCC to open an NOI in order to gather information to decide whether to initiate a rulemaking.[2] Unlike *EHT*, the FCC was not required to analyze or weigh extensive evidence or affirmatively decide whether the current RF standards protect human health and the environment. In support of its petition, EMR only submitted a letter "identifying issues…[that] should be addressed" and later provided "a number of studies" suggesting a non-thermal health risk existed. 2003 WL 21939735, at *1. The FCC concluded this "dearth of…information" did not justify initiating a notice of inquiry. *Id.* at *3. Accordingly, the very nature of EMR's petition did not require much analysis or explanation. It was only a short jump in reasoning, easy for all to see, from EMR's petition to the FCC's decision.

The disparity between the *EHT* and *EMR* administrative records controls. In its opening brief, *EHT* noted over one-thousand peer-reviewed studies, science and medical reviews, and comments had been submitted, most of which contained research since the original 1996 exposure standards were adopted. EHT Merits Br. at 2, 11. The brief summarized evidence covering multiple causal mechanisms (*e.g.*, oxidative stress, modulation/pulsation), numerous disease endpoints (*e.g.*, reproductive, neurological, prenatal and perinatal, radiation sickness), and various

---

[2] 18 FCC Rcd. 16822, 16823, 2003 WL 21939735, at *1 (Aug. 14, 2003).

exposure sources (*e.g.*, existing 3G/4G towers, 5G small cells, cell phones, Wi-Fi, smart meters).  *Id.* at 14-45.  Given these complexities, no person would ever be able to figure out the how and why of the FCC's summary conclusions as to non-cancer issues.  *EHT*, 9 F.4th at 903, 906 (agency must provide "a discernable path to which a court may defer") (citation omitted).

> **2.**    The FCC's repeated citations to *EMR* in justifying its reliance on other agencies also fail.

As the FCC noted when denying EMR's petition, the Second Circuit had "recently" upheld (just three years prior) the RF standards in the face of similar allegations that they did appropriately guard against non-thermal risks.  2003 WL 2193975, at \*2-3 (citing *Cellular Phone Taskforce v. FCC*, 205 F.3d 82 (2000)).  The Second Circuit noted the Environmental Protection Agency ("EPA") had "been assigned the lead role in RF radiation health effects since 1970" and had "participated not only in the hearings and comments leading to the promulgation of the [RF standards], but also had been on the verge of releasing its own draft guidelines pertaining to the health effects of radiation in 1996."  *Cellular Phone Taskforce*, 205 F.3d at 91.  Given the short amount of time that had passed, it was entirely reasonable for the FCC to reject EMR's petition as EPA had not indicated in the interim that a new inquiry should be opened.  2003 WL 21939735, at \*2.  In fact, there was evidence in *EMR* that other agencies had stated in response to the

4

petition that they were continuing to conduct studies and monitor research, but had not recommended the exposure standards be revisited. *Id.* at *5 n.27.

Conversely, *EHT* involved completely different circumstances. The NOI was closed almost a quarter-century after the RF standards had been adopted, with the FCC conceding much had changed in terms of the available research, as well as the nature of current-day wireless environments and RF exposures. 2013 WL 1304134, at *68 (noting "a great deal of scientific research has been completed in recent years" and the "ubiquity of device adoption as well as advancements in technology"). Significantly, neither EPA (the presumptive lead agency on RF matters in *EMR*) nor any other agency aside from the Food and Drug Administration ("FDA") substantively responded to the NOI. Certainly, no person could now reasonably rely on representations made by EPA or other agencies 25 years ago, nor could one rationally point to their present-day "silence" as indicating they did not believe the RF standards need to be revisited. *EHT*, 9 F.4th at 906 (holding "[s]ilence does even indicate whether the expert agencies made any such determination, or whether they considered any of the evidence in the record").

The FCC's considerable reliance on FDA's statements also falls short in another respect. The FDA made clear it only has jurisdiction over cell phones and other electronic consumer products. Ex. A and Ex. B. Accordingly, FDA's statements could not have informed any FCC conclusions regarding other types

5

and sources of RF exposures identified in the record, including existing 3G/4G towers, the massive rollout of 5G small cells, and environmental damage. Thus, even if reliance on FDA's conclusory statements were not deemed arbitrary and capricious, as the FCC argues, no reasonable person could say they sufficiently explain the NOI's wholesale termination.

3.      In arguing the scientific evidence is "tentative" as to non-thermal risks, the FCC also violates the longstanding principle that a court cannot uphold agency action based on a rationale not stated in the underlying order. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). If the FCC wants to provide a "reasoned explanation" to close the NOI, it must first do so at the administrative level, precisely what this Court has ordered on remand. *EHT*, 9 F.4th at 914. The FCC cannot do so here to show its position was "substantially justified." *See FEC v. Rose*, 806 F.2d 1081, 1089 (D.C. Cir. 1986) (agency cannot use *post hoc* rationalization where it initially failed to adequately explain agency action).

The FCC relies on a short critique appearing in the dissent of a few studies the majority had given as record examples. *EHT*, 9 F.4th at 916-17. But the Order contains no such analysis or anything remotely resembling it as to non-cancer issues, whether as to those studies specifically or the over one-thousand others identified by EHT Petitioners. *Id.* at 910 (observing the FCC "said none of what

6

the dissenting opinion does").[3]  With only the FCC's conclusory statements to go on, this Court and the public cannot know what studies the FCC actually considered, what research the FDA evaluated in the context of its limited jurisdiction, and ultimately why the FCC closed the NOI.[4]

4.      In the final analysis, this Court found the FCC failed to adequately explain its decision even after applying an extremely deferential version of the Administrative Procedure Act's ("APA") arbitrary and capricious standard.  *EHT*, 9 F.4th at 903.  Indeed, this Court time and again described the FCC as falling well short of the APA's standards.  EHT Fees Mot. at 14.  This case therefore comes much closer to what this Court described in *Rose* as "so obviously defy[ing] the requirements of the APA" that it "compel[s] a finding that the underlying action was not substantially justified."  806 F.2d at 1089.

## II.     The FCC Fails To Show The Requested Fees Are Unreasonable

The FCC does not contest the hourly rates, but argues the number of hours should be reduced by 50 percent.  This Court should deny the FCC's request.

---

[3] This analysis also does not appear in the FCC's merits brief (with the exception of a short mention of the Department of Interior letter).

[4] This is not the first time in this appeal that the FCC has run afoul of *Chenery*.  In their merits reply brief, the EHT Petitioners identified numerous instances in which the FCC presented new arguments and analyses, and relied on extra-record evidence, including citing materials that did not even exist when the Order was issued.  EHT Merits Reply at 6, 8-9, 18, 20, 24, 31.

1.     While the FCC briefly acknowledges the voluminous record and
controverted scientific issues, it repeatedly downplays the extensive scope of this
appeal.  EHT counsel had to learn numerous technical and scientific issues,
including: (i) the basic science underlying radiological exposures; (ii) major
studies and research regarding non-thermal risks of RF emissions; (iii) how various
RF sources work, including 3G/4G towers, 5G small cells, and cell phones; (iv)
cell phone and wireless device RF-testing protocols; (v) disease causal
mechanisms, including oxidative stress and modulation/pulsation/peak exposures;
(vi) disease endpoints, including reproductive harms, neurological damage, and
prenatal and perinatal complications in children; and (vii) environmental harms.
*See, e.g.*, EHT Fees Mot., Gotting Decl. at 4.

The FCC also oversimplifies when it argues the legal claims were "straight-
forward."  As a practical matter, the vast majority of argument and briefing
focused not on legal issues but on technical and scientific material.  The FCC
discussed numerous items from the administrative record, and even extra-judicial
materials.  FCC Merits Br. at 5-8, 23-54.  The EHT Petitioners, in turn, presented
extensive analysis covering all of the technical and scientific issues identified
above.  EHT Merits Br. at 3-6, 11-52, 66-79; EHT Reply at 14-36.  The joint
appendix, constituting only a subset of the administrative record, ran over 10,000
pages.  The FCC also never mentions the substantial amount of additional work

required for the EHT Petitioners to successfully prosecute this case, including

establishing standing for two public interest groups and two individuals, *see* EHT

Merits Br. at 58-65, coordinating joint briefing with co-counsel, and preparing co-

counsel for oral argument. *See, e.g.*, EHT Fees Mot., Gotting Decl. at 4-5.

2.      The FCC also objects that EHT's counsel did not submit evidence

demonstrating they did not bill for unsuccessful claims or for duplicative work.

EHT's counsel worked on two issues on which they did not succeed, the National

Environmental Policy Act ("NEPA") claims and cancer-related issues.  With the

exception of an inadvertent time entry for the NEPA issue (5/5/20 JDN entry), for

which EHT no longer requests reimbursement, none of the time entries specifically

reference these matters.  That said, to further substantiate this matter, EHT counsel

identify in supplemental declarations time entries specifically referencing NEPA

and cancer claims that were redacted in the fees motion.  Ex. C, Myers Supp. Decl.

at 5; Ex. D, Gotting Supp. Decl. at 2.[5]

Moreover, while EHT counsel took the lead on certain issues, counsel for

the Children's Health Defense ("CHD") assumed responsibility for others.  EHT

Fees Mot., Myers Decl. at 7-8.  Specifically, CHD counsel was responsible for

radiation sickness and "Additional Legal Considerations" covering, *inter alia*,

---

[5] K&H has also removed from its initially requested fees certain entries for Al
Catalano.  He worked on various "cellular phone" matters, which included some
work on cancer issues.  The total amount for those fees is $5,494.50.  Ex. D at 2.

constitutional and property rights issues.  Consequently, EHT counsels' invoices do not reference those matters.  It is entirely unreasonable for FCC counsel to demand that EHT Petitioners otherwise prove a negative.

Furthermore, the parties prepared joint merits briefs to reduce duplication and make it easier and more efficient for the FCC and this Court to respond.  Accordingly, both parties contributed to various issues, not because they were duplicating work, but rather because each side had their own expertise and insights to contribute.  This holds true for some of the factual issues, such as knowledge regarding specific materials contained in the administrative record, certain technical issues, and various scientific matters, as well as applicable law, including standing and judicial review standards.  Ex. C at 3-4.  Similarly, the parties had to work together on merging and editing extensive draft sections and otherwise coordinate their efforts among 14 different clients.  Ex. C at 2-3.  EHT should not have to forego these reasonable and non-duplicative fees.

**3.**     The FCC maintains EHT counsels' invoices lack adequate detail, but only specifically disputes two instances involving entries by Edward Myers.  He justifies those entries in his supplemental declaration.  Ex. C at 2-5.

**4.**     Without support, the FCC argues the EHT Petitioners should have indicated the percentage reduction in overall fees that have not been claimed.  Nevertheless, that percentage is about 45 percent.  Ex. C at 6; Ex. D at 2-3.

10

5.      Contrary to the FCC's claims, it is irrelevant that the parties did not prevail on certain issues.  As discussed, EHT Petitioners have not requested reimbursement for work on those specific claims.  Otherwise, the EHT Petitioners secured full relief.  The *sine qua non* of this appeal was a remand requiring the FCC to adequately review the record and offer a reasoned explanation as to whether those standards remain protective of human health and the environment. EHT Merits Br. at 65; EHT Reply at 6, 9-10.  *Vacatur* was secondary.

## III.    Request For Additional Fees Related To EAJA Motion

EHT Petitioners hereby request reasonable fees associated with preparing the EAJA motion totaling $25,013.00.  Ex. C at 6-7; Ex. D at 3.

After adjustments, the total reimbursable amount now requested by the EHT Petitioners is **$192,798.25**.  Ex. C. at 7; Ex. D at 3.

Dated: January 25, 2022

Respectfully submitted,

/s/ Edward B. Myers
Law Office of Edward B. Myers
14613 Dehaven Court
North Potomac, MD 20878
301-294-2190
edwardbmyers@yahoo.com

*Counsel for EHT Petitioners*

11

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing complies with the formatting and type-volume restrictions of the rules of the U.S. Court of Appeals for the District of Columbia Circuit.  The brief was prepared in 14-point, double spaced, Times New Roman font, using the current version of Microsoft Word, in accordance with Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6).  The brief contains 2,449 words and therefore complies with Fed. R. App. P. 27(d)(2)(A).

/s/ Edward B. Myers

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 25, 2022, I electronically filed the forgoing document with the Court by using the CM/ECF system.  All parties to the case have been served through the CM/ECF system.

/s/ Edward B. Myers

# EXHIBIT A

1/25/22, 9:33 PM        Statement from Jeffrey Shuren, M.D., J.D., director of the FDA's Center for Devices and Radiological Health on the recent Nationa…

USCA Case #20-1138        Document #1932280        Filed: 01/25/2022        Page 15 of 49

**FDA NEWS RELEASE**

# Statement from Jeffrey Shuren, M.D., J.D., director of the FDA's Center for Devices and Radiological Health on the recent National Toxicology Program draft report on radiofrequency energy exposure

**For Immediate Release:**

February 02, 2018

One part of the Food and Drug Administration's mission is to ensure the safety of electronic products that emit radiation, like televisions and cell phones. These types of products are part of Americans' daily life and we take our duty to protect consumers with the utmost gravity.

With cell phones, we have relied extensively on a myriad of scientific evidence developed over many years to help inform our regulatory thinking. Although the Federal Communications Commission (FCC) sets the standard for radiofrequency energy exposure limits from cell phones, the FCC relies on the FDA and other health agencies for scientific expertise and input regarding those standards.

We respect the recently released research conducted by our colleagues at the National Toxicology Program (NTP), which is part of the National Institute of Environmental Health Sciences within the National Institutes of Health, on radiofrequency energy exposure. When we nominated this topic for study in 1999, there were limited epidemiological and long-term animal studies investigating the effects of radiofrequency energy exposure from cellular phones. Fortunately, since then, there have been hundreds of studies from which to draw a wealth of information about these technologies which have come to play an important role in our everyday lives. Taken together, all of this research provides a more complete picture regarding radiofrequency energy exposure that has informed the FDA's assessment of this important public health issue, and given us the confidence that the current safety limits for cell phone radiation remain acceptable for protecting the public health.

In this latest study, the NTP looked at the effects of high exposure to radiofrequency energy in rodents. It's important to understand that – as is commonly done in these types of risk assessment studies – the study was designed to test levels of radiofrequency energy exposures considerably above the current safety limits for cell phones to help contribute to what we already understand about the effects of radiofrequency energy on animal tissue. In fact, the current safety limits are set to include a 50-fold safety margin from observed effects of

USCA Case #20-1138          Document #1932280          Filed: 01/25/2022          Page 16 of 49

radiofrequency energy exposure. From the FDA's understanding of the NTP results, male rats that showed carcinogenic activity were exposed to a radiofrequency energy exposure rate that is much higher than the current safety standard. As our colleagues at NTP note in a statement (https://www.niehs.nih.gov/news/newsroom/releases/2018/february2/index.cfm) issued earlier today, "the levels and duration of exposure to radiofrequency radiation were much greater than what people experience with even the highest level of cell phone use, and exposed the rodents' whole bodies. So, these findings should not be directly extrapolated to human cell phone usage."

Looking at the results in animals, the conclusions still require careful discussion, as our preliminary understanding of the NTP results is that the study found mostly equivocal, or ambiguous, evidence that whole body radiofrequency energy exposures given to rats or mice in the study actually caused cancer in these animals. There are additional unusual findings from the study, such as the exposed rats living longer than the control group rats, that we are assessing to understand how that may be relevant to the results. The FDA looks forward to participating in the peer review of this study in March, which is an important and crucial step in scientific research to assure the integrity and quality of the data and the conclusions that can be drawn from it. Public comment is welcome during this period and can be provided through the NTP's Federal Register notice (https://www.federalregister.gov/documents/2018/01/29/2018-01523/draft-ntp-technical-reports-on-cell-phone-radiofrequency-radiation-availability-of-documents-request).

As part of our work to assess this important public health and consumer safety issue, the FDA has reviewed many sources of scientific and medical evidence related to the possibility of adverse health effects from radiofrequency energy exposure in both humans and animals and will continue to do so as new scientific data are published. We have reviewed the 2016 interim NTP results and are currently reviewing the full set of data from the NTP draft final report. The FDA will work quickly to thoroughly review the data and consider any impact of this work within the context of the full body of scientific evidence on this exposure.

In the meantime, I want to underscore that based on our ongoing evaluation of this issue and taking into account all available scientific evidence we have received, we have not found sufficient evidence that there are adverse health effects in humans caused by exposures at or under the current radiofrequency energy exposure limits. Even with frequent daily use by the vast majority of adults, we have not seen an increase in events like brain tumors. Based on this current information, we believe the current safety limits for cell phones are acceptable for protecting the public health.

The FDA, an agency within the U.S. Department of Health and Human Services, protects the public health by assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is

responsible for the safety and security of our nation's food supply, cosmetics, dietary
supplements, products that give off electronic radiation, and for regulating tobacco products.

# Related Information

- FDA: Cell Phones (/cell-phones)

- NTP: Draft Final Report
  (https://ntp.niehs.nih.gov/about/org/sep/trpanel/meetings/docs/2018/march/index.html)

- NTP: Federal Register Docket
  (https://www.federalregister.gov/documents/2018/01/29/2018-01523/draft-ntp-
  technical-reports-on-cell-phone-radiofrequency-radiation-availability-of-documents-
  request)

###

# Inquiries

**Media:**

✉ Stephanie Caccomo (mailto:Stephanie.caccomo@fda.hhs.gov)

☎ 301-348-1956

**Consumer:**

☎ 888-INFO-FDA

◉ More Press Announcements (/news-events/newsroom/press-announcements)

# EXHIBIT B



# DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Food and Drug Administration**
**Silver Spring, MD 20993**

April 24, 2019

Mr. Julius Knapp
Chief
Office of Engineering and Technology
U.S. Federal Communications Commission
445 12th St., NW
Washington, D.C. 20554

Received & Inspected

MAY 01 2019

FCC Mailroom

Dear Mr. Knapp:          DOCKET FILE COPY ORIGINAL

Thank you for your recent letter dated March 22, 2019 on behalf of the Federal
Communications Commission's (FCC). Your letter requests our guidance on
standards matter, particularly as new technologies such as 5G are introduced.
Previously, in a letter dated February 4, 2014, you also had requested our guidance on
standards related to the radiofrequency (RF) exposure principles or guidelines under
which FCC should consider the newer wireless power transfer (WPT) devices that
operate at frequencies for which exposure limits have not yet been specified in the
FCC's rules. In light of the new technologies, you also requested FDA to identify any
risks of interference to medical devices due to the use of WPT equipment.

Currently, the FCC specifies specific absorption rate (SAR) limits down to 100 kHz and
maximum permissible exposure limits for electric field, magnetic field, and power density
down to 300 kHz. We agree that with the increase in technology that uses frequencies below
300 kHz and even below 100 kHz, setting human exposure limits below 300 kHz and 100
kHz would better ensure the protection of the general public. The biological response to
frequencies in the range below 300 kHz is complex. At the lower end of this range,
electrostimulation (nerve stimulation) and induced currents predominate; at the upper end,
heating is the predominant effect. Electrostimulation is a rapid biological response; therefore,
the long averaging times associated with thermal-based SAR limits are not appropriate.
Although they are not identical in their specifications, both the IEEE C95.1-2005 and the
ICNIRP Guidelines (Health Physics, 2010) are adequate to protect the general public in this
frequency range. Either of these would be an adequate model for the FCC to adopt for their
rules below 300 kHz.

Regarding your request to identify any risks of interference to medical devices due to use of
WPT equipment. Several types of active medical devices (e.g., implantable cardiac
pacemakers, implantable deep brain stimulators (DBS), spinal cord stimulators, implantable
drug infusion pumps, and body worn insulin pumps) are known to be susceptible to

No. of Copies rec'd_____0
List ABCDE

JA 08186

Page 2 – Mr. Julius Knapp

electromagnetic interference (EMI) due to low frequency sources such as metal detectors, electronic anti-theft systems, and radio frequency identification (RFID) systems.[1,2,3] However, the potential for interference is greatly affected by the type of modulation and field strength. Part of the concern, regarding exposure to the lower frequency range, is that the prevailing consensus standards for external medical devices specify only limited immunity testing below 150 kHz. With the exception of testing for interference with power line magnetic fields at 50 Hz and 60 Hz, most non-implanted medical devices have not been tested for immunity below 150 kHz. Additionally, present implantable pacemakers are typically tested to the human exposure limits specified in the ICNIRP 1998 Guidelines (Health Physics 1998). Any emitter that exceeds the ICNIRP 1998 levels would be a potential source of interference to active implanted devices. Adoption of higher emissions levels may expose patients to unnecessary risk. Therefore, the most effective mitigation against EMI to active medical devices from the emissions of WPT devices is to reduce the WPT emissions and thus medical device exposure. The methods to reduce exposure should include limits on the WPT output power, designing the WPT with safety interlocks (i.e., designing the WPT source so that it can detect the presence of humans or animals and shut off or greatly reduce power output), creating exclusion zones, and recommending separation distances between the WPT emitter and any active medical devices.

With your inquiry related to safety standards, particularly as new technologies such as 5G are introduced, as you are aware, FDA is responsible for the collection and analysis of scientific information that may relate to the safety of cellphones and other electronic products. As a part of our ongoing monitoring activities, we have reviewed the results and conclusions of the recently published rodent study from the National Toxicology Program in the context of all available scientific information, including epidemiological studies, and concluded that no changes to the current standards are warranted at this time. As we have stated publicly, NTP's experimental findings should not be applied to human cell phone usage, that the available scientific evidence to date does not support adverse health effects in humans due to exposures at or under the current limits, and that the FDA is committed to protecting public health and continues its review of the many sources of scientific literature on this topic.

In summary, for standards related matter for WPT, either of IEEE C95.1-2005 and the ICNIRP Guidelines would be an adequate model for the FCC to adopt for their rules below 300 kHz.

Thank you for contacting us concerning this matter. If we can be of further assistance, please let us know. If you need any additional information, you may contact Bakul Patel, Director

---

[1] FDA guidance for industry, "Labeling for Electronic Anti-Theft Systems." August 15, 2000.
http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm070913.pdf.
[2] "Important Information on Anti-Theft and Metal Detector Systems and Pacemakers, ICDs, and Spinal Cord Stimulators", FDA Center for Devices and Radiological Health Letter to Cardiologists, Cardiac Surgeons, Neurosurgeons, and Emergency Physicians, September 28, 1998.
http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm062288.htm.
[3] S. Seidman, K. Kainz, J. Casamento, and D. Witters, "Electromagnetic Compatibility Testing of Implantable Neurostimulators Exposed to Metal Detectors," in The Open Biomedical Engineering Journal, pp. 63-70, 2010.

Page 3 – Mr. Julius Knapp

for Digital Health of the Center for Devices and Radiological Health, at
Bakul.Patel@fda.hhs.gov or by telephone at (301) 796-5528.

Sincerely,

Jeffrey Shuren, M.D., J.D.
Director
Center for Devices and
    Radiological Health

# EXHIBIT C

**United States Court of Appeals**
**for the**
**District of Columbia Circuit**

| | | |
|---|---|---|
| Environmental Health Trust, *et al.,* | ) | |
| Petitioners | ) | No. 20-1025 |
| | ) | |
| | ) | |
| v. | ) | On Petition for Review |
| | ) | of an Order of |
| | ) | the Federal Communications |
| Federal Communications Commission | ) | Commission |
| and United States of America, | ) | |
| Respondents. | ) | |

**SUPPLEMENTAL DECLARATION OF EDWARD B. MYERS**
**IN SUPPORT OF JOINT MOTION OF PETITIONERS IN**
**CASE NO. 20-1025 FOR ATTORNEYS' FEES AND EXPENSES UNDER**
**THE FEDERAL EQUAL ACCESS TO JUSTICE ACT**

I, Edward B. Myers, declare as follows:

1.      I am an attorney admitted to practice before this Court.  I am a member of

the bars of the District of Columbia and Maryland.  This supplemental declaration

is based upon my personal knowledge.

2.      This supplemental declaration is submitted in support of the "Joint Motion

of Petitioners in Case No. 20-1025 for Attorneys' Fees and Expenses Under the

Federal Equal Access to Justice Act" ("Motion"), filed December 10, 2021, and the

"Reply In Support of Joint Motion of Petitioners in Case No. 20-1025 for

Attorneys' Fees and Expenses Under the Federal Equal Access to Justice Act and

Supplemental Request for Fees" ("Reply"), filed January 25, 2022.

3.      I hereby incorporate by reference and reaffirm the statements that I previously made in the "Declaration of Edward B. Myers in Support of Joint Motion of Petitioners in Case No. 20-1025 for Attorneys' Fees and Expenses under the Federal Equal Access to Justice Act" (Exhibit 3 to the Motion).

4.      I am submitting this supplemental declaration (a) to clarify certain billing entries for which the petitioners in this case are seeking reimbursement under the Equal Access to Justice Act, 28 U.S.C. § 2412, *et seq.* ("EAJA"); and (b) to submit a supplemental claim for EAJA reimbursement for work related to the preparation and prosecution of the Motion.

5.      I first would like to clarify the appropriateness of (a) time entries for July 24 through 29, 2020 insofar as they pertain to the final preparation and submission of the Petitioners' Joint Opening Brief, filed in this consolidated proceeding on July 29, 2020; and (b) a May 28, 2020 time entry for 1.5 hours for a "tutorial re data base".

6.      The time entries for July 24 through July 29 included such language as "revising draft brief and numerous emails re same" (quoting the July 26 entry).  It was necessary and reasonable in my view to use this language without providing additional detail regarding specific issues or parts of the brief on which I was working because this time was dedicated to merging various sections of the draft

2

brief (composed by three different attorneys, supplemented and modified by input from several clients with technical or scientific knowledge) into a single document in order to complete a final version of the joint brief acceptable to all petitioners and their counsel and ready for filing on the July 29th due date. This process, not uncommon in such circumstances but complicated by the technical and scientific complexity of the subject matter, required significant efforts to ensure the document had a logical flow, was not repetitive, contained proper legal citations, and met the Court-ordered word limitation.  It would have been impossible to perform this task by confining myself to one set or subset of issues or parts of the brief.  As July 29 approached, the intensity of this effort increased (as it typically does when attorneys representing multiple clients (14 in the consolidated case) are faced with an impending deadline) and different sections of the brief had to be considered together in order to develop a unified and streamlined document. Under these circumstances, it would have been inaccurate to submit a time entry that indicated otherwise.

7.      It is not correct to view this effort at finalizing briefs as somehow duplicative or unnecessary.  To the contrary, the work was essential in the development of the final written products and, in fact, substantially reduced duplication and made it easier and more efficient for the FCC and this Court to respond.  Moreover, as part of that effort, there were necessarily various issues that

both parties contributed to, not because they were duplicating work, but rather because each side had their own expertise and insights to contribute. This holds true for some of the factual issues, such as knowledge regarding specific materials contained in the administrative record, certain technical issues, and various scientific matters, as well as applicable law, including standing and judicial review standards.

8.      In regards to the above-referenced entries indicating that I worked on the Petitioners' Joint Opening Brief from July 24 to July 29, 2020, it is also important to note that, where more detailed time entries could reasonably have been provided, I followed the practice of providing that level of detail. Thus, for example, my redacted "Itemized Billing Statement" for the month of July 2020 (see Attachment B to Exhibit 3 of the Motion) states that, over the period of July 4 through July 14, 2020, and again on July 21, 2020, I worked on the following specific issues related to the effects of radiofrequency radiation—"testing," "Children," and environment ("Bees and Trees"). It was only when such specific references became inaccurate because I was engaged in assembling the joint opening brief for filing (July 24 through 29) that I did not provide them.

9.      Furthermore, my review of the unredacted billing entries during the merits phase of this proceeding confirms that I appropriately did not seek reimbursement for activities related to unsuccessful claims. For example, I worked on the issue of

4

whether the FCC erred in the Order below by not having conducted a review under the National Environmental Policy Act, 42 U.S.C. § 4332(c) (NEPA) on several dates in 2020, including April 10; June 11 and 28; July 1, 3, 7, and 15; and August 4.  I have reproduced the pertinent time entries in Attachment A to this Declaration.  But, because the petitioners were not successful on appeal regarding the NEPA issue, I appropriately redacted those entries from the billing statements submitted with the Motion.

10.    Moreover, I personally conducted a search of my unredacted billing statements over the course of the merits phase of this proceeding (January 2020 through January 2021) and hereby affirm that I found no billing entries referring to the issues of radiation sickness, constitutional claims, or cancer—all issues on which the petitioners were not successful on appeal.

11.    With respect to the May 28, 2020 entry for 1.5 hours for a "tutorial re data base," I wish to clarify that the data base in question was constructed by my clients and a team of expert volunteers, and this data base contained all documents in the agency's administrative record in the relevant FCC dockets on appeal in order to make it possible to conduct text and keyword searches.  As such, the time spent in learning how to navigate the data base was in the nature of case preparation and was properly claimed for reimbursement under EAJA.

12.    I would also like to bring to the Court's attention two additional facts: First,

the rate that I charged of $200 per hour throughout the merits phase of this proceeding was a below-market rate tailored to the circumstances of my clients—two non-profit organizations of very limited means and two individuals of similarly modest means.  Second, I substantially reduced my total billable hours for work on the merits phase of this case by $16,700 in the process of redacting work on items covering issues on which the EHT Petitioners were not successful or matters not directly related to the merits of the case. These reductions were made off of $66,250 in total billables to the client.

11.     Paragraph 22 of my original declaration (Exhibit 3 to the Motion) stated that the EHT petitioners would be filing a supplemental request for additional fees incurred that have not yet been invoiced once briefing on the Motion is concluded and fees are awarded.  Because it is unlikely that further briefing will be required of this matter, the EHT petitioners have determined to file their supplemental request with this Reply.  Accordingly, I request reimbursement for reasonable fees incurred in preparing the Motion totaling $8,060.00 out of total billable hours of $12,400 for work performed in the post-merits phase of this case.  *See* Attachment B for the time entries that support this supplemental request.  I note that the time entries for this supplemental filing are not redacted since all time was spent in furtherance of the the Motion but I made a discretionary adjustment reducing the amount for which reimbursement is sought by 35% (in line with the percentage

6

reductions for the amounts claimed for reimbursement in the merits phase of the proceeding).

12.     I further aver that the time entries referenced in this supplemental declaration are true and correct.

13.     In the initial Motion, I requested EAJA reimbursement on behalf of the EHT petitioners in the amount of $49,550.00.  When the supplemental request of $8,060.00 for work in the post-merits phase of this case is taken into account, the total amount of fees for which reimbursement is sought increases to **$57,610.00**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed January 25, 2022, at Frederick, MD.

/s/Edward B. Myers
Edward B. Myers

7

# ATTACHMENT A

| DATE | TIME ENTRY | TIME |
|---|---|---|
| APRIL 10 | Legal Research re NEPA | 1.0 |
| JUNE 11 | Call with KH re NEPA issues | 0.5 |
| JUNE 28 | Legal research/email from KH re NEPA | 0.25 |
| JULY 1 | Call with EG and emails re case and briefs, esp. submissions in record that address NEPA | 0.75 |
| JULY 3 | Call with EG and emails re case and briefs, esp. NEPA | 0.5 |
| JULY 7 | Emails re NEPA causality issue | 0.25 |
| JULY 15 | Emails re proposed changes to NEPA regs. and possible impact on case | 0.25 |
| AUGUST 4 | Emails with EG and CHD counsel re NEPA standing issue | 0.25 |

Total        3.75 hours

@ $200/hr. = $750

# ATTACHMENT B

# Law Office of Edward B. Myers

**14613 DeHaven Court**
**North Potomac, MD 20878**
**Phone: (301) 294-2190**
**edwardbmyers@yahoo.com**

BILLING STATEMENT
(Costs and Fee Reimbursement Phase of Case)

### SERVICES

| DATE | ACTIVITY | HOURS |
|------|----------|-------|
| 8/14/21 | Research on Security Point Holdings (.75); Drafting EAJA Motion and circulated same to EG (4.25) | 5.0 |
| 8/14/21 | Research in response to emailed question from client asking about seeking rehearing on NTP and cancer determinations; emailed response to same. | 0.5 |
| 8/19/21 | Emails to clients notifying them of procedures and deadlines for seeking costs and legal fees and responding to their questions re same | 0.25 |
| 8/20/21 | Emailed response to client asking more questions about copying costs eligible for reimbursement | 0.25 |
| 8/23/21 | Emails with EG confirming any costs eligible for reimbursement | 0.25 |
| 8/24/21 | Research re 42 USC 402(i) regarding the awarding of costs and email to EG re same | 1.0 |
| 8/26/21 | Prepared and filed cost reimbursement application | 0.5 |
| 9/3/21 | Reviewed CHD's draft motion to amend opinion to include all petitioners | 0.5 |
| 9/6/21 | Emails to clients and EG re CHD's proposed motion to amend opinion to include all petitioners | 0.5 |
| 9/27/21 | Revised and expanded draft EAJA Motion; circulated same to EG | 5.25 |
| 11/3/21 | Email with EG re attorney affidavits to accompany EAJA Motion | 0.25 |
| 11/5/21 | Review comments from EG on draft EAJA Motion | 0.5 |
| 11/8/21 | Drafted and emailed draft affidavit for myself for comment | 1.25 |
| 11/9/21 | Incorporated EG comments in draft Motion (1.0); drafted digest of relevant cases (1.5) | 2.5 |
| 11/10/21 | Finalized and emailed case digest to EG | .5 |
| 11/16/21 | Emailed clients explanation of eligibility criteria under EAJA and explained need for affidavits for each and responded to client questions re same | 0.75 |

| 11/17/21 | Further revised draft EAJA Motion regarding remand related issues, et al. and emailed same to EG | 4.0 |
|---|---|---|
| 11/19/21 | Drafted affidavit for CSCP and emailed same to CF (2.0) and raised issue of seeking permission to file financial information under seal (responding to client inquiry) (.25) | 2.25 |
| 11/22/21 | Redacted billing statements for inclusion in EAJA Motion | 1.5 |
| 11/29/21 | Revised draft EAJA Motion in response to comments from EG | 0.5 |
| 11/30/21 | Incorporated KH billing entries in draft EAJA Motion | 1.0 |
| 12/1/21 | Research and related emails with EG re use of Laffey Matrix in EAJA Motion and revised and circulated draft EAJA Motion to reflect same (1.0); revised redacted billing sheets (1.0) | 2.0 |
| 12/2/21 | Reviewed draft EG affidavit | .5 |
| 12/3/21 | Reviewed and edited EM billing entries | 0.75 |
| 12/6/21 | Edited EM affidavit (0.75) and minor edits to redacted time sheets (0.25) | 1.0 |
| 12/7/21 | Researched recent court case on Fitzpatrick/Laffey Matrix | 1.0 |
| 12/8/21 | Reviewed draft affidavit for Cesar Loya and contacted Loya and Liz Barris re same (0.5); call with counsel for government to try to resolve fee request and notify them of impending petitioners' motion (0.25) | 0.75 |
| 12/9/21 | Spoke with TS re confidentiality of financial data to be provided to government and need for filing under seal (0.25); reviewed draft affidavit for Debra Moses, CPA, providing balance sheet for TS, and made edits on same (0.5); emailed Liz Barris reminding her that financial data in balance sheet would be publicly available (0.25) | 1.0 |
| 12/10/21 | Revised draft EAJA Motion and filed same | 3.5 |
| 12/16/21 | Reviewed and responded to draft consent motion to extend time for respondents' opposition and petitioners' replies | 0.5 |
| 1/20/22 | Case research and preparation of digest of cases re substantial justification issue (for purposes of reply to government's opposition to EAJA motion) | 3.0 |
| 1/21/22 | Drafted proposed topical outline of reply to government's opposition | 1.25 |
| 1/23/22 | Drafting and editing portion of reply dealing with section II of government's opposition and supplemental affidavit | 7.0 |
| 1/24/22 | Revising draft affidavit and attachments thereto | 5.5 |
| 1/25/22 | Final revisions to reply and to draft affidavit and attachments thereto, including time entries through 1/25/22 | 5.25 |

|                              |           |
|------------------------------|-----------|
| Total Hours Billed           | 62.00     |
|                              |           |
| Billed Amount                | $12,400.00 |
| Less 35% discretionary adj.  | 4,340.00  |
|                              |           |
| Invoice Total                | $ 8,060.00 |

# EXHIBIT D

**United States Court of Appeals**
**for the**
**District of Columbia Circuit**

| | | |
|---|---|---|
| Environmental Health Trust, *et al.,* | ) | |
| Petitioners | ) | No. 20-1025 |
| | ) | |
| | ) | |
| v. | ) | On Petition for Review |
| | ) | of an Order of |
| | ) | the Federal Communications |
| Federal Communications Commission | ) | Commission |
| and United States of America, | ) | |
| Respondents. | ) | |

**SUPPLEMENTAL DECLARATION OF ERIC P. GOTTING**
**IN SUPPORT OF JOINT MOTION OF PETITIONERS IN**
**CASE NO. 20-1025 FOR ATTORNEYS' FEES AND EXPENSES UNDER**
**THE FEDERAL EQUAL ACCESS TO JUSTICE ACT**

I, Eric P. Gotting, declare as follows:

1.      This supplemental declaration is submitted in support of the "Joint

Motion of Petitioners in Case No. 20-1025 for Attorneys' Fees and Expenses

Under the Federal Equal Access to Justice Act" ("Motion"), filed December 10,

2021, and the "Reply In Support of Joint Motion of Petitioners in Case No. 20-

1025 for Attorneys' Fees and Expenses Under the Federal Equal Access to Justice

Act and Supplemental Request for Fees" ("Reply"), filed January 25, 2022.

2.      I hereby incorporate by reference and reaffirm the statements that I

previously made in the "Declaration of Eric P. Gotting in Support of Joint Motion

of Petitioners in Case No. 20-1025 for Attorneys' Fees and Expenses under the

Federal Equal Access to Justice Act," filed on December 10, 2021.  EHT Fee Mot.,

Gotting Decl. (Exhibit 4).

3.     The time claimed for legal fees pursuant to the Motion does not

include time spent for issues on which the EHT Petitioners were unsuccessful on

appeal.  For example, the following entries in Attachment A were either partially

or wholly redacted which specifically reference work on the National

Environmental Policy Act ("NEPA") and cancer claims.[1]

4.     Keller and Heckman (K&H) is further reducing its requested billable

amounts for certain time entries associated with Al Catalano that were not

completely redacted in the initial Motion.  He worked on a broad range of cellular

phone issues, including some cancer issues.  To be overinclusive, K&H is not

requesting any time associated with entries listed on Attachment A and related to

his cell phone work.  These entries total $5,494.50.

5.     In the initial Motion, K&H reduced the overall amounts sought for

reimbursement as represented by invoices in Attachment C to the Motion by a total

of $129,070.25 (not including the additional reductions as outlined in this

supplemental declaration).  This includes items covering issues on which the EHT

---

[1] The claimed legal fees inadvertently included one NEPA entry (5/5/20 JDN 3.50
hours).  The EHT Petitioners no longer request reimbursement for those hours
totaling $1,137.50 at JDN's 2020 EAJA rate).

2

Petitioners were not successful, matters not directly related to the merits, and additional discretionary reductions.  *See* EHT Fees Mot., Gotting Decl. at 9.

6.    K&H requests additional reimbursement for reasonable fees incurred in preparing the Motion and Reply totaling $16,953.00.  *See* Attachment B (for convenience, applying 2020 and 2021 EAJA rates).

7.    In the initial Motion, KH requested reimbursement for a total of $124,797.25.  *See* EHT Fees Mot., Gotting Decl., Attachment D.  When the additional reductions from paragraph 4 and note 1 above (totaling $6,632.00) are subtracted from that amount, and the supplemental reimbursements requested in paragraph 6 above are added, the total amount of fees K&H now requests that the FCC reimburse pursuant to EAJA is **$135,188.25**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  January 25, 2022


Eric P. Gotting

3

# ATTACHMENT A

| Date | TKPR Name | Narrative |
|---|---|---|
| 4/15/2020 | Tarter, Javaneh S. | Conference with E. Gotting re researching FCC 2013 docket for comments on 5G and NEPA and status of litigation |
| 4/27/2020 | Gotting, Eric P. | Review case law re standing and NEPA; correspondence with E. Myers and E. Catalano re strategy |
| 4/29/2020 | Gotting, Eric P. | Review case law re standing and NEPA |
| 4/30/2020 | Tarter, Javaneh S. | Review 2013 RF docket comments re cell phones and create spreadsheet; conference with E. Gotting re NEPA legal research |
| 5/4/2020 | Catalano, Albert J. | Emails E. Myers, E. Gotting re briefing issues; review administrative record re cell phones |
| 5/4/2020 | Tarter, Javaneh S. | Begin research for cases re meaning of hard look doctrine under NEPA and case law where agency failed to comply with NEPA for not taking a hard look at relevant issues for environmental assessment |
| 5/5/2020 | Tarter, Javaneh S. | Research cases re criteria for hard look doctrine under NEPA and case law where agency failed to comply with NEPA for not taking a hard look at relevant issues for environmental assessment; summarize research for E. Gotting |
| 5/6/2020 | Catalano, Albert J. | Review administrative record re cell phone issues; call E. Myers re cell phone issues |
| 5/7/2020 | Catalano, Albert J. | Review briefing and related amicus issues; call E. Myers, E. Gotting re same review administrative record re cell phone issues |
| 5/12/2020 | Catalano, Albert J. | Conference with E. Gotting re briefing issues; review administrative record issues re cell phones |
| 5/14/2020 | Catalano, Albert J. | Review cell phone issues |
| 5/18/2020 | Catalano, Albert J. | Conference E. Gotting re briefing; call E. Myers, E. Gotting re briefing, amicus issues, strategy, emails E. Myers re amicus issues and briefing; review cell phone issues in RF Termination Order |
| 5/20/2020 | Catalano, Albert J. | Review FCC RF Order and related administrative record issues re cell phones; emails E. Myers, E. Gotting re amicus and briefing issues |
| 5/21/2020 | Catalano, Albert J. | Review FCC RF Order and administrative record re cell phone issues |
| 5/22/2020 | Catalano, Albert J. | Review FCC RF Termination Order and related cell phone issues in administrative record from government agencies and industry groups supporting FCC |
| 5/26/2020 | Catalano, Albert J. | Review agency correspondence to FCC; emails E. Myers re same |
| 5/27/2020 | Catalano, Albert J. | Review federal agency correspondence and reports re RF and cell phones issues |
| 5/28/2020 | Catalano, Albert J. | Standing, non-thermal and study issues; review same issues; review FDA filings and statements |
| 6/1/2020 | Catalano, Albert J. | Conference E. Gotting re administrative record issues for FDA statements; call E. Gotting, E. Myers re standing and briefing issues |
| 6/3/2020 | Catalano, Albert J. | Review agency and APA issues re cell phone issue |
| 6/3/2020 | Tarter, Javaneh S. | Correspond with E. Gotting re use of database for researching FCC record; begin reviewing FCC docket for NEPA comments |

| | | |
|---|---|---|
| 6/4/2020 | Tarter, Javaneh S. | Reviewing FCC docket for NEPA comments; correspond with E. Gotting re legal research on cases where agency improperly abdicates duties to another party |
| 6/5/2020 | Tarter, Javaneh S. | Conference with E. Gotting re legal research; review additional cases that addressed whether agency inappropriately abdicated its responsbilities by relying on another party's scientific assessment; review FCC docket re NEPA comments |
| 6/7/2020 | Gotting, Eric P. | Review and edit motions to extend brief word counts and scheduling order deadlines; research NEPA issues |
| 6/8/2020 | Gotting, Eric P. | Review NEPA and CEQ regulations |
| 6/8/2020 | Johnson, Taylor D. | Case law research and analysis re: NEPA; email to E. Gotting re: same |
| 6/8/2020 | Tarter, Javaneh S. | Review FCC docket for NEPA comments and draft spreadsheet of comments |
| 6/9/2020 | Gotting, Eric P. | Edit motion to extend word counts; review NEPA case law |
| 6/9/2020 | Tarter, Javaneh S. | Review FCC docket for NEPA comments and create spreadsheet of comments |
| 6/10/2020 | Gotting, Eric P. | Review NEPA case law re 40 CFR 1507 regulations; review administrative record re NEPA references |
| 6/10/2020 | Tarter, Javaneh S. | Review FCC docket for NEPA comments and create spreadsheet of comments |
| 6/11/2020 | Gotting, Eric P. | Review case law re NEPA applicability; conference with J. Nekoomaram re same; conference with E. Myers re case strategy |
| 6/11/2020 | Tarter, Javaneh S. | Conference with E. Gotting re NEPA legal research |
| 6/12/2020 | Gotting, Eric P. | Research NEPA standing issues in DC Circuit; correspondence with E. Myers re same |
| 6/12/2020 | Tarter, Javaneh S. | Review case law re requirement to conduct environmental assessment for categorical exclusions under NEPA regulations; CEQ NEPA regulations and guidance on whether EIS or EA is required for procedural NEPA regulations |
| 6/16/2020 | Catalano, Albert J. | Research administrative record re third party websites; emails E. Myers, E. Gotting re administrative record issues |
| 6/16/2020 | Tarter, Javaneh S. | Review preamble language in final rule for CEQ NEPA regulations for guidance on whether EIS or EA is required for procedural NEPA regulations; review case summaries from Lexis re CEQ NEPA regulations and procedures; research law review articles re same; send summary of research to E. Gotting |
| 6/17/2020 | Catalano, Albert J. | Emails E. Gotting, E. Myers re NTP Study issues; review FCC Order and FDA statements re NTP Study issues |
| 6/17/2020 | Tarter, Javaneh S. | Review CEQ guidance on CEQ NEPA regulations for information re whether EIS or EA are required for procedural NEPA rules, or for revisions or review of categorical exclusions; send research to E. Gotting |
| 6/18/2020 | Catalano, Albert J. | Review NOI and RF Order re FDA website issue |
| 6/18/2020 | Gotting, Eric P. | Review case law re NEPA categorical exclusions; conference with J. Nekoomaram re same; review legislative history |
| 6/22/2020 | Catalano, Albert J. | Review FDA website research and issues |

| | | |
|---|---|---|
| 6/22/2020 | Tarter, Javaneh S. | Review websites cited to in FCC order and locate websites in FCC administrative docket; conference with library staff re reviewing archive of websites; review archive of websites to see if they were available at the time they were cited in FCC order; research federal case law re whether environmental impact statement or environmental assessment is required in setting or revising a categorical exclusion under NEPA |
| 6/23/2020 | Catalano, Albert J. | Draft section of cellphone issues for brief; conference with E. Gotting re same |
| 6/23/2020 | Tarter, Javaneh S. | Research federal case law re whether environmental impact statement or environmental assessment is required in setting or revising a categorical exclusion under NEPA; talk with E. Gotting about new legal research |
| 6/25/2020 | Catalano, Albert J. | Draft brief section on cell phones |
| 6/25/2020 | Gotting, Eric P. | Draft NEPA opening brief section; review administrative record comments re NEPA |
| 6/25/2020 | Tarter, Javaneh S. | Research what DC Circuit courts look for when evaluating agency decision to not do environmental impact statement or environmental assessment under NEPA; summarize cases for E. Gotting |
| 6/26/2020 | Gotting, Eric P. | Review articles re DACA decision and remand without vacatur; conferences with T. Johnson and J. Nekoomaram re NEPA research; review 9th Cir. small cell brief re same |
| 6/26/2020 | Tarter, Javaneh S. | Email A. Catalano re access to database; review and revise summary of case law re DC Circuit standard of review for agency decision that NEPA does not apply and no environmental impact statement or environmental assessment is required; research case law and articles re whether NEPA requires an agency to do an EA or EIS when promulgating or revising a categorical exclusion and criteria courts look at when evaluating categorical exclusions |
| 6/28/2020 | Gotting, Eric P. | Review NEPA case law re hard look doctrine |
| 6/29/2020 | Catalano, Albert J. | Draft brief section re ce;; phones |
| 6/29/2020 | Gotting, Eric P. | Review case law re NEPA hard look doctrine; conference with J. Nekoomaram re same |
| 6/29/2020 | Johnson, Taylor D. | Research and analysis re: NEPA case law in the D.C. Circuit; email to E. Gotting re same |
| 6/29/2020 | Tarter, Javaneh S. | Research case law and articles re whether NEPA requires an agency to do an EA or EIS when promulgating or revising a categorical exclusion and criteria courts look at when evaluating categorical exclusions; review NEPA guidance on creation of categorical exclusions and substantiation requirements; email research to E. Gotting; conference with E. Gotting re legal arguments; research case law where court finds that agency must still satisfy statutory obligation to address certain issues in rulemaking even if commenters do not provide specific proposals or alternatives; |

| | | |
|---|---|---|
| 6/30/2020 | Catalano, Albert J. | Draft section for brief re cell phones; review related issues in administrative record |
| 6/30/2020 | Gotting, Eric P. | Correspondence with E. Myers re children argument; review NEPA procedural cases |
| 7/1/2020 | Gotting, Eric P. | Conference with E. Myers re briefing issues and strategy; conference with A. Catalano re same; review case law re NEPA hard look doctrine |
| 7/2/2020 | Tarter, Javaneh S. | Research case law re interpreting the meaning of "significantly affecting the quality of the human environment" under NEPA and meaning of uncertainty and controversy factors; summarize cases for E. Gotting |
| 7/3/2020 | Gotting, Eric P. | Conference with E. Myers re case strategy; review NEPA case law |
| 7/4/2020 | Gotting, Eric P. | Review standard of review under NEPA for failure to do EA or EIS |
| 7/4/2020 | Tarter, Javaneh S. | Search DC Circuit cases re standard of review when agency does not conduct EIS or EA in violation of NEPA; email E. Gotting responding to research question |
| 7/5/2020 | Gotting, Eric P. | Review NEPA case law re major federal actions; correspondence with T. Johnson re same; review APA case law re notice and comment in context of statutory requirements |
| 7/5/2020 | Johnson, Taylor D. | Legal research re: NEPA standard of review and major federal actions; email to E. Gotting re same |
| 7/6/2020 | Gotting, Eric P. | Review NEPA case law re significant impact on human environment |
| 7/7/2020 | Gotting, Eric P. | Outline and draft NEPA argument |
| 7/8/2020 | Gotting, Eric P. | Draft NEPA standard of review, statement of the case, and argument; review administrative record re NEPA comments |
| 7/10/2020 | Gotting, Eric P. | Draft NEPA argument section |
| 7/11/2020 | Gotting, Eric P. | Edit drafts re APA standard of review, NEPA, and statement of the case; review A. Catalano cell phone draft; correspondence with E. Myers and A. Catalano re same |
| 7/15/2020 | Gotting, Eric P. | Edit cellular phone and cancer section; conferences with CHD counsel re brief editing, etc.; review administrative record and studies re 5G and MMWs |
| 7/20/2020 | Gotting, Eric P. | Conference with E. Myers re brief strategy; review cancer research and draft section; review standing case law; outline legal argument section |
| 9/24/2020 | Gotting, Eric P. | Conference with J. Nekoomaram re FCC citation project; correspondence with E. Myers re briefing strategy; review NEPA notes and case law re de novo review |
| 9/25/2020 | Gotting, Eric P. | Research Dania decision and "new" actions under NEPA |
| 9/25/2020 | Johnson, Taylor D. | Begin legal research re applicability of Chenery to FCC's NEPA defense |
| 9/26/2020 | Gotting, Eric P. | Research major federal action cases and new NEPA evaluations; review case law cited by FCC re same; review case law re Chenery and waiver |
| 9/26/2020 | Johnson, Taylor D. | Continue legal research re applicability of Chenerey to FCC's NEPA defense |

| | | |
|---|---|---|
| 9/27/2020 | Gotting, Eric P. | Review NEPA case law cited by FCC; conference with T. Johnson re research on Chenery |
| 9/27/2020 | Johnson, Taylor D. | Continue legal research re applicability of Chenerey to FCC's NEPA defense; email to E. Gotting re same |
| 9/28/2020 | Gotting, Eric P. | Review case law re Chenery and NEPA; review E. Myers topic outline; conference with E. Myers re same; review case law re major federal action |
| 9/28/2020 | Johnson, Taylor D. | Continue legal research re applicability of Chenerey to FCC's NEPA defense |
| 9/29/2020 | Gotting, Eric P. | Review case law re NEPA and major federal action |
| 9/30/2020 | Johnson, Taylor D. | Continue legal research re applicability of Chenerey to FCC's NEPA defense |
| 10/1/2020 | Gotting, Eric P. | Review and edit reply brief outline and correspondence with E. Myers re same; review additional case law re applicability of Chenery to NEPA |
| 10/1/2020 | Johnson, Taylor D. | Continue legal research re applicability of Chenerey to FCC's NEPA defense |
| 10/9/2020 | Gotting, Eric P. | Draft NEPA section and review relevant case law; conference with J. Nekoomarm re ICORE case |
| 10/10/2020 | Johnson, Taylor D. | Legal research re functional NEPA compliance and de novo review; email to E. Gotting re same |
| 10/11/2020 | Gotting, Eric P. | Review CHD edits re standard of review and NEPA; correspondence with CHD counsel re same; correspondence with E. Myers re joint brief strategy |
| 10/11/2020 | Johnson, Taylor D. | Legal research re functional NEPA compliance and de novo review; email to E. Gotting re same |
| 10/12/2020 | Gotting, Eric P. | Review case law re NEPA standard of review; review NEPA cases cited by FCC in opposition brief; draft edits to NEPA section re same |
| 10/14/2020 | Johnson, Taylor D. | Cite check standard of review and NEPA sections of brief on FCC case; email to E. Gotting re same |
| 10/16/2020 | Gotting, Eric P. | Review and edit draft reply brief; review FDA jurisdiction over electronics and correspondence with CHD counsel re same; conference with E. Myers re Shuren statements; draft NEPA summary of argument; review cell phone testing issue re normal conditions |
| 1/5/2021 | Gotting, Eric P. | Review NEPA notes and cases; draft oral argument questions and outline |
| 1/6/2021 | Gotting, Eric P. | Review NEPA notes and cases; draft oral argument questions and outline |
| 1/7/2021 | Gotting, Eric P. | Review NEPA notes and cases; draft oral argument questions and outline |
| 1/8/2021 | Gotting, Eric P. | Review NEPA notes and cases; draft oral argument questions and outline |
| 1/10/2021 | Gotting, Eric P. | Respond to NEPA and standing questions from E. Myers in preparation for oral argument |

| 1/13/2021 | Gotting, Eric P. | Correspondence with E. Myers re NEPA administrative record comments and categorical exclusion issue |
| 1/15/2021 | Gotting, Eric P. | Participate in moot court; review NEPA and standing notes for moot court |
| 1/17/2021 | Gotting, Eric P. | Conferences with E. Myers and CHD counsel re oral argument strategy and potential questions; review NEPA oral argument notes and send to CHD counsel for argument prep |
| 1/18/2021 | Gotting, Eric P. | Draft responses to CHD counsel NEPA questions |
| 1/19/2021 | Gotting, Eric P. | Respond to CHD questions re NEPA argument; conference with E. Myers re same |
| 1/20/2021 | Gotting, Eric P. | Conference with E. Myers and CHD counsel re NEPA oral argument questions; respond to CHD email questions re same |

# ATTACHMENT B

| Date | TKPR Name | Bs Hrs | Narrative |
|------|-----------|--------|-----------|
| 11/28/2021 | Gotting, Eric P. | 1.00 | Review time sheets for EAJA petition; correspondence with E. Myers re same |
| 11/29/2021 | Gotting, Eric P. | 1.00 | Review time sheets; conference with E. Myers re billing entries to include in EAJA petition |
| 11/30/2021 | Gotting, Eric P. | 1.00 | Work on billing entries for EAJA petition; correspondence with E. Myers re same |
| 12/1/2021 | Gotting, Eric P. | 1.00 | Review time sheets for EAJA petition; correspondence with E. Myers re same |
| 12/2/2021 | Gotting, Eric P. | 2.00 | Draft supporting affidavit; review E. Myer edits to KH time sheets; conference with S. Ryans re time sheet redaction project |
| 12/3/2021 | Gotting, Eric P. | 2.00 | Work with S. Ryans to redact KH time sheets for EAJA petition; draft declaration in support of EAJA petition; review Petitioners' draft affidavits; review redactions to E. Myers invoices; correspondence with E. Myers re same |
| 12/6/2021 | Gotting, Eric P. | 2.00 | Review E. Myers declaration; finalize KH time sheet redactions and edits; review E. Myers time sheets and redactions; correspondence with E. Myers re same; review Petitioners' affidavits in support of EAJA petition; edit E. Gotting declaration re fees claimed |
| 12/8/2021 | Gotting, Eric P. | 2.00 | Work on fee calculations; conferences with T. Johnson and S. Ryans re same; review T. Johnson research re same |
| 12/9/2021 | Gotting, Eric P. | 3.00 | Draft motion for EAJA fees; research eligibility requirements under EAJA; conferences with E. Myers re same |
| 12/10/2021 | Gotting, Eric P. | 3.00 | Draft and edit motion for EAJA fees; draft and edit supporting declaration and exhibits; conferences and correspondence with E. Myers and support staff re same |
| 1/22/2022 | Gotting, Eric P. | 2.00 | Draft fees motion reply brief; review relevant case law and administrative record materials; correspondence with E. Myers re same |
| 1/23/2022 | Gotting, Eric P. | 2.00 | Draft fees motion reply; review relevant case law and administrative record materials; correspondence with E. Myers re same |
| 1/24/2022 | Gotting, Eric P. | 2.00 | Draft fees motion reply; correspondence with E. Myers re same |

|  |  |  |  |
|--|--|--|--|
|  | **Total Hours** | **24.00** |  |
|  | **$342/hour (2021 rate)** | **$ 8,208.00** |  |

| Date | Name | Hours | Description |
|------|------|-------|-------------|
| 11/26/2021 | Gustafson, John B. | 0.75 | Strategize arguments for attorneys' fees with E. Gotting |
| 11/29/2021 | Gustafson, John B. | 1.75 | Read and research case law re attorneys' fees |
| 11/30/2021 | Gustafson, John B. | 2.00 | Continue researching case law re "prevailing party" and summarize research; confer with E. Gotting re same |
| 12/1/2021 | Gustafson, John B. | 1.50 | Continue researching case law re attorneys' fees |
| | **Total Hours** | **6.00** | |
| | **$325/hour (2020 rate)** | **$ 1,950.00** | |
| 12/7/2021 | Johnson, Taylor D. | 0.75 | Research re recent examples of motions for leave to file under seal that were granted in the D.C. Circuit Court of Appeals |
| 12/8/2021 | Johnson, Taylor D. | 4.25 | Legal research re EAJA fee petitions; email memos to E. Gotting re same |
| 12/9/2021 | Johnson, Taylor D. | 2.25 | Continue legal research re EAJA fee petitions; email memo to E. Gotting re same |
| | **Total Hours** | **7.25** | |
| | **$325/hour (2020 rate)** | **$ 2,356.25** | |
| 12/2/2021 | Ryans, Samantha L. | 2.00 | Call with E. Gotting re timesheet redactions; redact timesheets for January - July 2020 |
| 12/3/2021 | Ryans, Samantha L. | 5.50 | Call with E. Gotting re redactions for timesheets; continue working on redactions on timesheets |
| 12/6/2021 | Ryans, Samantha L. | 4.25 | Continue working on timesheet redactions, calls with E. Gotting re same |
| 12/8/2021 | Ryans, Samantha L. | 2 | Call with E. Gotting re summary of fee calculations; continue working on redactions on timesheets and calculating statutory rates |
| 12/9/2021 | Ryans, Samantha L. | 1.00 | Continue working on redactions on time sheets |
| 12/10/2021 | Ryans, Samantha L. | 2.00 | Finalize E. Gotting declaration and attachments |
| | **Total Hours** | **16.75** | |
| | **$265/hour (2020 rate)** | **$ 4,438.75** | |